**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

_____

| | | |
|---|---|---|
| Martha Winkler, a single woman, | ) ) ) | |
| | ) | No.  CV-15-01786-PHX-DLR |
| Plaintiff, | ) ) | |
| vs. | ) ) | Phoenix, Arizona April 1, 2019 |
| City of Phoenix, et al., | ) ) | 3:48 p.m. |
| Defendants. | ) ) | |
| _____ | ) | |

**BEFORE:  THE HONORABLE DOUGLAS L. RAYES, JUDGE**

**<u>REPORTER'S TRANSCRIPT OF PROCEEDINGS</u>**

**<u>TELEPHONIC CONFERENCE</u>**

Official Court Reporter:
Jennifer A. Pancratz, RMR, CRR, FCRR, CRC
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 42
Phoenix, Arizona 85003-2151
(602) 322-7198

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

UNITED STATES DISTRICT COURT

**A P P E A R A N C E S**

For the Plaintiff:

    Blackwell Law Office, PLLC
    By:  Jocquese L. Blackwell, Esq.
        Gillmore B. Bernard, Esq.
    3101 North Central Avenue, Suite 820
    Phoenix, AZ 85012

For the Defendants:

    Wieneke Law Group, PLC
    By:  Kathleen L. Wieneke, Esq.
        Christina G. Retts, Esq.
    1095 West Rio Salado Parkway, Suite 209
    Tempe, AZ 85281

**P R O C E E D I N G S**

(Proceedings commenced at 3:48 p.m.)

THE COURTROOM DEPUTY:  Case No. 15 Civil Case No. 15-1786, Winkler versus City of Phoenix, this is the time set for telephonic conference.

Counsel, please announce.

MR. BLACKWELL:  Jocquese Blackwell and Gillmore Bernard on behalf of Ms. Winkler.

MS. WIENEKE:  Good afternoon, Your Honor.  Kathleen Wieneke and Christina Retts on behalf of Officer Gillespie.

THE COURT:  All right.  Good afternoon.

MR. BLACKWELL:  Good afternoon, Judge.

THE COURT:  So we're all set to start this trial next week on Tuesday.  I've got a couple questions before we get started with your issues.

MR. BLACKWELL:  Yes, Judge.

THE COURT:  With regard to voir dire, I don't -- we're not going to -- we're using the same jury for both phases; right?

MR. BLACKWELL:  I would assume so, Judge.

THE COURT:  Yeah.  That's my plan.

Ms. Wieneke, you agree with that?

MS. WIENEKE:  Yes, Your Honor, although counsel and I were talking about that this afternoon and thought that depending on the outcome of the first phase, we may want to ask

the Court to allow us to recess, and if there is a liability finding, allow the parties to have a settlement conference to try to resolve the case before going on to phase two.  And if that's the case, we wouldn't use the same jury.

THE COURT:  No, I'm -- that's fine if we had plenty of time, but we're setting this trial.  We're going to go forward.

So my question is more about voir dire.  I think I need to ask questions about damages during this voir dire even though the first phase isn't going to get into damages.  So that was my question.  I just wanted to see what you guys thought.  But I think -- I'm pretty sure I'm going to do that.

Are there any other accommodations we need to make for the fact that we're doing this in two phases now?  I haven't thought of any, but I'm sure there are some.  Any other thoughts or concerns?

MR. BLACKWELL:  We have -- the only issue that was brought to my attention, and I didn't have a chance to talk to Ms. Wieneke about that today, but Dr. Pribram is disabled.  I don't know what he has.  I don't know what happened to him.  But he has an issue traveling.

So if we had to go into the second phase, I would be asking to see if there's a possibility of having him testify via camera or some type of video testimony.

THE COURT:  Yeah.  We do that all the time.  We'd have to set that up, though.

MR. BLACKWELL:  Yes, sir.

THE COURT:  All right.  You know, Ms. Wieneke, your point -- you're dealing with a client who needs lots of time to get things settled, though; right?  Is that right?

MS. WIENEKE:  Yes, Your Honor.

THE COURT:  I'm just wondering --

MS. WIENEKE:  That's one of the things -- go ahead.

THE COURT:  Is there some way you could come with some authority in case there's a verdict on liability that would give you the opportunity to try to negotiate a settlement before we go into the second phase?

MS. WIENEKE:  No, Your Honor.  I couldn't do that.

But what I had talked to Mr. Blackwell about was the possibility of trying to get either a private mediation or before -- I know it's harder to get in before the magistrate judges, but to go, subject to city council approval, which is a little more unconventional, but I do have a new city council and mayor, and to try to do it that way on a more immediate basis after the liability phase.

The problem I'm having, Your Honor, quite candidly, is with the trial being pushed back, I am losing the availability of my damages expert.  And it's causing quite a problem.

THE COURT:  Okay.  I see.  All right.

Well, maybe it would make sense, then, to -- if we get a verdict for plaintiff, to end the trial there and reschedule

the second phase down the road.  Because I -- it would be a shame to try a case for an extra week just on damages when it looks like, I assume, there would be a greater chance of settlement at that point.  And I don't think that it would be fair --

MS. WIENEKE:  Right.

THE COURT:  -- to Ms. Wieneke to not have her damage experts in this case available that week.

Is what you're telling me is your damage experts won't be available if we go that second week?  Is that what I'm hearing?

MS. WIENEKE:  Right, Your Honor.  I had two of them that told me that their only availability was on the 9th of April which, of course, is now the first day of trial.

THE COURT:  All right.  Okay.  Well --

MS. WIENEKE:  I'm still trying to work with them, but --

THE COURT:  You know --

MR. BLACKWELL:  If I may ask --

THE COURT:  Go ahead.

MR. BLACKWELL:  I'm sorry, Judge.

THE COURT:  Go ahead, Mr. Blackwell.

MR. BLACKWELL:  I was going to ask Ms. Wieneke, have they given you any additional time where they could be available?

MS. WIENEKE:  Well, like I said, I'm still trying to work with them.  But these dates have been blocked off now for five months for them so --

THE COURT:  Yeah.  I've been there.  I understand how that works.

Here's the problem -- your problem is if we don't finish this trial now, we're probably looking many, many months down the road before we can get the second phase in.  So --

MS. WIENEKE:  That's why, Your Honor, if I may, I am fairly confident -- and I've known Mr. Blackwell for some time.  I'm fairly confident that if there is a liability finding, the parties can reach a resolution.

THE COURT:  Okay.

MS. WIENEKE:  And there would be no need for a second phase.

THE COURT:  Okay.  All right.  You know --

MS. WIENEKE:  But it would need to be with the cajoling of a mediator.

THE COURT:  Okay.  Yeah, I was thinking probably the same thing.

All right.  Let's do that then.  We're just going to try one phase of this trial then.  We'll just try the liability phase.  I'll have to back out my questions that Mr. Blackwell -- I assume they're Mr. Blackwell's questions about the ability to render damage verdicts.  I'll try to get

all those out of there, and then we'll focus just on liability.

Okay.  Anything else before we -- you guys have an issue.  What's the issue?

MR. BLACKWELL:  Judge, if I may, the issue is on Friday when we were on the phone, I believe the Court and Ms. Wieneke asked me who I wanted to have as our witnesses for the liability phase, since the Court has agreed that it would be prudent to bifurcate it, bifurcate the trial, that is.

And one of the witnesses that I left out was Dr. Weise.  So I called this morning before the lunch break.  I called Ms. Wieneke and let her know I wanted to call Dr. Weise. And she believed based on it being a liability phase trial, that his testimony would not be necessary.

THE COURT:  Let me ask you, who's Dr. Weise, and what's he going to talk about?

MR. BLACKWELL:  Dr. Weise is going to talk about basically -- he's the emergency room treating physician.  He's the emergency room treating physician, and he was going to talk about basically the injuries that he observed.

THE COURT:  Okay.  And how does that relate to liability?

MR. BLACKWELL:  Based on -- good question, Judge.  I believe based on the *Graham v. Connor* case, the Graham factors, looking at head note 3, which is page 396 --

THE COURT:  Hang to a second.  Stop.  The court

reporter didn't hear the name of the case.  Can you state that again?

MR. BLACKWELL:  I apologize.  *Graham v. Connor*, Judge.

THE COURT:  Could you spell that for her?

Do you have that?

MR. BLACKWELL:  G-R-A-H-A-M.

THE COURT:  She's got it.  I'm sorry.  Go ahead.

MR. BLACKWELL:  I apologize, Judge.

Looking at head note 3, which is page 396 of the case, it says:  Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.

And so in this particular case, you look at the nature and quality of the intrusion, just like the type and amount of force.  So if you look at Rule 9.25, which is the jury instruction for the use of force, and the defendant's use of force instruction, I think it's their number 6, it says the type and amount of force used.

I guess the best analogy would be like a rock on a scale.  The nature would be the rock, and the amount of force would be the weight of the rock.

In this particular case, before we spoke to the Court, it looks like they were willing to -- and please correct me if

I'm wrong, Ms. Wieneke -- concede that the officer took Ms. Winkler down.  She hit her face.  And at this point there was a laceration and there was bleeding.

My argument is that there -- there's more than that. So the amount of force actually is after being taken to the ground, she has the flesh tore above her eye, she has the contusion on her head which was bleeding, she has internal hemorrhaging in her brain, and she has a fracture on the back of her head.  We have to be able to talk about the amount of force used in relationship to the takedown in reference to why the officer was there.

And if the defense believes that all we can say is that she received a laceration and she was bleeding, then that's not a fair embodiment of the amount of force he was actually -- that was actually used.

Officer Gillespie even says himself -- initially he says she fell down.  And then when he was interviewed by PSC a year later, he said, well, yeah, I took her down to the ground using a one-arm takedown.

And so I think -- no, I did not include Dr. Weise in my request for witnesses for the bifurcated trial.  He has been noticed -- timely noticed.  We had an argument in your court about Dr. Weise's testimony.  I should not be punished because during my crisis last week I neglected to add Dr. Weise to the list.

THE COURT:  Okay.  Thank you.

Ms. Wieneke?

MS. WIENEKE:  Thank you, Your Honor.

We did file the emergency joint motion to continue trial and stipulation to bifurcate liability and damages on March 29th.  And in that, we articulated the witnesses that would be called for -- by each side.  And those included Ms. Winkler; Officer Gillespie; plaintiff's police procedures expert, Mr. Kirby; and defendant's police procedures expert, Mr. Meyer.  It did not include Dr. Weise.  So, therefore, we have been operating under the belief that Dr. Weise would not be called during the liability phase.

Mr. Blackwell is correct that he called me today and said that he intended to call Dr. Weise, to our surprise, because we believe Dr. Weise is purely a damages witness.  Dr. Weise has no opinions on causation.

He can talk about what he observed in the medical records, which are that there was an occipital fracture, which is the back of the head, and an orbital fracture, which is over the eyebrow.  But he can't testify as to what caused those fractures.

Indeed, when I talked with Mr. Blackwell, I said, well, what would my cross-examination be?  Do you know what caused those?

And he said, well, he would have to concede, no, I

don't.

And so I said, then why is his testimony relevant?

And he said, well, I need to prove those fractures to be able to -- be able to talk about the type and amount of force used.

I said, but I don't see how the medical evidence proves that the type and amount of force used under the Graham factors, if you can't even link up the medical injury to the force itself.

Moreover --

THE COURT:  Well, let me just interrupt you for a second.

This is not unusual --

MS. WIENEKE:  Sure.

THE COURT:  -- in any case where the doctor's not there and doesn't see the event, but someone shows up at the emergency room with injuries and the people at the event say what happened, and the doctor says what injuries they saw.  And that's -- that links it up, and the jury can make its own determination whether or not it's connected.

I don't see that -- I don't see --

MS. WIENEKE:  Well, that might be --

THE COURT:  I don't see that being an issue here at all.

MS. WIENEKE:  That might be -- that might be the case,

Your Honor, if there was some causation evidence.  That is, if the doctor could say, this is the type of injury that can be caused by this type of an event.

But the doctor, number one, has never been disclosed to provide those types of opinions.  And you've already ruled --

THE COURT:  Let me just interrupt you.  He doesn't have to.  Someone gets thrown on their face and they come in with a broken eye socket, I think the doctor can say, I found a broken eye socket, and the jury can do the rest.

So I think that there's sufficient relevance for his testimony, and I don't think there's any surprise there that he is going to testify about her injuries, and I think it's clearly relevant to show whether there was excessive force or not to find out how she was injured from the event.  So I think Dr. Weise is fair game and should be allowed to testify.

MS. WIENEKE:  Your Honor, if I may continue just making my record here.

THE COURT:  Okay.  Go ahead.

MS. WIENEKE:  The point of bifurcating, Your Honor, was to limit the damages evidence from the liability evidence.  And the amount of force -- let's just say, for example, that Ms. Winkler had a thin skull, and so let's say she was susceptible to fractures.

There is no correlation, then, if the officer used a

certain amount of force if she then had a fractured skull. There's no correlation between the amount of force that was used to then cause that injury.

THE COURT:  Well --

MS. WIENEKE:  Without any type of medical evidence --

THE COURT:  I fully agree with you, and if there's evidence she has a thin skull, I think you should present that. But I think that this is -- this is -- I can't think of any more relevant evidence than the nature of the injuries sustained as a result of an event involving an officer in an excessive force case.

MS. WIENEKE:  Well, Your Honor, for example, what if, in an excessive force case using a firearm, if the officer fires at the plaintiff and the shot misses?  Because there was no injury sustained, would the plaintiff -- or the defendant be able to say, because there was no gunshot wound to the plaintiff, there was no excessive force?

THE COURT:  Well, I think you've got to look at the nature of your claim.  Part of that -- there are separate types of evidence that you can present, and in a case like this where there is physical contact and the person is claiming that they were excessively handled by the police, the nature of the injury is relevant.  So I'm going to allow Dr. Weise to testify.

Is there anything else we need to talk about?

MR. BLACKWELL:  Thank you.

MS. WIENEKE:  If I could, Your Honor --

THE COURT:  Go ahead.  I'm sorry.

MS. WIENEKE:  If I could just understand the scope of -- if I could understand the scope of the Court's ruling, what exactly will the scope of Dr. Weise's testimony be allowed and what is the scope of my cross-examination of him going to be allowed to be?

THE COURT:  Dr. Weise will be allowed to testify about what he observed and what he determined to be the nature of the injuries, his diagnosis, what he was told by his patient as to the cause of the injury.  He'll be able to explain in whatever detail he can where the injury occurred, the forces that could cause that type of injury, and anything that he has knowledge about regarding the nature and extent of the injury.

And the nature -- and what was told to him by his patient.  That's an exception to the hearsay rule.

MS. WIENEKE:  And just so I could make my record, Your Honor, Dr. Weise was the discharge doctor.  He did not treat this patient.  He simply wrote the discharge summary after four days in the hospital.  And there was no 26(a)(2)(B) report disclosed for this doctor.

And so just for the record, we want to be clear that we object to him providing any opinions that were not disclosed.  In fact, there were no opinions disclosed as to any

causation, any observations, and we would object to Dr. Weise saying anything other than what is in his discharge summary for discharge of this patient.

THE COURT:  Okay.  I was under the misimpression that Dr. Weise was the treating doctor.  In that case, I think you're right.

MS. WIENEKE:  No, Your Honor.  He was not.

THE COURT:  He's limited to what's in his records.

Is there something more than what's in his records, Mr. Blackwell, you intended to ask him?

MR. BLACKWELL:  I was only going to ask him questions about his discharge summary, Your Honor.  And I was not going to ask him about bills, cost of bills --

THE COURT:  We're not talking about that.  We're talking about what her injuries were.  Do you intend to explore anything --

MR. BLACKWELL:  Yes, sir.

THE COURT:  -- with him beyond what's in his discharge summary?

MR. BLACKWELL:  No, Your Honor.

THE COURT:  Okay.  You're limited to what he's put in his records because that's all he's got.  Did he ever touch her or examine her?

MR. BLACKWELL:  Yes.  He was -- he met her.  He knows who she is and everything.

THE COURT:  All right.  So he treated her for her injuries?

MR. BLACKWELL:  Yes.

THE COURT:  Okay.  Well, then he can talk about that.

MS. WIENEKE:  Well, just to be clear, on the discharge.

MR. BLACKWELL:  He was the attending -- he's the attending physician.  He's kind of like the quarterback in the hospital.  He's the attending physician.  He makes sure everything happens the way it's supposed to happen, and he gave her a discharge summary, Your Honor.

THE COURT:  Okay.  Well, he can testify about --

MS. WIENEKE:  I need to correct the record, Your Honor.

THE COURT:  Go ahead.

MS. WIENEKE:  Imohi was the attending physician.

THE COURT:  Well, he's limited to what's in his discharge summary.

MR. BLACKWELL:  Yes, sir.

THE COURT:  I think that's the simple way to do it.

MR. BLACKWELL:  Thank you.

THE COURT:  All right.  Anything else?

Okay.  We'll see you at 8:30 on Tuesday.

MS. WIENEKE:  Not from us, Your Honor.

MR. BLACKWELL:  Thank you very much.

THE COURT:  8:30 on Tuesday.  Bye-bye.

MR. BLACKWELL:  Thank you.  Bye-bye.

MS. WIENEKE:  Thank you.

(Proceedings concluded at 4:09 p.m.)

UNITED STATES DISTRICT COURT

C E R T I F I C A T E

I, JENNIFER A. PANCRATZ, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control.

DATED at Phoenix, Arizona, this 16th day of June, 2020.


s/Jennifer A. Pancratz_____
Jennifer A. Pancratz, RMR, CRR, FCRR, CRC