**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

_____

| | | |
|---|---|---|
| Martha Winkler, a single woman, | ) ) | |
| | ) | No.  CV-15-01786-PHX-DLR |
| Plaintiff, | ) ) | |
| vs. | ) ) | Phoenix, Arizona April 9, 2019 |
| City of Phoenix, et al., | ) ) | 8:36 a.m. |
| Defendants. | ) ) | |
| _____ | ) | |

**BEFORE:   THE HONORABLE DOUGLAS L. RAYES, JUDGE**

**<u>REPORTER'S TRANSCRIPT OF PROCEEDINGS</u>**

**<u>JURY TRIAL - DAY 1</u>**
**<u>(Pages 1 through 231, inclusive)</u>**

Official Court Reporter:
Jennifer A. Pancratz, RMR, CRR, FCRR, CRC
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 42
Phoenix, Arizona 85003-2151
(602) 322-7198

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

**A P P E A R A N C E S**

For the Plaintiff:

    Blackwell Law Office, PLLC
    By:  Jocquese L. Blackwell, Esq.
         Gillmore B. Bernard, Esq.
    3101 North Central Avenue, Suite 820
    Phoenix, AZ 85012

For the Defendants:

    Wieneke Law Group, PLC
    By:  Kathleen L. Wieneke, Esq.
         Christina G. Retts, Esq.
    1095 West Rio Salado Parkway, Suite 209
    Tempe, AZ 85281

I N D E X

SUMMARY OF COURT PROCEEDINGS                              PAGE:
Jury Voir Dire                                             21
Preliminary Jury Instructions                            143
Opening Statements
         By Mr. Blackwell                                 156
         By Ms. Wieneke                                   166
Sidebar Conferences                                    33, 64,
                                                       83, 87

| WITNESSES FOR THE PLAINTIFF: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| **Martha Winkler** | | | | |
| By Mr. Bernard | 191 | | | |

E X H I B I T S

| NO. | DESCRIPTION | REC'D |
|---|---|---|
| 5 | 911 Call Log, which was provided by the City of Phoenix Prosecutor's Office | 141 |
| 18 | Google Maps Screen Shots of location of incident WINK 00043-00046 | 141 |
| 55 | Circle K video frames | 141 |
| 57 | Calls for service document | 141 |
| 504 | Chu Scene Photos | 141 |
| 505 | Aerial of Circle K | 141 |
| 506 | Gillespie Diagram | 141 |
| 566 | Circle K Surveillance Video - Front Door View | 141 |
| 567 | Circle K Surveillance Video - POS A View | 141 |
| 568 | Circle K Surveillance Video - POS B View | 141 |
| 569 | Circle K Surveillance Video - Candy View | 141 |

UNITED STATES DISTRICT COURT

**P R O C E E D I N G S**

(Proceedings commenced at 8:36 a.m.)

(Prospective jurors not present.)

THE COURTROOM DEPUTY:  Civil Case No. 15-1786, Winkler versus City of Phoenix and others, on for jury trial.

Counsel, please announce for the record.

MR. BLACKWELL:  Good morning, Your Honor.  Jocquese Blackwell and Mr. Gillmore Bernard on behalf of Ms. Winkler, who's in the jury room --

THE COURT REPORTER:  I can barely hear you.

THE COURT:  Start all over again.

MR. BLACKWELL:  Good morning, Your Honor.  Jocquese Blackwell and Gillmore Bernard and Ms. Winkler are present for our trial.  We're ready to proceed.

THE COURT:  All right.  Good morning.

MR. BERNARD:  Good morning, Your Honor.

MS. WIENEKE:  Good morning, Your Honor.  Kathleen Wieneke, along with my partner, Christina Retts, along with Officer Gillespie, ready for trial.

THE COURT:  All right.  Good morning.  First, are we going to -- how many days will this take now, since we bifurcated it?  Four days now?

MR. BLACKWELL:  Judge, we should be done no later than -- everybody should be done by Monday, I would say.  Hopefully Friday.

UNITED STATES DISTRICT COURT

THE COURT: Four days then? I'll tell the jury four days? We only have five witnesses.

MS. WIENEKE: I think that would be right, Your Honor.

THE COURT: All right. And we're ready to start today; everybody's ready to go?

MR. BLACKWELL: Yes, Judge.

THE COURT: All right. Did I -- have you guys stipulated into evidence certain exhibits so we can just get them into evidence without having to lay foundation and save time on that?

MR. BLACKWELL: There's some issues with a number of them, Judge.

THE COURT: Are there any exhibits we can stipulate into evidence?

MR. BLACKWELL: Yes, Judge. A number of them, we can.

THE COURT: Well, why don't you guys meet and make the list and give it to -- and I'll put it on the record when you're ready. We'll put them all into evidence. We won't have to spend time laying foundation for those. Okay?

MR. BLACKWELL: Yes, sir.

THE COURT: All right. Now, my recollection, there were -- on the motions in limine, there were some questions about Ms. Winkler's prior history with mental health. It seemed like I was going to allow that if the experts on the damages would talk about it. Since there's no damages, I don't

see her mental health or her prior contact with police ever coming into evidence unless you raise it.

MR. BLACKWELL:  I agree, Judge.

THE COURT:  Okay.

MS. WIENEKE:  Your Honor, in the interaction that Officer Gillespie had with Ms. Winkler, he formed some impressions about her.  I would want to be able to explore with Officer Gillespie those impressions that he had, which formed the basis of his interactions and his conclusions.

THE COURT:  Yeah.  I mean, what he's -- the basis of his decisions to act the way he did is relevant.

MS. WIENEKE:  Right.

THE COURT:  But her history of mental health or prior police contact isn't anymore, so that won't be coming in.

MS. WIENEKE:  Of course.  He would have no evidence of that, so it would only be based on his interaction.

THE COURT:  Yeah, that's fine.

MS. WIENEKE:  I agree, Your Honor.

MR. BLACKWELL:  The only objection that I have, Judge, on that issue is Officer Gillespie is not a doctor.  And so his statement -- and there's a code in the CAD report where it's like a mental issue.  He says that on the radio, but he's not a doctor, so I don't know how he could form that opinion with his brief interaction with Ms. Winkler.

THE COURT:  Whatever his mind -- whatever he thinks

gave him reasonable cause or probable cause to act the way he did are his beliefs.

Mr. Blackwell, I'm talking.

MR. BLACKWELL:  I'm sorry.

THE COURT:  Okay.  So he can testify as to what he believes was the reason for his actions.  Okay?

MR. BLACKWELL:  Yes, sir.  Thank you.

THE COURT:  All right.  You guys are preparing a new statement of the case?  Is that what's happening now?

MR. BLACKWELL:  Yes, sir.

THE COURT:  Okay.  With regard to final instructions, there's a lot of very -- varying final instructions.  My understanding of this is a false arrest and an unnecessary force or excessive force case.  Do we need instructions more than that?

There are about six different instructions, different theories, a Terry stop and all this other stuff.  I don't know that that's even appropriate here.  Do you agree with that?

MR. BLACKWELL:  I agree with that, Judge.

MS. WIENEKE:  Well, Your Honor, to the extent the jury wants to conclude that there wasn't actually an arrest, that this was an investigative detention, we believe that those instructions are essentially the lesser-included instructions that may -- would have justified his detention of her, and so that would be appropriate to give to the jury.

THE COURT: Okay. Well, I'm not going to rule on that yet, then. If you guys don't agree, we'll see how the evidence plays out.

Is there something you needed to bring up before we get started?

MR. BLACKWELL: Yes, Judge.

I'll start with the police report. We objected to hearsay as it pertains to the exhibit, I think it was Exhibit 1, which is Defense Exhibit 503, which is the police report, on hearsay grounds.

And so I think the discrepancy is the defense believe that we are just stipulating that this document comes in and goes to the jury. My intent was -- and maybe I didn't articulate my intent -- was that we got to use the police report during the trial because Officer Gillespie may be asked questions about it. I need to be able to provide it to him. However, it was never our intent that the jury gets the police report.

THE COURT: Okay. All right. If you have an objection and it's not admissible, it won't come in. But you can ask the officer about it without it becoming -- going in to the jury.

MR. BLACKWELL: Absolutely.

THE COURT: Okay.

MR. BLACKWELL: That was that one.

And there are -- I guess if you -- I don't know if you want to talk about the -- some of the discrepancies we have with some of the exhibits that we want to use at this point.

THE COURT:  I don't know what you mean by discrepancies.

MR. BLACKWELL:  Well, for example, there's an interview that took place at the hospital of Ms. Winkler.  The defense wants to redact certain statements Ms. Winkler made as it pertains to some of the injuries and the pain that she was experiencing at the time.

I believe that if they're going to use any of it, then the rule of completeness states that all of it should come in.  I understand that their intent is to use it for impeachment purposes.  The issue is, I would just ask, if the Court is inclined to let them use it for impeachment purposes, that they at least allow us to -- the Court allows us to complete the story.

So if they just pull out an excerpt of her saying one thing, we should be able to at least fill in the context of the statement, Judge.

THE COURT:  If what she uses in their cross-examination needs fuller -- the full statement in that area of what she's talking, then fine.  But I'd have to -- I can't do this in a vacuum.  I'd have to know what you're talking about.

I mean, completing the statement is completing the statement.

MR. BLACKWELL:  Yes, sir.

THE COURT:  You don't have to put in the entire statement to complete part of what she's cross-examining them on.  But sometimes, I've seen it often where there's another sentence or two that is left out that really unfairly paints the picture of what the person said, and that needs to be added.

But without knowing where we are with this, I can't address that now, unless you have something specific you want to point to.

MR. BLACKWELL:  Specifically, well, no, not -- I mean, specifically, if she says -- from the defense perspective, if Ms. Winkler said, "My face is hurting," then from their perspective, that goes to damages.  I believe it goes to the amount of force that Officer Gillespie used on that day.  If she says --

THE COURT:  All right.  Well, I -- this is still too vague.  I'll have to see what we're talking about.

MR. BLACKWELL:  Thank you, Judge.

THE COURT:  Okay.  And the statement you're talking about is using the statement for cross-examination; right?  I mean, is this statement coming into evidence?  Is it --

MR. BLACKWELL:  They want to use her -- they want to

use part of her interview -- we're going to talk about the interview.

THE COURT:  Okay.  Well, I don't know what to tell you.  In a vacuum, I just can't make any -- I can't make any rulings without knowing what specifically you want -- if you have something specific you want to point to in the statement, I'll look at it, but I can't do this in a vacuum.

MR. BLACKWELL:  I don't have a problem with this.  The issue is, I'm just bringing it up to the Court.  The defense has a problem with the entire thing coming in.  I don't have a problem with it coming in, and so I'm just, I guess, priming the pump because I know for a fact the defense has a problem with it.

And so I don't think it's irrelevant.  I think all the statements she made to the police officers within the hour of her being attacked by Officer Gillespie are relevant, particularly if she's talking about the pain that she had at the time.

THE COURT:  Okay.  I suspect what the defense is objecting to is not relevance, it's probably hearsay.  I don't know.  But --

MS. WIENEKE:  Your Honor, if we could just raise up to about 30,000 feet here.  This is the plaintiff's interview that she gave --

THE COURT:  I understand.

MS. WIENEKE:  -- in the hospital.  And this case has been bifurcated, so her damages, whether she's experiencing pain at that moment in the hospital, hours after Officer Gillespie's interaction, are no longer relevant.

THE COURT:  We've already had this discussion, and I can't make a ruling until I see how it's being played out at trial, I guess.

MS. WIENEKE:  And while we believe that her statement is nonhearsay under Rule 801(d)(2) because it's a party admission, if we intend to offer it, we believe there are certain statements that she made in the context of that statement that are no longer relevant because of the bifurcation which would have been relevant had this case been tried all together.

For example, if Ms. Winkler says, "I had a brain bleed," that statement is no longer relevant or admissible --

THE COURT:  Okay.  Hang on a second.

We already discussed this issue, and the question was for excessive force, the amount of injury this person sustained is relevant.  If that's where we're going, I don't want to do this again.

MS. WIENEKE:  But if I may, Your Honor, we had that discussion on the phone, and when we discussed it previously, it was in the context of a motion in limine before the bifurcation.

Ms. Winkler's statement, "I have a brain bleed," was something that a doctor told her.  It is not something that she knows from her own, and it's not a statement she's giving to her medical provider.  It's something somebody else is repeating to her.

It is not, then, information that Officer Gillespie would have known, and it's not a statement for purposes of medical diagnosis because it's being repeated back to her.

THE COURT:  I understand that.  I've already ruled.  The extent of her damages is relevant.

Now, I don't know whether you're arguing hearsay or relevance.  It sounds like you're arguing -- we start out with relevance, then we move to hearsay.  But for relevance, it's relevant to the extent of damages she received.

MS. WIENEKE:  Well, just to be clear on the record, Your Honor, 401, 803, and 403, Your Honor, because the purpose of bifurcation was to keep out the damages and the extent of her injury, and to the extent that she makes statements --

THE COURT:  And she's not claiming damages here, and the jury's not going to decide damages.  But I've already ruled that it's relevant -- the extent of the injury she sustained as a result of the encounter is relevant to the excessive force question.

MS. WIENEKE:  And if I may just finish my record, Your Honor.

THE COURT:  Okay.  Go ahead.

MS. WIENEKE:  To the extent that she is saying six hours later, "I'm in pain" has no relevance to the extent of her injury.  That's her subjective feeling at that moment, and that's unduly prejudicial, particularly since this jury is not going to be rendering an opinion.  It doesn't go to the extent of her damage -- or her injury, I'm sorry.

THE COURT:  I disagree.  The more pain you're in, for the longer you're in, the more reflective of the nature of the extent of the injury.

So you made your record.  I'm not changing my decision, and we're moving forward.

All right.  Anything else you need to bring up, either side?

MR. BLACKWELL:  One thing, Judge.  Two things.

Ms. Winkler, I forgot to tell the Court before we started, needs the headphones so she can hear properly.

THE COURT:  Okay.

MR. BLACKWELL:  The updated statement of the case was emailed to Ms. Farmer, and we have the electronic exhibits for the jury at the end on this flash drive.

THE COURT:  Okay.  There are electronic exhibits that will be exhibited?

MR. BLACKWELL:  Yes, sir.

MS. WIENEKE:  No.  What?

MR. BLACKWELL:  We're going to use -- we're going to -- yes.  Well, we have to use the Court's equipment to play the surveillance footage from the Circle K.  However, the defense had it transformed to MP-3 and they need to get that at the end.

THE COURT:  What I want to talk about now are things we need to clear up before the jury comes in.  Is there anything else we need to talk about?

MR. BLACKWELL:  No, Judge.

MS. WIENEKE:  Yes, Your Honor.

I want to alert the Court there was some publicity this morning about this trial, about this case.

THE COURT:  Okay.

MS. WIENEKE:  So we definitely do need that instruction.  The Court had raised a question about that previous.  And so we would maybe need to ask some extra questions about that.

Also, during opening statement, I anticipate two areas of potential concern I want to alert the Court to.

THE COURT:  Okay.

MS. WIENEKE:  One is that I anticipate -- and I've had a discussion with counsel about this --

THE COURT:  Hang on a second.

Mr. Blackwell, you ought to listen to what she's saying so you can respond.  Okay?

MR. BLACKWELL:  Yes, sir.

THE COURT:  Go ahead.

MS. WIENEKE:  I had discussed this with counsel before raising it with the Court.  I anticipate that counsel will tell the jury that Officer Gillespie intended to throw Ms. Winkler to the ground and that he intended to cause her damage, to hurt her.

I have discussed with counsel, and now I'm raising it to the Court, that under *Graham v. Connor*, an officer's subjective intent is not relevant.  Indeed, the Court, under the model instructions, will instruct this jury at the end that the subjective intent is not for your concern.

And so I believe that telling this jury in opening statement that the officer intended to throw her to the ground and cause harm would be grounds for a mistrial, and I want to alert the Court to that.  Because that's contrary to *Graham;* that's contrary to the model Ninth Circuit instruction. Because the subjective intent of the officer, given the reasonable objective officer standard, is not the law.

The second issue that I want to raise with the Court is that Ms. Winkler has gone on the record as stating that from the time Officer Gillespie grabbed her wrist until the time she woke up in the hospital, she has no memory.  So to the extent that she's going to suggest or counsel's going to suggest that he body slammed her, she has absolutely no basis to say that.

THE COURT:  Well, didn't she have a fractured skull or something?

MS. WIENEKE:  Well, Your Honor, this gets us back to if she has no memory of that, she can't say what happened.  She can't fill in the blank.

THE COURT:  Well, I think --

MS. WIENEKE:  That's a lack of foundation.

THE COURT:  I think it's fair to comment on circumstantially what may have happened based on other evidence.  I mean, I don't think she's the only witness to this.

MS. WIENEKE:  I'm sorry?

THE COURT:  She's obviously not the only piece of evidence as to what happened, her testimony.  There's other evidence.  But I'll let Mr. Blackwell respond.

Mr. Blackwell, first of all, tell me, what are you going to talk about with regard to the officer's intent?

MR. BLACKWELL:  Thank you, Judge.

It -- basically, I'm going to say that Officer Gillespie intended to either throw her down or take her down, as he said in the police -- in the interview on July 16th, 2014.

As it pertains to me saying that he intended to cause her harm, I never said that yesterday or have I said that to defense counsel.  I'm not going to tell the jury:  He said he

intended to cause her harm.  The interview questioner -- the question was:  Did she fall, as you said a second ago, or what?

And then Gillespie says:  Well, I took her to the ground.  I meant to do that.

So he said it, so I should be able to say that based on the evidence.

THE COURT:  All right.  Hang on a second.  Are you objecting to that?

MS. WIENEKE:  I'm sorry?

THE COURT:  Are you objecting to him saying that?

MS. WIENEKE:  The act of taking him to the ground, no.  That --

THE COURT:  No, that he said, "I intended to take her down."  I'm not sure --

MS. WIENEKE:  No.

THE COURT:  Okay.  Well, that's -- he says he's not going to argue it, or he's not going to suggest in opening statement that he intended to hurt her.  He's going to say he intended to take her down.  It was apparently based on what the officer said.

MR. BLACKWELL:  Yes, sir.

THE COURT:  So I think you can say that.

MR. BLACKWELL:  Thank you, Judge.

THE COURT:  Now, what's your response to her second issue?

MR. BLACKWELL:  The second issue, I believe the Court covered it, but I'll just say that Ms. Winkler -- it's true that Ms. Winkler, after being grabbed --

THE COURT:  Let me ask you this:  What is the evidence that she was body slammed?

MR. BLACKWELL:  Her injuries dictate that she was body slammed, Judge.

THE COURT:  Okay.  So you're basing it on the extent of her injuries?

MR. BLACKWELL:  Yes, sir.

THE COURT:  Okay.  I think that's fair circumstantial evidence.  And if the evidence proves otherwise, you -- if the jury doesn't buy your circumstantial argument, they don't buy it.

MR. BLACKWELL:  Yes, sir.

THE COURT:  But it was -- extensive injuries like that, I think that suggests there was quite an amount of force applied, and I think that that's reasonable to assume that may have been what happened.

MR. BLACKWELL:  Thank you, Judge.

MS. WIENEKE:  And if I just may make my record, Your Honor, the grand jury instruction also says that the officer's conduct is not to be judged with the benefit of 20/20 hindsight.  And working backwards from the injury to determine the amount of force, I think, violates *Graham*.

THE COURT:  That's not evaluating the officer's conduct.  That's circumstantial evidence of what happened.  So I'm allowing him to do it.

Anything else to bring up?

MR. BLACKWELL:  I can't think of anything, Judge.

THE COURT:  From the defense?

MS. WIENEKE:  No, thank you, Your Honor.

THE COURT:  All right.  As soon as the jury gets here, we'll get started.

MR. BLACKWELL:  Yes, sir.

THE COURT:  Oh, I don't know how long jury selection will last, but my plan is wherever we end up, we'll take about an hour and a half for strikes and for lunch and then come back and start the trial.  Sometimes we finish jury selection at 11:00 o'clock, sometimes we finish at 12:30.  Does anyone have an objection to working through lunch if that turns out to be -- through the 12:00 to 1:00 hour, 12:00 to 1:00 o'clock hour?

MR. BLACKWELL:  No objection to that, Judge.

MS. WIENEKE:  No.

And as a reminder, Your Honor, we did stipulate to alternative strikes.

THE COURT:  Yeah.  Okay.  However you want to do it's fine with me.

And remind -- I'll remind you, what I'll do is when I

get most of the way through, I'll call you up and I'll show you -- tell you what jurors I intend to let go at that point, and you guys can tell me if you have an objection.  Just bring me your notes when you come up.  Okay?

MR. BLACKWELL:  Thank you, Judge.

(Recess taken, 8:56 a.m. to 9:13 a.m.)

(Prospective jurors present.)

THE COURT:  Good morning.  Welcome to the United States District Court for the District of Arizona.  In a moment, the clerk is going to call the case.

THE COURTROOM DEPUTY:  This is Civil Case No. 15-1786, Martha Winkler versus the City of Phoenix and others.  This is the time set for a jury trial.

THE COURT:  Is the plaintiff ready to proceed?

MR. BLACKWELL:  Yes, Your Honor.  Plaintiffs are ready.

THE COURT:  Is defense ready?

MS. WIENEKE:  Yes, Your Honor.

THE COURT:  Will all prospective jurors please rise and be sworn.

(Prospective jurors sworn.)

THE COURT:  Please be seated.

Good morning.  We're about to begin the jury selection process in this case.  I'll be asking you a number of questions, and later the lawyers will have some questions for

you too.

These questions are not intended to pry unnecessarily into your private lives, but it's necessary for us to ask questions to find out if you know anything about the facts of this case, if you know the parties, if you have any preconceived notions you might have any difficulty setting aside, or whether you have any prior experiences which may cause you to side with one party or the other.

In other words, I'm going to do everything I can to assure the parties that the jury selected to try this case will be both fair and impartial.

Now, I don't want to be impersonal, but we go by the numbers here simply because it just goes quicker and it's easier.  So I won't be calling you by name; I'll be calling you by number, and I apologize for that.

When I ask a question, if your answer to the question is "no," you don't need to do anything.  But if your answer is "yes," please raise your hand and hold up your number so I can see it.

Then I'll call on you -- I'll probably call on you for some follow-up on your answer.  When I do, please stand up and state your number.  I ask you to stand because the court reporter is taking down every word we say, and it makes her job a lot easier if you're standing and she can see you.

If I ask a question and you don't want to answer that

question in front of the other jurors, let me know and we'll talk about your answer to that question at a recess when the other jurors are not there.

Before we go any further, though, let me introduce our staff.

You've already met Michele, Michele Morgan.  She is the courtroom clerk.  She takes care of the exhibits, she takes care of jurors, she takes care of me.  She does everything.

Mary Farmer is my judicial assistant.  She's in the chambers behind the wall here.

Jennifer Pancratz is here taking down every word we say.  She's the court reporter.

I have two law clerks, Kyle La Rose and Andrew Fox.

My name is Doug Rayes.  By any chance, does anyone know me or any member of my staff?

No response.  Okay.

This trial is expected to last four days, Tuesday, Wednesday, and Thursday, and Friday of this week.  We expect this trial to be over by Friday.

Our normal daily schedule is from 9:00 a.m. till noon, take a break around noon, wherever we are with the witnesses, take a break for an hour to hour and a half, and we go till 4:30 or 5:00 in the afternoon.  We usually go no longer than 90 minutes at a time without a break.  After about every 90 minutes, we break for about 15 minutes.

Is there anything about the length of this trial or the daily schedule that presents a problem for anybody that is so serious that you think you need to request to be excused?

PROSPECTIVE JUROR:  Number 16.

THE COURT:  Okay.

PROSPECTIVE JUROR:  This will create a very, very big financial burden on me.  I'm a stagehand.  I'm working over in Tempe on a stage show that's scheduled for five weeks.  If I miss -- today I had to beg off to come and do this.  If I lose any more, I will lose the entire run, which could mean financial crisis for me.

THE COURT:  What is the stage show?

PROSPECTIVE JUROR:  "Wicked."

THE COURT:  Okay.  And what's your role in that?

PROSPECTIVE JUROR:  I'm the house head carpenter.  I run the crews down there for the last 35 years.

THE COURT:  And that's at Gammage?

PROSPECTIVE JUROR:  Yes, it is.  I just, I can't afford a hit like this.

THE COURT:  Okay.  All right.  Thank you.

PROSPECTIVE JUROR:  Thank you, Your Honor.  Number 23. My daughter is right now very sick.  We suspect that she might have appendicitis.  She's 13 years old.

THE COURT:  And where is she now?

PROSPECTIVE JUROR:  She's right now -- my husband is

taking her to the doctor.

THE COURT:  Okay.  And why do you suspect appendicitis?

PROSPECTIVE JUROR:  She's been complaining about the pain in -- the lower abdominal pain in appendicitis area for two or three days right now.

THE COURT:  And she's at the doctor right now?

PROSPECTIVE JUROR:  She has appointment at 9:00 in the morning, so, yeah.

THE COURT:  And you need to be with your daughter.

PROSPECTIVE JUROR:  I would serve up here if that's -- you insist, and it's my honor to be here as well, but I feel like it's a family emergency so it's at your -- you make the decision, what's right.

THE COURT:  All right.  You're excused.  You can go be with your daughter.

PROSPECTIVE JUROR:  Thank you.

THE COURT:  All right.  Thank you for coming.

PROSPECTIVE JUROR:  Thank you so much.

PROSPECTIVE JUROR:  Good morning.  Juror No. 22.

As well as volunteering here this morning, I volunteer in the afternoons all this week for Gilbert Softball/Little League.  And our schedule this week on Thursday and Friday, we do have games that start right at 5:00, and I prepare the field for our games that are scheduled for Thursday and Friday and

might be -- I'm the primary manager for those teams, so it might be a delay with traffic if it comes down to it based on the schedule that you described today.

THE COURT:  So to prepare the field, you put lines on the bases and --

PROSPECTIVE JUROR:  Yep.

THE COURT:  And clear up the -- put the bags on the bases?

PROSPECTIVE JUROR:  Correct.

THE COURT:  Nobody else can do that?

PROSPECTIVE JUROR:  I have an assistant coach that might be able to do it, but it's limited.  It's all volunteer service.  I can't be guaranteed.  I'm the primary manager and, you know, I've been the primary individual to do that for the previous games.  It could be a possibility.

THE COURT:  And all the kids have parents, I assume?

PROSPECTIVE JUROR:  Yes, they all have parents.  Some of them are not approved to be on the field with the kids. It's really background checks and so forth, so...

THE COURT:  Wow.  Okay.

All right.  Thank you.

PROSPECTIVE JUROR:  Number 39.  Good morning, by the way.

THE COURT:  Good morning.

PROSPECTIVE JUROR:  Mine's more of a financial and

burden of my child.  I have to take him to school every morning.  And I also live in Maricopa City so it's -- it was about two hours to get here this morning.  And my wife works at about 4:00 a.m. in the morning, she leaves for work.  And so I usually take him to school in the morning.

Also, I'm self-employed and this is a huge financial burden for me because I'm also the only technician on my -- well, my company.  So I run a mobile auto repair business in Maricopa.

So the traveling and then taking care of my child.  I was lucky enough that my wife was able to exchange her day off from tomorrow to today so I could be here this morning, but outside of that, I have really nobody to take care of my child. My family's all from California so we're kind of, you know, my wife and myself out here.

So just -- it's just a huge burden.  And then also losing a week of employment for myself would be a gigantic problem for my business because everything would have to stop basically.

THE COURT:  What's your business?

PROSPECTIVE JUROR:  Mobile auto repair.

THE COURT:  And how old is your child?

PROSPECTIVE JUROR:  He's 5.

THE COURT:  And how does he get -- he goes to kindergarten?

PROSPECTIVE JUROR:  Yeah.  He goes to a Montessori there in town, and I take him in the mornings at about 8:30 every morning.

THE COURT:  And there's no carpool that you've set up with --

PROSPECTIVE JUROR:  No.  It's a private Montessori, unfortunately.

THE COURT:  Okay.  All right.  Thank you.

PROSPECTIVE JUROR:  Thank you.

PROSPECTIVE JUROR:  Hi.  Juror 37.  I have two jobs, so one of them is working in a doctor's office, which I have no coverage for this week.  And my part-time job that I go directly after work at 5:00 o'clock, I would not be able to make it on time as it's in Surprise, Arizona.

So that's why I'm --

THE COURT:  What's your second job?

PROSPECTIVE JUROR:  I'm a caregiver, so I have patients that I go see after I get off of work.

THE COURT:  And what do you do for the doctor?

PROSPECTIVE JUROR:  I'm a medical assistant.

THE COURT:  All right.  Thank you.

PROSPECTIVE JUROR:  Good morning.  Juror No. 34.  I just -- the reason for my issue is I just got started a new job yesterday, and I'm new on the project.  We have a project that's going to be happening in Tucson.  So I'm trying to learn

the project before I'm being sent down there, and this is my first week on the job.  And we're supposed to be headed down there in the next couple weeks, and so I'm just trying to prepare myself for the job.  And since this is my first week, this kind of came up and is going to be hindering the projects that are going on in Tucson.

THE COURT:  And what's your job?

PROSPECTIVE JUROR:  I'm a project business administrator.

THE COURT:  For?

PROSPECTIVE JUROR:  For a construction company, for Arrowhead Builders.

THE COURT:  And what kind of construction?

PROSPECTIVE JUROR:  It's a healthcare facility in Tucson, near -- near San Javier, by -- what's the -- Pascua Yaqui.  Pascua Yaqui.  So they're going to be starting a project down there.  We're building a healthcare center, so that's my main issue right now.

THE COURT:  All right.

PROSPECTIVE JUROR:  And since I'm just beginning, I just started yesterday, I'm a little brand-new to the company, so...

THE COURT:  Okay.  Well, thank you.

Does anybody else feel that the length of the trial or the daily schedule presents a problem?

Michele, right there.  43.

PROSPECTIVE JUROR:  Good morning.

THE COURT:  Good morning.

PROSPECTIVE JUROR:  I am Juror 43.  I always take my daughter to school in the morning because she is early.  I work at nighttime.  And right now I just ask and beg somebody to take her to school at 7:30, because she has choir today, but tomorrow she's going to be at school at 8:30.

THE COURT:  And you work at night?

PROSPECTIVE JUROR:  Yeah.  2:30 to 11:00 o'clock.

THE COURT:  2:30 --

PROSPECTIVE JUROR:  2:30 in the afternoon to 11:00 at night.

THE COURT:  Okay.  All right.

Okay.  Thank you.

PROSPECTIVE JUROR:  Thank you.

PROSPECTIVE JUROR:  Hello, Your Honor.  I'm number 5.  And my only issue is just my 14-year-old son had back surgery about a month ago, and we have a follow-up appointment on Friday that I'm pulling him out of school for.  And my husband leaves town tonight for work.

THE COURT:  Okay.  And this is a follow-up as a result of the back surgery?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Okay.  Okay.  Thank you.

Is there anybody else who feels that the length of the trial or the daily schedule will present a problem for you?

Okay. I'm going to introduce the people at counsel table now. The plaintiff is represented by Jocquese Blackwell and Gillmore Bernard of the Blackwell Law Firm.

Mr. Blackwell, would you introduce your client, please.

MR. BLACKWELL: Thank you, Your Honor.

Good morning, ladies and gentlemen of the jury. My client's name is Ms. Martha Winkler.

THE COURT: Does anyone know Mr. Blackwell, Mr. Bernard, or Ms. Winkler?

Has anyone ever heard of the Blackwell Law Firm?

PROSPECTIVE JUROR: I'm a paralegal -- oh, sorry. Number 6.

THE COURT: Number 5.

PROSPECTIVE JUROR: Number 5. Not 6.

THE COURT: You're close.

PROSPECTIVE JUROR: I'm a paralegal for a law firm, and I've just seen the name come across our desk.

THE COURT: Okay. Have you formulated any opinions about the law firm?

PROSPECTIVE JUROR: No.

THE COURT: Or Mr. Blackwell?

PROSPECTIVE JUROR: No.

THE COURT: Okay. Thank you.

The defense is represented by Kathleen Wieneke, Christina Retts, of the Wieneke Law Group.

Ms. Wieneke, would you introduce your client, please.

MS. WIENEKE: Good morning, everyone. Our client is Jason Gillespie.

THE COURT: Does anyone know Ms. Wieneke, Ms. Retts, or Officer Gillespie?

Okay. No response. Thank you.

I'm going to read a brief statement about what this case is about just so we have a context when we ask our questions and talk to you.

This is a case brought by Martha Winkler against Phoenix police officer Jason Gillespie. Ms. Winkler claims that Officer Gillespie violated federal law by arresting her without probable cause and using excessive force during the arrest on July 19, 2014.

Officer Gillespie denies liability and claims that Ms. Winkler's arrest was supported by probable cause, and deny there was excessive force.

Has anyone heard, seen, or read anything about the facts of this case?

MR. BLACKWELL: Your Honor? May we approach briefly? I'm sorry.

THE COURT: Okay.

UNITED STATES DISTRICT COURT

(At sidebar on the record.)

MR. BLACKWELL:  Judge, it sounded like you said the 19th.  Did you say the 19th or the 16th?

THE COURT:  I said the 19th.  I thought -- are you talking about the date?

MR. BLACKWELL:  Yes, sir.

THE COURT:  I only said what was written there.

MR. BLACKWELL:  That's our fault, Judge.  It's the 16th.  Not a problem.

THE COURT:  The date isn't important at this point.

MR. BLACKWELL:  All right.

(End of discussion at sidebar.)

THE COURT:  I've been corrected.  The date of this event was not July 19th; it was July 16th, 2014.

Okay.  Have you or any members of your family or close personal friends ever been involved in a case like this case?

Number 40.

PROSPECTIVE JUROR:  Good morning.  Juror No. 40.  I've got a brother in Colorado, has been in and out of legal trouble since he was about 14.  Several assaults.  And some of those arrests did come with accusations of, you know, unlawful use of force in arrests and things of that nature.

THE COURT:  Okay.  It sounds like he -- your brother experienced some claims similar to these claims.

PROSPECTIVE JUROR:  Yes.

THE COURT:  Would the fact that your brother's been involved in that situation and has made those claims affect you in any way as far as your ability to sit in this trial and base the case and the decision in this case solely on the evidence presented in this trial?

PROSPECTIVE JUROR:  No.

THE COURT:  Could you be fair and impartial to both sides in this case?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Okay.  Thank you.

PROSPECTIVE JUROR:  Number 39, Your Honor.  My father has been in law enforcement for 27 years, served with Oakland PD.  I feel that I probably would be a little bit biased as far as towards the police officer side just based on that and the multiple charges that were -- lawsuits that were dropped against my father.  He never went to -- I don't think he ever went to actually court about it, but growing up as a child, he's been served many subpoenas, served at court for lawsuits and whatnot too.

THE COURT:  Okay.  So you haven't heard any evidence yet, but you're already convinced that you can't be fair and impartial?

PROSPECTIVE JUROR:  It would be tough for me.  I mean, honestly, with the law enforcement background of my family and friends, it's -- I would be probably very speculative on one

end to the other.

THE COURT: Okay. Thank you.

PROSPECTIVE JUROR: Good morning. I'm number 25. I don't know if this is relevant, but my son is a prosecutor for the City of Chandler. And so if it means that -- has he been involved in these cases, yeah, he has. So I don't know if that means any relevance need to me. Does that make sense?

THE COURT: Yeah, I hear what you're saying. This is not a criminal case. This is a civil case.

PROSPECTIVE JUROR: Okay. So it's not --

THE COURT: So your son is in Chandler, so he's -- it sounds like he's a prosecutor doing criminal cases; is that true?

PROSPECTIVE JUROR: Yeah. I mean, he works for the City of Chandler, yes. So it wouldn't be any relevancy. I mean, I don't know if that's --

THE COURT: No, no. There may be situations in those trials where issues like this come up.

PROSPECTIVE JUROR: Okay.

THE COURT: But my question is, is the fact that your son is a prosecutor for the City of Chandler, do you think that would impact your ability to sit on this trial and be fair to both sides?

PROSPECTIVE JUROR: No. No.

THE COURT: Could you decide this case based solely on

the evidence, regardless of what your son's position is?

PROSPECTIVE JUROR:  Yes, absolutely.

THE COURT:  And if you were to sit in this trial and find that the plaintiff proved her case and found for the plaintiff, do you think you'd have to answer to your son and say, "This is why I did this"?  You know, would you feel uncomfortable making that decision, knowing that your son's a prosecutor?

PROSPECTIVE JUROR:  No.

THE COURT:  Okay.  Thank you.

PROSPECTIVE JUROR:  Hello, Judge, I'm number 17.  I was a victim of a police officer who actually was hostile with me, threw me against a car when I was younger, and searched me for no reason at all.  And I was told afterwards that he should have called a woman officer to do that, which he didn't.  He dumped my purse out.  He was very rude to me.

And because that happened to me and because this young lady over here is a woman, I would definitely be biased. There's no way I can sit here and listen to this woman being mishandled by this young man that's an officer and a woman probably should have came and searched her or --

THE COURT:  Okay.

PROSPECTIVE JUROR:  -- do whatever.

THE COURT:  Well, you haven't heard any evidence yet. All I've read to you is what the parties' positions are.

PROSPECTIVE JUROR:  I'm sorry.  I couldn't --

THE COURT:  Just having heard what you've heard, you've already made up your mind, it sounds like.

PROSPECTIVE JUROR:  I certainly have, based on my experiences.

THE COURT:  All right.  Thank you.

Anybody else?

And the question, is there anything about -- the question is, have you or any members of your family ever been involved in a case like this.  Anybody else?

Okay.  Finally, is there anything about the nature of this case that would make it difficult for you to sit as a juror and be fair and impartial to both sides?  Other than what I've already been told.

PROSPECTIVE JUROR:  Juror No. 12.  I've been previously arrested like when I was 21 in Arizona, and I've been on the other side of the police and everything.  And I just feel like my decision can some -- I don't know if it would be fair or -- I don't feel like I should be able to give that judgment to somebody due to the fact I've been on the other side and been judged myself.

THE COURT:  Okay.  Well, the question is this:  If you were to be on this jury and you heard the evidence and went back to the jury room to deliberate, could you make your decision based only on the evidence presented in this trial, or

would you feel like you're already leaning towards one side having not even heard the evidence?

PROSPECTIVE JUROR:  Well, due to the fact my trial -- not a trial, but when I went to court and everything --

THE COURT:  I'm asking you about this trial.

PROSPECTIVE JUROR:  This trial?

THE COURT:  If you're a juror in this trial, can you make a decision based only on the evidence, or do you think your prior experience would play in your decision?

PROSPECTIVE JUROR:  I think my prior experience will play in my decision.

THE COURT:  Are you already leaning towards one side or the other in this case?

PROSPECTIVE JUROR:  Yes.

THE COURT:  You haven't heard any evidence yet, but you already feel like one side should win?

PROSPECTIVE JUROR:  Yes, Your Honor.

THE COURT:  Okay.  Thank you.

Anybody else?

I'm going to read a list of the witnesses who will testify in this trial.  If you know or think you know any of these witnesses, please let us know.

You've already heard the plaintiff, Martha Winkler, she'll be testifying.  The defendant, Officer Jason Gillespie, will be testifying.  Ron Kirby.  Dr. Timothy Weise.  And

retired Captain Greg Meyer.

Does anyone know or think they know any of these witnesses?

Okay.  No response.

Does anyone have strong feelings either for or against a party who brings a lawsuit?

No response.

This is a civil case; this is not a criminal case. This is a civil case, and civil cases are decided by a different standard than criminal cases.  Criminal cases, it's proof beyond a reasonable doubt.  In civil cases, the standard's much lower.  It's preponderance of the evidence. Probabilities.  What's most probable.

Does anyone have any problem applying this lower burden of proof than used in a criminal case?

No response.

Have you or any members of your family ever been a party or a witness in any litigation, excluding a domestic relations or traffic case?

PROSPECTIVE JUROR:  Juror 9.  I don't know if it's relevant, but when I was in college I was jumped by a bunch of skinheads, and so I had to go to court and testify against them, and was involved in a lot of different lawsuits when I was 19.  I had to go back and forth from Arizona to Oklahoma.

THE COURT:  As a result of that incident?

PROSPECTIVE JUROR:  Yeah.

THE COURT:  Okay.  All right.  Based on your experience -- is that the only case you've been involved in involving litigation?

PROSPECTIVE JUROR:  Yeah.

THE COURT:  And you testified in court on that case?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Based on that experience, do you feel like you'd have any difficulty sitting in this trial as a juror and being fair to both sides?

PROSPECTIVE JUROR:  No.

THE COURT:  All right.  Thank you.

PROSPECTIVE JUROR:  I'm Juror No. 10.  And my mother was involved in a train accident many years ago, and there was litigation following that incident.  But I was not -- I didn't -- I wasn't a witness.  I wasn't even present for the litigation.

THE COURT:  Okay.  Would your mother's experience having been a witness and maybe a litigant in that case, would that impact your ability in any way in this case to be a fair and impartial juror?

PROSPECTIVE JUROR:  No.

THE COURT:  All right.  Thank you.

Do you or any member of your family have legal training?

PROSPECTIVE JUROR:  Juror No. 4.  My brother-in-law is a district magistrate judge, and my sister and brother are both police officers.

THE COURT:  And where does your brother-in-law work?

PROSPECTIVE JUROR:  Kansas.

THE COURT:  Okay.  And you said your sister and brother?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Are police officers?

PROSPECTIVE JUROR:  A dispatcher and a police officer.

THE COURT:  And which department?

PROSPECTIVE JUROR:  One in Lincoln, Nebraska, and one in Seneca, Kansas.

THE COURT:  Would the fact that you have relatives involved in those positions, do you think that would affect your ability in any way to sit in this trial as a juror and be fair to both sides?

PROSPECTIVE JUROR:  No.

THE COURT:  You could decide this case based only on the evidence?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Okay.  Thank you.

PROSPECTIVE JUROR:  Juror 5.  I'm a paralegal at a law office in town.

THE COURT:  And which firm do you work for?

42

PROSPECTIVE JUROR:  Whitley Legal Group.

THE COURT:  Okay.  And what kind of practice is that?

PROSPECTIVE JUROR:  We do litigation and trademarks and probate.  And estate planning.

THE COURT:  Okay.  All right.  Would the fact that you work in a law firm and apparently have some legal training, would that affect your ability in any way to sit in this trial as a juror and be fair and impartial?

PROSPECTIVE JUROR:  No.

THE COURT:  Okay.  Thank you.

PROSPECTIVE JUROR:  Juror No. 14.  I worked for 15 years for JPMorgan Chase and Tiffany and Bosco as a paralegal.

THE COURT:  Okay.  And it sounds like you're not doing that anymore?

PROSPECTIVE JUROR:  No.

THE COURT:  Would the fact that you have had that experience working in a law firm and having the legal experience you had, would that affect your ability in any way to sit in this trial as a juror and be fair and impartial?

PROSPECTIVE JUROR:  No.

THE COURT:  And what kind of practice were the lawyers you were working with, what kind of practices did they have?

PROSPECTIVE JUROR:  Bankruptcy.

THE COURT:  Okay.  Thank you.

PROSPECTIVE JUROR:  Juror No. 1.  My son's been a

police officer for 20 years.  He's a sergeant rank in Kansas. But ever since he's joined the force, I've never asked and he never offers anything about his cases, so I don't think I'd have any bias here at all.

THE COURT:  All right.  Where in Kansas is he?

PROSPECTIVE JUROR:  Leawood, Kansas.  Suburb of Kansas City.

THE COURT:  All right.  So you have a son who's a police officer in Kansas.

PROSPECTIVE JUROR:  Yes.

THE COURT:  And let me ask you the question:  Do you think the fact that your son holds that position, you would be inclined to favor one side or the other in this case?

PROSPECTIVE JUROR:  I don't believe so.

THE COURT:  You could decide -- could you decide this case solely on the evidence presented at trial?

PROSPECTIVE JUROR:  Yes, I can.

THE COURT:  All right.  Thank you.

PROSPECTIVE JUROR:  Hi.  Juror No. 30.  Both my parents were attorneys.  My father was a trial attorney.

THE COURT:  Okay.  And where did they practice?

PROSPECTIVE JUROR:  Here in Phoenix.  My father was an employment attorney.  He represented City of Phoenix for -- I know the fire department, possibly the police department.  I'm not sure.

THE COURT:  Okay.  And your mom, what kind of practice did she have?

PROSPECTIVE JUROR:  I'm not exactly sure what area of law.  She worked at Fennemore Craig here in town.

THE COURT:  Would the fact that both your parents were lawyers in any way impact your ability to be a fair and impartial juror in this case?

PROSPECTIVE JUROR:  No.

THE COURT:  All right.  Thank you.

PROSPECTIVE JUROR:  Number 25.  My son is an attorney, works for the City of Chandler.

THE COURT:  Okay, thank you.

PROSPECTIVE JUROR:  Okay.

THE COURT:  Would the fact -- let me just ask you.  I think you've already answered this, but would the fact --

PROSPECTIVE JUROR:  Yeah, you asked me that already, but I didn't know if it was relevant.  Yeah, it wouldn't affect me.

THE COURT:  All right.  Thank you very much.

PROSPECTIVE JUROR:  Good morning, Your Honor.  Number 41.  My husband and I were legal assistants for lawyers.

THE COURT:  Okay.  And who do you work for?

PROSPECTIVE JUROR:  Bankruptcy attorneys for Catalyst Law Firm and criminal justice with Coolidge Law Firm.

THE COURT:  Okay.  Is that in Coolidge?

PROSPECTIVE JUROR:  Sorry?

THE COURT:  Coolidge Law Firm, where is it?

PROSPECTIVE JUROR:  It's in Chandler.

THE COURT:  Okay.  Would the fact that you and your husband hold those positions impact your ability in any way to be a fair and impartial juror?

PROSPECTIVE JUROR:  No, sir.

THE COURT:  All right.  Thank you.

PROSPECTIVE JUROR:  Juror 46.  My brother-in-law's an attorney.

THE COURT:  Okay.  And where?

PROSPECTIVE JUROR:  North Carolina.

THE COURT:  Okay.  What kind of practice does he have?

PROSPECTIVE JUROR:  I have no idea.  We're not particularly close.

THE COURT:  All right.  I think I know the answer to this, but I have to ask it anyway:  Would the fact that he holds that position impact your ability to be fair and impartial in this case?

PROSPECTIVE JUROR:  It will not.

THE COURT:  Thank you.

PROSPECTIVE JUROR:  Good morning.  Juror 24.  I used to be a paralegal.

THE COURT:  Where?

PROSPECTIVE JUROR:  Aiken, Schenk, Hawkins and

UNITED STATES DISTRICT COURT

Riccardi.

THE COURT:  And what kind of practice is that?

PROSPECTIVE JUROR:  I was in bankruptcy.

THE COURT:  Would your experience as a paralegal impact your ability in any way to be a fair and impartial juror in this case?

PROSPECTIVE JUROR:  No.

THE COURT:  All right.  Thank you.

PROSPECTIVE JUROR:  Number 39, Your Honor.  As I stated before, my father is in law enforcement for 27 years.

THE COURT:  I think we already talked about that. Thank you.

PROSPECTIVE JUROR:  Yes, sir.

PROSPECTIVE JUROR:  Juror 38.  My sister and brother-in-law are both Phoenix police officers.

THE COURT:  Okay.  This involves -- the case here involves a Phoenix police officer.  Would the fact that a Phoenix police officer is a party in this case impact your ability to be a fair and impartial juror in this case?

PROSPECTIVE JUROR:  I don't think so.

THE COURT:  Did you say it's your brother?

PROSPECTIVE JUROR:  My sister and brother-in-law.

THE COURT:  Sister and brother-in-law both work there. So if you were on this jury and you found for the plaintiff and awarded money -- excuse me, found liability -- and this case is

only about liability.  It's not about money in this case -- found liability for the plaintiff, how would you feel explaining that to your brother and sister-in-law if they were to ask you later on?

PROSPECTIVE JUROR:  Probably wouldn't be fun.

THE COURT:  You would feel some pressure from them, do you think?

PROSPECTIVE JUROR:  No, I don't think so because they're in law enforcement because they're fair.  They want justice.

THE COURT:  But you'd still feel like they -- you'd have to explain what you did?

PROSPECTIVE JUROR:  I'm sure I would explain what I did.

THE COURT:  Okay.  All right.  Thank you.

PROSPECTIVE JUROR:  Juror 33.  My brother is a police officer with the Tempe Police Department.

THE COURT:  Okay.  And how long has he been there?

PROSPECTIVE JUROR:  I don't know.  Probably 15 years, maybe.  He was a police officer in Prescott Valley prior to that.

THE COURT:  Okay.  So he's been a police officer for a while then.

PROSPECTIVE JUROR:  Yes.

THE COURT:  Are you close to him?

PROSPECTIVE JUROR:  Not super close.  We see each other once or twice a year.

THE COURT:  And this is your brother?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Would you feel like if you were on this jury, you could be fair to both sides and decide this case based only on the evidence?

PROSPECTIVE JUROR:  I do.

THE COURT:  Okay.  Thank you.

Anybody else?

Okay.  The way this case works -- the way these cases work is that the jury hears all the evidence, and when the case is over, I'll give the jury instructions about what the law is.  And the jury's expected to apply the law to the instructions.

Sometimes the law is different than what you think it is or what it should be.  Does anyone feel they'd have any difficulty following the law as I give the instructions and disregarding or ignoring your own feelings about what the law is or what the law should be?

No response.

Does anyone feel they'll be unable to render a verdict solely on the basis of the evidence presented during trial, setting aside personal beliefs, opinions, or biases you might have, other than what you've already told me?

No response.

Has anyone operated a business before?

PROSPECTIVE JUROR:  What's the question?

THE COURT:  Have you ever operated a business?

PROSPECTIVE JUROR:  I currently operate my own photography business.

THE COURT:  Thank you.

THE COURT REPORTER:  I need your number, please.

THE COURT:  Your number, please.

PROSPECTIVE JUROR:  Oh, sorry.  Number 41.

THE COURT:  Thank you.

PROSPECTIVE JUROR:  Juror 46.  A consulting company.

THE COURT:  Okay.

PROSPECTIVE JUROR:  Number 39.  Owner and operator of a mobile auto repair business.

THE COURT:  All right.  Thank you.

PROSPECTIVE JUROR:  Juror No. 22.  Household moving and storage out of California, as well as independent consulting for technology here in Arizona.

THE COURT:  All right.  Thank you.

PROSPECTIVE JUROR:  38.  I do reading tutoring.

THE COURT:  All right.  Thank you.

PROSPECTIVE JUROR:  Juror 28.  I have two different retail businesses, one a dance wear store and one a kids' furniture store.

THE COURT:  Thank you.

PROSPECTIVE JUROR:  Juror 14.  We own a retail store and a manufacturing business.

THE COURT:  Thank you.

PROSPECTIVE JUROR:  Juror No. 5.

THE COURT:  Whoa.

PROSPECTIVE JUROR:  Many, many -- I'm sorry, 6.  Thank you.

She said 6.  I said 5, okay.

THE COURT:  Why don't you two switch seats.

PROSPECTIVE JUROR:  Juror No. 6.  Many, many years ago my wife and I operated an antique store.

THE COURT:  Okay.  Thank you.

PROSPECTIVE JUROR:  I design fabric and handbags for the quilting industry, and I own my own publishing business.

THE COURT:  Okay.  Thank you.

THE COURT REPORTER:  I need your number, please.

PROSPECTIVE JUROR:  I'm sorry.  3.

PROSPECTIVE JUROR:  Number 1.  I was independent owner-operator truck driver for 30 years.

THE COURT:  Okay.  Thank you.

PROSPECTIVE JUROR:  Hi, number 17.  Me and my husband, we have an IT consulting firm company.

THE COURT:  What kind of consultant?

PROSPECTIVE JUROR:  IT consulting.

THE COURT:  Oh, IT, okay.  I didn't hear that.  Okay.

Thank you.

PROSPECTIVE JUROR:  Juror No. 49.  Back in 2000 my wife and I owned a little store, a retail store.  Also, I was a manager, store manager for 20 years.

THE COURT:  All right.  Thank you.

PROSPECTIVE JUROR:  I'm Juror No. 10.  And for 10 years I managed a retail business, but it was not my business. I mean, I managed a retail store, but it was not my business. I was an employee.

THE COURT:  Okay.  This question is about ownership.

All right.  Did any of you know anybody else on this jury before today?

Okay.  No response.

Does anyone feel that people generally bring too many lawsuits?

PROSPECTIVE JUROR:  Juror 24.  I'm in the insurance business, and we deal with a lot of people who file claims against restaurants and things like that, so I've seen a lot of lawsuits come across.

THE COURT:  Are you an adjuster?

PROSPECTIVE JUROR:  I'm not, no.

THE COURT:  What do you do?

PROSPECTIVE JUROR:  I'm in the personal lines, but I help with filing commercial claims.

THE COURT:  All right.  And which insurance company do

you work for?

PROSPECTIVE JUROR:  Farmers Insurance.

THE COURT:  And based on your feeling about too many lawsuits, do you have any feelings about this case?

PROSPECTIVE JUROR:  I don't have any feelings about this case.

THE COURT:  I mean, can you decide this case based solely on the evidence?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Okay.  Thank you.

PROSPECTIVE JUROR:  I'm Juror 34, number 34.  I worked for the Maricopa County Bar Association, and I listened to a lot of calls for people seeking lawyers.  I was a part of their lawyer referral program at one time that they used to have. Well, I think 15 years ago.

So I listened to a lot of calls throughout the day for frivolous things from just anything and everything I got calls for from people who were seeking referrals to lawyers in the Valley, throughout the Valley.

THE COURT:  Okay.  I hear what you're saying.  You don't know if these people ever filed lawsuits, but they called and they were inquiring about talking to a lawyer about a claim.

PROSPECTIVE JUROR:  Correct.

THE COURT:  And based on that, you feel there's too

many lawsuits?

PROSPECTIVE JUROR:  Sometimes you would hear them all the time and they were looking to seek to hire a lawyer, and that's why they would call me.  That's why they would like tell me their story, tell me what happened --

THE COURT:  Okay.  So what you heard --

PROSPECTIVE JUROR:  -- tell me the incident.

THE COURT:  -- were people who felt like they might have a case and wanted to talk to a lawyer.

PROSPECTIVE JUROR:  Yeah.

THE COURT:  That's what the basis of your answer is, then?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Okay.  Thank you.

PROSPECTIVE JUROR:  No particular reason.  It's just my general opinion.

THE COURT:  Okay.  You have no factual basis for it; you just have that opinion?

PROSPECTIVE JUROR:  Well, just from the things you hear about people spilling coffee on themselves and stuff like that.  I mean, if you're stupid enough to spill coffee on yourself, you know, you don't bring a lawsuit about it.  You know the coffee's supposed to be hot.

THE COURT:  Okay.  And you know nothing about that lawsuit either, do you?

PROSPECTIVE JUROR:  No, I don't.

THE COURT:  Okay.  You can't prove it, but you just know it's true.

PROSPECTIVE JUROR:  Okay.

THE COURT REPORTER:  Sir, I need you to state your number.

PROSPECTIVE JUROR:  49.

THE COURT:  39, I already know how you feel.  Let's move on.  Anybody else?

All right.  Have you had any particularly pleasant or unpleasant experiences with a law enforcement officer or a law enforcement agency other than what you've already told me?  Has anyone had any particularly pleasant or unpleasant experiences with law enforcement or a law enforcement officer?

PROSPECTIVE JUROR:  Number 14.  Many years back, I was a victim of a violent crime in California, and I became really close to the officers that were investigating the situation. And my current business now in my retail store and my manufacturing business, we deal a lot with law enforcement. That's pretty much a majority of our business.

THE COURT:  Would your experience with law enforcement, you think, cause you to feel like you'd have any problem being a fair and impartial juror in this case?

PROSPECTIVE JUROR:  No.

THE COURT:  Okay.

PROSPECTIVE JUROR:  Juror No. 4.  In 2014 I received some death threats and tried to get involvement with the Phoenix Police Department, and the whole situation was pretty traumatic.  But there wasn't really anything done about it, and eventually I had to move across the city.

THE COURT:  So I'm trying -- so you're characterizing that experience as an unpleasant experience with law enforcement?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Okay.  Would that experience, you think, cause you any concern about your ability to sit in this trial as a juror and be fair to both sides?

PROSPECTIVE JUROR:  I'd like to think it wouldn't.  I hope not.

THE COURT:  Can you assure me it won't?

PROSPECTIVE JUROR:  No.

THE COURT:  Okay.  You have some concerns about that?

PROSPECTIVE JUROR:  Yes.

THE COURT:  All right.  So what you're saying is you might have difficulty, if you're on this trial, to separate what happened to you from the facts in this case, and that might impact your ability to decide the case based only on the facts you hear in this courtroom?

PROSPECTIVE JUROR:  I think I could separate my experience from the facts in the courtroom.  I would -- it was

a traumatic experience, and it -- I don't always know what's going to trigger the feelings from that.

THE COURT:  Okay.

PROSPECTIVE JUROR:  I don't know if that answers your question.

THE COURT:  Yeah, it does.  Thank you.

PROSPECTIVE JUROR:  Number 16.  About four years ago, I was taking some chairs from my daughter's house to my house on Christmas Eve.  Policeman followed me right to my home.  I turned into the property.  He turned on the lights.  He says, "Have you been drinking?"

I said, "No.  Give me a Breathalyzer.  I'm fine."

Couple minutes later, here comes another policeman.  Oh, this -- their lights were on.  Same question.  I said, "Give me a Breathalyzer."

Went on.  A few minutes later, here comes a third cop car.  Same ordeal.  A few minutes later, here comes number four.  Now, they have their lights, and we have a nice quiet community.  And they embarrassed me quite a bit in front of my neighbors.  I've never done anything wrong my entire life.

And they harassed me, and finally I said, "Are you going to arrest me or not?  I haven't done anything wrong."

And they're all looking at each other, and they're trying to back out of it.  And finally they let me go, and this was about an hour in my front yard harassing me.  And, yeah, it

tainted me.

THE COURT:  Okay.  Well, let me ask you this:  Do you feel like because of that experience, you're so tainted that if you were on this jury, you couldn't decide the case based solely on the facts; that experience would impact your decision?

PROSPECTIVE JUROR:  I think it would.

THE COURT:  Okay.  Thank you.

PROSPECTIVE JUROR:  Juror 30.  I have a couple very good friends who are police officers, and I've had other friends over the years, or neighbors and stuff.  But to be clear, I still feel that I'm fair and impartial.

THE COURT:  Okay.  I'm sure you are, but my question is, do you think there's anything in being on this jury that if you were to find for the plaintiff, you'd have to answer to them and explain to your friends who are officers, "Hey, this is what really happened" and kind of sheepishly, maybe --

PROSPECTIVE JUROR:  No, sir.

THE COURT:  You wouldn't have any concerns about how your friends who are officers might react to you if you were to find for the plaintiff in this case?

PROSPECTIVE JUROR:  Not at all.

THE COURT:  Okay.  Thank you.

PROSPECTIVE JUROR:  Juror 31.  I worked for the Department of Corrections for about 24 years, in HR most of the

time.

THE COURT:  Okay.  So you've had experience with law enforcement in the Department of Corrections?

PROSPECTIVE JUROR:  Correct.

THE COURT:  And based on that experience, do you feel like you'd have any difficulty deciding this case based only on the facts?

PROSPECTIVE JUROR:  No.

THE COURT:  Could you be fair and impartial to both sides in this case?

PROSPECTIVE JUROR:  Yes.

THE COURT:  All right.  Thank you.

PROSPECTIVE JUROR:  Number 50.  I've spent 10 years working with Glendale PD officers on my -- I teach on my campus with the SROs.  They would come in, work -- grade papers, work with us, so I had some very favorable relationships with those officers.

THE COURT:  Would that affect your ability to sit on this trial and be fair to both sides?

PROSPECTIVE JUROR:  I don't believe so.

THE COURT:  If the evidence shows that the plaintiff should prevail, would you have any difficulty in voting for the plaintiff?

PROSPECTIVE JUROR:  No, I would not.

THE COURT:  If the evidence shows the defendant should

prevail, would you have any difficulty voting for the defendant?

PROSPECTIVE JUROR:  No, I would not.

THE COURT:  All right.  Thank you.

PROSPECTIVE JUROR:  Juror 37.  I've had good and bad experiences with police officers, but one that I will never forget is I was really young and there was like a raid going on across the street from our house, and the policemen came and we were all -- you know, had guns pointed to us, and that was very scary and I'll never forget that.  It had nothing to do with us.

And another experience that I recently had last year was with my daughter.  She had a threat at school.  They sent a police officer to my house to question my daughter.  She was just getting home from school, and I did not give them permission to speak to her because she was a minor, and they still spoke to her without me.  And before -- by the time I got there, they already had left and questioned her and everything without my permission.

So that's the only experience I've had that was bad with them.

THE COURT:  Well, would those experiences cause you to have concerns about your ability to be fair and impartial in this case?

PROSPECTIVE JUROR:  No.  Because, you know, they've

done good for me as well, too, so...

THE COURT:  So if the evidence shows that the plaintiff hasn't proven her case, would you have any difficulty finding in favor of the defendant?

PROSPECTIVE JUROR:  No.

THE COURT:  And if the evidence shows the plaintiff has proven her case, would you have any difficulty finding for the plaintiff?

PROSPECTIVE JUROR:  I'm sorry.  I couldn't hear your question.

THE COURT:  If the evidence shows the plaintiff has proven her case, would you have any difficulty finding for the plaintiff?

PROSPECTIVE JUROR:  No.

THE COURT:  Okay.  Thank you.

Other than what you've already told me, have you or anyone close to you ever been employed in any capacity by a law enforcement agency?

PROSPECTIVE JUROR:  Juror No. 15.  I worked for like eight months as a 911 dispatcher in Florida.

THE COURT:  Okay.  And would that experience, you think, cause you any difficulty to sit in this trial as a juror and be fair to both sides?

PROSPECTIVE JUROR:  I would have no problem making a decision.

THE COURT:  All right.  Thank you.

PROSPECTIVE JUROR:  Juror No. 6.  I've known four or five highway patrolmen over the years.  I don't believe that would influence my judgment at all.

THE COURT:  So you could decide this case solely on the evidence presented at trial?

PROSPECTIVE JUROR:  Yeah.  They're all retired for quite a while.

THE COURT:  And the answer to my question is?  Can you decide this case --

PROSPECTIVE JUROR:  Yes.

THE COURT:  -- based solely on the evidence presented at trial?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Okay.  Thank you.

One thing I forgot to mention.  When we're talking, please wait until I finish my question before you begin your answer, and I'll try to wait until you finish your answer before I begin my next question.  The court reporter has to take down what we say, and she can't do it when we're both talking.

The other thing is -- and everyone's been pretty good about this -- please use words.  It drives her crazy when we say uh-huh and huh-uh.  And it's one of those things that in normal conversation we do it all the time, but for purposes of

this record, we need to use our words.  So thank you.

Anybody else?

You're going to hear testimony from police officers in this case.  Under the law, a police officer has no more credibility than any other witness to begin with.  The law expects that you'll treat each witness the same.  You'll be instructed that all witnesses should be judged based on -- entirely on the credibility of the testimony which they offer and their demeanor on the witness stand as well as other factors.

Does anyone feel that they'll have trouble following that law, the law that a police officer is to be given no greater or lesser credibility than any other witness?  Does anyone feel that's just something I have trouble with based on my experiences or my beliefs, and I can't follow that instruction?

Number 17?  We talked earlier.  I understand your position on that.

Okay.  No response.

Has anyone read or heard about incidents of police misconduct or use of unreasonable force that you think would tend to influence you in this case?

Okay.  No response.

Have you ever expressed any opinion in conversations concerning the problems of police brutality or misconduct?

No response.

Has anyone ever made a written or oral complaint against a law enforcement officer or law enforcement agency?

Number 4?  I assume it's the same incident you told us about before.

PROSPECTIVE JUROR:  Yes.

THE COURT:  Did you file a complaint?

PROSPECTIVE JUROR:  A verbal complaint at the precinct.

THE COURT:  Okay.  So you were inside the police station?

PROSPECTIVE JUROR:  Yes.

THE COURT:  And who did you make the complaint to?

PROSPECTIVE JUROR:  The receptionist.  I don't know if that's the correct term.

THE COURT:  Okay.  All right.  Thank you.

Was there any result of that complaint?  Anything happen?

PROSPECTIVE JUROR:  Not that I was made aware of.

THE COURT:  Did anyone ever get back to you on it?

PROSPECTIVE JUROR:  No.

THE COURT:  Did you expect them to?

PROSPECTIVE JUROR:  I hoped they would.

THE COURT:  Okay.  But you didn't fill out a formal complaint form or speak to anyone in charge; you just spoke to

the receptionist?

MS. WIENEKE:  Your Honor, could we approach, please?

THE COURT:  Okay.

(At sidebar on the record.)

MS. WIENEKE:  Your Honor, I'm not sure what the --

THE COURT REPORTER:  I can't hear you.

MS. WIENEKE:  -- asking more questions about whether they were satisfied with the adequacy of the complaint.

THE COURT:  Okay.  I'm asking the questions.  Thank you.

MS. WIENEKE:  If I may just state --

THE COURT:  Finish your record.

MS. WIENEKE:  Thank you.

There is no *Monell* claim in this case.  There is no question about --

THE COURT REPORTER:  I can't hear you.

MS. WIENEKE:  There is no *Monell* claim in this lawsuit.  There is no claim that there was a complaint filed and there was any adequacy related to the complaint.  It is our position that this witness has already established cause for his striking, and inquiring further of this witness is polluting the jury pool.

And we object to any further questioning of this witness.

(End of discussion at sidebar.)

THE COURT:  Number 4?

PROSPECTIVE JUROR:  We spoke with the receptionist. They had an officer come out, and I don't recall if there was a written report or just verbal about the event that happened, and then that was the end of it.

THE COURT:  Okay.  All right.  Thank you.

Have you or anyone known to you been injured due to a police officer's use of force?

No response.

Have you or any member of your family ever worked for the City of Phoenix, other than what you've already told me?

PROSPECTIVE JUROR:  My brother, Jody Diaz, was killed with the City of Phoenix in 1992 at 24th Street and the freeway.  He was a maintenance manager, and a John Deere tractor killed him.

THE COURT:  He was working for the City of Phoenix at that time?

PROSPECTIVE JUROR:  He was.  My dad was.  All my cousins, everybody.  And in 1992, my brother died.  He's -- they have a memorial across the street for him.

THE COURT:  So I'm not clear.  Was all your family working for the City of Phoenix?

PROSPECTIVE JUROR:  Most of them do.  Or they have.

THE COURT:  Okay.  All right.  Would the fact that you have relatives --

PROSPECTIVE JUROR:  I would.  I would absolutely have a problem.

THE COURT:  I haven't finished my question.  I'm not sure what you're answering.

PROSPECTIVE JUROR:  Okay.

THE COURT:  The question is this:  Based on the fact that you have family that works for the City of Phoenix, do you think that would impact your ability to be a fair and impartial juror in this case?

PROSPECTIVE JUROR:  I do.

THE COURT:  Okay.  And it sounds like you wouldn't be able to decide this case based solely on the evidence; is that true?

PROSPECTIVE JUROR:  Correct.

THE COURT:  Okay.  Thank you.

THE COURT REPORTER:  I need your number, ma'am.

PROSPECTIVE JUROR:  I'm sorry.  29.

PROSPECTIVE JUROR:  Juror No. 18.  I currently work for Valley Metro, which is partially owned by the City of Phoenix.

THE COURT:  You work there?

PROSPECTIVE JUROR:  Uh-huh.

THE COURT:  Is that yes?

PROSPECTIVE JUROR:  Yes, sir.

THE COURT:  And do you think that because you work for

an agency that's associated with the City of Phoenix, you'd have difficulty sitting on this trial as a juror and deciding this case based solely on the evidence?

PROSPECTIVE JUROR:  No, sir.

THE COURT:  All right.  Thank you.

Anybody else?

Is anyone employed by a healthcare institution, hospital, doctor, or other healthcare provider, other than what you've already told me?

PROSPECTIVE JUROR:  Number 29.  I work for Veracare Hospice.  I'm a community healthcare consultant.

THE COURT:  Okay.  Thank you.

PROSPECTIVE JUROR:  Number 48.  Work for the Veterans Administration.

THE COURT:  What do you do there?

PROSPECTIVE JUROR:  I'm a voucher examiner.

THE COURT:  Okay.  Thank you.

PROSPECTIVE JUROR:  Juror No. 6.  I worked for about 35 years either in hospitals or healthcare insurance companies.

THE COURT:  And holding what positions?

PROSPECTIVE JUROR:  It's all IT.

THE COURT:  Okay.  Thank you.

Number 11?

PROSPECTIVE JUROR:  Juror 11.  I'm a physician.  I work at St. Joseph's.

THE COURT:  And what kind of practice do you have?

PROSPECTIVE JUROR:  I'm a radiologist.

THE COURT:  Okay.  And how would it impact the hospital's operation if you're out of commission for four days?

PROSPECTIVE JUROR:  It's a little bit of a challenge, but we can work around it for that short time frame.

THE COURT:  Okay.  Thank you.

Have you or any member of your family ever worked for a convenience store such as a Circle K, 7-Eleven, or QuikTrip?

PROSPECTIVE JUROR:  Juror No. 12.  My brother worked for QuikTrip back in like 2012.

THE COURT:  Okay.  Thank you.

PROSPECTIVE JUROR:  Juror 37.  I worked at Circle K many years ago.

THE COURT:  Okay.  During what time frame?  Do you remember?

PROSPECTIVE JUROR:  About 15 years ago.

THE COURT:  And for how long?

PROSPECTIVE JUROR:  Maybe a year.

THE COURT:  Okay.  And your position there was?

PROSPECTIVE JUROR:  I was just a cashier.

THE COURT:  Okay.  Thank you.

PROSPECTIVE JUROR:  Juror No. 34.  My cousin works for QuikTrip in Glendale.

THE COURT:  Okay.  Thank you.

Have you or any member of your family ever been a member of any search and rescue organization, volunteer fire department, police reserves or posse, including the Maricopa County Sheriff's Posse?

No response.  Oh, I'm sorry.  There is one response.

PROSPECTIVE JUROR:  Juror 10.  I have a sister who is currently a volunteer with the fire department crisis response for Maricopa -- for City -- Maricopa County.

THE COURT:  Okay.

PROSPECTIVE JUROR:  City of Surprise.

THE COURT:  All right.  Thank you.

Have you or any member of your family ever engaged in any protests, marches, parades, either in person or on TV, against police, police brutality, minority rights, immigration, Sheriff Joe, or anything similar to that?

PROSPECTIVE JUROR:  Juror No. 12.  I marched with my cousin in the DREAM Act back in 2013, I believe.  It was during that whole thing, but yeah, I did march with them for the DREAM Act.

PROSPECTIVE JUROR:  Juror No. 4.  I've been a part of a couple different marches and protests, the biggest one being the Black Lives Matter protest in 2016.  It was around the 4th of July in downtown Phoenix.

THE COURT:  Okay.  Thank you.

PROSPECTIVE JUROR:  Juror 37.  My brother does a

protest for immigration.  He still currently does that.

THE COURT:  Have you ever been involved in the protest?

PROSPECTIVE JUROR:  No.

THE COURT:  Okay.  Thank you.

Other than what you've already told me, have you or any member of your family been subjected to what you consider to be unfair treatment by any governmental entity, law enforcement agency or department, under any circumstances?

Okay.  No response.

Other than what you've already told me, have you or any member of your family or close personal friend ever been subjected to what you consider to be unfair treatment by anyone from the City of Phoenix?

No response.

Have you ever filed a complaint, either formal or informal, against the City of Phoenix or any one of its agencies or any local, state, or federal government?

No response.

Have you or any member of your family or close personal friend ever filed a claim against any governmental agency or entity, law enforcement agency, or prison correctional facility?

No response.

Other than what you've told me, have you or any member

of your family ever had any courses or training in medicine or nursing?

PROSPECTIVE JUROR:  My wife is a registered -- oh, Juror No. 40.  My wife is a nurse.  She was a neuro ICU nurse at Barrow's and still works at St. Joe's.

THE COURT:  As an ICU nurse?

PROSPECTIVE JUROR:  No, she's in labor and delivery now.

THE COURT:  All right.  Thank you.

PROSPECTIVE JUROR:  Number 50.  My mother works for the surgery center at Mayo Clinic, taking care of patients before and after surgery.

THE COURT:  Okay.  Thank you.

PROSPECTIVE JUROR:  Juror No. 6.  My wife was a nurse for 35 years at Banner Health, mostly in kidney dialysis.

THE COURT:  Thank you.

Have you or any member of your family ever taken any college or graduate courses in law, criminal justice, or social work other than what you've already told me?

PROSPECTIVE JUROR:  Number 50.  My husband has an associate's degree in criminal justice.

THE COURT:  Thank you.

PROSPECTIVE JUROR:  Juror 24.  I have a justice studies degree at ASU.

THE COURT:  Thank you.

PROSPECTIVE JUROR:  Juror No. 22.  My wife is --
master's degree in social work.  Social study.

THE COURT:  Thank you.

PROSPECTIVE JUROR:  Juror No. 32.  My daughter has a
master's in social justice.

THE COURT:  Thank you.

PROSPECTIVE JUROR:  Number 7.  I am currently in a
criminal justice -- going to school for criminal justice.

THE COURT:  Are you in school now?

PROSPECTIVE JUROR:  I stopped -- I'm taking a break,
but I will be going back.

THE COURT:  Okay.  And where are you going to school?

PROSPECTIVE JUROR:  I was going to Triumph, but the
school shut down.

THE COURT:  Okay.  All right.  Thank you.

PROSPECTIVE JUROR:  Number 1.  My son has a bachelor's
degree in criminal justice.

THE COURT:  All right.  Thank you.

All right.  Does anyone on the panel believe that
police officers are corrupt?

No response.

Does anyone here feel that police officers are too
quick to arrest?

No response.

THE COURTROOM DEPUTY:  Judge, number 17.

THE COURT:  Number 17, okay.  We've already talked -- it's the same situation as before?  All right.

Does anyone here feel that police should never use force to arrest a subject?

No response.

Has anyone here ever witnessed a crime in progress where police officers responded?

PROSPECTIVE JUROR:  Juror No. 15.  While I was a dispatcher for Florida, in Florida, I was on a run with several officers were -- we were -- where I saw.

THE COURT:  Okay.  All right.  Thank you.

PROSPECTIVE JUROR:  Number 7.  I witnessed a hit-and-run.  I was the one that called 911, and saw DPS show up.

THE COURT:  Okay.  Did you see any arrests occur?

PROSPECTIVE JUROR:  Yes.

THE COURT:  That you witnessed?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Okay.  All right.  Thank you.

Have you or any member of your family or close personal friend ever been arrested?  And if you want to talk -- answer this question outside the presence of the other jurors, just let me know.

PROSPECTIVE JUROR:  Hello.  I'm Juror 13.  My sister was arrested for DUI.

UNITED STATES DISTRICT COURT

THE COURT:  Okay.  Is there anything about her experience that you think would cause you any problem to sit in this trial as a juror and be fair to both sides?

PROSPECTIVE JUROR:  No.

THE COURT:  All right.  Thank you.

PROSPECTIVE JUROR:  Juror No. 12.  I was arrested around 21 for a DUI.

THE COURT:  Okay.  Would anything about that experience, you think, cause you problems to be a fair and impartial juror in this case?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Okay.  Thank you.

PROSPECTIVE JUROR:  Juror 5.  My brother was arrested for disorderly, drunk in the airport.

THE COURT:  Okay.  Would anything about his experience cause you any difficulty to sit in this trial as a juror and be fair to both sides?

PROSPECTIVE JUROR:  No.

THE COURT:  All right.  Thank you.

PROSPECTIVE JUROR:  Juror No. 6.  I have a friend that was arrested for a DUI.

THE COURT:  Anything about his experience do you think would cause you any trouble to sit in the trial as a juror and be fair and impartial to both sides?

PROSPECTIVE JUROR:  No.

UNITED STATES DISTRICT COURT

THE COURT:  Thank you.

PROSPECTIVE JUROR:  Number 7.  My brother and my dad have been arrested.

THE COURT:  Okay.  Anything about their experiences that occurred during that arrest, those arrests, that you think would cause you difficulty to be fair and impartial in this case?

PROSPECTIVE JUROR:  No.

THE COURT:  All right.  Thank you.

PROSPECTIVE JUROR:  Juror No. 27.  I've been arrested. I've had family arrested also.

THE COURT:  Okay.  Anything about your experience or your family's experience about being -- having been arrested cause you difficulty to sit in this trial as a juror and be fair and impartial?

PROSPECTIVE JUROR:  No, sir.

THE COURT:  Okay.  Thank you.

PROSPECTIVE JUROR:  18.  My younger brother was arrested for excessive speed.

THE COURT:  Okay.  Anything about that experience that you think would cause you difficulty to be a fair and impartial juror in this case?

PROSPECTIVE JUROR:  No, sir.

THE COURT:  All right.  Thank you.

Is there something different than what you've told me

before?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Okay.

PROSPECTIVE JUROR:  Juror 17.  My son was arrested for drugs.

THE COURT:  Okay.  All right.  Thank you.

PROSPECTIVE JUROR:  Juror No. 42.  My brother was arrested for a DUI.

THE COURT:  Was there anything about his experience you think would cause you difficulty to be a fair and impartial juror in this case?

PROSPECTIVE JUROR:  No.

THE COURT:  Thank you.

PROSPECTIVE JUROR:  Juror 37.  Both my brothers and my dad have been arrested.

THE COURT:  Okay.  And is there anything about their experiences you think would cause you to be -- have trouble to be a fair and impartial juror in this case?

PROSPECTIVE JUROR:  No.

THE COURT:  All right.  Thank you.

PROSPECTIVE JUROR:  Number 36.  My son was arrested when he was in high school.

THE COURT:  Was there anything about his experience that you think would cause you difficulty to be a fair and impartial juror in this case?

PROSPECTIVE JUROR:  No.

THE COURT:  Thank you.

PROSPECTIVE JUROR:  Number 34.  I was arrested in my younger self-destruct days.

THE COURT:  Okay.

PROSPECTIVE JUROR:  So it -- I don't know if it would sway, if I would be biased or anything, because in those instances, it was my own stupidity.  So it was my choices that I made that I was arrested.

THE COURT:  Okay.  Thank you.

PROSPECTIVE JUROR:  So...

PROSPECTIVE JUROR:  Number 50.  My ex-husband was arrested for a DUI during our marriage.

THE COURT:  Was there anything about his experience or your experience that you may have witnessed that would cause you any difficulty to be fair and impartial in this case?

PROSPECTIVE JUROR:  I don't think so.

THE COURT:  Can you assure me it won't?

PROSPECTIVE JUROR:  Yes, I can.

THE COURT:  All right.  Thank you.

PROSPECTIVE JUROR:  Number 49.  My son was arrested for driving without a license.  He was only 15.

THE COURT:  Okay.  Was there anything about his experience that you think would cause you problems or difficulty to be a fair and impartial juror in this case?

PROSPECTIVE JUROR:  No.

THE COURT:  All right.  Thank you.

Does anyone have any -- has anyone or any family members worked with persons wrongfully accused of crimes such as the Innocence Project, the ACLU, or other organizations?

No response.

Have you or any family member ever felt mistreated by the court system?

No response.

Do you or any member of your family -- have you or any member of your family ever had a head injury?

PROSPECTIVE JUROR:  I'm sorry, what was that?

THE COURT:  Let me rephrase the question.

Have you or any member of your family ever suffered a head injury that required medical treatment?

PROSPECTIVE JUROR:  Yes, sir.  I was hit by a car when I was young and got some stitches and stuff on my head.

THE COURT:  Okay.

PROSPECTIVE JUROR:  Also, I was shot in the head with an arrow, requiring some stitches.

THE COURT:  Okay.  That must have hurt.

PROSPECTIVE JUROR:  Yeah, it did.

THE COURT:  Thank you.

THE COURT REPORTER:  I need you to state your number, sir.

THE COURT:  Your number is 49?

PROSPECTIVE JUROR:  49.

THE COURT:  Okay.  Thank you.

PROSPECTIVE JUROR:  34.  My uncle received a traumatic brain injury back in '84 and suffered a severe coma, became basically a vegetable, vegetative state.

THE COURT:  Okay.  Thank you.

PROSPECTIVE JUROR:  Number 36.  My sons were trying to show me a car so they were lifting me up on the ramp, and I just went right over and hit the other car.  And I think I blacked out for a while, and then they had to take me to the hospital because I couldn't remember a lot of things.

THE COURT:  Okay.  Thank you.

PROSPECTIVE JUROR:  Thank you.

PROSPECTIVE JUROR:  Number 37.  I've had about seven car accidents, which none of them were my fault, wrong place, wrong time, but I have had head injuries in like at least three of those accidents.  And I've actually had a TV fall on top of my head, and I had bad headaches for like two years.

THE COURT:  Okay.  Thank you.

PROSPECTIVE JUROR:  Number 42.  My husband hit a tree while skiing and ended up with staples in his head and -- but then he was fine.

THE COURT:  Okay.  Thank you.

PROSPECTIVE JUROR:  Number 44.  My oldest daughter,

when she was 13, back in '99, was pushed off a merry-go-round and hit a brick wall and ended up having to have surgery. Had -- at the brain stem, damaged the brain stem.

THE COURT:  Okay.

PROSPECTIVE JUROR:  She's no longer -- she's fine now.

THE COURT:  Okay.  Thank you.

PROSPECTIVE JUROR:  Number 45.  My mother-in-law had a traumatic brain injury which resulted in a chemical imbalance.

THE COURT:  Okay.  How did the injury occur?

PROSPECTIVE JUROR:  She was getting up out of bed. There was a shelf in the hotel room.  She hit her head.  And it was a subdural -- subdural --

THE COURT:  Subdural hematoma?

PROSPECTIVE JUROR:  Right.

THE COURT:  All right.  Thank you.

PROSPECTIVE JUROR:  Juror 46.  My son had a medical procedure, passed out on the way out to the car, fractured his skull.

THE COURT:  He passed out and fell?

PROSPECTIVE JUROR:  Yeah.

THE COURT:  Hit the ground?

PROSPECTIVE JUROR:  Uh-huh.

THE COURT:  Is that yes?  Yes?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Okay.  Thank you.

PROSPECTIVE JUROR:  In 19 -- this is Juror No. 48.  In 1972, had a concussion to the back of the head, 13 stitches.  1984, got jumped and beat with one of those car -- anticarjacking things across the face and knocked out.

THE COURT:  Okay.  Thank you.

PROSPECTIVE JUROR:  Juror 30.  My son has had a couple mild concussions, and both he and I have had lacerations before that required stitches.

THE COURT:  Okay.  Were your son's concussions the result of a sport?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Football?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Okay.  Thank you.

PROSPECTIVE JUROR:  Sorry, one was sports -- one was football, one was basketball.

THE COURT:  Okay.  Thank you.

PROSPECTIVE JUROR:  Juror No. 40.  Again, my brother, several assaults.  Several of those resulted in hospital stays with trauma to the head.

THE COURT:  Okay.  Thank you.

PROSPECTIVE JUROR:  Juror 17.  My father, he suffered a severe head trauma in a DUI.  A guy was driving drunk, and it was a very fatal accident and he died.

THE COURT:  Oh, I'm sorry.  Thank you.

PROSPECTIVE JUROR:  Juror 13.  When I was 8, I fell and got a concussion and required stitches.

THE COURT:  Okay.  Thank you.

PROSPECTIVE JUROR:  Juror 11.  Concussion, sports-related, as a teenager.

THE COURT:  Soccer?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Okay.  Thank you.

PROSPECTIVE JUROR:  Juror 9.  When I was jumped in Oklahoma, I had a beer bottle smashed over my head and had eight stitches.

THE COURT:  Okay.  Thank you.

PROSPECTIVE JUROR:  Juror No. 2.  I had concussions through sports-related incidences.  And my daughter is kind of a klutz so she fell, hit her head on a rock, and split her head open.

THE COURT:  Okay.  Thank you.

PROSPECTIVE JUROR:  Number 7.  My brother has had several injuries to the head.

THE COURT:  And from?

PROSPECTIVE JUROR:  One was gang related and the other one was yard work.

THE COURT:  All right.  Thank you.

Not having heard any evidence, is there anyone leaning toward finding in favor of one party or the other at this

point?  Other than what you've already told me.

Is there any reason you can think of that might prevent you from being a fair and impartial juror in this case, other than what you've already told me?

As you sit here now, does the plaintiff or the defendant start out even or does someone feel that one starts out a little ahead of the other?  Other than what you've already told me.

No response to any of those questions.

I'm going to take a short moment to speak to the lawyers.  Would counsel approach, please.

(At sidebar on the record.)

THE COURT:  Okay.  These are the jurors I suggest we let go at this time based on either hardship or cause.

Number 16, he has a financial burden, working at a stage show and he'd lose apparently some sort of standing to do his job.

Anybody have any objection to 16?

MR. BLACKWELL:  No objection.

MS. WIENEKE:  No objection.

THE COURT:  Okay.  16 is struck.

22 is a volunteer for softball Little League.  Any objection to 22?

MR. BLACKWELL:  No objection.

MS. WIENEKE:  No objection.

THE COURT:  39 has to take the child to school and is self-employed.

MR. BLACKWELL:  No objection.

MS. WIENEKE:  No objection.

THE COURT:  37, two jobs, and looks like she works a lot of hours.

MR. BLACKWELL:  No objection.

MS. WIENEKE:  No objection.

THE COURT:  34 just started a new job.

MR. BLACKWELL:  No objection.

MS. WIENEKE:  No objection.

THE COURT:  43 takes her daughter to school in the morning.

MR. BLACKWELL:  No objection.

MS. WIENEKE:  No objection.

THE COURT:  5, a 14-year-old back --

MR. BLACKWELL:  No objection.

THE COURT:  -- back surgery.

MS. WIENEKE:  No objection.

THE COURT:  17 can't be fair.  Any objection?

MR. BLACKWELL:  17?  No objection.  I remember 17.

MS. WIENEKE:  No objection.

THE COURT:  12 can't be fair.

MR. BLACKWELL:  No objection.

MS. WIENEKE:  No objection.

THE COURT:  38 can't be fair.

MR. BLACKWELL:  No objection.

MS. WIENEKE:  One moment, Your Honor.

THE COURT:  She's the one who said she felt like she'd have to explain -- if she found for the plaintiff, that she'd have to explain to her brother and her sister-in-law, who are Phoenix PD.

MS. WIENEKE:  If I can just have a moment, Your Honor.

THE COURT:  Sure.

MS. WIENEKE:  I don't have her on my list.  My recollection of her, she was kidding.

THE COURT:  I didn't think she was kidding.  She said she could be fair but she did say she'd have to explain to her brother and sister-in-law, who work for the Phoenix Police Department.

MS. WIENEKE:  Right.  And I'm still looking for my notes, Your Honor.  But also --

THE COURT:  Did you have an objection or not?

MS. WIENEKE:  Yes, I have an objection.

THE COURT:  Okay.  I'll let you try to rehabilitate her then.

Number 4, unpleasant experience regarding the death threats.  Any objection?

MR. BLACKWELL:  No objection.

MS. WIENEKE:  No objection.

THE COURT:  Number 16 can't be fair.  We've already got 16 gone.  Never mind.

29 can't be fair.

MR. BLACKWELL:  No objection.

MS. WIENEKE:  No objection.

THE COURT:  These are the ones I have.  Does anyone have any others?  This isn't the time to argue for cause, just for one you think we can all agree on to narrow the field.  Any others?

MR. BLACKWELL:  One second, Judge.

Judge -- oh, she's gone already.

THE COURT:  Okay.  Any --

MR. BLACKWELL:  I don't think so, Judge.

THE COURT:  Do you have any?

MS. WIENEKE:  Yes, Your Honor.

The only one that I would say is Juror No. 21 appeared to be sleeping.  I don't know if you noticed it from your vantage point.

THE COURT:  I did see it.

MS. WIENEKE:  He appeared to be sleeping throughout the entire time.  Or not the entire time but --

THE COURT:  I'll take a close look at him.

MS. WIENEKE:  Okay.  Thank you.

(End of discussion at sidebar.)

THE COURT:  All right.  The following jurors are

excused, and I want to thank you for participating and your willingness to serve.

Juror No. 16.  Juror No. 22.

THE COURTROOM DEPUTY:  They can leave their numbers on their chairs.

THE COURT:  Leave your numbers on your chairs when you leave, and you're free to go home now.  Thank you for serving. But leave your numbers on your chair and you can head out the door.

39.  37.  34.  43.  14.  17.  12.  29.

MR. BLACKWELL:  Your Honor, may we approach?

THE COURT:  Okay.  Hang on.  Wait.

(At sidebar on the record.)

MR. BLACKWELL:  Did you say 14?

MS. WIENEKE:  It should have been 4, not 14.

MR. BLACKWELL:  It should have been 4, not 14.

THE COURT:  I'm sorry.  I'm sorry.  Yeah.

(End of discussion at sidebar.)

THE COURT:  14, I misspoke.  14 is still on.  4 is excused to go.

(The Court and the courtroom deputy confer.)

THE COURT:  29.  She's going to catch 14, I hope.

While we're waiting, what we're going to do is everyone has a number on the back of your card, or questions on the back of your number.

Starting with Juror No. 1, would you please stand up and answer those questions on the back of your number.

PROSPECTIVE JUROR:  Juror No. 1.  I've lived in Tucson for six years.  I have a year and a half of junior college, majored in computer science.  I'm married at the present time. I have a son and a daughter and a stepson.  I am retired, and my spouse is retired.  I served on a federal jury about eight years ago on a civil suit.

THE COURT:  Thank you.

Hang on a second.  Were you the foreperson of that jury?

PROSPECTIVE JUROR:  No, I was not.

THE COURT:  Okay.  Thank you.

We've been going about 90 minutes.  Let's take a short recess.  We'll come back at 10 after 11:00.  During the recess, do not talk to anybody about this case.  Don't let anybody talk to you about the case.  Don't do any research.  Don't do any investigation.  Come right back here in the same seats you're in and we'll finish up.

You're excused.

(Prospective jurors not present.)

THE COURT:  Okay.  Is there anything we need to take up before we recess?

MS. WIENEKE:  Your Honor, is 14 gone?

THE COURT:  We can't catch her.  We tried.  And I

apologize.  It was -- I meant 4 and it was came out as 14 because I -- I don't know.  I don't know how that -- I've got 5 -- right next to 5, I have 14-year-old back surgery, and maybe that's where I came up with 14.  I don't know.

All right.  So I need to get rid of 5 still.  Okay.

MR. BLACKWELL:  Judge, if this -- before you spoke to us, Judge, we had already informed Ms. Wieneke that -- just now that we were going to strike her anyway, so just to let the Court know.

THE COURT:  Okay.  Well, I --

MS. WIENEKE:  Well, no --

THE COURT:  Regardless, that shouldn't have happened and I --

MR. BLACKWELL:  Totally understand.

MS. WIENEKE:  Well, I want to make clear, that was the plaintiff's position; it was not the defendant's position.

THE COURT:  I understand that.  I had no intention to let that juror go, and that wasn't my intention.  So that -- there was nothing that that juror said that I would have struck her for cause.  Okay.  At least as of the time she left.

MR. BLACKWELL:  Thank you, Judge.

THE COURT:  All right.  Anything else to bring up?

MS. WIENEKE:  No, thank you, Your Honor.

THE COURT:  Okay.

(Recess taken, 10:48 a.m. to 11:09 a.m.)

(Prospective jurors present.)

THE COURT:  Please be seated.

Juror 14, thank you for coming back.  I apologize.

PROSPECTIVE JUROR:  Yeah.  I do want to be honest, Your Honor, I did look up the case information on the way down in the elevator.  I don't know if that makes a difference.

THE COURT:  So what did you look at?

PROSPECTIVE JUROR:  AZCentral.

THE COURT:  Okay.

PROSPECTIVE JUROR:  I read the article about what happened.

THE COURT:  Okay.  All right.  Was there anything that you read in that article that you think would cause you to favor one side or the other?

PROSPECTIVE JUROR:  No.  No.

THE COURT:  Okay.  All right.  Thank you.

I know what happened.  I was looking at my notes, and Juror No. 5 was the one I was supposed to let go.  And next to my notes is "14-year-old daughter with back surgery."  So I read the 14 and said 14 instead of 5.

So Juror No. 5, you're excused and I apologize.

You didn't miss anything.  Where we were was we were asking each juror to answer the questions on the back of their numbers, and we're at Juror No. 2 now.

PROSPECTIVE JUROR:  Juror No. 2.  General location of

UNITED STATES DISTRICT COURT

my residence is Apache Junction.  Education, I do have some college.  I do have a CDL Class A license.

Let's see.  My marital status is single right now.  I have two children.  One of them is 10, and one of them is 6.  I work for a plumbing company, and my spouse works for an animal hospital.  And I have no prior jury experience.

THE COURT:  And what do you do?

PROSPECTIVE JUROR:  I work for Cooper Sewer and Drain.  I go out and I dig up septic tanks or I do rooterings and stuff like that.

THE COURT:  All right.  Thank you.

PROSPECTIVE JUROR:  You're welcome.

PROSPECTIVE JUROR:  Thank you.  Juror No. 3.  I live in Sun Lakes, Arizona.  I'm married.  One child.  Self-employed, husband and myself.  And criminal trial about 20 years ago.

THE COURT:  Okay.  Were you the foreperson of that jury?

PROSPECTIVE JUROR:  No, I was not.

THE COURT:  Was there a verdict in that case?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Do you remember what it was?

PROSPECTIVE JUROR:  It was a mistrial, actually, so I guess --

THE COURT:  All right.  Thank you.

PROSPECTIVE JUROR:  Juror No. 6.  I live in northern Peoria.  I have a college degree in business administration.  I'm married with two children.  My wife and I are both retired.  And I have not served on a jury but been called several times.

THE COURT:  All right.  Thank you.

And what did you do before you retired?

PROSPECTIVE JUROR:  I was in -- just before I retired I was in healthcare insurance software.  We wrote the software, not the insurance company.

THE COURT:  Okay.  And what did your wife do before she retired?

PROSPECTIVE JUROR:  She was an RN, Banner Health.

THE COURT:  All right.  Thank you.

PROSPECTIVE JUROR:  Number 7.  I live in downtown Phoenix.  I have some criminal justice studies.  Single, no children.  And I work for TSA.  And no prior jury service.

THE COURT:  And what do you do for TSA?

PROSPECTIVE JUROR:  I'm a transportation security officer.

THE COURT:  What does that mean?

PROSPECTIVE JUROR:  I work at the checkpoint.

THE COURT:  Okay.

PROSPECTIVE JUROR:  Screening.

THE COURT:  All right.  Thank you.

PROSPECTIVE JUROR:  Juror No. 8.  General location is

central Phoenix.  No education after high school.  Marital status, I am married.  No children.  I am an operations manager.  My spouse is a flight attendant.  And no prior jury service.

THE COURT:  What does an operations manager do?

PROSPECTIVE JUROR:  Manage --

THE COURT:  Operations?

PROSPECTIVE JUROR:  Yeah.  Just oversee several supervisors, making sure we run smoothly.

THE COURT:  And who do you work for?

PROSPECTIVE JUROR:  Home Depot.

THE COURT:  Thank you.

PROSPECTIVE JUROR:  Juror No. 9.  Chandler.  I have a BA in marketing from ASU.  Divorced.  Two children.  I'm a retail manager.  And I have not served on a jury prior.

THE COURT:  All right.  Thank you.

PROSPECTIVE JUROR:  Juror No. 10.  I live in Surprise, Arizona.  I have a bachelor's in sociology.  I am married.  I have two children.  I worked in a variety of fields:  a time in social welfare, telecommunications marketing, and most recently, retail housewares.  And my husband is a semi-retired chemical engineer.

And I have served on a jury before in the Commonwealth of Virginia.  It was a civil case, and I was the foreman.

THE COURT:  You were the foreperson?  Okay.  Thank

you.

PROSPECTIVE JUROR:  Juror 11.  I live in Phoenix.  I have a bachelor's in science and a medical degree.  And I'm divorced and I have two children, 8 and 4.  And I'm employed, Dignity Healthcare at St. Joseph's.  And I have not served on a jury.

THE COURT:  Thank you.

PROSPECTIVE JUROR:  I'm Juror 13.  I live in Phoenix.  I have a bachelor of fine arts and an MBA.  I am not married and I don't have children.  I'm employed at the University of Phoenix.  And I have not served on a jury previously.

THE COURT:  What do you do at the University of Phoenix?

PROSPECTIVE JUROR:  I'm an academic counselor.

THE COURT:  Okay.  Thank you.

PROSPECTIVE JUROR:  Juror No. 14.  I live in north Phoenix.  I do have a paralegal certificate.  I am married.  I have one child.  My husband and I both own our businesses together.  And I have served on a criminal trial before, and I was the foreman.

THE COURT:  You were the foreperson?

PROSPECTIVE JUROR:  Yes.

THE COURT:  And was there a verdict in that case?

PROSPECTIVE JUROR:  Yes.  Second degree murder.

THE COURT:  Okay.  Guilty?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Okay.  Thank you.

PROSPECTIVE JUROR:  Juror No. 15.  Reside in Phoenix. Accounting degree.  Divorced.  Two girls.  Unemployed at this time.  And I've never served on a jury.

THE COURT:  What do you do when you're employed?

PROSPECTIVE JUROR:  I worked for a furniture company, a large furniture company, in customer service.

THE COURT:  Okay.  Thank you.

PROSPECTIVE JUROR:  Juror No. 18.  General education. I live in Gilbert.  I am married at this time.  I have two adult children.  I am employed at Valley Metro.  I'm a utility relocation specialist, and my wife works for a tech firm here in town.  And I have served on a criminal jury in the past.  It was a rape case, and it was an acquittal.

THE COURT:  Were you the foreperson?

PROSPECTIVE JUROR:  No, I was not.

THE COURT:  All right.  Thank you.

PROSPECTIVE JUROR:  Juror No. 19.  I live in east Chandler.  I have a BS in physics from Arizona State University.  I am married.  We do not have children.  I am a tutor for the NROTC at Arizona State, and my husband works in e-discovery for Epic Systems.  And I have not served on a jury.

THE COURT:  What's NROTC?

PROSPECTIVE JUROR:  The Naval ROTC at Arizona State.

THE COURT:  Oh, they have Navy there now?

PROSPECTIVE JUROR:  Uh-huh.

THE COURT:  All right.  Thank you.

PROSPECTIVE JUROR:  Juror No. 20.  I live about an hour away from Yuma in a small town, Wellton.  I've had a high school education, a little bit of college.  I'm married.  I have three children.  My spouse and I are both retired.

I served -- well, I was called for jury duty in Yuma last year.  I didn't get chosen.  And I lived in Michigan, and I served on a jury there in Detroit.

THE COURT:  Okay.  And what did you do when you were employed?

PROSPECTIVE JUROR:  I was a cook.

THE COURT:  Okay.  And the trial you served on in Virginia, what kind of case was it?

PROSPECTIVE JUROR:  No, I served on a trial in Detroit.

THE COURT:  Detroit, I'm sorry.  What kind of case was it?

PROSPECTIVE JUROR:  It was a criminal case.

THE COURT:  Were you the foreperson of the jury?

PROSPECTIVE JUROR:  No.

THE COURT:  Was there a verdict?

PROSPECTIVE JUROR:  Yes.

THE COURT:  What was the verdict?

PROSPECTIVE JUROR:  Guilty.

THE COURT:  Okay.  Thank you.

What was the charge?

PROSPECTIVE JUROR:  Robbery.

THE COURT:  Okay.  Thank you.

PROSPECTIVE JUROR:  Juror No. 21.  I live in Tempe.  I have a Bachelor of Science degree.  I am married.  We have no children.  I work in IT, and my spouse is a stay-at-home spouse.  And I've never served on a jury.

THE COURT:  Where do you work?

PROSPECTIVE JUROR:  I work for First American Title Insurance.

THE COURT:  Okay.  Thank you.

PROSPECTIVE JUROR:  Juror 24.  I live in Tempe.  I have a bachelor's in justice studies.  I'm married.  I have two kids, 13 and 10.  I'm employed by Farmers Insurance, and my husband has a construction company.  And I've never been on a jury.

THE COURT:  Okay.  Thank you.

PROSPECTIVE JUROR:  I'm Juror 25.  I live in Chandler. I have a BA in elementary education from ASU.  I'm married.  I have four sons.  I am retired now from teaching, and my husband works -- he's a software analyst for Charles Schwab.  And I've never been on a jury before.

THE COURT:  And how long did you teach?

PROSPECTIVE JUROR:  I taught for six years.

THE COURT:  And where?

PROSPECTIVE JUROR:  In Mesa public schools.

THE COURT:  Was there a particular subject or grade that you taught?

PROSPECTIVE JUROR:  Fourth grade, yeah.

THE COURT:  Okay.  Thank you.

PROSPECTIVE JUROR:  Number 26.  I live in Gilbert, and I'm currently majoring in psychology.  I'm single, no kids.  I work at a home interior company primarily as a customer service rep, and I'm a server.  And I've never been on a jury before.

THE COURT:  Are you currently in school?

PROSPECTIVE JUROR:  Yeah.

THE COURT:  Are you missing school for this jury trial?

PROSPECTIVE JUROR:  No.  No.  I start in May, so yeah.

THE COURT:  Well, this would be a good experience for a psychology major.

PROSPECTIVE JUROR:  Yeah.

THE COURT:  Sitting in a jury trial.

PROSPECTIVE JUROR:  Hello.  Juror No. 27.  I live in Phoenix.  I had -- I have some credits for Phoenix College, so some college credits.  I'm not married, no children.  I work for Waste Management.  And this is my first time at a jury.

THE COURT:  I didn't understand.  Who do you work for?

PROSPECTIVE JUROR:  At Waste Management.

THE COURT:  Waste Management, okay.

PROSPECTIVE JUROR:  Yes.

THE COURT:  And what do you do there?

PROSPECTIVE JUROR:  Sales.

THE COURT:  Okay.  Thank you.

PROSPECTIVE JUROR:  Yep.

PROSPECTIVE JUROR:  Juror 28.  I live in Peoria.  A bachelor's in business.  I'm married, no children, and both my husband and I are retired.  And I've never served on a jury before.

THE COURT:  Hang on a second.  What did your husband and you do before you retired?

PROSPECTIVE JUROR:  I was in sales and my husband was in retail.

THE COURT:  All right.  Thank you.

PROSPECTIVE JUROR:  Juror No. 30.  I live in Glendale. I have a bachelor's in business with majors in accounting and finance.  Married with two children, ages 17 and 15.  My wife and I both work for American Express.  And I have no prior jury experience.

THE COURT:  What do you and your wife do for American Express?

PROSPECTIVE JUROR:  I am the director of merchant pricing, and my wife's a manager, also on the merchant side.

THE COURT: All right. Thank you.

PROSPECTIVE JUROR: Juror 31. I live in Avondale. Some college. I am divorced. Two girls, I have two girls. I worked for the State of Arizona for almost 29 years, most of that with the Department of Corrections, and I'm currently at the Department of Child Safety as a chief human resources officer. And I've been on the selection process a couple times for a jury but never selected.

THE COURT: All right. Thank you.

PROSPECTIVE JUROR: Juror No. 32. I live in Ahwatukee. I have some college. Married. Three adult children. I'm employed as an office manager for a management consulting firm. I also work part-time at Arizona State University. I have had some jury duty. I was on one case, DUI, and I was not the foreperson.

THE COURT: What kind of case was it?

PROSPECTIVE JUROR: DUI.

THE COURT: DUI? Was there a conviction or an acquittal?

PROSPECTIVE JUROR: They were guilty.

THE COURT: Okay. Thank you.

PROSPECTIVE JUROR: Juror No. 33. I live in north Phoenix. I have a four-year bachelor's degree in accounting. I'm married. I have two children, ages 6 and -- no, 5 and 7. I'm employed. I'm a senior accountant at Albertson's

companies.  My husband is a database administrator for PetSmart.  And I've never served on a jury.

THE COURT:  Thank you.

PROSPECTIVE JUROR:  Juror No. 35.  I live in Chandler, Arizona.  I have a bachelor's degree in electrical engineering.  Not married.  No children.  Employed by Pearson as a math test scorer.  And I have prior jury service, and it was a criminal trial.

THE COURT:  Was there a verdict in that case?

PROSPECTIVE JUROR:  Yes.  They were convicted.

THE COURT:  And were you the foreperson?

PROSPECTIVE JUROR:  No.

THE COURT:  What was the charge?

PROSPECTIVE JUROR:  It was a child abuse, like sex case.  I don't remember the specifics.

THE COURT:  All right.  Thank you.

PROSPECTIVE JUROR:  Number 36.  I live in Ahwatukee.  I have two years of community college at Mesa Community College.  I'm divorced.  I have two children.  I'm retired from Bank of America.

And I worked on two prior juries.  One was with the State of Arizona AHCCCS program against the doctors, I think, that started it here from Chicago.  And the other one was two business partners suing each other.

THE COURT:  So it sounds like they were both civil

cases.  Is that right?

PROSPECTIVE JUROR:  Yeah, I think so.

THE COURT:  Were you the foreperson in either trial?

PROSPECTIVE JUROR:  No, I was not.

THE COURT:  Okay.  Thank you.

PROSPECTIVE JUROR:  Thank you.

PROSPECTIVE JUROR:  Juror No. 38.  I live in Gilbert. I have a bachelor's in political science and a master's of elementary education.  I am married.  I have four children.  I have a 13-year-old and a 15-year-old still at home.  I do reading tutoring.  My husband's an electrical engineer.  And I've never served on a jury.

THE COURT:  Thank you.

PROSPECTIVE JUROR:  Juror No. 40.  Phoenix.  Some college.  I am married.  Two children, 9 and 1.  I am a business banker with Chase.  My wife is an RN at Dignity Health.  And no prior jury experience.

THE COURT:  All right.  Thank you.

PROSPECTIVE JUROR:  Juror No. 41.  Chandler, Arizona. I'm currently a student getting my BA in leadership.  I am married.  No children.  I currently work for Amazon Seller Support.  My husband as well works for Amazon Seller Support. And I have no prior jury service.

THE COURT:  Thank you.

PROSPECTIVE JUROR:  Juror No. 42.  I live in south

Tempe.  I have a bachelor's degree from the University of Iowa. I'm married.  I have two children:  a daughter, junior in college; a son, junior in high school.  I'm currently employed part time for a performance apparel company for bands, choirs, orchestras.  My husband is a sales manager.  And no prior service before with a jury.

THE COURT:  Thank you.

PROSPECTIVE JUROR:  I'm Juror No. 44.  I live in El Mirage, Arizona.  I have an AA degree in early childhood education.  Divorced.  Six children, one of which is still under 18.  She's 14.  So I'm a Head Start teacher right now, been for 26 years.  And I've been in jury selection 20 years ago but was not chosen.

THE COURT:  Thank you.

PROSPECTIVE JUROR:  Juror No. 45.  I live in Peoria. I have two years' college.  I'm married.  I have one adult child.  I'm an assistant controller.  My spouse is a CIO.  I have served on a jury once before about 25 years ago in a criminal case.

THE COURT:  Were you the foreperson?

PROSPECTIVE JUROR:  No.

THE COURT:  All right.  Thank you.

PROSPECTIVE JUROR:  Juror 46.  I live in Scottsdale. I have a Bachelor of Science and an MBA.  I am married.  I have two children.  I am mostly retired.  My wife is in between

jobs.  And I've never done this before.

THE COURT:  And what do you do?

PROSPECTIVE JUROR:  Supply chain stuff.  I was in purchasing for 20 years and just everything along that line.

THE COURT:  And what are you doing now?

PROSPECTIVE JUROR:  I do a little bit of consulting.  Mostly just sit around and watch TV.

THE COURT:  I just don't understand.  Who do you consult with?

PROSPECTIVE JUROR:  Smaller companies, start-ups, things like that.

THE COURT:  Supply chain stuff?

PROSPECTIVE JUROR:  Yeah.

THE COURT:  Okay.  Thank you.

PROSPECTIVE JUROR:  Juror No. 47.  I live in Peoria.  Education, I have a Bachelor of Science in fashion marketing, an MBA, and a master's in management.  I am married.  I have one child, who's 4.  I am an executive director for Empire Beauty School, and my husband is the director of IT for Arizona Kidney and Hypertension Disease Centers.

And I have served prior jury service back in Wisconsin.  It was a criminal case, and they were found guilty.

THE COURT:  Were you the foreperson?

PROSPECTIVE JUROR:  No.

THE COURT:  Thank you.

PROSPECTIVE JUROR:  I'm Juror 48.  I live in Maricopa, Arizona.  I have a little college after high school.  I'm married.  My wife and I have 10 children.  We also have 10 grandchildren under the ages of 18 that live in our residence.  And like I say, I work with the Phoenix Veterans Administration, and my wife is a shipping and receiving clerk at Lowe's.  And I have not been on a prior jury.

THE COURT:  Thank you.

PROSPECTIVE JUROR:  I'm Juror No. 49.  General location is Yuma, Arizona.  I live in the Foothills.  I have got three years of college after high school.  Majored in theology.  Marital status, I am a widower.  I have seven sons.  They're all over the age of 18.  And right now I am retired.

And prior jury service, I was on the grand jury in Yuma for three months, back about eight years ago.  Then I was called again about four years ago, but I wasn't selected.

THE COURT:  Okay.  Thank you.

PROSPECTIVE JUROR:  Juror No. 50.  I live in Peoria. I have a bachelor's in secondary education and a master's in educational leadership.  I'm married.  I have three children, ages 12, 10, and 5.  I am a junior high teacher.  My husband works for U-Haul.  And I have no prior jury service.

THE COURT:  Thank you.

PROSPECTIVE JUROR:  Juror No. 51.  I live in Goodyear, Arizona.  I have some college, about a year.  Marital status,

married.  I have two kids, 5 and 2.  And my current employment is Department of Defense.  I'm actually on Title 32 orders, deployed to the border right now.  Spouse is a stay-at-home mom.  And I have no prior jury service.

THE COURT:  All right.  Thank you.

Okay.  I just have a couple more questions.

Does anyone have any reason whatsoever such as a physical disability, a health problem, or home problems that might interfere with your serving as a fair and impartial juror in this case?  Anything that you haven't told me already?

No response.

Sometimes jurors think of answers to questions much after the time the question was asked.  Has anyone thought of any answers to questions I asked earlier that you didn't think of at the time the question was asked?

PROSPECTIVE JUROR:  I believe you asked if we knew another juror.  And I think I know number 6.

THE COURT:  Okay.  And how do you know number 6?

PROSPECTIVE JUROR:  My children are best pals with his grandson.

THE COURT:  Okay.  It sounds like you don't know each other very well.

PROSPECTIVE JUROR:  No.

THE COURT:  But this is a question for both of you.  If you both end up on this jury, in the jury room deliberating,

would the fact that you have this knowledge of him or knowledge of her interfere with your ability to stick with your own beliefs in how you vote for the outcome of this case?

PROSPECTIVE JUROR:  No.  I'm quite stubborn.

PROSPECTIVE JUROR:  Juror 6, no.

THE COURT:  All right.  One last thing.

THE COURT REPORTER:  I need your number, ma'am.

THE COURT:  Your number?

PROSPECTIVE JUROR:  33.

THE COURT:  Is there anything I haven't asked you that you think either I or the lawyers should know about you before we decide who's going to be on this jury?

Okay.  No response.

At this time the lawyers will have an opportunity to ask you some questions.  Mr. Blackwell?

MR. BLACKWELL:  Thank you, Judge.

Juror No. 1?  How you doing, sir?

PROSPECTIVE JUROR:  Just fine, thank you.

MR. BLACKWELL:  Thank you.

I believe you stated earlier that your son was a -- I guess a sergeant, like a leader of a police force, a sergeant in Kansas; is that correct?

PROSPECTIVE JUROR:  That is correct.

MR. BLACKWELL:  And you stated earlier that there is no communication between yourself and your son about any of the

work he does?

PROSPECTIVE JUROR:  No, sir.

MR. BLACKWELL:  Do you have any kind of communication with your son at all?

PROSPECTIVE JUROR:  Yeah, we -- he's still in Kansas, of course, but we communicate about once a month.  And it's not about what he's doing on his job.  It's, is your job working out all right for you, the promotions and what have you.  He's happy with it.

He's very professional.  I've watched him through his whole career.  When he puts on the uniform, he becomes a police officer.  And I let it -- I let it go at that.  He's very professional about it.

MR. BLACKWELL:  All right.  And the Court had asked you earlier, as it pertains to whether your relationship with your son, knowing that he's a sergeant up in Kansas, would have any bearing on your ability to be fair and impartial.  I believe you said it wouldn't have any bearing on your ability to be fair and impartial; is that correct?

PROSPECTIVE JUROR:  That's correct.  No bearing at all.

MR. BLACKWELL:  All right.  And with that backdrop, knowing that this case involves an officer of the law and then a regular citizen, layperson, Ms. Winkler, from your perspective, your relationship with your son, would the fact

that he's an officer, would that, I guess, bubble up in your mind and maybe sway you either way against either the officer or Ms. Winkler?

PROSPECTIVE JUROR:  No, it wouldn't.  Actually, I think it would be interesting to hear the case and see what the facts actually reveal.

MR. BLACKWELL:  All right.  Number 14?  Number 14. Now, number 14, I know there was a mix-up and you left the courtroom.

PROSPECTIVE JUROR:  Right.

MR. BLACKWELL:  And I believe you informed us that while you were on the elevator, you had a chance to look at an article; is that correct?

PROSPECTIVE JUROR:  That's correct.

MR. BLACKWELL:  And that article was in the Arizona Central.

PROSPECTIVE JUROR:  It was on AZCentral.

MR. BLACKWELL:  Online, I would assume.

PROSPECTIVE JUROR:  Yes.

MR. BLACKWELL:  All right.  And did you have a chance to read the entire article?

PROSPECTIVE JUROR:  No.  About half.

MR. BLACKWELL:  Okay.  Did you see anything, see any pictures on the article?

PROSPECTIVE JUROR:  No.

MR. BLACKWELL:  All right.  And do you recall the date of the article?

PROSPECTIVE JUROR:  It was on the front page, but I can't -- I can't think of it now.

MR. BLACKWELL:  And when you came back, you informed the Court that based on your, I guess, reading of that article, and I'm paraphrasing, you still can be fair and impartial?

PROSPECTIVE JUROR:  Right.

MR. BLACKWELL:  All right.

PROSPECTIVE JUROR:  Yes.

MR. BLACKWELL:  And do you think your position now, if you were to become a juror, that you have more information about this case than the rest of this potential panel in this courtroom?

PROSPECTIVE JUROR:  I wouldn't say more information because it's the paper.  You're going to get one side, usually.

MR. BLACKWELL:  Right.  And in that side you received, you would agree, please correct me if I'm wrong, that because everyone else in this courtroom has said they don't know anything else about the case, you have a little bit more information than they would?

PROSPECTIVE JUROR:  Yes.

MR. BLACKWELL:  All right.  And if you can step outside yourself, if that's possible, would it be fair, from your perspective, if you were to stay on with this information

that you have that they don't have?  What do you think?

PROSPECTIVE JUROR:  That's a hard question to answer, honestly.

MR. BLACKWELL:  Why do you think it's hard to answer?

PROSPECTIVE JUROR:  Because you hear something and you don't know if it's necessarily the truth.  I mean, I guess I would have to hear both sides.  But it probably would play a little bit of a factor in the beginning, I would say, until I heard all the facts.

MR. BLACKWELL:  Okay.  And so what you learned may play a part in your determination of the facts in this case prior to hearing anything we may say; is that correct?

PROSPECTIVE JUROR:  Yes.

MR. BLACKWELL:  Now, let's say since you're here that there is another courtroom in this complex where a juror like yourself would be a part of that particular panel.  Would you think with your backdrop, meaning everything you know to this very point, would it be fair for you as a juror in this case with these parties to be in another courtroom determining the outcome of another potential case?

PROSPECTIVE JUROR:  Yeah.  Yes.

MR. BLACKWELL:  Okay.  Based on the fact that you may have read that article when you were on the elevator; correct?

PROSPECTIVE JUROR:  Right.

MR. BLACKWELL:  Number 15.  Now, number 15, I believe

you stated earlier that you were -- or you used to be a dispatcher.

PROSPECTIVE JUROR:  Correct.

MR. BLACKWELL:  And that was for a police agency?

PROSPECTIVE JUROR:  It was, yes.  In Florida.

MR. BLACKWELL:  How many years did you do that?

PROSPECTIVE JUROR:  It was just under a year.  It was about nine months.

MR. BLACKWELL:  Where were you at?

PROSPECTIVE JUROR:  Stuart, Florida.  East Coast. North of West Palm.

MR. BLACKWELL:  And when you were in that particular position, did you work with law enforcement?

PROSPECTIVE JUROR:  Of course, yes.

MR. BLACKWELL:  Did you receive a number of calls?

PROSPECTIVE JUROR:  Yes.

MR. BLACKWELL:  Now, if this particular case involved dispatch calls, with your backdrop, your experience as a dispatcher, do you think, kind of along the same lines of the questions I asked Juror No. 14, there may be a better case for you to sit on that doesn't involve dispatch calls, 911 calls, and officers?

MS. WIENEKE:  I object, Your Honor.  That's not the standard.

THE COURT:  Overruled.

MR. BLACKWELL:  What do you think?

PROSPECTIVE JUROR:  I don't believe so.  I mean, listening is what I did.  Listening and directing people to the right area of need.  I basically stood apart from that, so all I did was listen and just -- I was the implement to make action happen.

MR. BLACKWELL:  Now, with that, did you ever, when you were a dispatcher, think that this person is weird or this person shouldn't have called 911?

PROSPECTIVE JUROR:  Never.  That was not my job.

MR. BLACKWELL:  All right.  Okay.  Thank you.

THE COURT:  Mr. Blackwell, two minutes.

MR. BLACKWELL:  Thank you, Judge.

One more, if I may.

THE COURT:  Go ahead.

MR. BLACKWELL:  Thank you, Judge.

Juror No. 24.  Juror No. 24, please correct me if I'm wrong.  I was taking some notes down as you spoke earlier, and I believe you stated that -- there was a question about too many lawsuits.  Is that correct?

PROSPECTIVE JUROR:  Yes.

MR. BLACKWELL:  Do you remember that question?

PROSPECTIVE JUROR:  I do.

MR. BLACKWELL:  And I wrote down that you were one of the ones who raised your placard as it pertains to that

question about the too many lawsuits.

PROSPECTIVE JUROR:  Correct.

MR. BLACKWELL:  All right.  And what was it about the too many lawsuits?  When you thought about the question, what made you raise your placard?

PROSPECTIVE JUROR:  What made me raise my number was I'm in insurance, and part of my job was filing claims that people had against our insureds.  And a lot of our insureds are big businesses, and so they had these complaints that would a lot of times result in a lawsuit.

So I would see a lot of that come in, so that's why I --

MR. BLACKWELL:  And when you say you see a lot of it, from your perspective, does it give you any angst when you have a number of calls coming in when you're on the job about these lawsuits, people filing lawsuits?

PROSPECTIVE JUROR:  Yeah, because a lot of it's pretty ridiculous, yeah.

MR. BLACKWELL:  And in a case like this, I want to ask the same question.  Now, if there was another courtroom in this complex, all right, and in that courtroom it had nothing to do with a complaint against an individual like in this case, an officer, without knowing the facts, do you think you would present -- well, be a better juror in another courtroom that had nothing to do with, like, filing a complaint against

anyone?

PROSPECTIVE JUROR:  I think what I had seen with my job and what's going on here has -- I can separate myself from that.  I don't think it would affect how I would serve on a jury.

MR. BLACKWELL:  Okay.  And then just my last question on this point:  If you were -- if you were up there and you became a member of our panel, if -- do you believe that you could keep -- well, do you believe that there would be no way for your feelings about multiple lawsuits being filed, and I'm going to paraphrase, frivolous lawsuits being filed, from your perspective, would you keep that from bubbling up in your mind and affecting your ability to be fair and impartial during the proceedings in this courtroom?

PROSPECTIVE JUROR:  I believe so.

MR. BLACKWELL:  Okay.  Thank you, Judge.

THE COURT:  All right.  Thank you.  Ms. Wieneke?

MS. WIENEKE:  Thank you, Your Honor.

Good afternoon, ladies and gentlemen.  Or morning, I suppose, still.

Juror No. 24, if I could just piggyback on Mr. Blackwell's question to you.  You understand that not -- none of you have heard a single bit of evidence in this case.  Given what you do for a living, do you believe that you can set that aside, come into this courtroom, sit in that jury box,

listen to the evidence, and decide this case based on the facts that you hear in this courtroom?

PROSPECTIVE JUROR:  Yes.

MS. WIENEKE:  And are you confident of that?

PROSPECTIVE JUROR:  Yes.

MS. WIENEKE:  Thank you.

And let me ask that same question, that line of questioning to Juror No. 14.  Regardless of how many cases are going on in this courthouse today, this is the case that my client and Ms. Winkler is concerned with.  And I want to ask you that question.

We all bring our life experiences into this room.  We can't just set those aside.  But what both of these folks are interested in is are you willing to set aside whatever you read in that newspaper, right, because that's not evidence, listen to what the witnesses have to say that are going to come into this courtroom and sit on that witness stand, look at the exhibits that you're going to be given, and understand that's the evidence, and decide this case based on that evidence, disregard whatever you may have read in that newspaper.  Juror No. 14, I want you to look into your soul and tell us, can you do that?

PROSPECTIVE JUROR:  Yes.

MS. WIENEKE:  And do you believe that you can give these two folks a fair shot and be fair and impartial and

decide this case based on the evidence you hear?

PROSPECTIVE JUROR:  Yes.

MS. WIENEKE:  I'd like to ask Juror No. 9 -- pick on you a little bit.  You've all had to answer some questions and we're probing into your background, and that's part of this process.  You were kind enough to share some personal information about you, and you said you had been assaulted back in Oklahoma.

PROSPECTIVE JUROR:  Yep.  That's correct.

MS. WIENEKE:  Now, I'm sure that was not a good experience for you.  Is there something about that experience that may kind of color the way you see the evidence in this case?  Maybe how you color Ms. Winkler's experience and what she's going to have to say or maybe how you color what Officer Gillespie is going to have to say in this case, looking deep into your soul?

PROSPECTIVE JUROR:  Honestly, probably not the evidence itself, but the whole experience of being in the room is very uncomfortable, having gone through it personally.  Having to be a witness.  Having to relive memories.  This is not a comfortable situation for me at all, and I would rather not be here.

MS. WIENEKE:  And thank you for your candor.  Because things and experiences that we've had in the past, they can be triggered by things we're experiencing in the moment.  And so

what I'm asking you, Juror No. 9, is as you're here and you see people get on that witness stand, knowing that you were on that witness stand as well, do you think that that might trigger you and take you back to your experiences and maybe you won't be paying as close attention as if you had not experienced those experiences yourself?

PROSPECTIVE JUROR:  I think it could distract me, absolutely.

MS. WIENEKE:  And if you're not willing to give that full attention, not because you're not trying but because of what you experienced, those traumatic events in your life, do you believe if you were sitting in Ms. Winkler's shoes or if you were sitting in Mr. Gillespie's shoes that maybe that you couldn't be as fair and impartial, not because you're not trying but because of your own experiences?

PROSPECTIVE JUROR:  Yes, I believe that I could not be impartial.

MS. WIENEKE:  Okay.  Well, thank you so much for your candor.

I want to ask Juror No. 7 a little bit more about your background.  You are studying justice studies, and you work as a transportation officer at the airport.

PROSPECTIVE JUROR:  Correct.

MS. WIENEKE:  But you've also shared with us some experiences about your family members --

PROSPECTIVE JUROR:  Correct.

MS. WIENEKE:  -- and some troubles that they've had with law enforcement officials; right?

PROSPECTIVE JUROR:  Correct.

MS. WIENEKE:  If you were sitting in Officer Gillespie's shoes, I just want to ask you, sir, would you be comfortable, given your life experiences, with you sitting as a juror?

PROSPECTIVE JUROR:  Not really.

MS. WIENEKE:  And why is that?

PROSPECTIVE JUROR:  I have a huge support for law enforcement, and I'm currently in the process of being hired on Phoenix PD.  So I -- I don't feel like I would be comfortable.

MS. WIENEKE:  So you think you might be tipping a little more in favor of Officer Gillespie and against Ms. Winkler?

PROSPECTIVE JUROR:  Yes.

MS. WIENEKE:  All right.  Well, thank you for your candor.

Is there anybody on the panel right now who maybe feels the opposite way, that right now their scales of justice, which are supposed to start out even, aren't quite even, maybe they're tipped a little in favor of Ms. Winkler and against Officer Gillespie?  Is there anybody who feels that way right now?

THE COURT:  Two minutes.

MS. WIENEKE:  Thank you, Your Honor.

Juror No. 11, our radiologist.  Now, you obviously have the education and experience in medicine, and in particular, reviewing CT scans, MRIs, things like that.  You bring with you your life experiences and your knowledge of medicine.

You're going to hear from probably a medical doctor that Ms. Winkler's going to call to the stand, and his testimony may be on a limited subject.  Do you believe that you could set aside your knowledge of medicine and just listen to that evidence that that physician may talk about and limit your understanding of that based on what that evidence is in this courtroom, and not bring your body of knowledge into this courtroom, and limit it to this courtroom?

I didn't say that very well, but I hope you understood my question.

PROSPECTIVE JUROR:  I do -- I do understand, and yes, I believe I can do that.

MS. WIENEKE:  All right.  And so just to be clear, you kind of have to close that gate; right?  You can't let that floodgate of your understanding and knowledge come into this courtroom.  Are you confident that you can do that?

PROSPECTIVE JUROR:  I am.

MS. WIENEKE:  Okay.

All right.  And then Juror No. 3, I think you told us that you were self-employed, and I just wanted to find out a little bit more about your employment history, if you could share that with us.

PROSPECTIVE JUROR:  I started a business 15 years ago designing fabric and handbags for the quilting industry.  I've since gone on to write 52 patterns that are circulated around the world.

MS. WIENEKE:  And do you do this business online, or do you have a physical brick-and-mortar structure?

PROSPECTIVE JUROR:  Mostly online, but I sell to distributors who sell to stores all over the world.

MS. WIENEKE:  Okay.  All right.  Thank you for that.

PROSPECTIVE JUROR:  Thank you.

MS. WIENEKE:  And then Juror No. 20 -- pardon my back.  Just need to make sure that I'm speaking into the microphone.

Are you still living in Wellton?

PROSPECTIVE JUROR:  Yes.

MS. WIENEKE:  And will you have to drive to and from the courthouse every day?

PROSPECTIVE JUROR:  Well, I stayed at a hotel yesterday, so if the State will pay for me to stay here, that's what I would do because it's a long drive back and forth.  Two and a half hours home, two and a half hours back.  So...

MS. WIENEKE:  Right.  So would you -- if -- you would

have to make that drive every day, then, if you can't stay in a hotel.  Right?

PROSPECTIVE JUROR:  Right.

MS. WIENEKE:  And would that be a hardship for you?

PROSPECTIVE JUROR:  Yeah, because my husband has to drive me because I recently had knee surgery.

MS. WIENEKE:  I see.  I see.  All right.  Okay.

And I think my time is up, so thank you very much.  Thank you, everyone.

THE COURT:  Okay.  We're going to take a lunch recess.  We'll come back at 1:30.  During the recess, do not talk to anybody about this case.  Don't let anyone talk to you about this case.  You can tell your friends, your family, your employers that you are on a jury panel and that you expect it to last four days.

And don't try to do any research.  Don't look up on AZCentral what this case is about, and -- or anyplace else.  Don't try to investigate the parties, the lawyers, or anybody else.  Everything you need to know about this case you'll learn in this courtroom.

So please have a good lunch.  Leave your numbers on your chairs.  You come back to this courtroom.  You'll assemble in the back area over there, and Michele will announce who's selected.

Juror No. 14, would you stay please, though, for a

second?

Everybody else, we'll see you back here at 1:30. You're excused.

(Prospective jurors not present.)

(Juror No. 14 present.)

THE COURT:  Please be seated.

Juror No. 14, you didn't do anything wrong.  It was my fault.

THE COURTROOM DEPUTY:  We still have one juror.

THE COURT:  The jurors have to all leave.  Is there a juror in here?

(Prospective jurors not present.)

THE COURT:  I'd like to find the article you read so the lawyers can look at it and see --

PROSPECTIVE JUROR:  Okay.

THE COURT:  Can you pull -- do you have your phone with you or whatever --

PROSPECTIVE JUROR:  Yes, I do.

THE COURT:  Can you pull it up and let the lawyers look at it?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Okay.  Have the lawyers had a chance to review the article?

MR. BLACKWELL:  Yes, Judge.

THE COURT:  Ms. Wieneke?

MS. WIENEKE:  Yes.

THE COURT:  Did you review -- okay.

Juror No. 14, just so it's clear for the record, having read that article, have you formulated any opinions about this case?

PROSPECTIVE JUROR:  Not -- well, not really but, I mean, the money factor did play a part.

THE COURT:  Okay.  All right.  Would it make a difference to you if I told you the jury in this case isn't deciding the money that's going to be -- the jury only decides whether the plaintiff has proven responsibility by the officer. That's all the jury's going to decide in this case.

PROSPECTIVE JUROR:  Okay.  Yeah, that would be a little bit different, I guess.

THE COURT:  So how does the money play in your thinking, though?

PROSPECTIVE JUROR:  The whole frivolous lawsuit things, I guess, just thinking about people filing lawsuits for large amounts of money against the City.

THE COURT:  So you formulated an opinion that this may be a frivolous lawsuit where she's asking for a lot of money she's not entitled to?

PROSPECTIVE JUROR:  Possibly.

THE COURT:  All right.  Any follow-up questions?

Mr. Blackwell?

MR. BLACKWELL:  No, Judge.

THE COURT:  Ms. Wieneke?

MS. WIENEKE:  Yes, Your Honor.

Juror No. 14, as the judge explained, the only issue in this case is whether the officer is liable for false arrest or excessive force.  There will be no determination of damages.  You understand that?

PROSPECTIVE JUROR:  Yes.

MS. WIENEKE:  And with respect to the evidence that's going to be presented in this case, can you reserve judgment as to the final outcome based on the evidence, including the witnesses and the exhibits that you receive in this case?

PROSPECTIVE JUROR:  I think so, yes.

MS. WIENEKE:  Well, do you think so or --

PROSPECTIVE JUROR:  Yes.

MS. WIENEKE:  Okay.  All right.

THE COURT:  All right.  You're excused.  We'll see you back at 1:30.  Thank you.

(Juror No. 14 left the courtroom.)

THE COURT:  Please be seated.

Mr. Blackwell, do you have any strikes for cause or for hardship?

MR. BLACKWELL:  Yes, Judge.

Number 14.  Judge, when I asked the question, I recall her telling me when I was up there --

THE COURT REPORTER:  Can you please use the microphone.

MR. BLACKWELL:  When I asked the question -- I apologize.  When I asked the questions when I was up at the podium, Judge, I believe she stated that she would have a problem being fair and impartial.  I understand that when she spoke with Ms. Wieneke, then she changed her mind and pivoted and said she could be fair and impartial --

THE COURT:  Hang on a second.  I don't remember her saying she couldn't be fair and impartial.  Maybe I missed that.  My notes don't say that.  The only thing that caught my attention was her statement about frivolous lawsuits and her thought that this could be one of them based on the money the article mentioned.  That's the only issue I'd have with her.

MR. BLACKWELL:  Well, Judge, I apologize.  I'm sorry. I'm not apologizing for it.  We have a discrepancy, Judge.  We just have a discrepancy.  I recall her saying that she could not be fair and impartial when I asked the question specifically about the fact that she saw it, would it be fair -- maybe in my mind I'm saying -- I asked her, would it be fair --

THE COURT:  Hang on a second.  Let me review the transcript.

MR. BLACKWELL:  Yes, sir.

THE COURT:  Was this a question you asked just after

all the jurors had left?

MR. BLACKWELL:  No, sir.  It was a question that I asked at the podium when I was asking the questions of the various jurors that I spoke to.  One of the questions, the way I posed it, was in my -- from my memory, was based on the fact that you read an article and no one else in this courtroom has read that article, meaning on the panel.

THE COURT:  Oh, okay.

MR. BLACKWELL:  Would that be fair for you to stay on the jury.

THE COURT:  But she didn't say she couldn't be fair and impartial.  She didn't know what it meant, I think, for her to have that knowledge compared to everybody else.  And my concern with her is whether or not she's formulated any opinions after having read that article that may impact her ability to be fair and impartial.

MR. BLACKWELL:  Thank you, Judge.

THE COURT:  The way you asked the question, I don't see any issue there.  My only question is -- about her now is the fact that she saw the monies and questioning the frivolous lawsuit aspect of it.

MR. BLACKWELL:  Well, I can speak to that, if you like.

THE COURT:  Well, I want to hear Ms. Wieneke speak to it.

MS. WIENEKE:  I'm sorry?  I didn't hear that.

THE COURT:  I'd like to hear you say -- what's your position on that?

MS. WIENEKE:  Well, I think that the questions that Mr. Blackwell were asking were, would it be fair for you to have this knowledge and --

THE COURT:  I've already passed that.  Those questions don't impact.  My only concern is, she came up with a question about whether or not the amount of money involved in the case suggests maybe this is a frivolous lawsuit.  That got my attention.

MS. WIENEKE:  Yes, Your Honor.  And that's when I believe that I successfully rehabilitated her, as pointed out by the Court, and when I reinforced that, that this case would not be determined -- the jury would not be determining damages, only the liability issues.  And then I again asked her again if she could be fair and impartial, and she said yes.

THE COURT:  I think -- that troubles me, the idea she's thinking of a frivolous lawsuit after having read that article.  And it was my fault for her being released, but I -- once she talks about frivolous lawsuits in the context of the lawsuit in this case, I've got problems with it.  So --

MS. WIENEKE:  Your Honor -- yes.

THE COURT:  Go ahead.

MS. WIENEKE:  She also said she would wait to hear all

the facts and listen to the evidence and that she would put aside what she read in the article.

THE COURT:  I know she said that.  But she's already -- she already told me that, too, and then she mentioned something about frivolous lawsuits.  So I'm going to strike her for cause.  Number 14 is struck for cause.

Mr. Blackwell, any others?

MR. BLACKWELL:  15, Judge.  I believe based on my communication with Juror No. 15 --

THE COURT:  15?  What was it?  I don't -- I don't even have notes on 15.

MR. BLACKWELL:  15 was a dispatcher.

THE COURT:  Yeah.

MR. BLACKWELL:  And I asked her questions about being fair and impartial during this trial.  I also asked her the same question I asked 14 as pertains to whether there's a better courtroom for her --

THE COURT:  Yeah, that's not helpful to me.

MR. BLACKWELL:  I'm sorry?  I didn't hear you.

THE COURT:  That's not a helpful question.  That doesn't help me decide whether or not she can be fair and impartial.

MR. BLACKWELL:  Well, if the juror --

THE COURT:  I didn't hear her say she couldn't be fair and impartial.

MR. BLACKWELL:  All right, Judge.

THE COURT:  So number 15, your motion to strike for cause is denied.

MR. BLACKWELL:  Thank you.

THE COURT:  Any others?

MR. BLACKWELL:  No.

THE COURT:  Ms. Wieneke?

MS. WIENEKE:  Move to strike number 9 for cause, Your Honor.

THE COURT:  Any objection?

MR. BLACKWELL:  Number 9, no, Judge.

THE COURT:  Okay.  Number 9 is struck for cause.

MS. WIENEKE:  Move to strike number 20 for hardship.

THE COURT:  Michele, is she going to be put up in a room here?

(The Court and the courtroom deputy confer.)

THE COURT:  She said it's a hardship if we don't put her up, and I'm checking with Michele to see if we're going to be putting her up.

MS. WIENEKE:  Thank you, Your Honor.

Also, Your Honor, I don't know if you watched Juror No. 21.  That was the juror that I said that I observed sleeping during the process.  I don't know -- he's right behind me, so I can't watch him, but I don't know if you watched him after I alerted the Court.

THE COURT:  I didn't see anything after you alerted me.  But I wasn't paying close attention to him before that, so I didn't see anything.  Did you see anything after you alerted me?

MS. WIENEKE:  My staff alerted me that he was again closing his eyes.  And, you know, I can't tell -- we can't tell if he's just down, you know, but --

THE COURT:  It's not uncommon for jurors to close their eyes when they're listening to other people.  I've seen that happen before, and so I -- nothing came to my attention that made me believe that he was sleeping.

MS. WIENEKE:  Fair enough, Your Honor.

THE COURT:  Any others?

MS. WIENEKE:  Those are the only ones.  Thank you, Your Honor.

MR. BLACKWELL:  Judge, I overlooked one, if I may make a brief argument.

Number 7, I think at the end he stated that he was tipping in favor of Officer Gillespie.  I think he's the -- he's trying to get in the police academy with the Phoenix PD.

THE COURT:  Okay.  Any objection to number 7?

MS. WIENEKE:  No objection, Your Honor.

THE COURT:  Number 7 is struck for cause.

Mr. Blackwell, please raise them when it's your turn, though.  I mean, you already passed the panel to her.  So do

you have any others you want to raise now?

MR. BLACKWELL:  No, Judge.

THE COURT:  All right.  We're checking on number 20.

(The Court and the courtroom deputy confer.)

THE COURT:  Michele informs me, from Yuma, we'll pay for the room, so she'll have a place to stay.  So it shouldn't be a hardship for her.

MS. WIENEKE:  Thank you, Your Honor, for checking.

THE COURT:  Okay.  You guys are going to make your strikes.  I forgot, was it -- it's three each; right?

MR. BLACKWELL:  Yes.

THE COURT:  You know, I don't know -- we agreed on nine jurors, so we'll do that.  Then we'll select an alternate at the end?  Is that the plan, out of -- randomly?  We don't need to do --

(The Court and the courtroom deputy confer.)

THE COURT:  Any objection to that?

MR. BLACKWELL:  No, Judge.  I would just ask the Court, if the Court could read out all the jurors that are stricken, just to make sure we're all on the same sheet of music.

THE COURT:  Okay.

MS. WIENEKE:  Wait, can we go back to what you were saying, though?  You said we'll pick the alternate at the end?

THE COURT:  Yeah.

MS. WIENEKE:  Yes, Your Honor.

THE COURT:  The only reason I say that is in a civil trial, there's no set number of jurors, but it seems to me it would make sense to have eight and not nine jurors just so we get it.

What I have, Michele -- do you have them, Michele?

THE COURTROOM DEPUTY:  I don't have them yet.  I can do them real quick, though.

THE COURT:  Michele's going to give us the official tabulation on who the jurors are.

MR. BLACKWELL:  Thank you, Judge.

THE COURT:  And she'll also give you the number of the cutoff --

MS. WIENEKE:  Thank you.

THE COURT:  -- so that when you're making your strikes, you're not making strikes beyond that number because you're wasting your strike if you are.

MR. BLACKWELL:  Yes, Judge.

THE COURT:  Are there any objections to the preliminary instructions?

MS. WIENEKE:  No.

MR. BLACKWELL:  I can look right quick, Judge.

THE COURTROOM DEPUTY:  I think I have them all.

THE COURT:  Okay.

THE COURTROOM DEPUTY:  Counsel?  Are we ready?

MS. WIENEKE:  Yes.

MR. BLACKWELL:  Yes.

THE COURTROOM DEPUTY:  The strikes I have are 4, 5, 7, 9, 12, 14, 16, 17, 22, 23, 29, 34, 37, 39, and 43.

THE COURT:  I count 15 there.  Is that what you guys have?

Is that right, Michele?  15?

So it's 9 plus 6, 25?  So 25 jurors -- no, 15, I'm sorry.  9 plus 6.

THE COURTROOM DEPUTY:  15.  Up to number 25 is the last one.

THE COURT:  Juror 25 is the cutoff.  Any juror above 25 will not be on this panel.

MS. WIENEKE:  Got it.

MR. BLACKWELL:  Got it, Your Honor.

And preliminary instructions are fine.

THE COURT:  Okay.  So when we come back, we'll seat the jury, I'll give the preliminaries, make your opening statements, then Mr. Blackwell, are you ready to put on your witnesses?

MR. BLACKWELL:  Yes, Judge.

THE COURT:  Okay.  We'll see you guys at 1:30.

MR. BLACKWELL:  Thank you.

(Recess taken, 12:12 p.m. to 1:31 p.m.)

(Prospective jurors not present.)

UNITED STATES DISTRICT COURT

THE COURT:  Are we ready to proceed?

MR. BLACKWELL:  Judge, we have a --

THE COURT:  I'm sorry.  We have what?

MR. BLACKWELL:  Batson challenge.  I'm sorry.

Can you hear me?

THE COURT:  Okay.  It's 1:30.  You bring it up now.

Okay.  What is it?

MR. BLACKWELL:  Well, the defense has struck the only remaining African-American juror on the panel from the numbers that we had down to 25.

THE COURT:  Which number?

MR. BLACKWELL:  Number 10.

THE COURT:  Okay.  Ms. Wieneke?

MS. RETTS:  Your Honor --

THE COURT:  Ms. Retts?

MS. RETTS:  Thank you.

Under *Purkett vs. Elem*, the plaintiff has the burden of proving discriminatory intent, and that has not been met here.  We have neutral --

THE COURT:  He's argued that there was only one black juror left and you struck him, so I think that's enough.  Tell me what the basis was.

MS. RETTS:  We're concerned with her personal experience and background.  First, she has a bachelor's in sociology, which is the study of social problems, causes and

consequences of human behavior, which relates exactly to the issues that we are to -- before the jury today to decide is human behavior, the consequences of that behavior.

So we have concern that she's going to bring with her training, experience, that she will bring into the jury room and potentially not being able to set aside.

I believe she said that somebody else in the family, husband or herself, has a work history in social welfare, which also brings in that same history and experience.

She mentioned that her sister is a volunteer for the fire department crisis response.  The fire department crisis response would relate to CIT issues.  The plaintiff has already brought up concern of there being mention in the dispatch records of a 918.  And crisis response, in her sister's experience, may inform upon her knowledge that -- of a background that's not going to come into evidence in this case.

In the records, there is reference to CIT, and we're concerned about that coming in when that should not be an issue in this case.  The -- CIT is crisis intervention training.

The plaintiff, in one of their strikes, struck a dispatcher who had only eight months on the job as a dispatcher.  And so that's the same concern that they obviously probably --

THE COURT:  Wait.  Was that a strike for cause or a peremptory strike?

MS. RETTS:  Peremptory strike.

THE COURT:  But you're not challenging that under Batson.  We're looking at this under a different -- I mean, I don't know what his reason was, but I'm looking for objective reasons that don't go to a racial motive.

So far I haven't heard any.  Do you have anything else?

MS. RETTS:  She has a personal family experience with civil litigation.  Her mother was involved in a train accident.  That is a direct family member who has sued as a result of the injuries sustained.

This is a case involving injuries, and so we see this as being a difficulty to set aside that.  When you see a family member, a direct family member suffer as a result of an injury, that is an experience that is very difficult for you to set at the door when you come into the jury.

THE COURT:  Okay.  Mr. Blackwell?

MR. BLACKWELL:  Yes.  Thank you, Judge.  Just briefly.

The issues that the defense raised, they could have asked the question of this particular juror during their turn, during the voir dire.  They didn't.

The prima facie case here is that they struck a member of a protected group, African-American juror, as I stated.  They exercised their peremptory challenge to remove that juror, and I believe the inference as it pertains to them removing a

juror raises an inference of discrimination.

In this case, they haven't -- it would be one thing if they spoke to the juror, asked those particular questions that they presented to the Court just now based on my Batson challenge to ferret out that information.  They didn't.

And so they can't -- there's no analogy to us removing a dispatcher.

THE COURT:  I'm not talking about -- talk about the reasons she gave.  She gave about six different objective reasons as to why they believe that this juror was someone they'd want to strike peremptorily.  Tell me what's wrong with them.

MR. BLACKWELL:  The reasons that they gave -- I can't say there's anything wrong with the reasons they provided the Court.  What I'm saying is if those are true reasons, they could have spoke to that juror at the time.  They know for a fact she's the last black juror on the panel.  And just removing her now saying, oh, well, she has this experience or relationship --

THE COURT:  Well, in fairness to both of you, you only had ten minutes, and I'm not going to fault them for not spending ten minutes on a juror when they had only a few minutes.

So all I want to address is their reasons that they gave.  Because they're not required to speak to jurors.  I

asked them questions, and they're telling me what their reasons are based on the juror's answers.

MR. BLACKWELL:  One moment, Judge.

Judge, the things -- let's look at the information they provided the Court.  I don't recall her saying that her mother was actually involved in litigation.  I didn't write that down.  I don't know if the Court wrote that down for Juror No. 10.

As it pertains to her being in sociology, I don't believe that has anything to do with this particular case.  We're not in a damages phase case.  This is whether or not the officer used unreasonable force.

Her husband is actually a chemical engineer.  Again, she can't lean on her husband for any additional information in this case unless his chemical engineering training, unlike mine, has something to do with medical procedures.

So, Judge, I don't believe they provided this Court with information that this Court could use that their reason for removing Juror No. 10 was not based on her race.

THE COURT:  Their reasons don't have to be reasonable.  They just have to be honest as to why they did this as opposed to a racial motive.  Isn't that true?

MR. BLACKWELL:  That's true.

THE COURT:  Am I misstating it?

MR. BLACKWELL:  You didn't misstate it, Judge.

THE COURT:  Okay.  I'm going to deny your Batson challenge.  They gave me plenty of reasons.  The last one was the most persuasive.  And I don't think the first ones are all that reasonable, but the last one made some sense to me.  And I know reasonableness isn't the question, but I have to evaluate in light of whether I believe they're telling me the honest answer, and I'm not going to say they're not.

So your motion is denied.

MR. BLACKWELL:  Thank you, Judge.

THE COURT:  Thank you.

All right.  We ready to bring the jury in?

MR. BLACKWELL:  Yes.

THE COURT:  Oh, exhibits.  Have you guys reached an agreement on some exhibits so we can put them in evidence now?

MR. BLACKWELL:  Yes, Judge.  Some of them.

THE COURT:  Why don't you give me the list and I'll put them in evidence right now.

MR. BLACKWELL:  All right, Judge.  You want me to read it or give it to you?  I'll read it.

THE COURT:  You know, last time you gave me a wrong number --

MR. BLACKWELL:  That is true.

THE COURT:  -- and I misstated it, so maybe Ms. Wieneke's list might be the best one --

MR. BLACKWELL:  I didn't give you the wrong number.

Actually, it was the defense.  So they wrote down 19 versus 16.  But I'll give you these --

THE COURT:  That's not important.  I'm just saying.

MR. BLACKWELL:  You brought it up, Judge.

All right.  Number 5.

THE COURT:  Give me the whole list, okay?

MR. BLACKWELL:  All right.  May I approach?

THE COURT:  Okay.

Pursuant to stipulation, the following exhibits are admitted into evidence:  Exhibit 5, 18, 55, 57, 504, 505, 506, 566, which is a CD -- all these are CDs now:  566, 567, 568, and 569.

Is that agreed on by both sides?

MS. WIENEKE:  Yes, Your Honor.

THE COURT:  Mr. Blackwell, you listening?

MR. BLACKWELL:  Yes, Judge, I was listening.  I'm just making sure that we're going to -- even though --

THE COURT:  All I want to know is did you stipulate to the admission of these exhibits.

MR. BLACKWELL:  Yes, Judge.

THE COURT:  These exhibits are admitted into evidence.

(Exhibit Nos. 5, 18, 55, 57, 504, 505, 506, 566, 567, 568, and 569 admitted into evidence.)

THE COURT:  All right.  We ready?

MR. BLACKWELL:  Yes.  The only thing I want to make a

record of is when we play our exhibit, which is the surveillance tape, it's the same exhibit.  It's just in a different form as the ones the Court just admitted.

And I don't believe the defense has a problem with that.

THE COURT:  You guys can do what you want to do as long as you agree to it --

MR. BLACKWELL:  Yes, sir.

THE COURT:  -- and it's not illegal.  Okay?

MR. BLACKWELL:  Thank you, Judge.

THE COURT:  All right.

Okay.  Let's get started.

(Prospective jurors present.)

THE COURT:  Come on in.  Stay behind the barrier there.  We're going to announce who's seated and have you seated in a moment.  Come on in.  Just fill in.

Please be seated.

At this time Michele is going to read the numbers of the jurors selected to try this case.  As your number is called, please come forward and be seated as directed by Michele.

THE COURTROOM DEPUTY:  Juror No. 3.

Juror No. 6.

Juror No. 8.

Juror No. 13.

Juror No. 18.

Juror No. 19.  Ma'am, you'll come in this front row right here.

Juror No. 20.

Juror No. 21.

Juror No. 25.

THE COURT:  Those of you who were not selected, your day of jury service is now complete.  I want to thank you very much for your participation and your willingness to serve. You're now free to go home, and the admonition against talking to anybody about this case is lifted.  You can talk and research it if you want.

But I want to thank you.  Our system of justice doesn't work unless people are willing to come down here and sit through this process, so thank you very much.

Okay.  Will the jury please stand and be sworn.

(Jury sworn.)

THE COURT:  Please be seated.

Welcome and congratulations.  You made it.  We're going to go over some preliminary instructions, and then when we're done with that, the lawyers will make their opening statements.

So everyone should have a copy of the preliminary instructions.  Turn to page 2, and we'll go over them together.

Duty of Jury.

Members of the jury, you are now the jury in this case. It's my duty to instruct you on the law. These instructions are preliminary instructions to help you understand the principles that apply to civil trials and to help you understand the evidence as you listen to it.

You will be allowed to keep this set of instructions to refer to throughout the trial. These instructions are not to be taken home and must remain in the jury room when you leave in the evenings.

At the end of the trial, these instructions will be collected and I will give you a final set of instructions. It's the final set of instructions that will govern your deliberations.

It's your duty to find the facts from all the evidence in the case. To those facts, you will apply the law as I give it to you. You must follow the law as I give it to you whether you agree with it or not, and you must not be influenced by any personal likes or dislikes, opinions, prejudices, or sympathy.

That means you must decide the case solely on the evidence before you. You will recall you took an oath to do so.

Please do not read into these instructions or anything I may say or do that I have an opinion regarding the evidence or what your verdict should be.

This case has been bifurcated. This means that

certain portions of the case will be decided before other portions of the case.  In this portion, you will not be deciding whether Ms. Winkler has proven that she suffered any damages.

Claims and Defenses.

To help you follow the evidence, I will give you a brief summary of the positions of the parties.

The plaintiff, Martha Winkler, asserts that defendant, Officer Gillespie, violated her constitutional rights to be free from false arrest and excessive force.  The plaintiff has the burden of proving these claims.

Defendant denies those claims and asserts that the arrest was supported by probable cause and that the use of force was justified under the circumstances.

Burden of Proof/Preponderance of the Evidence.

When a party has the burden of proving any claim or affirmative defense by a preponderance of the evidence, it means you must be persuaded by the evidence that the claim or affirmative defense is more probably true than not true.

You should base your decision on all the evidence, regardless of which party presented it.

What is Evidence.

The evidence you are to consider in deciding what the facts are consists of:

1.  The sworn testimony of any witness;

2.   The exhibits that are admitted into evidence;

3.   Any facts to which the lawyers have agreed; and

4.   Any facts that I may instruct you to accept as proved.

What is Not Evidence.

In reaching your verdict, you may consider only the testimony and exhibits received into evidence.  Certain things are not evidence, and you may not consider them in deciding what the facts are.  I will list them for you.

1.   Arguments and statements by the lawyers are not evidence.  The lawyers are not witnesses.  What they may say in their opening statements, closing arguments, and at other times is intended to help you interpret the evidence, but it is not evidence.  If the facts as you remember them differ from the way the lawyers have stated them, your memory controls.

2.   Questions and objections by lawyers are not evidence.  Attorneys have a duty to their clients to object when they believe a question is improper under the rules of evidence.  You should not be influenced by the objection or by the Court's ruling on it.

3.   Testimony that is excluded or stricken or that you're instructed to disregard is not evidence and must not be considered.  In addition, some evidence may be received only for a limited purpose.  When I instruct you to consider certain evidence only for a limited purpose, you must do so and may not

consider that evidence for any other purpose.

4.   Anything you may see or hear when the Court is not in session is not evidence.  You are to decide the case solely on the evidence received at the trial.

Direct and Circumstantial Evidence.

Evidence may be direct or circumstantial.  Direct evidence is direct proof of a fact, such as testimony by a witness about what that witness personally saw or heard or did.  Circumstantial evidence is proof of one or more facts from which you could find another fact.

You should consider both kinds of evidence.  The law makes no distinction between the weight to be given to either direct or circumstantial evidence.  It's for you to decide how much weight to give to any evidence.

Ruling on Objections.

There are rules of evidence that control what can be received into evidence.  When a lawyer asks a question or offers an exhibit into evidence and a lawyer on the other side thinks that it is not permitted by the rules of evidence, that lawyer may object.

If I overrule the objection, the question may be answered or the exhibit received.  If I sustain the objection, the question cannot be answered and the exhibit cannot be received.  Whenever I sustain an objection to a question, you must ignore the question and must not guess what the answer

might have been.

Sometimes I may order that evidence be stricken from the record and that you disregard or ignore that evidence. That means when you're deciding the case you must not consider the stricken evidence for any purpose.

Credibility of Witnesses.

In deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe.  You may believe everything a witness says or part of it or none of it.

In considering the testimony of any witness you may take into account:

1.  The opportunity and ability of the witness to see or hear or know the things testified to;

2.  The witness's memory;

3.  The witness's manner while testifying;

4.  The witness's interest in the outcome of the case, if any;

5.  The witness's bias or prejudice, if any;

6.  Whether other evidence contradicted the witness's testimony;

7.  The reasonableness of the witness's testimony in light of all the evidence; and

8.  Any other factors that bear on believability.

Sometimes a witness may say something that is not

consistent with something else or he or she -- excuse me, he or she said.  Sometimes different witnesses will give different versions of what happened.  People often forget things or mistake -- or make mistakes in what they remember.

Also, two people may see the same event but remember it differently.  You may consider these differences, but do not decide that testimony is untrue just because it differs from other testimony.

However, if you decide that a witness has deliberately testified untruthfully about something important, you may choose not to believe anything the witness said.  On the other hand, if you think that the witness testified untruthfully about some things but told the truth about others, you may accept the part you think is true and ignore the rest.

The weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testify. What is important is how believable the witnesses were and how much weight you think their testimony deserves.

Conduct of the Jury.

I'll now say a few words about your conduct as jurors.

First, keep an open mind throughout the trial and do not decide what the verdict should be until you and your fellow jurors have completed your deliberations at the end of the case.

Second, because you must decide this case based only

on the evidence received in the case and on my instructions as to the law that applies, you must not be exposed to any other information about the case or to the issues it involves during the course of your jury duty.

Thus, until the end of the case or unless I tell you otherwise, do not communicate with anyone in any way and do not let anyone else communicate with you in any way about the merits of the case or anything to do with it.

This includes discussing the case in person, in writing, by phone or electronic means, via email, text messaging, or any internet chat room, blog, website or application, including but not limited to, Facebook, YouTube, Twitter, Instagram, LinkedIn, Snapchat, or any other forms of social media.

This applies to communicating with your fellow jurors until I give you the case for deliberation, and it applies to communicating with anyone -- everyone else, including your family members, your employer, the media or press, and the people involved in the trial, although you may notify your family and your employer that you have been seated as a juror in this case and how long you expect the trial to last.

But if you are asked or approached in any way about you jury service or anything about this case, you must respond that you've been ordered not to discuss the matter, and report the contact to the Court.

Because you will receive all the evidence and legal instruction you properly may consider to return a verdict, do not read, watch, or listen to any news or media accounts or commentary about the case or anything to do with it, although I do have information that there is a news report about this case.  We heard this during the jury selection, that there's an article in AZCentral about it.  Don't read that article or any other article about this case if it appears anywhere.  Avoid it.

Do not do any research such as consulting dictionaries, searching the internet, or using other reference materials, and do not make any investigation or in any other way try to learn about the case on your own.  Do not visit or view any place discussed in this case, and do not use internet programs or other devices to search for or view any place discussed during the trial.

Also, do not do any research about this case, the law, or the people involved, including the parties, the witnesses, or the lawyers, until you have been excused as jurors.  If you happen to read or hear anything touching on this case in the media, turn away and report it to me as soon as possible.

These rules protect each party's right to have this case decided only on evidence that has been presented here in court.  Witnesses here in court take an oath to tell the truth, and the accuracy of their testimony is tested through the trial

process.

If you do any research or investigation outside the courtroom or gain any information through improper communications, then your verdict may be influenced by inaccurate, incomplete, or misleading information that has not been tested by the trial process.

Each of the parties is entitled to a fair trial by an impartial jury, and if you decide the case based on information not presented in court, you will have denied the parties a fair trial.

Remember, you have taken an oath to follow the rules, and it's very important that you follow these rules.  A juror who violates these restrictions jeopardizes the fairness of these proceedings, and a mistrial could result that would require the entire trial process to start over.

If any juror is exposed to any outside information, please notify the Court immediately.

Publicity During Trial.

If there is any news media account or commentary about the case or anything to do with it, you must ignore it.  You must not read, watch, or listen to any news media account or commentary about the case or anything to do with it.

The case must be decided by you solely and exclusively on the evidence that will be received in the case and on my instructions as to the law that applies.  If any juror is

exposed to any outside information, please notify me immediately.

No Transcript Available to Jury.

I urge you to pay close attention to the trial as testimony is given. During deliberations, you will not have a transcript of the trial testimony.

Taking Notes.

If you wish, you may take notes to help you remember the evidence. If you do take notes, please keep them to yourself until you go to the jury room to decide the case. Do not let note-taking distract you. When you leave, your notes should be left in the courtroom. No one will read your notes.

Whether or not you take notes, you should rely on your own memory of the evidence. Notes are only to assist your memory. You should not be overly influenced by your notes or those of other jurors.

Questions to Witness by Jurors.

You will be allowed to propose written questions to witnesses after the lawyers have completed their question of each witness. You may propose questions in order to clarify the testimony, but you are not to express any opinion about that testimony or argue with a witness.

If you propose any questions, remember that your role is that of a neutral fact-finder, not an advocate. Before I excuse each witness, I will offer you the opportunity to write

out a question on a form provided by the Court.  Do not sign the question.  I will review the questions with the attorneys to determine if it's legally proper.

There are some questions that I will not permit or will not ask in the wording submitted by the juror.  This might happen either due to the rules of evidence or other legal reasons or because the question is expected to be answered later in the case.  If I do not ask a proposed question or if I rephrase it, do not speculate as to the reasons.

Do not give undue weight to questions you or other jurors propose.  You should evaluate the answer to those questions in the same manner you evaluate all the other evidence.

By giving you the opportunity to propose these questions, I'm not requesting or suggesting that you do so.  It will often be the case that the lawyer has not asked -- it will often be the case that a lawyer has not asked a question because it's legally objectionable or because a later witness may be addressing that subject.

Bench Conferences and Recesses.

From time to time during the trial, it may become necessary for me to talk with the attorneys out of the hearing of the jury, either by having a conference at the bench when the jury is present in the courtroom or by calling a recess.

Please understand that while you are waiting, we are

working.  The purpose of these conferences is not to keep relevant information from you but to decide how certain evidence is to be treated under the rules of evidence and to avoid confusion and error.

Of course, we will do what we can to keep the number and length of these conferences to a minimum.  I might not always grant an attorney's request for a conference.  Do not consider my granting or denying a request for a conference as any indication of my opinion of the case or what your verdict should be.

Outline of a Trial.

Trials proceed in the following way:

First, each side may make an opening statement.  An opening statement is not evidence.  It is simply an outline to help you understand what the party expects the evidence will show.  A party is not required to make an opening statement.

Then the plaintiff will present evidence, and counsel for the defendant may cross-examine.  Then the defendant may present evidence, and counsel for the plaintiff may cross-examine.

After the evidence has been presented, I will instruct you on the law that applies to the case, and the attorneys will make closing arguments.

After that, you will go to the jury room to deliberate on your verdict.

Now we're at the point of the trial where the attorneys will make their opening statements. Plaintiff has the burden of proof. Plaintiff goes first.

Remember, what's said in opening statements is not evidence. It's an outline or a road map of where this party expects the evidence will take you.

Mr. Blackwell?

MR. BLACKWELL: Thank you, Your Honor.

Ladies and gentlemen of the jury, the reason I'm grabbing my phone, I'm going to time 1 minute and 42 seconds. And I want you to experience that 1 minute and 42 seconds just sitting there being quiet, doing nothing else but experiencing that time.

I'm going to start the time now.

That was 1 minute and 42 seconds.

On July 16th, 2014, Ms. Martha Winkler experienced an altercation with Officer Gillespie. And that altercation forever changed her life.

Ms. Winkler went to the Circle K because she was feeling lucky. On that very day, she set out to buy three lottery tickets.

She arrived at Circle K off 7th Avenue and McDowell -- I'm sorry, Bethany Home. She went inside. She saw a store clerk that she had seen before, a Mr. Alex Ford. They had a brief conversation about seeing him before, and she informed

him she wanted to buy a lottery ticket.  She had a $5 bill.
She gave him a $5 bill and bought one lottery ticket for $1.

She steps out of the line.  She's thinking, well, I want to buy two more lottery tickets.  She sees a gentleman next to her in a separate line, the line for Mr. Leslie Nelson, another cashier for Circle K.

She talks to the gentleman.  He's in a striped shirt.  And she tells him, "You look lucky.  Could I perhaps buy the same numbers you're buying?"  No problem.

So they walk to the counter together.  Ms. Winkler has her money out.  She places her money on the counter.  And the gentleman places his money down and purchases his lottery tickets.

And then something weird happens.  There's a conversation/discrepancy that turns into an argument between Mr. Nelson and Ms. Winkler over her purchasing $2 for one lottery ticket.  And you'll hear through testimony that the argument was that Ms. Winkler needed to pay $4 because the gentleman before her had paid $4.  But the true issue was she only wanted to pay $2 for one additional lottery ticket.

During the argument, Ms. Winkler realizes that Mr. Nelson just won't back down.  He's telling her, "You've got to buy -- you've got to pay for the second ticket.  You've got to pay $4."  As if she could not say, "I can't -- I don't want to purchase this ticket."

So finally he says, "Don't worry about it."  You see him -- you'll see him give her her $2 back.  He rings up the purchase for $2 worth of one lottery ticket, and she steps out of the line.

She goes back to Mr. Ford's line, informs him of the incident, and says she wants to speak to a manager.  He says, "No problem."  He's going to find a manager for her.  "Wait here.  Let me find a manager's number."

So during that time, he's, like, trying to find the manager's number.  You'll see he's going to great lengths of giving her a card.  He tries to show her another number for the regional manager.  But he cannot get to the manager, for whatever reason.  And time passes.  She's still waiting to speak to the manager.

Finally, she calls the police.  And when she called the police, Alex Ford comes out with the phone, "I got the manager."  So you'll see Ms. Winkler talking to -- on the phone, and she's talking to the manager of the store.

She puts the phone down, gives the phone back to Mr. Ford, and she leaves the store, informs them that she had called the police.  And she called the police again.

You heard the testimony that the 911 operator informed her that police will be there in ten minutes.  "Wait there.  Don't leave.  The police are on their way."

So she waits.  And she waits.  And so she saw another

guy, an individual out there. She says, "Hey, I've tried to call the police. Can you call the police? Maybe there will be more urgency if you call and let them know I'm still here waiting for the police."

She had saw some officers across the street. They could have been on a different call. They may have been talking to each other. They wanted to make sure that the police agency knew that she was at the Circle K at 7th Avenue and Bethany Home.

She waits. She waits. She waits. She calls again. And she called practically almost every 10 minutes. They would say wait 10 minutes. She would wait 10 minutes; she would call.

Now, by this time Officer Gillespie gets the dispatch call. And he decides, and you'll hear from him, that he's going to go answer this call.

Now, meanwhile, there's no one on dispatch telling Ms. Winkler, "Hey, you know what, this is not a priority call. Why don't you go home, let somebody come and meet you at your home and talk to you about this issue that you have at Circle K."

Additionally, no one on 911 told her, unbeknownst to Ms. Winkler, that someone from the Circle K called the police as well and said she was trespassing. But they didn't tell her that.

57 minutes later, Officer Gillespie arrives. And you'll see in the video, he sits there and sits there for a number of seconds. Ms. Winkler waits. And then you'll see Ms. Winkler walk towards the vehicle to tell him who she is. "I'm the person that called."

But before she can get a word out, before she could say boo, he says -- and this is Officer Gillespie -- "What do you want?"

Ms. Winkler, alarmed, she says, "We need a supervisor." And she hurries away. You'll see her walk away quickly from Officer Gillespie.

Officer Gillespie, you'll see him. He doesn't speak again to Ms. Winkler. When he arrives, he goes into the store. And you'll see him in the store talking to two individuals. And 31, 32 seconds later, he walks out.

Officer Gillespie is going to testify and tell you that the individuals in the store gave him information that Ms. Winkler was trespassing. Mind you -- mind you -- Officer Gillespie will also tell you that Ms. Winkler called first, that she called several times, because he knew it because it started the CAD report. CAD report is a computer automated data report.

He's going to tell you that when he pulled up and he saw a lady in the pink shirt and the tan skirt, he knew it was Ms. Winkler. He knew she was the person that called. He's

going to tell you that.

He's going to tell you that he didn't speak to Ms. Winkler outside of saying, "What do you want?"

He didn't try to ask her, "May I help you?  How can I help you?  I know you called several times.  What seems to be the problem?"

He's going to tell you when he came out of the store, he told her, "They said you were trespassing."

Ms. Winkler is going to tell you that when he came out of the store, the first thing out of his mouth was, "I need your ID."

You'll see her walking towards him with her hand stretched out with an ID.  She gives him her ID.

Officer Gillespie is going to tell you he doesn't even know if he told Ms. Winkler to leave.  You're going to get an instruction -- you might get an instruction on what trespass is, what a trespass is.

In this case, Officer Gillespie will tell you to your face when he testifies under oath that he doesn't even remember if he asked her to leave.  He can't recall if Ms. Winkler refused to leave.

Ms. Winkler's going to tell you when she testifies that Officer Gillespie never told her to leave.  He never asked her to leave.

Officer Gillespie's going to tell you that from his

perspective, Ms. Winkler was acting erratic.  He's going to tell you that he couldn't get a word in edgewise.  That's what he's going to tell you.

He's going to tell you when he pulled up, when he pulled up, he thought that there was something wrong with her, mentally.  Because he used his code, this police code that delineates that.

He's going to tell you that he decided to grab her wrist, and he grabs the left wrist and he grabs the right wrist.  Right?  He grabs her arms.

He's going to tell you that he grabbed her arms and at one point he thought she was going to run into traffic.  So instead of her going into traffic or pulling him into traffic, he decided to throw her or use a one-arm takedown and took her to the ground.

Now, if you can imagine, if I'm Officer Gillespie, and there's an individual, a young lady in front of me, a 56-year-old grandmother at the time, he's holding the right arm, he's holding the left arm, and he's telling -- he's going to tell you that he took her over and threw her -- well, took her down to his right.  He's going to say he took her down. I'm saying it's a throw-down, that he threw her down.

The reason I'm saying it's a throw-down or he threw her down is because when Officer Gillespie tells an individual during an interview what he did, he said that he took her down,

and when he took her down he meant to do it.

Now, the issue is the force that Officer Gillespie used was unreasonable.  Evidence and testimony will show that Ms. Winkler suffered a number of injuries.  When he threw her down, he threw her down, took her down onto her -- the right side of her face, onto the concrete in front of the Circle K.  Directly in front of the Circle K.

She suffered an orbital fracture on the right side of her face, a large laceration that bled out, bled on the street, right in front of the Circle K; an occipital bone fracture, or fracture to the back of her head; and a subdural hematoma.  Some people call that -- will call that a brain bleed.

When Officer Gillespie wrote his report, and he wrote his report within an hour after this incident, he writes in his report that Ms. Winkler fell, not that he took her down.  He wrote that she fell and hurt herself.

Ms. Winkler is rushed to the hospital -- oh, I'm sorry.  He's going to also tell you she was unconscious momentarily, based on the force that he used to take her down.

When she goes to the hospital, she's interviewed by officers surrounding her bed in the hospital room while she's on morphine.  And they asked her questions about what happened to her at the Circle K.

And she tried her best to inform them what happened, why she was there, but she didn't have a memory of what

happened after Officer Gillespie grabs her wrist, and until she is told in the hospital what actually happened to her, told about her injuries.

Officer Gillespie, his interview is almost a year later. Almost a year later. And when he was asked specifically: Okay, okay, you said she fell. Did she fall? You said she fell a second ago. Did she fall?

Because, remember, his police report was the only report, from his perspective, that was written. And he told the people back in 2014 that she fell.

And now people are wondering during this interview, realtime: Why did you say she fell?

Oh, I took her down.

Ms. Winkler called for help. She called for help from an individual that has a duty to help. "Protect and serve" is what they say. A duty.

This individual didn't care to learn why --

MS. WIENEKE: Objection, Your Honor. It's argument.

THE COURT: Overruled.

Go ahead and make your statement, but keep argument out of it. This is a presentation of the expected evidence, not argument.

Go ahead.

MR. BLACKWELL: Based on evidence and testimony, there was no true attempt to understand why Ms. Winkler called the

police, why did she call for help.  There was a rush to judgment as pertains to why Officer Gillespie comes out of the store and doesn't ask Ms. Winkler for her side of the story.

After Officer Winkler -- I'm sorry, Officer Gillespie tells Ms. Winkler, "They said you were trespassing," she tells him, "Absolutely not.  I bought lottery tickets.  I'm the one who called the police."  Again, not knowing before Officer Gillespie comes out of the store that somebody else had called and said she had did something.

Ladies and gentlemen, based on the evidence that's going to be presented to you during this trial -- and I ask that you take copious notes.  And if you can remember everything you hear, please try to remember it.

Our burden is a preponderance of the evidence.  That's our burden.  That's our case.  We have to prove to you that more likely than not, it's more probably true than not, that Officer Gillespie used excessive force and that his seizure or his arrest of her was unwarranted.

Ms. Winkler will tell you herself that when she was on the phone and Officer Gillespie came out of the store, she's on the phone with 911 asking for a supervisor to be present. During the entire time she was outside, during her interactions, both interactions with Officer Gillespie, Ms. Winkler will tell you that Officer Gillespie never said she was under arrest, never said, "You need to leave this

property," never asked her to leave.  Ms. Winkler never refused to leave.

At the end of this case, I'm going to ask you that each and every one of you find that Officer Gillespie is responsible and he's liable for his use of excessive force and his wrongful arrest.

Thank you, Your Honor.

Thank you, ladies and gentlemen.

THE COURT:  Ms. Wieneke?

MS. WIENEKE:  Thank you.  Your Honor, may I move the easel?

THE COURT:  Yes.

MS. WIENEKE:  Thank you.

Where should I put it, Your Honor, that is not in your way or -- is this good or --

THE COURT:  Can the jury see that?  Can all the jurors see that?

Mr. Blackwell, you good with that?

MR. BLACKWELL:  If I may move, Your Honor.

THE COURT:  You can move.  Fine.  That's a good spot.

MR. BLACKWELL:  Thank you.

MS. WIENEKE:  May it please the Court, counsel, Ms. Winkler, Officer Gillespie, ladies and gentlemen of the jury.

Walk away.  That is what Martha Winkler did when

Officer Gillespie told her she was under arrest and when she improperly resisted his lawful arrest.

Your Honor, we're going to play Exhibit 568, which is in evidence, a portion of the Circle K video surveillance at this time, starting at 7:44 p.m.

(Video played for the Court and the jury.)

And if we could just start again, Ms. Piasecki, and play that again.  It is just a few seconds.

(Video played for the Court and the jury.)

In that video, we see Ms. Winkler resisting Officer Gillespie's lawful arrest.

Walk away.  That is what Martha Winkler should have done when the Circle K clerks told her earlier in the evening to leave the property.

That is what she should have done when Officer Gillespie told her in that parking lot to leave the property.

And it is what she should have done after she bought that lottery ticket from the Circle K clerk.  A simple purchase of a lottery ticket.  A misunderstanding between a customer and a clerk that was immediately made right in less than that 1 minute and 42 seconds you all sat patiently here.  And with no money out to the customer.

If Martha Winkler would have just taken her ticket and walked away from that Circle K, then none of this would have happened.  Instead, a simple convenience store transaction

turned into seven 911 calls from Ms. Winkler over more than an hour, where she yelled over the phone to the poor 911 operator and repeatedly hung up on the 911 operator.

A simple convenience store transaction turned into a trespass call because Ms. Winkler remained at the Circle K long after that lottery transaction when the Circle K clerks called 911 to report her for trespass.

A simple convenience store transaction that turned into a lawful arrest by Officer Gillespie of Ms. Winkler after she repeatedly refused reasonable requests to leave.  And that lawful arrest turned into what you just saw, plaintiff's unlawful resistance of that arrest, resulting in reasonable force used by Officer Gillespie.

Very simply, folks, this is a case about a lawful arrest with reasonable force used to accommodate the plaintiff's unreasonable actions in resisting arrest.  And sadly, an unfortunate result, resulting in unfortunate injury.

Let me tell you about Officer Jason Gillespie.  He didn't start out his life, his adult life, wanting to be a police officer.  Growing up in Michigan, he began his working --

MR. BLACKWELL:  I'm going to object to relevance, Judge.

THE COURT:  Overruled.

MR. BLACKWELL:  Thank you.

MS. WIENEKE:  As I was saying, growing up in Michigan, he began his working life as an auto mechanic.  But later in life, he and his family decided to move from Michigan to Arizona and change careers.  And he was hired on by the Phoenix Police Department as a police officer.

But both as an auto mechanic and as a Phoenix officer, Officer Gillespie had to make judgment calls.  He had to assess the situation.  But unlike an auto mechanic, who have a lot more time, Officer Gillespie often is called upon to make split-second decisions in rapidly changing circumstances, many times when people's lives are on the line.

Officer Gillespie is a certified peace officer by the State of Arizona, having met all of the qualifications that the Arizona Peace Officers Standard and Training, POST, AZPOST, has set for him, both in his initial training at the academy and with the City of Phoenix Police Department, which requires annual training to retain his certification.

He graduated from the academy in 2008.  So by the time of this incident in 2014, he was a six-year veteran.  He has worked patrol his entire career.  He has worked all shifts: graveyard, afternoons, mornings.  And as of the time of this incident, he had been working this area for about a year, and so he was familiar with the neighborhood.

This Circle K that he responded to was at 7th Street and Bethany Home, not 7th Avenue.  Let me take you back to that

July afternoon.  It was a Wednesday.  Much warmer days than we're experiencing now.  But let's start at 1:00 o'clock in the afternoon.

Officer Gillespie arrives at the Desert Mountain Precinct.  He is wearing his dark police uniform, not long-sleeved but short-sleeved that day, with his nameplate on his chest and his Phoenix emblem clearly identifying him as a Phoenix police officer, with his name on his badge and his uniform.

Before heading out on the street, he carefully checks to make sure that he has all of his police equipment.  Having traded in his auto mechanic tools for his new set of tools: his portable radio, which he carries on his belt; his pistol; his Taser; his pepper spray; his flashlight.  These tools serve as his lifeline to the radio dispatch and help to protect him and the public.

He goes out to his fully marked police car, also marked with the City of Phoenix and emergency light bar on the top.  And he turns it on, which also turns on the car's radio.  Because in the car, he also has a police radio in addition to the portable one he carries on his waist.

Also in his car, he has a computer called a mobile data terminal, or an MDT for short.  You're going to hear that probably in this case.  MDT.  That computer also allows him to receive information about calls.  In addition to the radio, he

can receive calls over that computer as he's en route to calls.

As he turns on that car radio, his mobile data terminal, it instantly fires up and he starts to receive calls. But he doesn't mind, because that's his job, to respond to citizen calls.  That's what he signed up to do.

Even though this is a Wednesday, in his beat, Beat 615, there are no light days.  This is a busy day, and every day in his area is a busy day.

At about 7:24, Officer Gillespie is dispatched to the Circle K at 7th Street and Bethany Road.  A female has called 911.

Now, at that time, that call has been in line for a while.  It has been in the queue, so to speak, because there were no officers available to take the call.  That's how busy they were that night.

But on the way to the call, Officer Gillespie starts to scroll on his MDT to look at what we call the CAD.  That's going to be Exhibit No. 5.  You will have that in evidence.

The CAD is the computer-aided dispatch, and that is a printout of the call when it's in paper form, but on the computer it serves as the computer entry that the dispatcher is entering in based on the information they're getting directly from the callers.

So as Officer Gillespie is responding to this call, he's looking at the computer because he wants to know

information about the call he's going on before he ever gets there.

And he learns a lot about the call he's responding to. The female caller had called at 6:44 p.m. from the Circle K. In that initial call, she hung up twice on the 911 operator.

A second 911 call was made by the same person about 15 minutes later. The 911 operator noted that the caller was yelling about the response time. That happens. People get frustrated. That's understandable.

But a minute later, another call came from the same person, again complaining about the response time. This is now the third call.

Six minutes later, after that third call, a fourth 911 call was made. The caller was -- in the notes, the caller was yelling on the phone. Yelling at the 911 operator. Upset with the response time. And the caller hung up.

A fifth 911 call came in at 7:18 p.m., ten minutes after the last call. The call notes said the caller was very angry, and again, hung up. This is now the fifth hang-up by the caller.

The sixth 911 call came at 7:28, four minutes after Officer Gillespie was initially dispatched to the call.

Now, you just heard that Ms. Winkler is going to testify that she was told by the 911 caller that officers will be there in 10 minutes. Well, that evidence will be disputed

in this case, because Officer Gillespie was not even dispatched to this call until after the fifth call. And so the 911 operator knew that no officer was available, no officer had been dispatched to this call. And as a policy, the City does not tell citizens how long it will take to respond to a call.

MR. BLACKWELL: Objection.

THE COURT: What's your objection?

MR. BLACKWELL: I'm sorry, Judge. Objection. She's arguing. That's argument. That's argument, Judge.

THE COURT: Overruled.

Go ahead.

MS. WIENEKE: Because they don't know. They don't know how long it will take, so they don't tell the citizens, because it creates false expectations.

In the sixth call, Ms. Winkler demanded to speak to the 911 operator's supervisor, and it was transferred to the 911 operator's supervisor. Because she was unhappy with the way the 911 operator was handling the call. And that supervisor noted in the call notes that the caller was telling a disjointed story.

The seventh and final call that came in was at 7:41. Now, I told you about the CAD -- or the MDT that's in the officer's computer. When he arrives on scene, he pushes a button and that sends the time of his arrival to the dispatch, and they note that in the CAD.

Officer Gillespie arrived on scene at 7:41, the same time Ms. Winkler was making her seventh 911 call.

Officer Gillespie also learned from reviewing the CAD that the caller was described as a white female, 50s, wearing a pink skirt.  And the caller's name was Marty.

Now, in addition to this series of seven calls made by Marty, Officer Gillespie also had some additional information that he learned from his computer.  He learned that at 7:19, approximately a minute after one of Marty's 911 calls, a call came in from the Circle K.  And that call was complaining about a white female, 40 to 50s, five foot four to five foot six, wearing a white shirt, khaki shorts.

And that information was that this woman won't stop harassing customers in the parking lot.  The female is refusing to leave the property, and they want her removed from the property.

And you'll see in Exhibit 5, the notes that the call taker made, and in particular, the tense, "refusing to leave," which we submit implies that there had been a request to be made and there had been a refusal.

I'm showing you Exhibit No. 18, which is a blowup of the Circle K store that is involved in this incident.  There are gas pumps in the parking lot area.  And as you can see there, this is with North 7th Street, north being the direction of this white car towards me.

And you can see that there are two entrances off of 7th Street to access the parking lot, and then there is an entrance to access the parking lot off of Bethany Home.

Officer Gillespie arrived at 7:41, and he parked.  You can see this white van here.  There is a handicapped spot to the left of this white van.  He pulled in and he parked diagonally across this handicapped spot.

Not only was it a busy night for the police department, but it was a busy night for the Circle K.  You will see that as you see the customers coming in and out, making work for those two clerks that were working there.

Officer Gillespie did not have on his lights and siren.  This was not an emergency call.  So he parked diagonally across that space.

No sooner than is he able to barely get out of the door before he is confronted with what he describes as a visibly upset and angry woman meeting the description of Marty that he had already read about in the CAD.  And before he could fully get out of the car, she came up to him and she yelled, I want your supervisor.  And then she turned around and she left.

No, I'm not going to put my phone out and time out 4 seconds, because y'all can imagine what 4 seconds is.  But we can look at the video and see Ms. Winkler's approach to Officer Gillespie and how she immediately turned around after confronting him.

If we could play Exhibit 568.

(Video played for the Court and the jury.)

MS. WIENEKE:  And you'll be able to see this video throughout the trial.  We'll show it and you'll go to the jury room and you'll see it as many times and play it as many times as you want.

Officer Gillespie did not have an opportunity to ask Ms. Winkler any questions, because no sooner had she told him that she wanted her [sic] supervisor in that loud and angry voice did she turn around and storm away.

Ms. Winkler had been waiting for almost an hour for the police to come.  She had made seven 911 calls.  And when the police finally arrived, she spent less than 4 seconds yelling, I want your supervisor, and then turned around on her heels.

This left Officer Gillespie somewhat puzzled.  So he had two callers, remember, two complainants, Ms. Winkler and the Circle K people.  So he went inside to talk to the Circle K folks.

What you got?  What do you have to say?  And let's see about that interaction.

(Video played for the Court and the jury.)

MS. WIENEKE:  Here you can see Officer Gillespie walking from the parking lot area.  This is immediately after his confrontation with Ms. Winkler.  On the left, the gentleman

that you see is Mr. Nelson.  And on the right is Alex Ford.  This is Officer Gillespie walking into the Circle K.

(Video played for the Court and the jury.)

MS. WIENEKE:  Officer Gillespie leaves the Circle K and walks back over towards his patrol car.  Officer Gillespie is not angry.  He's simply calmly and patiently getting information from the two Circle K clerks about their call.

And even though his interaction is not long, in that interaction he learns a lot.  And here's what he learns.  He learns that the woman he had seen outside had been on the property for a long time and had been asked by the clerks to leave the property several times, but she would not leave.  And that they called police.

They told him that she was in the parking lot harassing customers.  They told him that they wanted her trespassed.  They told him that she was refusing to leave after they had asked her several times to leave.  They said the store wanted her trespassed.

Now, the information that Officer Gillespie gathered was not new to Officer Gillespie.  Because you'll recall that on his way to the call he read the CAD, which had the comments from the call that the clerks made.

So he already knew from dispatch that the employees were calling 911 because they wanted Marty removed from the property and she was refusing to leave and that she was

harassing customers.  Why is this important?

The information that he has just now received in person corroborated the information that he had from the CAD. And you will learn that corroboration of information is important to an officer when determining whether they have probable cause for an arrest.

Officer Gillespie then, as you just saw, went outside. Once again, an angry Marty approaches him.  The time and manner in which she approached him were all of her choosing.  She had a phone to her ear.

Now, Officer Gillespie does not know whether she was actually talking to someone or whether she just had a phone to her ear, but he knows that she was yelling loudly and she was still talking about a supervisor.  She was visibly upset, and she was angry.

Officer Gillespie asked her for her identification. Now, why would he do that?  If the store wanted her trespassed, what does that mean?  That means I need to get your identification so I can write down your name, your address information.  I can then get that information and I can give it to the store clerk, because they keep a log of people that they have asked to leave the property.  He wanted that information to give to them.

Another important reason why.  Look, if Ms. Winkler, after he had then said, would you please leave, and she left,

done.  Officer Gillespie can go.  He's done the information that the store clerks wanted and he can go on his way.

But Ms. Winkler refused to give her identification.  I want a police report, she says.  Well, Officer Gillespie hasn't even finished his investigation.  He can't write a police report at that moment.

No, ma'am.  Look, the folks want you trespassed.  You need to leave the property.

No.  She's refusing.  She's screaming.  She's irate.  She's yelling.  So much so, and you can watch the video, that people inside the store with the doors closed are doing this (indicating).

Because they hear the commotion outside.  And it's not Officer Gillespie who's raising his voice.  It's Ms. Winkler.

She refuses to give her ID.  He's asked her several times to leave the property.  She's not leaving.  He tells her she's being trespassed.

She says, but I'm a customer.  I bought these tickets.

Doesn't matter.  You can buy as many tickets as you want and you can still be trespassed.  If you cause a commotion, the store has the right to ask you to leave.

She kept arguing with him.  She kept yelling and screaming at him, and he was getting nowhere with her.  She was causing a scene in the parking lot.

All she has to do is remain calm, provide her ID, and

then leave the property. But she's not doing any of these things. And, ladies and gentlemen, that is her choice and solely her choice.

At this point, Officer Gillespie determined that continuing to stay in that parking lot, causing that scene with her after her repeated refusals to leave, is fruitless. And so he makes the decision to place her under arrest for trespass.

There had been several reasonable requests to leave the property, a refusal to leave, and noncompliance with every request.

The elements of trespass have been met. Officer Gillespie has no reasonable belief that she will leave, after having been in that parking lot and that store for an hour. And an arrest will now be made.

So Officer Gillespie reaches out to grab her right wrist and says, you are under arrest.

She yanks back her right arm and she yells, let go of my arms. And she starts to backpedal towards the cross traffic of the parking lot, without even looking where she's going, wearing her flip-flops.

Officer Gillespie tries to maintain his grip on her right wrist, but she is twisting and turning her body, and she's moving him around in a circle in that parking lot. Because at this point they are in between the safety of a parked car in the parking lot and Officer Gillespie's car at a

diagonal.

But as she twists and turns and moves backwards, they are moving closer and closer towards that cross traffic in the parking lot. And as they continue to struggle together, they're getting closer and closer.

And out of the corner of his eye, Officer Gillespie sees a car coming. And deeply concerned about that traffic and how busy that Circle K has been, he makes that split-second decision to take her down to the ground in what is called a straight-arm takedown.

And he moves her across his hip, and he takes her down to the ground. And all the while she is fighting and resisting and struggling, and he takes her down. And he will tell you that her level of resistance was a 9 out of a 10, with 10 being the highest.

And when he gets her to the ground, he notices that she has a laceration on her forehead that is bleeding, and he immediately calls for the fire department.

This is the start of the resisting. We'll show this one more time. Because you can't see the rest of the story.

(Video played for the Court and the jury.)

MS. WIENEKE: Here she yanks the arm back and she starts to move backwards before Officer Gillespie can even touch her. That's resisting arrest, ladies and gentlemen, and you do not have the right to do that.

UNITED STATES DISTRICT COURT

Let me say something about plaintiff's burden of proof. Ms. Winkler has the burden of proving her case to you. She has to prove that Officer Gillespie falsely arrested her without probable cause and that he used excessive force.

Officer Gillespie does not have to prove anything. That burden of proof remains on this table at all times. It is their burden to prove it to you.

So let's talk about the false arrest claim. You will learn that an officer can make an arrest if they have probable cause to believe a crime has been or is about to be committed.

In this case, we have the video. And you'll be able to look at the video, what happened inside the Circle K, what happened outside the Circle K.

Now, Officer Gillespie did not have dash cam. This was 2014. He did not have body cam. So we have to rely on the Circle K surveillance for the video that we have in this case. And there's no audio to the video.

So we do have to rely on the memory of folks, police reports, things that they wrote or said contemporaneous with the event.

Now, what the plaintiff is going to tell you is she's going to say, they never asked me to leave the store, the clerks. They never asked me to leave. And she's going to say that Officer Gillespie never asked me to leave.

And had they done so, I would have been compliant. I

would have left.  Because I'm helpful.  I'm compliant.

But we're going to suggest to you folks that the evidence will tell a different story.  You're going to learn that Ms. Winkler was never cheated at that Circle K that day.  She was made whole in this transaction in less than two minutes.  That Mr. Nelson never argued with her repeatedly, as she suggests.  And there was, frankly, no reason for her to even be dissatisfied.

But nevertheless, she strongly believes that she was wronged by the Circle K clerks, which made her angry.  She demanded to speak to their supervisor.  And when she talked to the manager who was home, not even working, she demanded that he come down to the store right there and take care of it for her right that minute.  And he said, ma'am, I'm not doing that. I'm happy to talk to you the next day.

No.  That's not good enough for Ms. Winkler.  You come here right now.  And he wouldn't do that, and that made her more angry.

And by the time Officer Gillespie got there, she was a 10 out of 10 in the anger meter.  Because she didn't get satisfaction from the Circle K or their manager, she didn't get satisfaction from 911 or their supervisor, and that's why the minute Officer Gillespie gets there, she doesn't even give him a chance.  She demands to speak to his supervisor.

You're going to learn that Officer Gillespie told the

plaintiff she was trespassing.  She admits it in that interview that Mr. Blackwell told you about.  Hours after this event, she was asked, did Officer Gillespie tell you you were trespassing?

Yes, the officer told me I was trespassing.

And it makes not a lot of sense that if the officer told her that she was trespassing, which she admits, that she didn't understand that she had been told to leave too.

You're going to learn in this case that the property was posted with "No Trespassing" signs, "Violators will be prosecuted."

And you're going to learn that the Circle K clerks called and reported her for trespassing before Officer Gillespie got there.

Folks, the officer -- the evidence will show that on this false arrest claim, there was probable cause to arrest her for trespass.  But even if -- it never had to get to that point, because all she had to do at any moment was walk away.

But there was also probable cause for resisting arrest, and you've seen the video.  And once she yanked her arm away, that constitutes resisting arrest under Arizona law.

Now, there's also a claim of excessive force.  And you're going to learn a lot about what officers are trained to do in the state of Arizona and when they can use force in this case.

Officers are trained that in the types of resistance

they encounter -- of the various types of resistance they encounter.  Resistance can mean an officer tells you, hey, put your hands behind your back, and you say no.  Well, that's verbal noncompliance.  That's resistance.

The officers are also trained that there's passive resistance.  That's -- if any of you have ever had a 2-year-old going limp, well, people do that at protests.  They go limp.  That's called passive resistance.

Defensive resistance is something different.  Defensive resistance is you're not trying to hurt the officer, but what you do is you do something, some physical act that prevents the officer from getting your hands behind your back and getting you into handcuffs.  That's called getting you into custody.

So if the officer says, you're under arrest, and you go like this and you yank your arm back or even if you just tighten up, you're doing defensive resistance.  And officers are trained, and you'll hear evidence in this case, that what the plaintiff did was defensive resistance.  And in response to defensive resistance, an officer is entitled to use force.

And the types of force that they can use run the gamut.  Officer presence.  Just showing up in a uniform is officer presence.  That's a type of force.  Verbal commands.  Put your hands behind your back.  That's a type of force.  But when those things don't work, as they didn't here, additional

force is reasonable and necessary.

Empty hand control is what Officer Gillespie did here, a straight-arm bar.  If you've ever done martial arts, if you've ever done anything like that, you may be familiar with a straight-arm bar.  But it's a defensive tactic that's taught in the academy, and it was taught to Officer Gillespie.

And that's what he did that day because he had to make that decision, look, she's resisting.  I can't get her hands behind her back.  She's twirling around.  She's making me go on this round robin.  I need to get her hands behind her back, but she's also moving back towards that traffic.

And the officers are trained that these types of control holds and takedowns have minimal chance of injury.  And that was certainly Officer Gillespie's experience as well.

You will learn that these force options were reasonable responses to defensive resistance.  At the time that he went to reach for her wrist, Ms. Gillespie knew that she was under arrest.  She's admitted that.  She said, I knew he was going to arrest me.  He told me I was trespassing, and I knew he was going to arrest me.

And then we've seen that resistance.

Now, what about this traffic and this concern by Officer Gillespie that she was moving towards this traffic?  Police officers are taught that they can use force to protect their own lives and the lives of others.  Makes sense; right?

If Officer Gillespie believed that physical force was necessary, that it was safer to get her to the ground than to allow them to continue to move into this cross-traffic area and now be rolling around in a dark uniform where all this traffic was coming, then that's a decision you have to make as to whether that was reasonable.

Let's take a look at what the traffic conditions were in that parking lot. You're going to be able to see the timeline of the events, that at 7:44 --

And let me just say something about the video time and the police time. Unfortunately, the clocks are not synced, and so what we see in the video time is off a little bit from the CAD time, so it's not going to be exact. So while we can say that the officer arrived -- you can start playing it, Ms. Piasecki.

(Video played for the Court and the jury.)

MS. WIENEKE: While we can say the officer arrived at 7:41, that's going to be the police time, and it may not sync with the video surveillance.

The view you're looking at right now in the Front Door View is the camera view to the front door. To the right is where Officer Gillespie parked. And what you're going to see in a few seconds is all the people in the Circle K -- not all the people, but some of the people in the Circle K moving towards the door. There's one of the customers. This is when

Ms. Winkler is yelling and screaming outside.  She's looking at what's the commotion.

And then in a few seconds, you're going to see more of the customers moving to the front door.  And then on the top right, you're going to see a car that's moving from right to left screen, which we believe the evidence shows is the car that Officer Gillespie was concerned about that he acted in response to to protect himself and Ms. Winkler from moving into that harm's way.

That car you just saw travel northbound is on 7th Street.  There's another car traveling on 7th Street northbound.

And now you can see customers moving to the door. There is the car on the right front, moving in the parking lot, out towards the exit, and the customers are moving to the door to look out towards their right at the commotion.

And that car is some type of -- I believe it's a Dodge Charger, but you all be -- you will all be the judge of the type of vehicle it is.

And at 7:45, at the end of the clip that I just showed for you, you can clearly visibly see the traffic that was in the parking lot that raised the concern for Officer Gillespie. And that is why he had to immediately act in response to Ms. Winkler's fighting and resistance and protect them from danger.

You will learn that plaintiff had the power to control this situation with her good choices: by not fighting, by not resisting, and in response to Officer Gillespie's reasonable request to leave the property, to simply walk away.

And if Martha Winkler had just taken her ticket and left the Circle K and gone peacefully into the night, none of this would have happened.

At the close of this case, we will be asking you for a verdict in favor of Officer Gillespie. And I thank you kindly for your time.

THE COURT: Okay. Let's take our afternoon recess. We'll come back at 3:25.

(Jury not present.)

THE COURT: Please be seated.

Is there anything we need to take up?

MR. BLACKWELL: No, Your Honor.

MS. WIENEKE: Nothing, Your Honor.

THE COURT: Okay. Mr. Blackwell, are you ready with your first witness?

MR. BLACKWELL: Yes.

THE COURT: Okay.

MR. BLACKWELL: Thank you.

(Recess taken, 3:06 p.m. to 3:23 p.m.)

THE COURT: Mr. Blackwell, is there something you want to raise?

MR. BLACKWELL: Briefly, Judge.

During the defense opening, the term "lawful arrest" was used a number of times. Saying probable cause to make an arrest is part and parcel -- it goes with the instruction that we have. Saying lawful arrest, I think it goes into opening the door to the fact that Ms. Winkler actually was acquitted of trespass.

So I informed the Court and the defense back, I guess, last month that if the door was opened, that I would present it to the Court. And I would ask the Court to allow us during Ms. Winkler's testimony to elicit that she was found not guilty of trespass.

THE COURT: I don't think the door's been opened.

MR. BLACKWELL: All right, Judge.

THE COURT: Okay? We ready to bring in the jury?

MR. BLACKWELL: Yes.

THE COURT: Okay. Who's your first witness?

MR. BLACKWELL: Ms. Winkler.

THE COURT: Okay. We're going to break around 4:30 to 4:45 today.

MR. BLACKWELL: Thank you.

(Jury present.)

THE COURT: Please be seated.

Mr. Blackwell, you may call your first witness.

MR. BERNARD: It will be Ms. Winkler, Your Honor.

THE COURT:  Ms. Winkler, would you come up here, please.  Step right in front of the clerk, Michele.  She's going to swear you in.  Come right up here, right in front of her.

MARTHA WINKLER,

called as a witness herein by the Plaintiff, having been first duly sworn or affirmed, was examined and testified as follows:

THE COURT:  Mr. Bernard, you may proceed.

MR. BERNARD:  Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. BERNARD:

Q.  Good afternoon, Ms. Winkler.

A.  Good afternoon.

Q.  Can you hear me okay?

A.  I can.

Q.  Okay.  Now, introduce yourself to the jury, please.

A.  My name is Martha Marie Winkler.

Q.  And, Ms. Winkler, why are you here today?

A.  I'm here today because I was beat up by Officer Jason Gillespie over calling the police for help.

Q.  Now, is Officer Gillespie here today?

A.  He is.

Q.  Okay.  Where is he sitting?

A.  Right there (indicating).

Q.  Now, how old are you today?

A.   I am 61.

Q.   And what year did this happen?

A.   It happened in 2014.

Q.   So how old were you in 2014, if you don't mind me asking?

A.   I was 56.

Q.   Okay.  Now, where did you grow up?

A.   I grew up in northwest Pennsylvania, small town, little town by the name of Cochranton, Pennsylvania.

Q.   Okay.  And how long did you live in Pennsylvania?

A.   I was there for 21 years and moved out here when I was 21.

Q.   Now, did you go to school out here?

A.   I went to college.  I went to -- I was working a full-time job, and I started going to school part time at Mesa Community College.  Then I transferred to Phoenix College, and then ended up getting a business marketing degree at ASU in 1987.

Q.   Is business marketing, is that a bachelor's degree?

A.   Yes.

Q.   Now, did you get married?

A.   Did I get married?

Q.   Yes, ma'am.

A.   I did.

Q.   Okay.  Are you married currently?

A.   I am not married.

Q.   Do you have any children?

A.   I do.  I have an adult daughter that lives here in town.

Q.   Any grandchildren?

A.   I do.  I have two small grandchildren.

Q.   Do you spend any time with them?

A.   I spend as much time as possible.  I adore them.

Q.   Now, I want to direct you to the day of the incident.  Now, what part of the year was that in?

A.   It was July 16th.  It was the middle of the summer.  The hottest part of the summer in the middle of July, so it was hot.

Q.   And in 2014, you've experienced --

A.   Yes.

Q.   -- some Arizona summers; correct?

A.   Well, I've been here for over 40 years.  I moved here in 1978.

Q.   Now, on this day, did you go somewhere?

A.   I went to Circle K.

Q.   Okay.  And what brought you to that Circle K?

A.   I went to the Circle K because I helped a man in my apartment complex in a -- kind of a bad situation.  I saw he had confided in --

          MS. WIENEKE:  Objection, Your Honor.  Relevance.

          THE COURT:  Overruled.

          THE WITNESS:  I had helped a man in a personal situation.  And I felt so wonderful about it that I felt lucky over me helping him and him taking the help.

So I felt this luck, and I just instantly decided I was going to go to the Circle K up on the corner and buy $3 worth of lottery tickets, because I had spent three days helping this man.  So that's what I had in mind when I went to the Circle K.

BY MR. BERNARD:

Q.  Now, had you been to that Circle K before?

A.  I had been there.  Mainly just got gas.

Q.  And just to refresh the jury's memory, where is this Circle K located?

A.  701 East Bethany Home.

Q.  Okay.

A.  Bethany Home Road.

Q.  Now, prior to today, did you know that there were -- there was surveillance of the Circle K?

A.  Well, most Circle Ks have surveillance.

Q.  And have you seen the surveillance of you in that Circle K on July 16th, 2014 --

A.  I have.

Q.  -- prior to today?

A.  I have.

MR. BERNARD:  Okay.  And I want to show the witness and publish to the jury what's labeled as Defense 567, Your Honor.

THE COURT:  What exhibit number is this?

MR. BERNARD:  567, I believe, Your Honor.

THE COURT:  All right.

MR. BERNARD:  And it is admitted.

THE COURTROOM DEPUTY:  Mr. Bernard, are you using the --

MR. BERNARD:  No, ma'am.

THE COURTROOM DEPUTY:  Okay.

BY MR. BERNARD:

Q.  All right, Ms. Winkler.  Now, there are a number of cameras in front of you.  Do you see that?

A.  Uh-huh.

Q.  And the top left is labeled "Front Door."

Do you see that?

A.  Yes.

Q.  And then the top right is labeled "Candy."

Do you see that?

A.  Yes.

Q.  Bottom --

MR. BERNARD:  I'm sorry.  May we publish, Your Honor?

THE COURT:  Hang on a second.  Is this in evidence?

MS. WIENEKE:  Your Honor, all four views are separately in evidence as 569 through 566.

THE COURT:  Okay.

MS. WIENEKE:  So all four views displayed on one video image, if the record could just reflect that while Mr. Bernard

wants the witness to focus on the one particular camera angle, he's actually displaying 569 through 566 all at the same time.

THE COURT: Okay. That's fine.

Do you intend to display all four at the same time?

MR. BERNARD: Yes, Your Honor.

THE COURT: Go ahead.

MR. BERNARD: Yes, Your Honor.

And may we publish, Your Honor?

THE COURT: You may. Go ahead.

(Video played for the Court and the jury.)

BY MR. BERNARD:

Q. So, Ms. Winkler, do you see -- I think you confirmed the top one says "Front Door," the top left, and the top right is "Candy"?

A. Yes.

Q. And the bottom right says "POS A"?

A. Yes.

Q. And then the bottom left says "POS B"; correct?

A. Yes.

Q. Now, I want you to focus your attention on the Front Door camera. Okay?

Did you see yourself?

A. Yes.

Q. And what were you doing?

A. Coming in the door.

Q.   I want you to focus your attention on POS A.

Do you see yourself, Ms. Winkler?

A.   Yes.

Q.   And it's in POS A; correct?

A.   Correct.

Q.   What are you doing in that line?

A.   I'm standing in line to get a lottery ticket.

Q.   And at this time, are you having any conversations with anybody?

A.   Yes.  I -- actually, I'm not right at that time.

Q.   Well, it looks like you are showing an emotion.  What are you doing there?

A.   Yes.  I'm somewhat emotional over helping this man, because he had just been picked up by this Community Bridges to go to rehab.  So I was still feeling very emotional over him accepting this help and that it -- I felt it was going to be a really good thing in his life.

THE COURT:  Which camera are we looking at?

MR. BERNARD:  Your Honor, we're looking at POS A, which is the bottom right.

THE COURT:  All right.  Go ahead.

BY MR. BERNARD:

Q.   Now, Ms. Winkler, are you sad at this point?

A.   Well, I'm just kind of overjoyed for him.

Q.   Okay.  POS A.

Is that you still in line in the bottom screen, which is labeled "2 POS A"?

A.   Yes.

Q.   Now, Ms. Winkler, why did you pick this line to go into?

A.   Well, I had been to the store before and had met Mr. Ford. I just stepped up to his line.

Q.   You said you met Mr. Ford.  Have you had a conversation with Mr. Ford before?

A.   Yes, I did, and it was pleasant.

Q.   Now, remind me again, what was your plan when you go to Circle K?

A.   Well, like I said, when I left my place, I thought, I'm going to get $3 worth of lottery tickets.  I didn't know how I was going to break it up, if I was going to get three individual, a two and a one, whatever.  I just had it in my mind I was going to get $3.

And then when I got to the store, I got to talking to some people and then decided what to do.

Q.   I want you to focus your attention on 2 POS A, which is the bottom right.

Is that you talking to Mr. Ford?

A.   It is.

Q.   And what are you telling Mr. Ford?

A.   I'm telling him I want a $1 ticket.

Q.   What's Mr. Ford handing you?  Or what did he put on the

table, on the counter?

A.   The ticket.

Q.   And what did you give Mr. Ford?

A.   $1 -- or a $5 bill.  I had a $5 bill that I was going to give him.

Q.   What does Mr. Ford give you back?

A.   He hands me back four $1 bills.

Q.   Now, are you finished with your transaction there, Ms. Winkler?

A.   With Mr. Ford, yes.

Q.   All right.  And did he give you your correct change?

A.   He did.

Q.   Why don't you leave?

A.   Because I wanted to finish what I had in mind.  I wanted $3, so I needed to buy 2 more dollars for my mission that I had in mind.

Q.   Does Mr. Ford tell you to leave?

A.   No, he does not.

Q.   Does he say anything else to you?

A.   No.

Q.   Now, Ms. Winkler, do you see yourself in the bottom right camera, which is labeled "2 POS A"?

A.   Yes.

Q.   Do you see an African-American man in a striped shirt in the bottom left camera, which is labeled "3 POS B"?

A.   Yes.

Q.   Do you see the top of that African-American man's head in the Front Door camera, which is the top left?

A.   Yes.

Q.   Are you having a conversation with that man?

A.   I am having a conversation with him.

Q.   Now, without telling the jury what he said, do you make a decision on what you're going to do next?

A.   Yes.  I was going to --

Q.   And what is that decision?

A.   I was going to use his numbers to buy a $2 ticket.  He was going to allow me to use his numbers that he considered lucky, that he was going to share with me.  That's what I was going to do.

Q.   And you continue to have a conversation with this gentleman; correct?

A.   Yes.  He was very friendly to me.

Q.   Did he ever say no, lady, I don't want to talk to you?

A.   Not at all.

Q.   Anything like that?

A.   He was very friendly to me.  Very helpful.  I didn't know how to play the lottery really very well.

        MR. BERNARD:  Now, I'm going to make -- Your Honor, I'm going to make the screen which is labeled "3 POS B" larger.

        THE COURT:  Okay.

BY MR. BERNARD:

Q.  Now, what's happening here, Ms. Winkler?

A.  I'm walking over with him as he's starting to buy his $4 lottery ticket.  He was going to buy two Powerballs, and a Powerball is $2 each.

Q.  Now, at the time, did you know how much the tickets cost?

A.  He had told me a Powerball was $2.

Q.  Okay.  Now, what did you put down on the table?

A.  I put down $2, because I wanted one Powerball with his numbers.

Q.  Okay.  Now, what's the man doing?

A.  He is putting down his $4.

Q.  Now, when you put your $2 down, do you say anything to the clerk, Mr. Nelson?

A.  No, I don't.

Q.  Does the clerk say anything to you?

A.  No, he doesn't.

Q.  Now, what just happened?

A.  He just gave the man his ticket.

Q.  Is your money still on the table?

A.  Yes.

Q.  Now, what's the man saying to Mr. Nelson?

A.  He's saying --

        MS. WIENEKE:  Objection.  Hearsay.

        THE COURT:  Overruled.  It's not being offered for the

truth of the matter asserted.  It's being offered to explain what happened.

So go ahead.

BY MR. BERNARD:

Q.  What's the man saying to Mr. Nelson?

A.  He's saying, she wants the numbers I got but a $2 ticket.

Q.  Now, do you see the screen that's to the right of your -- of the video, Ms. Winkler?

A.  Yes.

Q.  Do you see that Mr. Nelson had rang up not only one $4 Powerball but two $4 Powerballs?

A.  Yes.

Q.  Is he -- at this moment, had Mr. Nelson charged you $4 for a Powerball?

A.  He had rung it up and he was trying to.

Q.  Okay.  When Mr. Nelson showed you the money, what does he say to you?

Do you want me to replay it?

A.  Yes, please.

Q.  When he's showing you the money right there, what is he saying to you, Ms. Winkler?

A.  Okay.  Well, I had had $2 on the table, and then because he was trying to make me buy a $4 ticket, I put 2 more dollars down.

Q.  Not yet.

He picked up your $2.

A. Oh, okay. He's picking up my $2. I can't see the dollar bills there. You can't see how many are there in his hand.

Q. I'm going to rewind it so you can see the transaction.

A. Okay. Yes.

Q. Do you see him pick up your $2?

A. Yes.

Q. And he's pointing to you. What is he saying?

A. He said, you gave me $2. I need $4.

Q. Now, what is the African-American man saying to Mr. Nelson?

A. He's saying, she wanted my numbers but she only wanted a $2 ticket.

Q. Now, it looks like you're putting something down.

A. Yes. Because he was insisting that I pay for the $4 ticket, so I initially started to pay the extra $2, even though that's not what I wanted. But he didn't clarify the order before he completed it.

Q. Okay. Now, it looks like you're talking to the man in the striped shirt again.

A. Yes.

Q. Are you -- why are you talking to him?

A. I'm just confirming. I have my finger up, I'm like, yeah, I just wanted one ticket. I just wanted one Powerball.

Q. What are you -- what are you doing with your fingers here?

A. That's what I'm doing, the same thing to him. I'm like, I

just wanted one.  I just wanted one.

Q.  Now, are you yelling at Mr. Nelson?

A.  No.

Q.  Is Mr. Nelson yelling at you?

A.  No.  Well, he's a little bit aggressive, but he's not yelling.

Q.  Now, at this point had Mr. Nelson correctly charged you for the ticket?

A.  Yes.  He is now --

Q.  I don't think you were watching.  We'll rewind.

A.  Okay.  All right.

Q.  What's Mr. Nelson doing, the clerk?

A.  He's presenting me with a ticket.

Q.  Is he presenting you with a ticket?

A.  Oh, okay.  He's -- he just gave the man his ticket.

Q.  So at this point is Mr. Nelson -- had Mr. Nelson refunded your money or charged you for the correct ticket that you asked for?

A.  Had he refunded my money?  No.

Q.  Is he still charging you $4 for --

A.  Yes.  He's still insisting that I pay the $4.  So that's why I'm like, no, that's not what I wanted.

Q.  What's Mr. Nelson doing now?

A.  Now he's giving me back $2.  And he finally decides to re-pull the correct $2 ticket.  And in the process he made the

comment, I got to eat this, meaning that the $2 difference or the -- actually, the $4 ticket that he pulled, that the store, from what he was saying, had to absorb the cost of this $4 ticket.  And that's apparently why he was being so insistent with me, is like he said, I got to eat this.  So I think that's --

Q.  Now, Ms. Winkler -- can you -- what was the confusion -- looking back now, what do you think the confusion was?

A.  Yeah.  Well, he should have confirmed that, you know, before he actually pulled the ticket, you want exactly the same thing.  But he saw that I only had $2 laying on the counter, so he should have immediately questioned it rather than picking it up and then saying, you owe me 2 more dollars.

Q.  Could you have told him?

A.  I should have.  It was partly both our faults.

Q.  Now, does Mr. Nelson give you a $2 ticket?

A.  Yes, he does.

And I also said at one point that, why don't you just file a refund on it.  I just figured that was possible.  And that's when he said the "I got to eat this," so...

Q.  Now, Ms. Winkler, after he gives you the ticket back, why don't you leave?

A.  Because I was feeling like he had tried to force me to buy this wrongly pulled ticket, and I just felt very -- I felt like it wasn't right, that if you don't want to buy something, you

shouldn't be forced to.

Q. Now, do you leave the store, though?

A. No, I didn't.

Q. Does Mr. Nelson say, hey, you've completed your transaction, you got to get out of here?

A. No. Never.

Q. Now, do you see yourself in what's labeled "POS A"?

A. Yes.

MR. BERNARD: Going to make that one larger, Your Honor.

BY MR. BERNARD:

Q. Now, why did you go back to -- and if we could rewind it --

Whose line is this, Ms. Winkler?

A. Mr. Alex Ford.

Q. Why did you go back to his line?

A. Because he was, like I said, he was nice to me when I'd been to the store before. And I stepped back over there to ask him, can I speak to your store manager?

Q. Now, do you say anything to Mr. Ford, Ms. Winkler?

A. I had said, can I speak to your store manager?

Q. Does he say anything to you or does he give you any commands?

A. No. He starts to go into the back of the store to look for the manager's number.

Q. Does he tell you to wait?

A.  He does.

Q.  Now, are you aware of how long Mr. Ford had been working there?

A.  I think -- he was pretty new.  When I was there before and talked to him, he had told me he was pretty new.

Q.  Now, while you're waiting, does Mr. Nelson speak to you?

A.  No.  Not at all.

Q.  While you're waiting, are you yelling anything to Mr. Nelson?

A.  No.  Standing there quietly.

Q.  Do you even talk to Mr. Nelson?

A.  No, I did not.

Q.  Do you even look at Mr. Nelson?

A.  No.  Did not.

Q.  What does Mr. Ford give you?

A.  He's handing me an 800 customer service number card.

Q.  Okay.  Is that what you asked for?

A.  No, it's not what I asked for.  I wanted to speak to their direct store manager.  I didn't want to really -- I wanted to talk to somebody that was directly over them, or in particular, Mr. Nelson.

Q.  Well, what was the number that he gave you?

A.  It was an 800 number for customer service, Circle K.

Q.  What do you do with the card?

A.  I give it back to him.  And I said, I'd like to speak to

your store manager.

Q.  Do you throw it at him?

A.  No, I do not.

Q.  When Mr. Ford walked away, does he say, get out of here, Ms. Winkler?

A.  No, he does not.

Q.  Does he say that you're trespassed, Ms. Winkler?

A.  No, he does not.

Q.  Does he say that you should probably leave?

A.  No, he did not.

Q.  What does he tell you to do?

A.  He told me to wait and he would try to find the store manager's number.

Q.  Now, it looks like some people are backing up in line. Does Mr. Nelson say, you got to come back tomorrow?

A.  No, he does not.

Q.  It looks like you have your arms crossed; is that correct?

A.  Yes, I do.

Q.  Are you cursing out anybody in that store?

A.  Not at all.  I'm not saying anything.

Q.  And while you're waiting for Mr. Ford, during that time, did anybody tell you to leave?

A.  No.  Not at all.

Q.  Now, what's happening here?  Are you having a conversation with Mr. Ford?

A.   I am.

Q.   Is Mr. Ford telling you to leave?

A.   No, he's not.

Q.   Does he present you with the manager's -- or a manager phone number at this point in the video?

A.   I don't know what he's doing there.

Q.   Okay.  You say you don't know what he's doing, but is he telling you to leave?

A.   No, he's not.

Q.   Now, looking at the bottom left, in screen 3 POS B, is that Mr. Ford?

A.   Yes.

Q.   Is that also Mr. Nelson?

A.   Yes.

Q.   Now, going to POS A, bottom right, is he talking to you again?

A.   Yes, he is.

Q.   What's he doing?

A.   He's starting to come around to point to the front of the store that the --

Q.   And now we're on -- I'm sorry to interrupt.  Now we're on Front Door, top right; correct?

A.   Uh-huh.

Q.   And what are you guys doing?

A.   He's pointing to the front of the store.  They have a sign

for the number of the regional manager.  And he said, call that.

Q.   Okay.  What are you doing right now?

A.   I'm putting that number into my phone.

Q.   Is that you also in the bottom left video, in 3 POS B?

A.   Yes.

Q.   Is that the number that you wanted?

A.   No, it's not.

Q.   Well, it's a manager, Ms. Winkler.  Why not?

A.   I wanted to speak to the direct store manager.

Q.   Why isn't that manager sufficient?

A.   Because a regional manager would be over maybe even the whole Western region.  I wanted to speak to the manager over that store.

        MR. BERNARD:  One second, Your Honor.

BY MR. BERNARD:

Q.   Now, you had the -- the altercation that you had with Mr. Nelson ended at 6:37, and that's when you asked for a manager from Mr. Ford?

A.   Correct.

Q.   Now it is 6:44 -- or 6:43:08?

A.   Correct.

Q.   In your opinion, is that a long time for you to be waiting for a manager?

A.   It is.

MS. WIENEKE:  Could you tell me -- pardon me.  I apologize.  Can you tell me the start time of -- what was the question?  Of when you asked for the manager or finished with the transaction?

MR. BERNARD:  Asked for a manager, I have -- Your Honor, may I?

THE COURT:  Is there an objection?

MS. WIENEKE:  I just asked for clarification.  I didn't catch it.  Because when he's showing the videos, he's not telling the times, and so I just didn't hear the part of that question.

MR. BERNARD:  Your Honor, the times are on the screen too.

THE COURT:  Well --

MR. BERNARD:  But I can clarify.

THE COURT:  I think it would be helpful if you did say what time we're talking about.

MR. BERNARD:  Thank you, Your Honor.

The time that I said that she went back into -- one second.

Is 6:37:54.  That's when she asked for a manager.

MS. WIENEKE:  Thank you.

BY MR. BERNARD:

Q.  Now, Ms. Winkler, you were -- how did this wait -- what were you thinking during this time that you were waiting?

A.   I just couldn't understand how they didn't know who their store manager was.

Q.   Based on that, what did you decide to do?

A.   So I wrote -- put that number in my phone, but I didn't call it.  And I went back over to him again, to Mr. Ford.

Q.   And while you're writing down this -- before you write down the number, did Mr. Ford tell you to leave?

A.   No, he did not.

Q.   Do you see yourself in POS A, which is the bottom right?

A.   Yes.

Q.   What are you doing in that line?

A.   I'm checking my phone, or maybe I was trying to text that manager.  I don't know.  But I had put her number in my phone.

Q.   Does anybody tell you to leave?

A.   No one ever tells me to leave.

Q.   Do you see yourself in the bottom left video that's labeled "POS B"?

A.   Yes.

Q.   Whose line is that?

A.   I'm talking to Mr. Nelson.

Q.   Is Mr. Nelson telling you to leave?

A.   No, he did not.

Q.   Do you ask Mr. Nelson anything?

A.   Yes.  I probably asked him, do you know who the store manager is?

Q.   Does Mr. Nelson tell you who the store manager is?

A.   No, he does not.

Q.   Now, during this time, are you preventing them from conducting their business?

A.   Not at all.

Q.   Is that you smiling?

A.   Yes.

Q.   Do you see yourself in the bottom right camera, POS A?

A.   Yes.

Q.   Are you talking to Mr. Ford again?

A.   Yes.

Q.   What are you talking to him about?

A.   I'm asking him, do you think you can find the store manager's number?

Q.   Does he ask you to leave?

A.   No, he does not.

Q.   Did he just leave?

A.   He went in the back.

Q.   Does he give you any commands?

A.   To stay there.  To wait.  Said, let me look again.

Q.   Now, looks like you're on your phone.

A.   Yes.

Q.   Are you making a phone call?

A.   Yes.

Q.   Who are you calling?

A.   I called the police.

Q.   Why did you call the police, Marty?

A.   Because it was taking so long, and I thought I would never get a store manager.  So I wanted to file a report on this wrong transaction, which I thought if he was forcing me to buy a wrong ticket, he was probably doing it to other people.  So I thought it was something worth filing a report on.  I mean, the Arizona lottery is a government agency.

Q.   Marty, do you still see yourself in this image?

A.   Yes.

Q.   What did Mr. Ford just hand you?

A.   He handed me the phone.

Q.   Does he tell you to leave the store?

A.   No, he does not.

Q.   Before Mr. Ford handed you the phone, did Mr. Nelson tell you to leave the store?

A.   No, he did not.

Q.   Who was on the phone, Ms. Winkler?

A.   The store manager.

Q.   Is that who you wanted to speak to?

A.   Yes.  He finally got him on the phone.

Q.   While you're on the phone, does the manager tell you to leave?

A.   No, he does not.  We're discussing the incident.

Q.   Now, during this whole interaction, if anybody told you to

leave, what would you have done?

A.   I would have left.

Q.   When you were on the phone with the police the first time, did they tell you to leave?

A.   No, they did not.  They told me to wait.

MR. BERNARD:  One second, Your Honor.

BY MR. BERNARD:

Q.   Now, Ms. Winkler, what did you just do?

A.   I'm sorry.  I missed that.  Again, please?

MR. BERNARD:  Replay it again.

THE COURT:  Which one are we looking at?

MR. BERNARD:  I'm sorry, Your Honor.  We're looking at POS A, and we're going to make that one large.

THE COURT:  Where is that?

MR. BERNARD:  It's the bottom right.

BY MR. BERNARD:

Q.   Did you see it, Ms. Winkler?

A.   Yes.

Q.   And what did you just do?

A.   I finished talking to him, and he wanted to talk to Mr. Ford, and I put the phone on the counter.

Q.   Okay.  And you say you finished talking to the manager; correct?

A.   Well, I -- yes.  At that point.

Q.   Did the manager tell you to leave?

A.   No, he did not.

Q.   Now, while you're waiting, are you disparaging Mr. Nelson?

A.   No, not at all.  I'm standing there quietly.

Q.   While you're standing there, does Mr. Nelson say anything to you?

A.   No.  He says nothing to me.

Q.   What just happened?

A.   Mr. Ford just handed me the phone again.  The manager wanted to speak to me again.

Q.   Did Mr. Ford say, after you're done with this phone call, you have to leave?

A.   No.

Q.   Does Mr. Ford say, the manager said you have to leave?

A.   No.

Q.   Now, do you see yourself in the upper right-hand screen labeled "Candy"?

A.   Yes.

Q.   Why are you going into this area?

A.   I wanted to get back away from the front area so I didn't disturb anybody, so I could talk to him and not disturb other customers.

Q.   Is this the same person that you were talking on the phone the first time?

A.   Yes.  The store manager.

Q.   During this second conversation, does the manager tell you

to leave?

A.   No, he does not.

Q.   Does he say that you've been trespassed from the store?

A.   No, he did not.

     MR. BLACKWELL:  6:58:45?

     MR. BERNARD:  Yes, sir.

BY MR. BERNARD:

Q.   Now, Ms. Winkler, do you still see yourself in the top right-hand screen, labeled "Candy"?

A.   Yes.

Q.   Are you still talking to the manager?

A.   Yes, I am.

Q.   Now we fast-forward a little bit.  Did anybody tell you to leave during that time?

A.   No, they did not.

Q.   During the time we fast-forwarded, did any of the clerks approach you and tell you to leave?

A.   No, not at all.

Q.   Do you still see yourself in the top right-hand screen labeled "Candy"?

A.   Yes, I do.  I'm up by -- I think that's like a soda fountain area.

Q.   Is anybody -- or withdraw that question.

     What did you just do?

     Do you want me to replay it?

A.   Yes.

Q.   What just happened?

A.   I just -- I came back up to the front area where Mr. Ford is, and I put the phone on the counter.

Q.   And do you see yourself in the bottom right screen, labeled "2 POS A"?

A.   Yes.

Q.   Do you say -- where are you going right now?

A.   I'm walking out the door.

Q.   Do you say anything to the clerks?

A.   No, I don't.

     Oh, actually, I said, "I'm calling the police" as I'm walking out the door.

Q.   Now, it looks like you're going to the left.

A.   Yes.

Q.   Why did you go to the left?

A.   Because my car was parked over there.

Q.   Were you going to wait in your car?

A.   No, I wasn't going to wait in my car, because I was having an AC problem and it was hot out there.  And -- but I was just going to go stand by my car.

Q.   Do you make any phone calls when you go outside?

A.   I did make a number of phone calls.

Q.   Why did you call?

A.   To find out when they would be there.

Q.  Why didn't you go home?

A.  Because I -- no one ever told me to go home.

Q.  Now, I want to go over the number of phone calls you made.
Okay, Ms. Winkler?

    Now, at this point, you can see on the screen you left
the Circle K at 6:59:47.  Is that correct?

A.  Correct.

Q.  Is that at least what the screens say?

A.  Yes.

Q.  Now, you made another call at 7:01.  Why did you make that
phone call?

A.  Well, I saw two police cars sitting over directly
diagonally at the CVS.  And they were sitting there for an
extended period of time.  And I thought that they were on the
wrong corner, because when I had called police, they kept
asking me repeatedly, what is the address?

    And I just kept telling them, 7th Street and Bethany
Home.  I said, I don't know.  The Circle K.  At the time I
didn't see the address on the building or what -- I just said,
7th Street and Bethany Home.

    So I thought these two police officers across the
street were confused and they were over on the wrong corner, so
that's why I called the police at that time.

Q.  Now, there's been some allegations that you would call and
you would hang up abruptly.

A.  My cell phone was almost dead.  I had an older style phone that it died very quickly.  And it had -- when it would get almost dead, it had a red -- I called it red bar.  And I -- at that point, because I had known what would happen before, it literally would die at any time.

So that's why I was very abrupt on the phone.  I would just say, how long?  And they kept saying either, they're on their way, is what they would say many times, they're on their way -- and also I thought since they said "they're," that two officers were coming.  Because when you say "they," that means one -- more than one.  And --

Q.  Ma'am -- I'm sorry to interrupt, Ms. Winkler.

Now, it looks like you called again at 7:08.  Why did you call then?

A.  Well, I waited about ten minutes.

Q.  Now, when you're on the phone with the 911 dispatcher, do they tell you to leave?

A.  No, they never told me to leave.

Q.  What do they tell you?

A.  They told me to wait, that they're on their way, and/or ten minutes.  They just kept repeating the same thing.

Q.  What about when you called at 7:18?  Why did you call then?

A.  Waited about 10 minutes and called again.

Q.  What about at 7:28?

A.  I waited 10 minutes and called again.

Q.   What about at 7:33?

A.   Well, that wasn't quite 10 minutes, but I saw -- and then I also saw another officer driving down 7th Street that I thought, if there were all these other officers in the area, why weren't they responding to this call?

Q.   Ms. Winkler, have you ever worked as a 911 dispatcher?

A.   Never.  So I don't know how it works.

Q.   Are you a prior -- did you ever have law enforcement training?

A.   Not at all.

Q.   Do you know the protocol on how officers are dispatched to calls?

A.   No, I don't.

Q.   Did anybody explain that to you --

A.   No, no.  They just kept telling me, they're on their way.

Q.   Now, at some point did you ask somebody else to call for you?

A.   Yes, I did.  There was a man in the front that I started talking to.  He was very friendly to me.  He had a crucifix hanging from his rearview mirror, so I talked to him.

     And I said -- and he told me his name.  It was Curtis. And I said, would you call the police for me?  I said, I have a situation here where I just want to talk to a police officer to document this, that I have gotten no resolution from the store manager.  I just simply want to document this.

Q.  Now, it looks like you went inside the store at one point again.

A.  Yes, I did.

Q.  When you go inside, does anybody say, hey, lady, you got to get out of here?

A.  No.  No one did.

Q.  Does anybody say, hey, we told you you couldn't come back in?

A.  No, they did not.  And I actually willingly went outside after I got off from the store manager.  They never told me to leave.

Q.  Now, and then you called again at 7:41.  Why did you call then?

A.  Well, it was about 10 more minutes.  No one had arrived. You know, from the very beginning they said, they're on their way.  They didn't --

MR. BERNARD:  One second, Your Honor.

MR. BLACKWELL:  7:42:30?

MR. BERNARD:  Yes, sir.

BY MR. BERNARD:

Q.  Now, Ms. Winkler, the times on the Circle K screen, it says 7:41 -- they're not all synced up.

MR. BLACKWELL:  One second.

BY MR. BERNARD:

Q.  Now, Ms. Winkler, it's on the clock which is labeled -- on

the screen which is labeled "3 POS B."  It's the bottom left.
Or the bottom -- it says 7:42:27.

A.   Uh-huh.

Q.   Approximately how long had you been waiting for an officer
to respond to your phone call?

A.   I don't know.  45 minutes?  I don't know exactly.

Q.   Approximately?

A.   Okay.  No --

Q.   I don't want you to do any math up there.  Just
approximately how long do you think?

A.   By the time of which phone call?

Q.   The first one.

A.   Oh, the first phone call?

Q.   And your first phone call, if it helps you, was at 6:45.

          THE COURT:  And what's the question?

          MR. BERNARD:  Approximately how long had she been
waiting for an officer to respond to her phone -- her initial
call.

          THE COURT:  At what time?

          MR. BERNARD:  6:45, Your Honor.

          THE COURT:  The call was 6:45.  What time are you
asking her?

          MR. BERNARD:  I'm asking her how long had she been
waiting.

          THE COURT:  Until he arrived?

MR. BERNARD:  Up until this point, which is --

THE COURT:  What point are you talking about?

MR. BERNARD:  I can rephrase the question, Your Honor.

THE COURT:  I just need to know the beginning and end time.

BY MR. BERNARD:

Q.  My question, Ms. Winkler, is since your initial phone call, which was at 6:45, to this point here in the screen, which is at 7:42, how long had you been waiting, approximately, for an officer?

A.  Oh, okay.  About an hour.

Q.  Okay, thank you.  I'm sorry if that was -- it was probably a weird question.

A.  That's okay.

Q.  Now, I want to draw your attention to -- which is -- I think I can write on here.

I want to draw your attention to this area here. Okay?

A.  (Nods head.)

Q.  Now, we slowed it down.  But how would you describe how Officer Gillespie's vehicle entered the Circle K parking lot?

A.  He came screaming into the parking lot.  A very busy parking lot.

Q.  Now, do you immediately approach Officer Gillespie?

A.  No.

Q.  Do you immediately approach his car?  I'm sorry.

A.  No.

Q.  Why not?

A.  Not immediately.  He sat in his car for, what I know now, 40 seconds.

Q.  Do you see yourself in that screenshot?

A.  Yes.

Q.  Okay.  Why do you then approach Mr. -- or Officer Gillespie?

A.  Because he looked up, and I started walking towards him to identify myself, that I was the person that had called the police for help, and I thought he was there to help me.

Q.  What happens when you get to him?

A.  So he said, what do you want?

Q.  Now, Ms. Winkler, does he just say, what do you want?

A.  He said it very aggressively.  "What do you want?"

Q.  And what do you do based on what he says?

A.  He was just -- I saw the -- he was -- he was angry and -- that I had called a number of times and -- and he -- after he said, what do you want, I saw that he looked so angry that I immediately wanted to deescalate this.  Because I instantly felt afraid that this officer wasn't there to help me.

So I instantly said, we need a supervisor.  And I said that meaning, like, wait.  Let's get somebody else here to talk about this.

All I wanted to do was talk.  That's all I wanted to do, was talk about this situation of this wrongly pulled ticket and then there was no resolution with the manager.

Q.  Now, Ms. Winkler, I'm going to show you your actions in a second.

MR. BERNARD:  And, Your Honor, I'm going to ask a couple more questions and I'll be done for today.

THE COURT:  Okay.

BY MR. BERNARD:

Q.  Now, Ms. Winkler, it looked like you approached and then you went away very quickly.

A.  Yes.

Q.  Why did that happen?

A.  Yes, because I was instantly frightened of him.

Q.  What was his demeanor?

A.  He was just very angry and not helpful.  And he never said, okay.  What's going on here?  Let's calm this down.  Tell me what this is all about.  Yeah.  He just said, what do you want?

Q.  And do you see the officer go into the store?

A.  Yes.  He was out there with me for four seconds.  He immediately goes into the store.

Q.  And when he comes out of the store, does he say anything to you?

A.  Yes, he does.

Q.  What are you doing when he comes out of the store?

A.  I was on the phone.

Q.  What does he say to you when he comes out?

A.  I was -- he immediately said to me, I need your ID.

Q.  Now, refresh my memory, Ms. Winkler.  You said you were on the phone?

A.  Yes.

Q.  And Officer Gillespie asked you something?

A.  Yes.  He said, I need your ID.

Q.  Okay.  Do you see yourself in this picture?

A.  Yes.

Q.  What's your arm doing?

A.  My arm is outstretched.  I'm walking up to him, handing him my ID.

Q.  Does Officer Gillespie make any other statements to you?

A.  Yes.

Q.  What does he say to you?

A.  He takes my ID and then he immediately says, they said you're trespassing.

Q.  What did you say to that?

A.  I said, I certainly am not.  I bought lottery tickets.

Q.  Does he say, Ms. Winkler, you got to leave?

A.  No.  He did not.

Q.  Does he say, Ms. Winkler, you're under arrest?

A.  No, he did not.

Q.  Does he say, Ms. Winkler, turn around, put your arms behind

your back.  I'm going to arrest you?

A.  No, he did not.

Q.  Does he say, Ms. Winkler, give me your wrist.  I'm going to arrest you?

A.  No, he did not.

Q.  What's the next thing that happened, Ms. Winkler?

A.  He said, put your cell phone down.

Q.  Then what happened?

A.  He immediately rushed toward me and was on me in an instant and grabbed my wrists.

Q.  What's the next thing you remember happening?

A.  I remember nothing after that until I was in ICU with a doctor at my side.

Q.  Ms. Winkler, did you just see yourself on the video?

A.  Yes.  Oh, I had my hands up and I was backing up, because he was coming towards me.  And I was -- I was terrified.

Q.  During that time, does he say, Ms. Winkler, you're under arrest?

A.  He does not.

Q.  If Officer Gillespie told you to leave, what would you have done?

A.  I would have left.

MR. BERNARD:  I think this is a good time to stop, Your Honor.

THE COURT:  Okay.  Let's take our evening recess.

We'll come back tomorrow and we'll start at 9:00 o'clock.

During the recess, remember, do not talk to anybody about this case. Don't let anybody talk to you about this case. Keep an open mind. And don't go to the Circle K at 7th Street and Bethany.

All right. We'll see you tomorrow.

(Jury not present.)

THE COURT: Please be seated.

Do we have anything to talk about before we go?

MR. BLACKWELL: Judge, we just had some redactions with the police report, but I guess -- I think we're good now because it's not coming in anyway.

THE COURT: Okay. I'm asking you, is there something you want from me before I leave?

MR. BLACKWELL: At this moment we don't have anything to ask you, Judge.

THE COURT: Okay. Ms. Wieneke?

MS. WIENEKE: No, Your Honor.

THE COURT: Okay. We'll start tomorrow at 9:00.

Are you finished with this witness, or you still have more questions?

MR. BERNARD: I still have more questions, Your Honor.

THE COURT: All right. We'll see you tomorrow morning.

MR. BERNARD: Briefly.

230

THE COURT:  Okay.

MS. WIENEKE:  Thank you.

(Proceedings adjourned at 4:41 p.m.)

C E R T I F I C A T E


       I, JENNIFER A. PANCRATZ, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

       I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control.

       DATED at Phoenix, Arizona, this 16th day of June, 2020.




                         s/Jennifer A. Pancratz_____ _____ ___
                         Jennifer A. Pancratz, RMR, CRR, FCRR, CRC