**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

_____

| | | |
|---|---|---|
| Martha Winkler, a single woman, | ) ) | |
| | ) | No.  CV-15-01786-PHX-DLR |
| Plaintiff, | ) ) | |
| vs. | ) ) | Phoenix, Arizona April 10, 2019 |
| City of Phoenix, et al., | ) ) | 9:25 a.m. |
| Defendants. | ) ) | |
| _____ | ) | |

**BEFORE:   THE HONORABLE DOUGLAS L. RAYES, JUDGE**

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**JURY TRIAL - DAY 2  (A.M. Session)**
**(Pages 232 through 326, inclusive)**

Official Court Reporter:
Jennifer A. Pancratz, RMR, CRR, FCRR, CRC
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 42
Phoenix, Arizona 85003-2151
(602) 322-7198

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

**A P P E A R A N C E S**


For the Plaintiff:

    Blackwell Law Office, PLLC
    By:  Jocquese L. Blackwell, Esq.
        Gillmore B. Bernard, Esq.
    3101 North Central Avenue, Suite 820
    Phoenix, AZ 85012

For the Defendants:

    Wieneke Law Group, PLC
    By:  Kathleen L. Wieneke, Esq.
        Christina G. Retts, Esq.
    1095 West Rio Salado Parkway, Suite 209
    Tempe, AZ 85281

**I N D E X**

**SUMMARY OF COURT PROCEEDINGS**                                              **PAGE:**


Sidebar Conferences                                               241, 252,
                                                                  282, 287,
                                                                  315

| WITNESSES FOR THE PLAINTIFF: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| **Martha Winkler** | | | | |
| By Mr. Bernard | 236 | | | |
| By Ms. Wieneke | | 251 | | |

**E X H I B I T S**

| NO. | DESCRIPTION | REC'D |
|---|---|---|
| 54 | Photos of Martha Winkler in Hospital | 245 |
| 6 | Copies of pictures taken at the scene at the Circle K which were photographed by an officer of the Phoenix Police Department and provided by the City of Phoenix Prosecutor's Office | 312 |

UNITED STATES DISTRICT COURT

**P R O C E E D I N G S**

(Proceedings commenced at 9:25 a.m.)

(Jury present.)

THE COURT:  Please be seated.

Mr. Bernard, are you -- do you have further questions for your witness?

MR. BERNARD:  Yes, Your Honor.

THE COURT:  Ms. Winkler, would you please retake the stand.  I remind you, you're still under oath.

Good morning.

JURY MEMBERS:  Good morning.

THE COURT:  We're going to have to break today about 11:50, and we'll -- for lunch, but we'll take a morning break before that.

But I just wanted everybody to know what the schedule is.

MR. BERNARD:  Thank you, Your Honor.

THE COURT:  You may proceed.

MR. BERNARD:  And, Your Honor, permission to publish the four cameras.  I believe they're already admitted as 576 -- one second.  I wrote it down.

THE COURT:  Anything that's admitted, you can publish.

MR. BERNARD:  569 through 566 -- or 566 through 569.

MARTHA WINKLER,

called as a witness herein by the plaintiff, having been

previously duly sworn or affirmed, testified further as

follows:

DIRECT EXAMINATION (Continued)

BY MR. BERNARD:

Q.   Good morning, Ms. Winkler.

A.   Good morning.

Q.   I just want to recap with you, going over what we talked

about yesterday briefly.

        MR. BERNARD:   One second, Your Honor.

BY MR. BERNARD:

Q.   Now, Ms. Winkler, on your screen, on the bottom left

position, which is labeled "3 POS B," do you see a gentleman

there?

A.   Yes.

Q.   And who is that gentleman?

A.   Mr. Leslie Ford -- Mr. Leslie Nelson.

Q.   And the gentleman that's in the bottom right camera,

labeled "2 POS A," who's that gentleman?

A.   Alex Ford.

Q.   Okay.   Now, at any time when you're in the store, do any of

these individuals tell you to leave?

A.   Never.

Q.   Do they say, "Ms. Winkler, you've been trespassed from the

store"?

A.   Never.

Q.   Do they say, "Ms. Winkler, never come back to the store again"?

A.   They never said that.

Q.   And I want to back up.  You're wearing something in your ears.

A.   Yes.

Q.   What is that?

A.   It's a hearing device, because I have lost 36 percent of my hearing from this traumatic assault to my head.  I now have to wear hearing aids for the rest of my life.

Q.   Now, at some point on July 16th, 2014, you go outside and you make some phone calls?

A.   Yes.

Q.   You make a number of phone calls; correct?

A.   Yes.

Q.   And you talked to different 911 dispatchers?

A.   Yes.

Q.   Now, do those 911 dispatchers tell you to leave?

A.   No.  None of them ever -- in fact, they told me to wait.

Q.   At any time do those 911 dispatchers tell you that actually somebody had called from the Circle K?

A.   No.  I would have been -- had a totally different --

Q.   Did they say, "Ms. Winkler, somebody from Circle K says

you're a trespasser"?

A.  No, they never told me that.

Q.  If the 911 dispatcher told you to go home, what would you have done?

A.  I would have went home.

Q.  Now, we've established that you've been waiting for about an hour since your first phone call --

A.  Yes.

Q.  -- to 911.

And now you're outside in the hot sun --

A.  Yes.

Q.  -- in the middle of July?

A.  Yes.

Q.  Are you angry at all?

A.  A little angry.

Q.  Are you angry at Mr. Ford?

A.  No, not at all.

Q.  Are you angry at Mr. Nelson?

A.  Yes, I was a little bit angry at him.

Q.  Are you angry at the 911 dispatchers?

A.  No, I was not angry at them.

Q.  Well, it sounds like they're telling you that officers are on the way, and you've been waiting for a long time.  You're not angry about that?

A.  No.  I was angry because the situation was out of their

control.  I was not angry at them.  I was a little angry over having to wait so long and not understanding why I was told repeatedly, but I was not angry at them.

Q.  Well, what about when Officer Gillespie gets there?  Were you angry at him?

A.  No, I was not.

Q.  What about when you come to him and he says, "What do you want?"  You weren't angry about that?

A.  I was alarmed.  Instantly alarmed.

Q.  What about when he comes outside the store and he says, "Give me your ID"?  Were you angry about that?

A.  No.  But again, I was instantly alarmed.

Q.  What about when he says, "Put your hands down"?  Were you angry then?

A.  No, I wasn't angry.  I was alarmed again.

Q.  What about when you're backing up with your hands up like this?

A.  I was terrified at that point.

Q.  You weren't angry?

A.  I was in disbelief and terrified at that point.

Q.  What about when you woke up in the hospital?

A.  I was in disbelief.

MR. BERNARD:  Permission to show the witness Exhibit 54, Your Honor.

THE COURT:  Okay.

MR. BERNARD:  I think she has it right now.

THE COURT:  All right.

BY MR. BERNARD:

Q.  Ms. Winkler, you've been handed Plaintiff's Exhibit 54.

Do you see it?

A.  Yes, I do.

Q.  Now, without showing the jury that exhibit, do you know

what this is?

A.  Yes, I do.

Q.  And what is it?

A.  Pictures of me in ICU with a neck brace on.

Q.  Well, how do you know it's you?

A.  Because I have my tan skirt with blood all over it.

Q.  In that picture?

A.  Yes.

Q.  All right.  What about the next pictures?

And why don't you flip through it, just to make sure

those are all pictures of you.  And let me -- and just look up

when you're ready.

Ms. Winkler, do you need to take a break?

A.  I'm okay.

All right.  I'm done.

Q.  Now, is that a fair and accurate representation of you in

the hospital, Ms. Winkler?

A.  Yes, it is.

MR. BERNARD:  May I approach the witness, Your Honor?

THE COURT:  You may.

(Conference off the record between Mr. Bernard and Ms. Wieneke.)

MR. BERNARD:  May we approach, Your Honor?

THE COURT:  Okay.

(At sidebar on the record.)

MS. WIENEKE:  So, Your Honor, we have a discrepancy between what was provided to us in terms of the exhibit.  It's much more -- it's larger than what was actually marked.  And --

THE COURT:  Well, let's get to -- do you have an objection?

MS. WIENEKE:  Yes, Your Honor.

THE COURT:  I'm assuming you're going to move these into evidence?

MR. BERNARD:  Yes, Your Honor.

THE COURT:  And you're objecting to that, okay.

Where are we?

MS. WIENEKE:  As cumulative and prejudicial.  And what Mr. Bernard has said, he's only going to offer actually four pictures.

THE COURT:  Okay.  Well, just take --

MS. WIENEKE:  And so we have no objection to the four pictures.

THE COURT:  Okay.  Well, if you're offering four and

there's no objection, let's just do that.

Yeah, you got too many in there.  Pick your best four and go with them.

MR. BERNARD:  The best four, Your Honor?

THE COURT:  Well, whichever ones you want, and let counsel see it so we can all see if there's any objection to those.  But I don't think she has an objection to just four of them.

Yeah, there's pictures in there that really are just duplicative of each other.

MR. BERNARD:  I understand.

These ones, Your Honor.

THE COURT:  These four here?

MR. BERNARD:  Yes, Your Honor.

THE COURT:  There's more than four here.

MR. BERNARD:  Yes, I understand.

THE COURT:  Oh, you're offering more than four?

MR. BERNARD:  Yes, Your Honor.  Sorry.

THE COURT:  Oh, okay.

MR. BERNARD:  That's duplicative.

THE COURT:  That's duplicative.

MS. WIENEKE:  We would object to this being duplicative and --

THE COURT REPORTER:  I can't hear you.

MS. WIENEKE:  We object to 75 and 76 as being

duplicative of the ones offered.  And that would leave five photographs of the plaintiff.

THE COURT:  What's this?

MR. BERNARD:  I think it's a color scale, Your Honor, and it just shows the bruising under her eye and what color it references to.

THE COURT:  Okay.  So you have no objection to this one?

MS. WIENEKE:  No, Your Honor.  And that would be 74.

THE COURT:  And you have no objection to this one?

MS. WIENEKE:  That would be number 73.  We have no objection.

THE COURT:  Okay.  Now, how are these not already covered by what's in these?

MR. BERNARD:  Your Honor, I believe this is just --

THE COURT:  What do these show that these others don't show?

MR. BERNARD:  This is a close-up photo of that one.

THE COURT:  It shows the same thing, though, doesn't it?  Are you trying to show something different than what's in here?

MR. BERNARD:  No, Your Honor.  I can work with that one.

THE COURT:  All right.  So we have a stipulation to the admissibility of these five photos?

MR. BERNARD:  Yes, Your Honor.

MS. WIENEKE:  If you also want to give any photographs of the clothing --

MR. BERNARD:  Oh, yes, thank you.

MS. WIENEKE:  -- we don't object to that.

We would stipulate to one --

THE COURT REPORTER:  I can't hear you.

MS. WIENEKE:  I'm sorry.  We would stipulate to one photo of the shirt, front and back.

Sorry.  This one is the back.

THE COURT:  For purposes of the record, are we going to make this Exhibit 54 now?

MR. BERNARD:  I think that would be prudent, Your Honor.

THE COURT:  I think 54 -- is that the exhibit we're talking about?

MR. BERNARD:  Yes, sir.

MS. WIENEKE:  Thank you, Your Honor.

THE COURT:  Okay.  Thank you.

(End of discussion at sidebar.)

MR. BERNARD:  May I publish, Your Honor?

THE COURT:  Well, are you offering Exhibit 54 into evidence?

MR. BERNARD:  Yes, Your Honor.

THE COURT:  Exhibit 54 is admitted into evidence.

(Exhibit No. 54 admitted into evidence.)

MR. BERNARD:  Thank you.

BY MR. BERNARD:

Q.  Showing what's been admitted into evidence as Exhibit 54 --

MR. BERNARD:  One second, Your Honor.

Now showing the witness what's been admitted Exhibit 54, Bates Stamp No. 00069.

BY MR. BERNARD:

Q.  Can you see that, Ms. Winkler, on your screen?

A.  Yes -- am I supposed to be looking over here?  It's not on my screen.

Okay.  Now it is.  All right.

Q.  Now, is that what you looked like when you arrived at the hospital, Ms. Winkler?

A.  Yes.

Q.  Now, when you arrived at the hospital, were you treated by anybody?

A.  Yes.  I was in the emergency room and then taken to ICU by Dr. Tim -- are you asking me who my doctor was?

Q.  No, not yet.

A.  Okay.

Q.  Your doctor, did he tell you what your injuries were?

A.  A little bit about it.

Q.  And what were they?

MS. WIENEKE:  Objection.  Hearsay.

THE COURT:  Overruled.

BY MR. BERNARD:

Q.  What were your injuries, Ms. Winkler?

A.  He told me that I had -- my brain was bleeding and that I had multiple fractures to my skull.

Q.  Presenting Exhibit 54, Bates Stamp No. WIN 00070.

Is that a close-up picture of what you looked like in the hospital?

A.  Yes.

THE COURT:  Is that from Exhibit 54?

MR. BERNARD:  Exhibit 54, Your Honor, yes.

THE COURT:  Okay.  Go ahead.

MR. BERNARD:  These are all Exhibit 54.

BY MR. BERNARD:

Q.  Showing Exhibit 54, Bates Stamp No. WIN 00071.

Is that a picture of your head?

A.  Yes.

Q.  Bates Stamp No. 00074.

Is this another close-up picture of your head?

A.  Yes.

Q.  Bates Stamp No. 00073.

Is this what your eye looked like after your encounter with Mr. Gillespie?

A.  Yes.

Q.  Thank you, Ms. Winkler.

Now, when you were in the hospital, did you have any visitors?

A.  I did.

MS. WIENEKE:  Objection.  Relevance.

THE COURT:  Are you going to the interview?  Is that where you're going with that?

MR. BERNARD:  Can I have one second, Your Honor?

THE COURT:  Sure.  I'm trying to understand.  I don't know where this is going.

(Conference off the record between Mr. Bernard and Mr. Blackwell.)

MR. BERNARD:  I withdraw that question, Your Honor.

THE COURT:  Okay.

BY MR. BERNARD:

Q.  Now, Ms. Winkler, when you were talking to the manager -- I'm sorry.

When you were talking to the manager, did the manager ever tell you to leave?

A.  No, he did not.

Q.  Did you ever make a statement that the manager told you he could meet you here tomorrow?

A.  Yes, I did.

Q.  But did the manager tell you to leave and come back tomorrow?

A.  No.

MS. WIENEKE:  Objection.  Asked and answered.

THE COURT:  Overruled.

BY MR. BERNARD:

Q.  Did you ever make a statement that Officer Gillespie told you you were trespassing?

MS. WIENEKE:  Objection.  Prior consistent statement.  It's hearsay.

THE COURT:  I'm sorry, what's the objection?

MS. WIENEKE:  It's hearsay, asking her if she made the statement.  It's a prior consistent statement.  It's hearsay.  There's no --

THE COURT:  Okay.  I don't think it's being offered for the truth of the matter asserted.  It's being offered as to whether she ever made the statement.  So overruled.

You can go ahead.

BY MR. BERNARD:

Q.  Did you ever make the statement that Officer Gillespie told you that you were trespassing?

A.  No.

Q.  Now, Ms. Winkler, while you were in the hospital, you were suffering from some injuries; correct?

A.  Yes.

Q.  And I want to put up Exhibit 54, Bates Stamp 71.

Looks like you had a head injury.  Is that you?

A.  Yes.

Q.  Were you on any medication --

A.  Yes.

Q.  -- during that time?

A.  I was on morphine.

Q.  Now, you were interviewed by some officers, weren't you?

A.  Yes.

Q.  And during that interview, didn't you say --

MS. WIENEKE:  Objection, Your Honor.  Leading.

THE COURT:  I haven't heard the question, but it sounds like you're going to a leading question.  Why don't you ask her what she said or maybe give her some direction where you want to go.

MR. BERNARD:  Yes, Your Honor.  One second.

BY MR. BERNARD:

Q.  Did you ever -- did you ever tell another officer that the officer told you you were trespassing?

MS. WIENEKE:  Objection, Your Honor.  It's been asked and answered.  The witness has already answered.

THE COURT:  Overruled.

Go ahead and ask it.

MR. BERNARD:  Thank you, Your Honor.

THE WITNESS:  Can you restate?

BY MR. BERNARD:

Q.  Did you ever tell another officer this statement:  "But the officer told me I was trespassing"?

A.   I did say that to the officer that night.

Q.   What did you mean by that?

A.   What I meant was, Jason Gillespie said to me, "They said you're trespassing."

Q.   And by "they," what do you --

A.   The clerks.  He said, "They said you're trespassing."

Q.   Now, Ms. Winkler, during this -- at the hospital, if you were interviewed by some officers, were -- bad question.

At the hospital, were you interviewed by officers?

A.   Yes.

Q.   Did those officers read you your Miranda rights?

A.   No.

Q.   Did those officers -- did you have an attorney present?

A.   No.

Q.   Did those officers ask you anything about your injuries?

A.   No.  Not at all.

Q.   Looking back at it now, do you think it would have been fair for those officers to interview you in the state you were in?

MS. WIENEKE:  Objection.  Leading and suggestive.

THE COURT:  Overruled.

BY MR. BERNARD:

Q.   You can answer.

Do you think it was fair of those officers to interview you?

A.   No.   It was not.

MR. BERNARD:   No further questions, Your Honor.

CROSS-EXAMINATION

BY MS. WIENEKE:

Q.   Good morning, Ms. Winkler.

A.   Good morning.

Q.   You have a notebook in front of you that you took up to the stand?

A.   I do.

Q.   And what's that notebook?

A.   A little steno pad I've written a few notes on.

Q.   And have you studied those notes as you've prepared for your testimony?

A.   I've studied a lot of notes.

Q.   I'm asking you about those notes, ma'am.

A.   I just --

Q.   Did you write notes to help --

A.   I just wrote a few notes while I was sitting up here.

Q.   And I'm sorry.   It would be real helpful if you just wait for me to finish --

A.   All right.

Q.   -- so that we can have a clear record so --

A.   Okay.

Q.   -- so only one person speaks at a time.   Okay?

A.   Okay.

Q.  All right.  So going back to your steno pad, I noticed that while you were sitting at the table, you were writing notes and things.  And were you writing those notes to help you remember things so it would assist you in your testimony?

A.  Yes.

        MR. BERNARD:  Objection.  Compound question, Your Honor.

        THE COURT:  Overruled.

BY MS. WIENEKE:

Q.  And you brought that steno pad up there to the witness stand to help you and assist you in testifying?

A.  Yes.

        MS. WIENEKE:  Your Honor, I would ask that the notes be produced pursuant to Rule 612.

        MR. BERNARD:  Objection, Your Honor.

        Can we approach?

        THE COURT:  Okay.

        (At sidebar on the record.)

        MR. BERNARD:  Your Honor, she just said those are the notes that she's been writing since she just -- she just sat down this morning.  There's nothing else on that pad.  They can look at it.  These are her notes that she's been writing during the course of the trial.

        MR. BLACKWELL:  Trial notes.

        THE COURT REPORTER:  I can't hear you.

MR. BLACKWELL:  She has trial notes, but the notes up there she writes when she sits down, so she's taking notes on questions that she's being asked.

THE COURT:  Those aren't typical 612 records.  She didn't have them before the trial, according to what they're telling us.

MS. WIENEKE:  I don't know, Your Honor.  I thought I laid adequate foundation that she said she looked at those notes.  She wrote them to assist her in her testimony.

THE COURT:  Well, as she's sitting there testifying, she's writing them down.

I don't know what the issue is about these notes.

MR. BLACKWELL:  Judge, she's allowed --

THE COURT:  Let me look at them, and I'll let you know.  Just continue, and I'll take a look at her notes.

MS. WIENEKE:  Okay.  Thank you.

(End of discussion at sidebar.)

THE COURT:  Ms. Winkler, can I see your notes?

THE WITNESS:  Sure.

THE COURT:  You may continue.

MS. WIENEKE:  Thank you, Your Honor.

BY MS. WIENEKE:

Q.  Ms. Winkler, I would like to ask you about your time in the hospital, since that's kind of where we left off.

You said that you were interviewed in the hospital?

A.   Yes.

Q.   And a detective came and interviewed you within some hours after the incident --

A.   Yes.

Q.   -- is that right?

A.   Actually, there was a whole group of them.

Q.   Okay.  More than one?

A.   There was about six or -- six of them and I think a photographer -- and a photographer.

Q.   I'm sorry?

A.   There was many of them.

Q.   A photographer came?

A.   Yes.  He took all those pictures.

Q.   And do you have Exhibit 54 still in front of you, or --

A.   No.

Q.   -- did you give that back?

A.   I do not.

        MS. WIENEKE:  Counsel, do you have it?

        Thank you.

BY MS. WIENEKE:

Q.   One of the things that you asked them to do was take photographs of your clothing.

        Do you recall that?

A.   Yes, I do.

        MS. WIENEKE:  Your Honor, with the Court's permission,

I'd like to allow the Exhibit 54 to be published to the jury, which is in evidence.

THE COURT:  You may.

MS. WIENEKE:  Thank you.

MR. BLACKWELL:  What's the Bates stamp?

MS. WIENEKE:  I'm sorry, Mr. Blackwell.  I cannot read the Bates stamp the way this is assembled on this photograph.

MR. BLACKWELL:  That's okay.  We'll figure it out.

BY MS. WIENEKE:

Q.  Ms. Winkler, do you recognize this shirt as the shirt that you were wearing on the evening of the incident?

A.  Yes.  I most certainly do.

Q.  I'm sorry?

A.  I most certainly do.

Q.  All right.  This is the front of your shirt?

A.  Yes, it is.

Q.  It's a light-colored pink shirt?

A.  Yes.

Q.  And if you look here, you see the label, which reflects that this is inside-out.

Do you see that, ma'am?

A.  It is now.

Q.  Well, you weren't wearing it that way that night; right? But the photograph is taken inside-out; would you agree?  Given the fact that we can see the label on the left side of the

photograph.

A.   They --

          MR. BERNARD:  Objection.  Relevance.

          THE COURT:  Overruled.

          THE WITNESS:  It could have been turned inside-out at the hospital.  I don't know.

BY MS. WIENEKE:

Q.   But I'm just asking you whether you would agree that we can see the label on the left-hand side of the photograph, which is at the time that this picture was taken.  Would you agree?

A.   Yes.

Q.   All right.  And then showing you another photograph from Exhibit 54, which is the back side of your shirt.

          Do you see that, ma'am?

A.   Yes.

Q.   And these are photos that were taken by one of the police officers who came to your hospital room to take photographs; correct?

A.   Correct.

Q.   And these photographs were taken with your permission; correct?

A.   Correct.

Q.   In fact, at your insistence.  Correct?

A.   They came with the photographer to take pictures.

Q.   At your insistence, ma'am.

A.  No, not at my -- no.

Q.  I'm sorry?

A.  I did not specifically request the photographer that I remember.

Q.  You insisted that photographs of your clothing be retrieved from the plastic bag that was in your room and be taken; correct?

A.  I did ask for my clothes to be photographed; yes, I did.

Q.  Yes, ma'am.

    And when the detective, Detective Moseley, came to your room, you invited him to sit on your bed; correct?

A.  I did.

Q.  He was kind to you?

A.  He was very businesslike.

Q.  He was kind to you?

A.  I wouldn't use that word.

Q.  He was patient with you?

A.  He was patient.

Q.  He interviewed you for an hour?

A.  Yes, he did.

Q.  Prior to the interview, he checked with your nurse, Shannon, to confirm that you were awake and alert?

        MR. BERNARD:  Objection.  Foundation.

        THE COURT:  Overruled.

        Do you know that?

THE WITNESS:  I don't know that personally, no.

BY MS. WIENEKE:

Q.  Ms. Winkler, have you read the police report in this matter?

A.  Yes, I have.

Q.  And have you read the summary of your interview in the police report?

MR. BERNARD:  Objection.  611.

THE COURT:  She just asked if she read the summary.  I mean, that's a yes-or-no question.

Overruled.

THE WITNESS:  Yes.

BY MS. WIENEKE:

Q.  And did you read the police report in preparation of your testimony?

A.  At different points in preparation.

Q.  Yes, ma'am.

And did you read in the police report that Detective Moseley was the one who came to interview you?

A.  I actually don't remember seeing the name Detective Moseley.

Q.  All right.  And you recall that Shannon was one of your nurses in the hospital?

A.  Yes, I do.

Q.  And Shannon was kind to you?

A.   Shannon was very kind to me.

Q.   And you recall that -- reading in the police report that Detective Moseley noted in the police report that he checked with Shannon before interviewing you?

MR. BERNARD:  Objection.  611.

THE COURT:  Okay.  611 is leading.  Are you making a hearsay objection?  I'm not sure what your objection is.

MR. BERNARD:  No, Your Honor.  I'm saying her cross-examination is outside the scope of my direct, Your Honor.

THE COURT:  Okay.  You're saying this is outside the scope of your direct?

MR. BERNARD:  Yes, Your Honor.

THE COURT:  I'm going to overrule that.

MR. BERNARD:  Thank you, Your Honor.

THE WITNESS:  Repeat, please.

BY MS. WIENEKE:

Q.   Yes, ma'am.

You recall from the police report that Detective Moseley checked with Shannon prior to interviewing you?

A.   I don't --

MR. BERNARD:  Objection.  Relevance -- or foundation.

THE COURT:  Sustained.  I don't know how she would know that.

THE WITNESS:  Yeah.

MS. WIENEKE:  All right.  May the witness be provided Exhibit No. 1, please?

BY MS. WIENEKE:

Q.  Ms. Winkler, at the bottom of Exhibit No. 1, there are Bates labels, Bates numbers.  And I'd like you to turn to Bates No. 16.  It's a very small number on the right bottom page.  Let me know when you have it.

THE COURT:  And what is this exhibit?

MS. WIENEKE:  Exhibit No. 1, Your Honor.

THE COURT:  What is it?

MS. WIENEKE:  It's the police report.

THE COURT:  Okay.

THE WITNESS:  I have it.

BY MS. WIENEKE:

Q.  This is the same police report that you said you reviewed in preparation of your testimony; correct?

A.  Well, I haven't reviewed them in great detail, but --

Q.  Understood.

So referring -- are you at page Bates No. 16?

A.  Yes, I am.

Q.  All right.  Specifically referring to your interview that Detective Moseley did?

THE COURT:  Is there a question?

MS. WIENEKE:  I'm just trying to orient her to the page, Your Honor.

THE COURT:  Okay.

MS. WIENEKE:  She appears to be looking for it.

BY MS. WIENEKE:

Q.  Do you see it?

A.  Okay.  Where on the page are you talking about?

Q.  Yes, ma'am.  I'm looking at the second paragraph.  If you could just read that second paragraph to yourself.

MR. BLACKWELL:  And what page are we on again?

MS. WIENEKE:  Yes, sir.  Bates No. 16.

MR. BLACKWELL:  What paragraph?  The second full paragraph from the top?

MS. WIENEKE:  Yes, sir.

BY MS. WIENEKE:

Q.  And have you read the second paragraph to yourself, Ms. Winkler?

A.  I have.

Q.  All right.  And does that help refresh your recollection as to, from your review of the police report, as to whether Detective Moseley checked with Shannon prior to interviewing you that evening?

A.  Yes.  Correct.

MR. BERNARD:  Objection.  Improper impeachment, Your Honor.

THE COURT:  It's not impeachment.  It's just refreshing her memory.  But I don't know how she would know

that if it's only in the report.  I guess --

MR. BERNARD:  I renew my objection to foundation.

THE COURT:  Yeah.  I mean, that was the original objection to this, and I think that's the correct objection.

If everything she got is from that report, that's -- that would be hearsay, and there's no foundation for that.  So I'm going to sustain the objection.

MR. BERNARD:  Thank you, Your Honor.

BY MS. WIENEKE:

Q.  Ms. Winkler, during your interview with Detective Moseley, he asked you whether you wanted ice for your face.  True?

MR. BERNARD:  Objection.  611, Your Honor.  Outside the scope of my direct.

THE COURT:  How is this inside the scope?

MR. BERNARD:  And relevance.

THE COURT:  Is this something he -- I don't remember him covering any of these issues.

MS. WIENEKE:  Yes, Your Honor.  Mr. Bernard asked this witness, during the interview, did the detective ask her about her injuries.  And her response was, no, not at all.

THE COURT:  Okay.  All right.  Overruled.

BY MS. WIENEKE:

Q.  Ms. Winkler, during the interview with Detective Moseley, at one point during the interview, he asked you if you wanted ice for your face.

Do you recall that?

A.  I do not recall that.

Q.  All right.

MS. WIENEKE:  May the witness be provided with Exhibit No. 525, please?

MR. BLACKWELL:  Where are we at?  I'm sorry.

MS. WIENEKE:  Exhibit 525.

THE COURT:  Exhibit 525?

MS. WIENEKE:  Yes.

BY MS. WIENEKE:

Q.  Do you have Exhibit 525?

A.  I do.

Q.  And this is a transcript of the recorded interview that was done by Detective Moseley, at least Volume No. 1.

Do you see that?

A.  I do see it.

Q.  And you read that transcript to prepare for your testimony; true?

A.  Yes.

Q.  Did you listen to the audio recording as well?

A.  Yes.

Q.  How many times did you review the transcript?

A.  I believe only once.

Q.  All right.  If you would, please turn to page 44 of Exhibit 525.

You see on the side, there are line numbers?

A.   Yes.

MS. WIENEKE:  I'm going to -- Your Honor, may I, for purposes of impeachment, display and publish the portion of the interview at page 44, starting at line 1892 and going to line 1906?

THE COURT:  Any objection?

MR. BERNARD:  Yes, Your Honor.  Improper impeachment.

THE COURT:  How so?

MR. BERNARD:  May we approach?

THE COURT:  No.  Just tell me.

MR. BERNARD:  Well, I -- based on this, the officer doesn't say, "I'm going to give you ice."  She says, "I'm going to put ice on my head."

THE COURT:  Okay.  Overruled.

BY MS. WIENEKE:

Q.   So, Ms. Winkler, starting at -- on page 44 of Exhibit 525, starting at line 1892, Detective Moseley asks you:  Question: Do you need me to get a --

Answer:  I'm serious.

Question:  -- a nurse?

Answer:  Uh, no, but I'm just --

Question:  Okay.

Answer:  -- going to put my ice on it.

Question:  Yeah.  Go ahead and put your ice on it.  Do

what you need to do.

Did I read that correctly?

A.  I think I'm not on the wrong page.  I have down here COP 000544.  Is that the correct page?

Q.  Page 44, ma'am?

A.  544.  Is that what --

THE COURT:  The page is up in the right-hand corner.

THE WITNESS:  Okay, up here.  Okay.  I don't see too well, so...

BY MS. WIENEKE:

Q.  I apologize.  I was referring to the page number and not the Bates number.

A.  All right.  Okay.

All right.  I have it.

Q.  And it's at the top of the page, line 1892.

A.  Okay.

THE COURT:  I'm confused.  Who's saying they're going to put ice on it, the officer or her?

MS. WIENEKE:  The detective is asking if you need a nurse.

THE COURT:  I thought the impeachment was that the detective offered to put ice on it.

MS. WIENEKE:  Well, Your Honor, this is an 801(d)(2) party admission, so it's nonhearsay and --

THE COURT:  I'm not claiming it's hearsay.  I'm trying

to understand where the impeachment comes in.  Because if she's putting the ice on herself, that's not quite impeachment.

MS. WIENEKE:  Well, the impeachment was that he didn't ask her anything about her injuries and didn't mention anything about her injuries.

THE COURT:  I'm going to sustain the objection.  That doesn't go there.

MR. BERNARD:  Thank you, Your Honor.

THE COURT:  I'm sorry.  I misunderstood where you were going with this.

MS. WIENEKE:  Your Honor, may -- may I offer it as a party admission?  As nonhearsay under 801(d)(2), it's a statement by a party opponent.

THE COURT:  I'm not sustaining the objection on hearsay.  I'm sustaining the objection on relevance.  This doesn't go to what you said it goes to.  It doesn't impeach her.

MS. WIENEKE:  All right.  Well, let me try this.

BY MS. WIENEKE:

Q.  Ms. Winkler, isn't it true that Detective Moseley did ask you about your injuries; in fact, asked you if you wanted a nurse?

A.  When I was saying that I was in extreme pain, he did say, "Do you want me to get a nurse?"

Q.  So he did ask you about your injuries; correct?  He was

concerned about your injuries?

A.   He did in that --

MR. BERNARD:  Objection.  Foundation and speculation.

THE COURT:  Sustained.

BY MS. WIENEKE:

Q.   Isn't it true that Detective Moseley --

THE COURT:  I sustained the objection.

MS. WIENEKE:  I'm asking a different question, if the Court pleases.

BY MS. WIENEKE:

Q.   Isn't it true that Detective Moseley offered to get you a nurse during the interview?

MR. BERNARD:  Objection.  Asked and answered.

THE COURT:  Overruled.

You can answer that question.

THE WITNESS:  Okay.  When I was saying I was in extreme pain, he did say, "Do you want me to get a nurse?"

BY MS. WIENEKE:

Q.   In response to that question, you never asked Detective Moseley to terminate the interview; correct?

A.   No, I did not.

Q.   In fact, during the entire hour interview, you never asked Detective Moseley or any of the officers to terminate the interview; correct?

A.   No, I did not.

Q.  And, in fact, Ms. Winkler, during the interview with Detective Moseley, you actually thanked him and told him that more officers should be like him.  True?

MR. BERNARD:  Objection.  Relevance.

THE COURT:  Overruled.

You can answer.

THE WITNESS:  Yes, I did say that.

BY MS. WIENEKE:

Q.  You asked for the interview to be tape-recorded; correct?

A.  Yes.  And he was already tape-recording.

Q.  That's right.

And in response to your request that it be tape-recorded, Detective Moseley said, "I already am"?

MR. BERNARD:  Objection.  Hearsay.

BY MS. WIENEKE:

Q.  Correct?

THE COURT:  Overruled.

THE WITNESS:  Correct.

BY MS. WIENEKE:

Q.  And you said, "Don't you need to tell a person that?"

Correct?

A.  Yes.

Q.  And he said, "No, I don't have to."

Right?

A.  Correct.

Q.   And you said, "I know.  You're exactly right.  Arizona law doesn't have to tell you that."

Correct?

A.   Correct.

Q.   So you already knew the law about tape-recording?

MR. BERNARD:  Objection.  611, Your Honor.

THE COURT:  Sustained.

I'm going to strike that last answer, and ignore it. It really has nothing to do with this case.

MR. BERNARD:  Thank you, Your Honor.

BY MS. WIENEKE:

Q.   Now, what you told Detective Moseley at 2:00 o'clock in the morning during your interview, which was in hours of this incident, was that the officer who responded to the scene told you that you were trespassing.  Correct?

A.   No.

Q.   Okay.  Just a moment.

A.   Can you restate that?

Q.   I'm sorry, Ms. Winkler?

A.   Can you restate that?

Q.   Sure.

What you told the officer, Detective Moseley, who was interviewing you, was that the officer who responded to the scene told you that you were trespassing.

A.   Officer Gillespie did not say that.

Q.   Okay.  And you have Exhibit 525 in front of you?

A.   Uh-huh.

Q.   So let's take a look at page 24, line 1003.

        MR. BLACKWELL:  What page again?  I'm sorry.

        MS. WIENEKE:  Page 24.

        MR. BLACKWELL:  Thank you.

        MS. WIENEKE:  Line 1003.

        THE WITNESS:  Okay.

BY MS. WIENEKE:

Q.   And your answer -- at 1001, the question was:  I didn't --

        And then the answer was:  Oh, but -- but the officer told me I was trespassing.

        Did I read that correctly?

A.   You did.

Q.   And then on page 25, starting at line 1039, the question was:  Okay.

        Answer:  Point so we can come back to it.

        Question:  Okay.

        Answer:  That he said I was trespassing.

        Did I read that correctly?

A.   Yes.

Q.   So two times in this interview, you said that the officer said that you were trespassing; correct?

A.   That is what I stated that night.

Q.   And today you're saying to this jury that it was the clerks

who said you were trespassing --

A.   Correct.

Q.   -- correct?

All right.  Either way, whether it was the clerks who said you were trespassing or the officer said you were trespassing, that night, you knew that you were trespassing at least insofar as either the clerks or the officer; correct?

A.   No.

Q.   All right.  "Trespassing" means staying on the property after you are no longer wanted; correct?

MR. BERNARD:  Ob- -- withdraw, Your Honor.

THE WITNESS:  I believe you have to be told you're trespassing or you have to leave.

BY MS. WIENEKE:

Q.   I'm sorry?

A.   I believe you have to be told you are trespassing or you have to leave.

Q.   All right.  So you were told you were trespassing but you don't believe you were ever told you had to leave?

A.   I was never told I was trespassing by anyone.  Not the clerks, not the manager on the phone, not the dispatchers.  No one.

Q.   So I'm confused, because I thought you just testified under oath that someone told you you were trespassing, either the officer or the clerks.

A.   Jason Gillespie said, "They said you're trespassing."
But --

Q.   Okay.  So the officer said that the clerks said you were
trespassing?

A.   That's what they told him.

Q.   Right.  So you were told you were trespassing?

A.   No, I was not.  I was never told I was trespassing.

Q.   But Jason Gillespie told you that they said you were
trespassing?

A.   That is correct.

Q.   That's being told you're trespassing.  Right?

A.   He simply said, "They said you're trespassing."  I was
never told by them, the manager, the dispatchers, no one, that
I was trespassing.

        THE COURT:  I think I can clear this up.  I think
where the problem is is the time frame.  She's reaching a point
where she's talking about trespassing being told her -- at the
moment when the officer came out.  Is that right?

        I'm trying to just clear this up.  When were you first
told someone said you were trespassing?

        THE WITNESS:  When Jason Gillespie said --

        THE COURT:  Speak into the microphone.

        THE WITNESS:  When Jason Gillespie said, "They said
you're trespassing."  That is the first time that I became
aware that this was even a second -- because I was the one that

called originally, and a number of times.  And then apparently the store called and then cited this.

But I never knew that.  No one ever told me that.

BY MS. WIENEKE:

Q.  And what you testified, Ms. Winkler, on direct examination, when your counsel was questioning you, was if you had known that the store had called the police to complain about you and said that you were trespassing, you would have left.  Right?

A.  I would have left.

Q.  Right.

And what you just told us is that Jason Gillespie told you in the parking lot that the store had said you were trespassing.  Right?

A.  That is what he said.

Q.  But you still didn't leave.  Right?

A.  I did not leave right then.

Q.  You didn't leave at all?

A.  I didn't have an option to leave right then.

Q.  You didn't leave, Ms. Winkler.  You stayed there and you argued with Mr. Gillespie?

A.  I did not argue.

Q.  You argued because you believed -- you believed, Ms. Winkler, that you couldn't be a trespasser because you had bought a lottery ticket.  True?

A.  I said, "I bought lottery tickets."  I did say that.

Q.   And you said it loudly.

A.   I simply stated it.  "I bought lottery tickets."

Q.   Ma'am, you said it loudly.

A.   Said it just about like this.  "I bought lottery tickets."

Q.   You said it so loudly that the people inside the store with the door closed came to the door to see what was the ruckus about; isn't that true?

A.   No.

          MR. BERNARD:  Objection.  Foundation.

          THE COURT:  Sustained.  I don't know how she would know that.

          MR. BERNARD:  And I'd ask the Court to strike her answer, Your Honor.

          THE COURT:  That last answer is stricken.  There's no foundation for what she could have known what other people heard.

          MR. BERNARD:  Thank you, Your Honor.

BY MS. WIENEKE:

Q.   Ms. Winkler, have you seen the video?

A.   Yes.

Q.   You've seen it over and again, haven't you?

A.   I have.

Q.   You watched that video in order to prepare yourself for this testimony, didn't you?

A.   Yes.

Q.   You watched it so that when you were able -- when you came to the stand, you'd be able to go over and be able to say what you did at what times.  True?

A.   Yes, ma'am.

Q.   And when you watched that video, you saw those customers go to the door and see -- and look out in your direction where you were with Officer Gillespie, didn't you, ma'am?

        MR. BERNARD:  Objection.  Foundation, Your Honor.

        THE COURT:  Overruled.

        THE WITNESS:  I believe they looked out right at the time when I -- and I don't remember this.  I probably screamed out when he was coming towards me.

BY MS. WIENEKE:

Q.   You saw them go to the window and go to the door before that, too, didn't you, ma'am?

A.   Because they saw an incident out in the parking lot.

Q.   An incident where you were screaming and yelling?

A.   No, I was not.

Q.   You were screaming and yelling, ma'am, because you were arguing with Officer Gillespie.

A.   No, I was not.

Q.   You were arguing because you didn't believe you could be trespassed because you bought a lottery ticket.

A.   I called to discuss the situation at the Circle K.

Q.   Well, let's talk about your calls.

"911.  What's your emergency?"  That's the way the 911 operator answered the call each and every time you called; right?

A.  Correct.

Q.  But you had no emergency, did you, ma'am?

A.  They didn't tell me I didn't have an emergency.

Q.  No, ma'am.  I'm asking you.

You had no emergency, did you?

A.  They didn't tell me I didn't have an emergency.

MS. WIENEKE:  Move to strike.  Nonresponsive.

THE COURT:  Sustained.

Just answer the question, please.

THE WITNESS:  Okay.  Restate, please.

BY MS. WIENEKE:

Q.  You had no emergency, did you, ma'am?

A.  I -- I don't know if you would consider that an emergency.

Q.  There was no crime that had been committed, was there?

A.  Could have been.

Q.  You were out no money; right?

A.  At -- no.

Q.  Were you out money, ma'am?

A.  No, I was not out.

Q.  They didn't rob you?

A.  No.

Q.  They didn't steal from you?

A.   No.

Q.   They didn't take your $2 and keep it?

A.   No.

Q.   They didn't keep your lottery ticket, did they?

A.   Not at that time, no.

Q.   Not at any time, ma'am.

A.   Actually, my --

Q.   Mr. Nelson did not keep your lottery ticket in that transaction?

A.   Mr. Nelson did not keep my lottery tickets.

Q.   Mr. Nelson made the transaction right in a matter of under two minutes; right?

A.   Yeah.  Correct.

Q.   He made you whole; right?

A.   Correct.

Q.   You called 911 to get a police report.  Right?

A.   To talk to an officer about the incident.

Q.   To get a police report?

A.   Not to get it, to make a police report.

Q.   To make a police report.

     It was a customer service matter, ma'am, wasn't it?

A.   I -- I debate that.  It could have been a --

Q.   Could have been what?

A.   Considered a --

Q.   What?

A.  Something that a police officer might want to document. That's what I was thinking.

Q.  Document an HR problem?

A.  I -- I just wanted to talk to an officer.

Q.  Ms. Winkler, what you told us yesterday was you wanted to talk to their manager.  Right?

A.  Yes.

Q.  You threw back the customer service 1-800 card.  "I don't want to talk to customer service."  Right?  "I wanted their manager."  Right?  That's what you told us yesterday; right?

A.  I asked him nicely, "I would like to speak to your manager."

Q.  Right.  "I don't want this 1-800 number."  That's what you told him; right?

He kindly gave you the 1-800 number, and you gave it back.  Right?

A.  I said, "I'd like to speak to the store manager."

Q.  Right.  And then when he showed you, "Here is our regional manager," you didn't want that either, did you?

A.  No.

Q.  And you said, "It took them a long time to get me the manager's number"; right?

A.  Correct.

Q.  You didn't call the regional manager to say, "Hey, what's the name of your on-duty manager here?"

You didn't do that?

A.   I don't -- I put the number in my phone, but I don't remember if I actually tried to call her.

Q.   You don't have any record of that, do you?  You would have given it to us if you did that?

A.   I don't know if it's on the call record.

Q.   But you don't have any memory or any record of calling the regional manager; right?

A.   No.  I don't think I did.

Q.   Right.  You wanted to speak to their manager, who wasn't --

A.   I wanted to speak to --

Q.   -- working that day --

A.   -- the store manager.

Q.   -- right?

A.   Yes, correct.

Q.   So you had them and insisted that they find him and get him at home; right?

A.   I thought he was at work if he was their store manager.

Q.   He wasn't working that night, ma'am.  You know that.

A.   No, I didn't know that.

Q.   Well, there were two people working that night, right, and it wasn't the on-duty manager; right?  He was off duty.

A.   I don't -- I didn't have any idea where he was.

Q.   So they go in the back and they get the phone and they give you the phone, and you're talking to the manager, who is not

working that day, and your wish is granted and you get to

finally talk to that manager, who you said, "I'm not leaving

this store until I talk to the manager."  Right?  That's what

you said?

A.  I believe I said that.

Q.  You did say that.

You said, "I'm not going outside.  It's" -- in fact,

your words were, "It's freaking hot out there."  That's what

you said; right?

A.  It was hot out there.  It was the 16th of July.

Q.  You said, "I'm going to stay inside this store until I talk

to that manager."  That's what you said; right?

A.  Something similar to that.

Q.  Because they had asked you to leave.

A.  No, they did not.  Not at any point.

Q.  All right.  So they give you the phone and you talk to that

manager for several minutes; right?

A.  Correct.

Q.  And that manager is kind to you?

A.  No, I would not call it kind.

Q.  You say, "I need you to come to this store right now."

That's what you told that manager?

A.  I said, "I would like for you to come to the store to

address this."

Q.  No, ma'am.  "You need to come to this store right now" is

what you told him.  Right?

A.  I may have said that.

Q.  And what he said to you was, "I'm not coming to the store tonight, ma'am.  I'm happy to meet with you tomorrow, when I'm at work."

And your response was, "I'm not coming back tomorrow. I'm never coming to this store again."

A.  That is --

MR. BERNARD:  Objection.  Hearsay.

THE COURT:  Overruled.

THE WITNESS:  That is correct.

BY MS. WIENEKE:

Q.  So his solution was not good enough for you.  Right?

A.  Correct, at that time.

Q.  Because your solution was that you went up to Mr. Nelson and you said, "You caused this, and you are going to be reported because you need to be fired."

A.  And what are you asking me?

Q.  That's what you said.

A.  I don't remember saying that.

Q.  All right.  Let's play it.  Let's play it.

MS. WIENEKE:  Do we have that clip ready to go?  The "You caused this.  You need to be fired."

Let's find that in Exhibit 525 and 524.

THE COURTROOM DEPUTY:  Is that in evidence?

MS. WIENEKE:  It's for impeachment, Your Honor.  I will find the reference.

THE COURT:  You'll let counsel know what you're going to play first.

MS. WIENEKE:  Yes, sir.

MR. BERNARD:  And, Your Honor, I believe Ms. Winkler said she doesn't remember saying it.  I don't think this is proper impeachment.

THE COURT:  Yeah.  She's not denying it.  She's just saying she doesn't remember it.  That doesn't --

MS. WIENEKE:  Well, Your Honor, can we approach then?

THE COURT:  Yeah.

(At sidebar on the record.)

THE COURT:  These are interviews of her?

MR. BERNARD:  Yes, Your Honor.

THE COURT:  Can you show me what you're going to use?

MS. WIENEKE:  Yes, Your Honor.

MR. BLACKWELL:  Which page are you on, Kathleen?

MS. WIENEKE:  Let me show you.  Let me just make sure.

Okay.  So it's, Your Honor, from Exhibit 525, starting at line 1306, going to line 1324.

THE COURT:  Okay.

MS. WIENEKE:  This is her interview.  It's an 801(d) admission.

MR. BERNARD:  And the question was, you said -- it

only pertains to 1323, because you said, "I'm reporting you and then you'll be fired."  And she said, "I don't remember saying that."  She's already said that she said all that.

MS. WIENEKE:  That's fine.  I can just --

MR. BERNARD:  Then I think it would be proper if you show her the statement.  And if she says, "I didn't say that," then you can --

THE COURT:  Okay.  All right.  I think you can play that snippet right there.

MS. WIENEKE:  Okay.  So I can play from line 1319 to line 1324?

THE COURT:  Yeah.

MR. BERNARD:  Your Honor, I would ask her to re-repeat the question and see if she remembers it.  Because her answer was, "I don't remember saying it," not that she didn't say it.

MS. WIENEKE:  I don't think that's proper, Your Honor.  Just because now she says, "Yeah, I remember" --

MR. BERNARD:  Or at least -- or show her the statement.

MS. WIENEKE:  I don't --

THE COURT:  Yeah, if she's not recalling it, at least show her the statement.  If she said it didn't happen, that would be different.  But if she's saying, "I don't remember saying it," show it to her, see if it refreshes her memory.  If it doesn't, then impeach her with the video.

MR. BERNARD:  Thank you, Your Honor.

MS. WIENEKE:  Wait.  All I'm --

(End of discussion at sidebar.)

MS. WIENEKE:  Your Honor, may I publish to refresh her recollection?

THE COURT:  Show it to her first.

Yeah, you can publish.  That's fine.  Go ahead.

BY MS. WIENEKE:

Q.  So we're looking at Exhibit 525, and we're referring to line 1323 through line 1325 on page 31, Ms. Winkler.

A.  Okay.

Q.  Does that refresh your recollection?

A.  Yes, I'm reading it.

Q.  "I'm reporting you and you need to be fired"?

A.  I apparently did say that.

Q.  Now, just to clarify, throughout this interview, you referred to the clerk as "Sal"?

A.  I thought that's what his name is.  It's Leslie Nelson.

Q.  So just to be clear, when you were referring to "Sal" in this interview, your recollection was the clerk's name was Sal, but in fact, you're referring to Leslie Nelson; correct?

MR. BERNARD:  Objection.  Relevance and 611.

THE COURT:  Overruled.

THE WITNESS:  I don't know if it said that on his nametag or if I was told that, but it's one and the same

person.

BY MS. WIENEKE:

Q.   So Sal is Leslie Nelson?

A.   Correct.

Q.   You also refer throughout this interview to a person named "Eric" as the second clerk.

A.   Correct.

Q.   Correct?

A.   Correct.

Q.   Eric is actually Alex Ford?

A.   Yes.

Q.   Correct?

A.   Correct.  I had only -- correct.  That's correct.

Q.   Now, we established, Ms. Winkler, that when you went to the Circle K that day, you were wearing the pink shirt.  You were also wearing a khaki skirt?

A.   Correct.

Q.   And flip-flops?

A.   Correct.

Q.   All right.  You drove to the Circle K that day?

A.   Yes, I did.

Q.   You were driving what type of vehicle?

A.   It was a Volkswagen Passat.

Q.   And where were you coming from?

A.   My apartment.

Q.   Which is located where at the time?

A.   You want the --

          MR. BERNARD:  Objection, Your Honor.  Relevance.

          THE COURT:  Overruled.

          THE WITNESS:  Right in the neighborhood.

BY MS. WIENEKE:

Q.   Could you be more specific?

A.   Do you want me -- do you want my exact address?

Q.   Well, how many miles was it from the Circle K at 7th Street and Bethany Home?

A.   Okay.  It was a quarter of a mile.

Q.   So there was nothing preventing you from getting in your car at any time and driving home and waiting for the police to respond there to be able to make your call to make your police report?

A.   They never told me to do that.

          MS. WIENEKE:  Move to strike.  Nonresponsive.

          THE COURT:  Ma'am, you need -- the question was asked --

          THE WITNESS:  Okay.

          THE COURT:  -- for yes or no.

          THE WITNESS:  Please restate.

          MS. WIENEKE:  What?

          THE WITNESS:  Please restate.

BY MS. WIENEKE:

Q.   Sure.

There was nothing preventing you from getting in your car and driving home and waiting at home to allow the police to respond there to take your police report?

A.   There was nothing -- correct.  That's correct.  There was nothing preventing me.

Q.   Now, you called 911 to make these calls; correct?

MR. BERNARD:  And, Your Honor, may we approach briefly?

THE COURT:  I'm sorry?

MR. BERNARD:  May we approach briefly?

THE COURT:  Okay.

(At sidebar on the record.)

THE COURT:  I don't think your last question made any sense.  You might want to rephrase that one.

MS. WIENEKE:  Okay.

MR. BERNARD:  I apologize, Your Honor.  I think she just needs her notebook back.  That's why she writes it down and --

THE COURT:  Oh, okay.

MR. BERNARD:  -- so she knows what the question is.

THE COURT:  I've reviewed the notebook.  It has nothing she reviewed to prepare her testimony.

MS. WIENEKE:  Okay.

THE COURT:  It doesn't refresh her memory.  She's just writing stuff down.

MR. BERNARD:  Thank you, Your Honor.

(End of discussion at sidebar.)

THE COURT:  Ms. Winkler, I want to give your notebook back to you.

THE WITNESS:  Okay.  Thank you.

Your Honor?  May I write some things down --

THE COURT:  Yes, you may.

THE WITNESS:  -- if I need to?

THE COURT:  Yes.

THE WITNESS:  Thank you.

Okay.  I lost my pen.

BY MS. WIENEKE:

Q.  All right.  I may have got jumbled up there.  I apologize.

I want to go back to the phone calls that you made from the Circle K.  Each time you made your call, you called 911; correct?

A.  Correct.

Q.  But you also know that there's another way to contact the police that's not an emergency.  It's called the Crime Stop line?

A.  Correct.

Q.  And you've called the Crime Stop line before?

A.  I may have.

Q.   I'm sorry?

A.   I --

MR. BERNARD:  Objection, Your Honor.  611 and relevance.

THE COURT:  Sustained.

MS. WIENEKE:  Your Honor, if I can make the record, the witness was asked about her familiarity with the 911 system, about dispatching and things like that, and I believe it's opened the door to this line of inquiry.

THE COURT:  Mr. Bernard?

MR. BERNARD:  Your Honor, I didn't go anywhere in my direct examination about Crime Stoppers.  We -- I specifically said 911 calls that she has made.  I never talked about a nonemergency line or anything like that.

THE COURT:  Okay.  You can explore with her her calls to 911.

MS. WIENEKE:  Okay.

THE COURT:  Because that was where he was -- his questions focused on the 911 system, so you can explore her knowledge of the 911 system.

MR. BERNARD:  Thank you, Your Honor.

BY MS. WIENEKE:

Q.   You have made calls to 911 before this day?

A.   I have in my lifetime.

Q.   And you had in the recent past, prior to this night?

MR. BERNARD:  Objection, Your Honor.  Can we approach on this issue?

THE COURT:  No.  Please go ahead.

THE WITNESS:  Sorry.  Restate, please?

BY MS. WIENEKE:

Q.  You had called 911 in the recent past prior to this night?

MR. BERNARD:  Objection.  Relevance.

THE COURT:  We've already discussed that.

MR. BERNARD:  Yes, Your Honor.

THE COURT:  You asked her questions about her knowledge of 911.  I'm going to allow cross-examination to find out what her knowledge is.  Because she called 911 may not be knowledge of how the system works, but we don't know until she asks the question.

MR. BERNARD:  I believe this is a fine line that we're walking, though, Your Honor.

THE COURT:  I understand.

MR. BERNARD:  Based on our motion in --

THE COURT:  I understand.  I know the motion in limine, but in fairness, you asked questions about her knowledge of 911, and she can ask questions that go to that issue.

MR. BERNARD:  Your Honor, I didn't ask questions about her knowledge of 911.  I asked questions about her calling 911 on that day, Your Honor.

THE COURT:  Well, I thought you asked questions about what she knew happened at 911 when someone makes a phone call.

MR. BERNARD:  I asked her if she knew, and she said she doesn't.  She's never -- she's not a 911 dispatcher.  She's not -- she doesn't have any prior police training.

THE COURT:  Well, I don't know what Ms. Wieneke's going to ask, so I'm going to let her ask some questions.  And if they're inappropriate, you can object.

MR. BERNARD:  Thank you, Your Honor.

THE COURT:  All right.

THE WITNESS:  So please restate.

BY MS. WIENEKE:

Q.  Yes.  In the 60 days prior to this incident, you had called 911; right?

A.  I may have.

Q.  Okay.  You're not sure?

A.  I'm not sure.

Q.  From your experience in calling 911, did you know that when you call 911 from your phone, that your phone number shows up to the 911 system?

A.  Yes.

Q.  And did you know that your address may show up if you're calling from a landline?

A.  Yes.

Q.  And you knew that from your prior experience?

A.   I don't know that.

Q.   So --

A.   I've never worked for 911 or in law enforcement.

Q.   Tell us what your telephone number was on the day of this incident.

A.   It was 602-369-3435.

Q.   You did not make all of your 911 calls from the Circle K from your cell phone; correct?

A.   Correct.

Q.   You made one of your calls from a pay phone?

A.   Correct.  There was a pay phone there.

Q.   And it's right there in the Circle K, right outside in the parking lot; right?

A.   And I didn't realize there was a phone there.

Q.   Pay phone 911 calls are free?

A.   I didn't know that.

Q.   Well, you made a pay phone 911 call that day; right?

A.   Well, actually, yes.  That is correct.  Yes.  From a pay phone, 911 calls are free, yes.

Q.   Right.

A.   Yes.

Q.   And that pay phone was right in front of where you parked your car; right?

A.   I was over to the side.  I did not even see that phone till much later.

Q.  Okay.  Let me show you, if we could --

MS. WIENEKE:  If the clerk could provide the witness with Exhibit No. 6 -- I mean, sorry, 506, pardon me, which is in evidence.

MR. BERNARD:  Ms. Wieneke, you said 506?

MS. WIENEKE:  I apologize.  504.  Too many 6s.

Sorry, Michele.

THE COURTROOM DEPUTY:  That's okay.

BY MS. WIENEKE:

Q.  And, Ms. Winkler, these are the photographs taken by the police at the scene of the Circle K.

Have you seen these photographs before, ma'am?

A.  Actually, I have not seen these photographs.

Q.  Okay.  Well, you'll see red numbers.  Those are the Bates numbers in the right corner.

Let me show you some of these photographs then.

MS. WIENEKE:  If I may publish to the jury, 506 is in evidence per stipulation -- I'm sorry, 504.

THE COURT:  You may.

MS. WIENEKE:  Thank you.

BY MS. WIENEKE:

Q.  So, and I want to call your attention to Bates No. 37.

Do you recognize that as the Circle K at 7th Street and Bethany Home?

A.  Yes.

Q.   And do you recognize the vehicle in the far right-hand corner of the parking lot as your vehicle?

A.   Yes.

Q.   And let me just circle this right here.

That red circle that I've drawn on the exhibit, do you recognize that as the pay phone that you made your sixth 911 call from?

A.   Yes.

Q.   All right.  And would you agree with me that that pay phone is right in front of your parked car?

A.   It is.

Q.   All right.  Showing you also from Exhibit 504 -- did I get that right, 504 -- Bates No. 38.

You see those gas pumps in the Circle K parking lot? You can look at your screen as well, Ms. Winkler.

A.   Yes, I see.

Q.   All right.  And you had been to this Circle K before this night; correct?

A.   I mainly got gas.

Q.   All right.  But you had been there before?

A.   Yes.

Q.   And you had been there two nights earlier, and you had spoken to Mr. Ford; correct?

A.   That's correct.

Q.   Now, on the time that you had been there before, did you

notice from Exhibit No. 504, Photograph No. 40, this "No Trespassing" sign that I've circled?

A.   Did I notice it?

Q.   At any time on the times you were there.

A.   No.

Q.   All right.  And then if we look at Photo No. 44, on the times you were there, did you ever notice this "No Trespassing" sign, "Violators will be prosecuted," on any of the visits to this Circle K?

A.   I didn't particularly notice it.

Q.   All right.

A.   They have many signs around their buildings.

Q.   Photograph No. 45, again, we see that silver car.  That's your vehicle; correct?

A.   Yes.

Q.   And Photograph No. 46, on the front face to the left of the big picture window is that "No Trespassing" sign again.

     Do you see that?

A.   Yes.

Q.   And then Photograph No. 48, this is a close-up picture of your vehicle.  And you can see the pay phone there?

A.   Yes.

Q.   Now, just to be clear, this gentleman and this black bag, that has nothing to do with you; correct?

A.   Correct.

Q.   By the way, in the video that we have seen of you going in and out of this store, you're not carrying a purse.  Correct?

A.   Correct.

Q.   You didn't bring a purse that night; right?

A.   My purse was in my trunk.

Q.   Okay.  You had your purse inside the trunk of your vehicle?

A.   Correct.

Q.   And was your wallet also inside the trunk of your vehicle?

A.   I took the ID out of my wallet when -- before the officer arrived.

MS. WIENEKE:  Move to strike.  Nonresponsive.

THE WITNESS:  But my -- my wallet was in originally -- please rephrase.

THE COURT:  Okay.  Let's take a break.  It's about time for morning recess.

Come back at 11:15.

(Jury not present.)

THE COURT:  Ms. Winkler, you can step down.

All right.  Anything to take up?

MR. BERNARD:  Two issues, Your Honor.  Yesterday there were some marshals in here.  If we could tell the jury that the marshals weren't -- or just explain why the marshals were here.

And the other issue, can we get a limiting instruction about why -- the whole issue with the notepad, that there was nothing wrong with her notepad and that's why you gave it back

to her?

THE COURT:  Okay.  Any objection?

MS. WIENEKE:  I would have to see what it is, the limiting instruction.

THE COURT:  I'll just tell them that -- you can step down.

The marshals were here -- this is just -- marshals come into cases during federal court and watch trials.  So there's no -- this is not a criminal case, so there was no one -- please be seated.

There was no one here who was being investigated.

And I looked at the notepad, and it was just her scribbling notes she was making as she was testifying.  It wasn't something she had obviously reviewed in preparation for her testimony or anything.  It was using to refresh her memory, so I don't think that has any relevance.

MR. BERNARD:  Thank you, Your Honor.

MS. WIENEKE:  Your Honor, I would just say about the marshals, I think that this might be a situation where the cure is worse than --

THE COURT:  Yeah, I didn't really pay much attention. I don't know if the jury -- are you -- I don't know why -- unless the jurors are familiar with the court system or who those were, they weren't wearing uniforms that I recall.

MR. BLACKWELL:  They were -- Your Honor, if I may

talk. I think they were like the court security.

THE COURT: Yeah. So --

MR. BLACKWELL: And so we were informed -- we asked why they were here, and we were informed that they were here because, I guess, a reporter had stated they were going to record anyway.

THE COURT: Okay, yeah.

MR. BLACKWELL: Even after the Court had told them, "You can't record." And so that's why they were here.

THE COURT: But I don't know if that -- I think that Ms. Wieneke may be correct, that why bring it up? I don't think it's even an issue, do you?

MR. BLACKWELL: All right, Judge.

THE COURT: I mean, I don't --

MR. BLACKWELL: I was alarmed by it yesterday, but they're not here today, so no big deal.

THE COURT: I mean, I just didn't see that as an issue. Are you serious that you think there's some concern here? I don't know --

MR. BERNARD: No, Your Honor. I thought they were here today. But I don't see them, so I don't think there's an issue. And I agree with Mr. Blackwell.

THE COURT: I mean, they're in a sports coat and pants, and we know who they are, but I don't think the jury would.

MR. BLACKWELL:  All right.

MS. WIENEKE:  Your Honor, there's one more issue.

Counsel asked on direct why Ms. Winkler was wearing the hearing device.  I thought the answer was going to be simply, "I just need it to assist me in hearing."

But unsolicited -- and I'm not blaming counsel -- but she then offered she has a 36 percent hearing loss as a result of this incident.  And I think that ran afoul of the Court's motion in limine order that she can't give causation opinions and she can't give those kinds of statements.

And that was never disclosed.  That's not even a medical opinion that her own hearing ENT doctor was --

THE COURT:  I don't think I made that ruling.  I think a person can testify about the injuries they sustained as a result of an event, and that's what she understood she sustained.

You can cross-examine her on that and say, you don't know that for a fact unless someone told you that, but I'm not going to give any instructions on that.  I think that's a fair question.

MS. WIENEKE:  Well, if I may just finish, Your Honor, and complete the thought.

There is no evidence in this record that she had a 36 percent hearing loss.  And this has now put us in a conundrum.  In order to --

THE COURT:  Okay.  I'm sorry to interrupt you, but that's a different story.

Is there anything in the record that she suffered a hearing loss as a result of this event?

MS. WIENEKE:  Let me be clear.  A 36 percent hearing loss.  She has a mild hearing loss, but no doctor has attributed it to this incident.  So just to be clear.

THE COURT:  Okay.  That's different.

Is there some medical evidence that her hearing loss was 36 percent and that it was attributed to what happened here?

MR. BERNARD:  No, Your Honor.

THE COURT:  Okay.  So I think that's fair cross-examination if you want to ask her about it.

MS. WIENEKE:  Well, but that -- ergo, that's the conundrum.  Now I put a spotlight on something that is not fair.

THE COURT:  So I can tell the jury to disregard the hearing loss?

MS. WIENEKE:  That's what I would like to do.

THE COURT:  Any objection to that?

MR. BERNARD:  Well, Your Honor, the only objection we have is the jury doesn't rule on damages anyway, so I don't think it --

THE COURT:  Well, I let the damages in because I felt

that in an excessive force case, the extent of the damages is evidence of the excessive force.  But when she's talking about damages that there's no evidence that it's connected, then I think that's unfair.

So we need to undo it, and the suggestion is that we undo it by telling the jury to ignore the hearing loss testimony.

MR. BLACKWELL:  I would ask the Court, if I may speak, Judge, on this issue -- it wasn't my witness -- that Ms. Wieneke be allowed to cross-examine Ms. Winkler on the issue of hearing loss.

It was noted -- there was noted hearing loss. However, she's correct; no one noted there was 36 percent hearing loss or anything like that.  She believes she -- her hearing was affected by the incident, but as far as there being some number, we have no number to report at all to this Court.

So that was -- I would understand the defense wanting to cross Ms. Winkler on that issue.

MS. WIENEKE:  I don't want to touch Ms. Winkler on this issue.  I don't want to put a flashlight on this.  I would rather it be struck from the record.

And as I said, I don't think the plaintiff did it on purpose but --

THE COURT:  The reason she's in the situation where she has to deal with this is because testimony came out that

was unsolicited and not supported by the records.

MR. BLACKWELL: Correct, Judge.

THE COURT: She doesn't know what Ms. Winkler's going to say, so now what?

MR. BLACKWELL: I would go with the limiting instruction, Judge.

THE COURT: All right. I'll just tell the jury that, "You heard Ms. Winkler testify about a hearing loss. I'm going to instruct you that that is not evidence for you to consider in this case."

MR. BLACKWELL: Yes, sir.

MR. BERNARD: Thank you, Your Honor.

THE COURT: Ms. Wieneke, you okay with that?

MS. WIENEKE: Yes, Your Honor. Thank you.

THE COURT: Okay.

MS. WIENEKE: What time are we returning, Your Honor?

THE COURT: 11:10. I'm going to have to break about 11:50, so we're not going to have much more time.

How much more time do you have left with your cross?

MS. WIENEKE: I don't know, Your Honor. I've been off my outline. I don't know. I'm sorry.

THE COURT: You've been going down some rabbit holes. Why don't you pick it up a little bit.

MS. WIENEKE: Thank you.

THE COURT: Oh, I told the jurors 11:15. I'm sorry.

MR. BLACKWELL:  Thank you, Judge.

(Recess taken, 11:03 a.m. to 11:18 a.m.)

(Jury present.)

THE COURT:  Please be seated.

Ms. Winkler, would you please retake the witness stand.

Ms. Wieneke, you may continue.

MS. WIENEKE:  Thank you, Your Honor.

BY MS. WIENEKE:

Q.  We were -- where we left off, Ms. Winkler, I was showing you from Exhibit 504 in evidence.

MS. WIENEKE:  And if we could publish for the jury, Your Honor.  Thank you.

BY MS. WIENEKE:

Q.  I'm showing you Bates No. 56 photograph.

A.  I can't hear.  I don't know what's going on here.  Do I have it the wrong way or what?  Oh, I had it -- I'm sorry.

Okay.

MS. WIENEKE:  And, Your Honor, did we want to make the announcement to the jury per our discussion?

THE COURT:  Yeah.

Earlier, when Ms. Winkler testified, she talked about a hearing loss.  I'm going to instruct you to ignore that testimony about the hearing loss.  I'm not saying she doesn't have a hearing loss, it's just we don't know where that came

from.

BY MS. WIENEKE:

Q.   So, Ms. Winkler, I want to call your attention to the area in the Photograph No. 56 of Exhibit No. 504.

You see the handicapped space?

A.   Yes.

Q.   And you testified yesterday that when Officer Gillespie arrived, he parked on a diagonal in the handicapped space. Does this Exhibit No. 504, Photograph No. 56, show the area where Officer Gillespie parked his vehicle?

A.   Yes.

Q.   Now, I think you described Officer Gillespie's arrival as "screaming into the parking lot."

Do you recall that?

A.   Yes.

Q.   Did he have his lights and siren on?

A.   No.

Q.   When you told the ladies and gentlemen of the jury that he screamed into the parking lot, were you trying to convey the fastness of his arrival?

A.   The what of his arrival?

Q.   The fastness, the quickness?

A.   The quickness coming into the parking lot.

Q.   All right.  So he was driving fast.  Is that what you were trying to convey?

A.  Yes.

Q.  And I imagine, then, that pleased you since you were waiting so long.

A.  Yes.

Q.  All right.  So you were happy when he came?

A.  I was happy --

Q.  Okay.  And --

A.  -- when he came.

Q.  And so when he arrived, you greeted him cheerfully?

A.  I don't remember if there was any cheerful greeting.

Q.  All right.  So the fastness and quickness of his arrival didn't please you so much that you greeted him cheerfully?

A.  I don't remember whether there was really any greeting other than -- yeah.  I'll just leave it at that.

Q.  Other than, "I want your supervisor"?

A.  No.  I never said that.

Q.  You never said that to him?  You never said, "I want your supervisor"?

A.  No, I did not.

Q.  The entire interaction, you never said, "I want your supervisor"?

A.  No, I did not.

Q.  All right.  So you were displeased with the fact that Officer Gillespie spent 40 seconds inside his patrol vehicle before getting out to greet you; true?

A.   He was in his patrol vehicle for 40 seconds.  I was neither pleased nor displeased.

Q.   And that displeased you?

A.   I really didn't have a reaction to it.

Q.   Okay.  And perhaps I misunderstood your testimony.  You were -- yesterday.

So you were ambivalent.  You had no opinion whatsoever about the fact that he spent 40 seconds in his patrol car before getting out?

A.   I don't know what I was thinking about him spending 40 seconds in his car.

Q.   And so what was the purpose of you noting that for the jury, that he spent 40 seconds in his patrol car before getting out?

A.   Just a matter of fact.

Q.   I'm sorry?

A.   Just a matter of fact.

Q.   So it was an irrelevant fact, as far as you're concerned?

MR. BERNARD:  Objection.  Argumentative.

THE COURT:  Overruled.

THE WITNESS:  It's a matter of fact.

BY MS. WIENEKE:

Q.   And -- but it didn't weigh you one way or another in terms of your demeanor?

A.   I didn't know he was -- I don't know what protocol is, how

UNITED STATES DISTRICT COURT

long they sit there for before they get out.  I don't know.

Q.  And you didn't know what he was doing inside his vehicle; right?

A.  No, I did not.

Q.  And you didn't know, for example, if he was looking at his computer to gain and gather more information --

A.  Correct.

Q.  -- before getting out to greet you; right?

A.  Correct.

Q.  All right.  So looking at this photograph, Exhibit No. 504, Photograph 56, do you recognize anywhere on this photograph -- well, let me go back.

      You heard your lawyer's opening statement to the jury?

A.  I'm sorry, say again?

Q.  Sure.

      You heard your lawyer's opening statement to the jury, his opportunity --

A.  Yes.

Q.  -- to address the jury --

A.  Yes.

Q.  -- and tell the jury the evidence that he expected to hear in the case?

A.  Yes.

Q.  And did you hear your lawyer's statement when he said to the jury that you bled out on the scene?

A.   Yes, I did hear him say that.

Q.   All right.  And do you recognize in this photograph that was taken after you left and went to the hospital, the blood on the parking lot from where you bled after the incident and after you were taken away to the hospital?

A.   Yes, I do see it.

Q.   All right.  And so can you -- if you just make a dot on that screen, you can show that to the jury.

THE COURTROOM DEPUTY:  Not with the pen, ma'am.  Ma'am.

MS. WIENEKE:  Oh, yeah, sorry.  With your finger.

THE COURTROOM DEPUTY:  Just with your finger.

THE WITNESS:  My finger?  Okay.

MS. WIENEKE:  Thank you.

THE WITNESS:  I think it's right there.

BY MS. WIENEKE:

Q.   All right.  And I'm going to put a circle around that area.

So that area there where you put those dots with your finger is the area of the blood mark on the pavement where your lawyer represented to the jury that you bled out on the pavement at the scene; correct?

A.   Yes.

Q.   Thank you.

Now, if you just tap the screen in the upper right corner where it says "Undo," those marks will go away.  Or I

will do it there.  All right.  Thank you, ma'am.

Now, at the scene, the fire department came and provided treatment to you; right?

A.  Yes.

MS. WIENEKE:  If the Court pleases, the clerk would provide the witness with Exhibit 516.  Exhibit 516.

This is not in evidence, if I may just publish to the witness, please.

BY MS. WIENEKE:

Q.  Now, Ms. Winkler, Exhibit 516 is a copy of the EMS report prepared by the fire department.

Have you ever seen this report before?

A.  Yes, I have.

Q.  Is that one of the reports you studied in preparation for your trial?

A.  I actually haven't seen it for a while.  But I have seen it.

Q.  All right, ma'am.  I'm going to just ask you some questions about this report.

One of the things I want to ask you about is towards the bottom of this report, where it makes a reference to your daughter, where it says, "tried to contact patient's daughter, Kara."

Do you have a daughter named Kara?

A.  I certainly do.

Q.   And is there any reason that you can think of that the fire department who filled out -- the fire personnel that filled out this report would know about your daughter Kara other than you providing that information?

MR. BERNARD:  Objection.  Foundation.

THE COURT:  Overruled.

MR. BERNARD:  And relevance.

THE WITNESS:  Could you please -- do I have to answer that?  Yes?

THE COURT:  Yes, answer it.

THE WITNESS:  Okay.  Can you please repeat?

BY MS. WIENEKE:

Q.   Sure.  I'm just asking you whether you have any knowledge or idea as to how the fire department personnel would know that you have a daughter by the name of Kara other than you providing that information to the fire personnel on scene.

A.   I do think I know how they knew.

Q.   Okay.  And how is that?

A.   They went through my phone.

Q.   Okay.  And do you have a recollection of being alert and oriented on the scene when the fire department came?

A.   Not at all.

Q.   All right.  And do you understand those terms, alert and oriented times four, times three, times two?

A.   I don't understand those terms.  I understand "alert and

oriented," but not --

Q.  Yes, ma'am.  Okay.

And do you see that in terms of how the fire department assessed you, they assessed you as alert and oriented times four?

MR. BERNARD:  Objection.  Foundation.

This is not in evidence.  She's testifying.

THE COURT:  What foundation is lacking?

MR. BERNARD:  This is not a -- it's not a report Ms. Winkler has written.

THE COURT:  Is this going to come into evidence?

MR. BERNARD:  No, Your Honor.

THE COURT:  Well --

MS. WIENEKE:  Your Honor, I'm asking the witness based on the Court's ruling that she can testify about her consciousness and what she experienced at the scene.

THE COURT:  Yeah, she can, but you can't use hearsay to ask her questions.

If this is not coming in, then I'm going to sustain the objection.

BY MS. WIENEKE:

Q.  All right.  Then, Ms. Winkler, do you believe that you -- do you recall whether you were alert and oriented at the scene?

MR. BERNARD:  Objection.  Asked and answered.

THE COURT:  Overruled.

THE WITNESS:  I don't remember anything from the time of the assault till I was in ICU.

MS. WIENEKE:  If the Court please, the clerk would hand the witness Exhibit No. 6.

BY MS. WIENEKE:

Q.  Do you recognize the photographs in Exhibit No. 6, Ms. Winkler?

A.  Yes.

Q.  Do these photographs accurately represent you and the condition of the parking lot after the incident?

A.  Yes.

MS. WIENEKE:  I would offer Exhibit 6.

MR. BERNARD:  No objection, Your Honor.

THE COURT:  Exhibit 6 is admitted into evidence.

(Exhibit No. 6 admitted into evidence.)

THE COURT:  Is it just the one picture of her that you're offering, or is it all the pictures?

MS. WIENEKE:  All of them, Your Honor.

THE COURT:  Okay.  Exhibit 6 is admitted.

MS. WIENEKE:  Permission to publish, Your Honor.

THE COURT:  You may.

BY MS. WIENEKE:

Q.  Showing you a portion of Exhibit No. 6, which is a photograph of you.  Appears to be in an ambulance.

Do you recognize yourself in that photograph of

Exhibit No. 6?

A.   Yes.

Q.   And are your eyes open?

A.   Yes, they are.

Q.   Are you wearing the clothing that you wore to the Circle K?

A.   Yes.

Q.   Is that similar to the clothing that we saw in the police photographs that were taken at the hospital?

A.   Yes.  It is the same clothing.

Q.   Now, I understand that you said you have no memory from the time the officer touched your wrist until the time that you woke up in the hospital.

        Does seeing this photograph of you in the ambulance refresh your recollection as to whether you were awake and alert at the scene of the incident at the time the fire department came and provided you treatment?

A.   I'm sorry.  The question is?

Q.   The question is, I understand that you said you didn't have any memory from the time the officer touched your wrist until the time you woke up in the hospital.

A.   Uh-huh.

Q.   Does seeing this photograph in Exhibit No. 6 in which you are awake and alert at -- in the ambulance, does that refresh your memory as to whether you were awake and alert at the scene?

A.   It does, but I do not remember that.

Q.   All right, ma'am.  Do you have any memories in the emergency room?

A.   I do not.

Q.   Based on the photograph that you just reviewed in Exhibit No. 6, would it be reasonable to conclude that at least in the fire -- ambulance, you were awake?

A.   Yes, correct.

Q.   Now, I want to take you back in time, Ms. Winkler, to when you arrived at the Circle K, right before that time, in the hour or so before.

What were you doing before you went to the Circle K, in that hour or so?

A.   I was at home thinking about this man that I had helped.

Q.   And you were emotional?

A.   I was very overjoyed that he went to rehab.

Q.   Did you make any phone calls in that time?

A.   Not after he left for rehab that I remember.  Not after he had left.

Q.   And I'm just asking you about in the 60 minutes before you arrived at the Circle K at or around 6:30, 6:29 or so, did you make any phone calls on your cell phone?

MR. BERNARD:  Objection -- objection.  Relevance.

THE COURT:  How is that relevant?

MS. WIENEKE:  Can we approach, Your Honor?

THE COURT:  All right.

(At sidebar on the record.)

THE COURT:  Let me just remind you guys to speak into the microphone.  The court reporter's having a hard time.

MS. WIENEKE:  Yes, sir.

THE COURT:  You're both now in the courtroom.

MS. WIENEKE:  Yes, sir.

THE COURT:  Okay.

MS. WIENEKE:  Your Honor, we have an impeachment exhibit, which reflects that Ms. Winkler, 30 minutes prior to arriving at the Circle K, made a call to Crime Stop to report illegal parking, which reveals that she knew that she could make calls to Crime Stop instead of calling the emergency line.  Didn't stay at the scene.  Left.  Which refutes this story that she's told for the first time here that she had to stay at the scene and couldn't leave.

MR. BERNARD:  Was that disclosed?

MS. WIENEKE:  It's an impeachment exhibit.

MR. BERNARD:  Was it disclosed?

MS. WIENEKE:  No.  It's an impeachment exhibit.  It doesn't have to be disclosed.

THE COURT:  I don't think it's relevant under 403.  It's just more evidence of her mental illness, in my opinion.  It has nothing to do with her being inconsistent, and I don't know how that helps understand the facts of this case.

MS. WIENEKE:  Well, if I could make my record, Your Honor, it doesn't have to do with mental illness.  It has to do with an excuse that she has come up with for the first time in court that she was told by the 911 operator that she had to stay, which there's no record of.

THE COURT:  I don't know how this phone call helps impeach that.

MS. WIENEKE:  Because she called the Crime Stop and she left.  No one told her she had to stay at the scene where she -- she called to report illegal parking.

THE COURT:  Okay.  I'm not going to let that in. That's irrelevant.

(End of discussion at sidebar.)

BY MS. WIENEKE:

Q.  When you arrived at the Circle K, it was a busy night at the Circle K; would you agree?

A.  Yes.  Yes.

Q.  You entered the Circle K holding your cell phone?

A.  Yes.

Q.  You had your money in your pocket?

A.  Yes.

Q.  Your first lottery ticket cost you a dollar?

A.  Yes.

Q.  It was a Lotto ticket?

A.  I believe so.

Q.   Your second lottery ticket was from Mr. Nelson; correct?

A.   Yes.

Q.   You told Mr. Nelson, "I'll have what he's having," pointing to the man we saw in the video in the striped shirt.  True?

A.   I don't think I did say that.

Q.   The man in the striped shirt bought two $2 Powerball tickets?

A.   Correct.

Q.   He had preselected his numbers on a sheet; correct?

A.   Correct.

Q.   He gave that sheet to Mr. Nelson, and Mr. Nelson rang it through; correct?

A.   Correct.

Q.   You did not make it clear to Mr. Nelson what you wanted; correct?

A.   There was some confusion.

Q.   Confusion which yesterday, for the first time, you have accepted partial responsibility for; correct?

A.   Correct.  I said that I could have been clearer.

Q.   Right.  In your interview with Detective Moseley, however, you never accepted any responsibility for that confusion; true?

A.   I don't remember.

Q.   Well, we previously established that you went to Mr. Nelson and you said, "You caused this.  I'm reporting you, and you need to be fired."

Correct?

A.  I did say that.

Q.  You didn't say to Mr. Nelson that night, "Mr. Nelson, it was an honest mistake.  I accept partial responsibility for this.  I could have been more clear."

You didn't say that to Mr. Nelson that night, did you?

A.  I did not.

Q.  You didn't say that to his manager when you talked to him, did you?

A.  No, I did not.

Q.  You said that, ma'am, respectfully, for the first time in front of this jury; true?

A.  I'm sorry.  Say again?

Q.  You said that for the first time in front of this jury?

A.  I said what, exactly?

Q.  That you could have been more clear.  You accept partial responsibility.

A.  I did say that for the first time.

Q.  Ma'am, do you accept partial responsibility or any responsibility for your actions in stepping back and yanking back when Officer Gillespie told you you were under arrest?

A.  I can't answer that question the way you -- break it up, please.

Q.  Do you accept any responsibility for your actions in yanking back your hand dond saying, "Let go of my arms"?

A.   I didn't yank back my hand.

Q.   Have you seen the video, ma'am?

A.   I had my hands up.

Q.   All right.  And you backed away from Officer Gillespie while you had your hands up; correct?

A.   Yes.

Q.   And you knew Officer Gillespie was trying to arrest you; right?

A.   No.

Q.   You knew Officer Gillespie was going to arrest you; true?

A.   No.

Q.   You were backing up towards the traffic; right?

A.   No.

Q.   You were backing up --

A.   I was --

Q.   -- away from the Circle K; right?

A.   Correct, yes.  I was backing up away from the Circle K.

Q.   And that's towards the cross traffic in the parking lot; right?

A.   There is traffic back there.

Q.   And you were backing up away from the safety of the two parked cars, Officer Gillespie's and the other car; right?

          MR. BERNARD:  Objection.  Foundation.

          THE COURT:  What's lacking?

          MR. BERNARD:  The defense counsel said "the safety of

the two parked cars."  Maybe it's argumentative, Your Honor.

THE COURT:  I'm sorry?

MR. BERNARD:  It's -- and argumentative.

THE COURT:  All right.  Rephrase the question, please.

BY MS. WIENEKE:

Q.  All right.  Ms. Winkler, did you believe that it was safer for you to be in between Officer Gillespie's car and the parked car, or was it safer for you to be back away, in the area where there was potential cross traffic?

A.  I didn't really think about that at the time.  All I knew --

Q.  Understood.

A.  -- was I was terrified.

Q.  You didn't think about it.

And did you look back before you started to back up?

A.  No, I don't believe I did look back.

Q.  But you put your hands up and you started to back away from Officer Gillespie; correct?

A.  Yes.

Q.  And at that moment you did that, you knew that he was trying to arrest you?

A.  No, I did not.

Q.  And you still have Exhibit 525 in front of you, ma'am?

A.  Was it the last one you gave me?

Q.  It's the big interview transcript that you had.

A.  Oh, okay.

Yes.

Q.  At page 50.

MR. BLACKWELL:  That's page 50 up on the top right?

MS. WIENEKE:  Yes, sir.

BY MS. WIENEKE:

Q.  Are you there?

A.  I am.

Q.  And starting at line 2167.  Question:  Okay.  So what happened?  He went inside.  He's inside about 10 minutes.

Answer:  Uh-huh.

Question:  What happened?

Answer:  He comes back out.  He immediately said -- I was holding my cell phone.  He said, Put your cell phone down. And I could just tell right then, oh, my God.

Question:  What could you --

Answer:  This guy --

Question:  What could tell?

Answer:  This guy is going to freaking arrest me.  I just knew that.  I just knew that these -- these people inside, Eric and Sal, were made lies, all lies about me.

All lies?

Answer:  Yes.  Over nothing.  Over nothing, yeah.  So he said, Put your cell phone down.  I'm allowed to hold my cell phone.

Did I read that correctly, ma'am?

A.   You did.

Q.   So what you told Detective Moseley that night was that you knew he was -- he, Officer Gillespie, was going to arrest you. Right?

A.   I thought that's what he thought he was going to do.

Q.   No, ma'am.  That's what you thought he was going to do.

A.   Well, I did say, "This guy is going to freaking arrest me," based on his actions.  But not based on anything he told me.

Q.   Right.  Based on his actions, you knew he was going to arrest you; right?  Right?

A.   Based on his actions.

Q.   Right.  And that's why you backed up, to avoid being arrested.  Right?

A.   I backed up because I was terrified.

Q.   You backed up, ma'am, because you were trying to avoid being arrested.  True?

A.   He never told me I was being arrested.

      MS. WIENEKE:  Move to strike.  Nonresponsive.

      THE COURT:  Ma'am, that calls for a yes-or-no answer. Please answer yes or --

      THE WITNESS:  I'm sorry?

      THE COURT:  That calls for yes or no.  Please answer yes or no.

      THE WITNESS:  Okay.  All right.  Okay.

All right.  Please restate.

MS. WIENEKE:  I'll ask the court reporter to read it back, please.

THE WITNESS:  Okay.

(Record read.)

THE WITNESS:  I don't know how I can answer yes or no to that.  I backed up for several reasons.

BY MS. WIENEKE:

Q.  And one of them was to avoid being arrested?

A.  I thought he may think he thinks he's trying to arrest me.  But he never said that.

Q.  Ma'am, you backed up to avoid having your hands placed in handcuffs and being arrested; yes or no?

MR. BERNARD:  Objection.  Asked and answered, Your Honor.

THE COURT:  Overruled.

THE WITNESS:  I don't know how to answer that.  I mean, if you want just a yes or no, I don't know how to answer that.

BY MS. WIENEKE:

Q.  You knew that being arrested meant that your hands would be placed behind your back and you would be placed into custody; right?

A.  Yes, correct.

Q.  And that's why you said, "Let go of my arms" as you were

backing up; right?

A.   I did not say that.

Q.   You never said, "Let go of my arms"?

A.   Maybe after he had my arms behind my back.

Q.   You mean after he had your hands in handcuffs or --

A.   No.  Just behind my back.

Q.   Okay.  And you said, "Let go of my arms" why?

A.   Because he was hurting me.

Q.   Because you didn't want to be put into custody; right?

A.   No.  Because he was hurting me.

Q.   Can you please turn to page 53.

     Are you there?

A.   I am.

Q.   And look at line 2316.

     Question:  Okay.  So the last thing you remember was him asking you to put your cell phone down?

     Answer:  Yes.

     Okay.  Do you remember him asking you to put your hands behind your back?

     Answer:  Uh-huh.  He just grabbed my arms, and I think I said something --

     Question:  Right outside.  That's a --

     Answer:  I think I said something like, "Let go of my arms."

     Did I read that correctly?

A.   Yes.

THE COURT:  Ms. Wieneke, I need to take a recess now. I have a presentation I have to make over lunch, so we have to break a little earlier than we expected, but we'll come back at 1:15.

During the recess, remember the admonition.  Don't talk to anybody about the case, don't let anybody talk to you about the case, and keep an open mind.

(Jury not present.)

THE COURT:  Ms. Winkler, you can step down.

Anything to take up?

MR. BLACKWELL:  No, Judge.

MS. WIENEKE:  No.

THE COURT:  Okay.  See you at 1:15.

(Proceedings recessed at 11:51 a.m.)

C E R T I F I C A T E


         I, JENNIFER A. PANCRATZ, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

         I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control.

         DATED at Phoenix, Arizona, this 16th day of June, 2020.


                         s/Jennifer A. Pancratz_____
                         Jennifer A. Pancratz, RMR, CRR, FCRR, CRC