**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

_____

| | | |
|---|---|---|
| Martha Winkler, a single woman, | ) ) ) | |
| Plaintiff, | ) ) | No.  CV-15-01786-PHX-DLR |
| vs. | ) ) | Phoenix, Arizona April 11, 2019 |
| City of Phoenix, et al., | ) ) | 8:31 a.m. |
| Defendants. | ) ) | |
| _____ | ) | |

**BEFORE:   THE HONORABLE DOUGLAS L. RAYES, JUDGE**

**<u>REPORTER'S TRANSCRIPT OF PROCEEDINGS</u>**

**<u>JURY TRIAL - DAY 3 (A.M. Session)</u>**
**<u>(Pages 448 through 591, inclusive)</u>**

Official Court Reporter:
Jennifer A. Pancratz, RMR, CRR, FCRR, CRC
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 42
Phoenix, Arizona 85003-2151
(602) 322-7198

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

**A P P E A R A N C E S**

For the Plaintiff:

    Blackwell Law Office, PLLC
    By:   Jocquese L. Blackwell, Esq.
         Gillmore B. Bernard, Esq.
    3101 North Central Avenue, Suite 820
    Phoenix, AZ 85012

For the Defendants:

    Wieneke Law Group, PLC
    By:   Kathleen L. Wieneke, Esq.
         Christina G. Retts, Esq.
    1095 West Rio Salado Parkway, Suite 209
    Tempe, AZ 85281

450

**I N D E X**

**SUMMARY OF COURT PROCEEDINGS**                                          **PAGE:**

Sidebar Conferences                                          532, 546, 564

| WITNESSES FOR THE PLAINTIFF: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| **Jason Gillespie** | | | | |
| By Mr. Blackwell | 463 | | | |
| By Ms. Wieneke | | 509 | | |

**E X H I B I T S**

| NO. | DESCRIPTION | REC'D |
|---|---|---|
| 520 | Gillespie Training History | 540 |
| 583 | Officer Gillespie's Police Report# 2014 01227732, dated 07/16/2014 (redacted) | 571 |

UNITED STATES DISTRICT COURT

**P R O C E E D I N G S**

(Proceedings commenced at 8:31 a.m.)

(Jury not present.)

THE COURT:  Please be seated.

Is there an issue we need to take up?

MS. WIENEKE:  Yes, Your Honor.  During the examination of Officer Gillespie, Officer Gillespie was asked about his police report.  And I just wanted to alert the Court that during my examination of Officer Gillespie, which I don't think we're going to have a break in between, I am going to be offering Officer Gillespie's portion of his police report, and I anticipate there will be an objection.

I've discussed it with counsel.  I'm going to be offering it.  I believe there's an exception to the hearsay rule under 803(8).  It's a public record.  And under the authority of *Long versus TRW Vehicle Safety Systems*, which is an Arizona District Court case decided on October 14th, 2011, which is a case that says that a police officer's opinions may become -- or are observed and recorded in a police report are admissible unless the factual findings are deemed untrustworthy and are an exception to the hearsay rule.

And so his recorded observations in his portion of the police report are an exception to the hearsay rule.  I'm going to intend to offer his portion of the report.

THE COURT:  Okay.  Mr. Blackwell?

MR. BLACKWELL:  Yeah.  My objection is -- may I see the case?

MS. WIENEKE:  Absolutely.  Here you go.

MR. BLACKWELL:  I just heard this just now.  Can I see the one that you have highlighted?  Thank you.

MS. WIENEKE:  I have that portion for you.

THE COURT:  You just learned this just now?

MR. BLACKWELL:  Yes, sir.  Just now.  This wasn't brought up before we came here.  I would object to it.  First and foremost, we already objected to the police report.

THE COURT:  Yeah, I know we already covered that.

MR. BLACKWELL:  Thank you, Judge.

THE COURT:  If you're going to read that case now, let's talk about it later.  Although you want to do this -- you're bringing this up right now as you're going to ask the question?

MS. WIENEKE:  Well, Your Honor, what I intend to do is offer up his portion of the police report and publish it to the jury during my examination of Officer Gillespie.

THE COURT:  That's my question.  Are you going to do this now?

MS. WIENEKE:  I'm sorry?

THE COURT:  Are you going to do this now?  Do we have to make this decision now?

MS. WIENEKE:  Well, when I question Officer Gillespie,

I intend to ask for its admission.

THE COURT: Okay.

MS. WIENEKE: And the other thing, Your Honor, is I intend to offer up the portion of the police report which summarizes Ms. Winkler's summary done by Detective Moseley. And that --

THE COURT: Whoa, whoa. Ms. Winkler's summary of what?

MS. WIENEKE: The summary of Ms. Winkler's interview done by Detective Moseley.

THE COURT: That's not coming in.

MS. WIENEKE: Which is a nonhearsay under 801(d)(2) --

THE COURT: We're not going to do summaries.

MS. WIENEKE: -- an admission by a party opponent.

THE COURT: An admission by a party opponent is her statement, not a summary of her statement.

MS. WIENEKE: And under the same line of cases, it is a present sense impression under 801(d) -- I'm sorry, under 803(2) and also is the recorded recollection and a business record and also is an exception under 803(8).

THE COURT: Okay. The summary is not coming in under any hearsay exception. It's not a present sense impression. Her statement is her statement. The summary is not her statement.

MS. WIENEKE: The other thing, Your Honor, I want to

raise with the Court is that during the examination, over our objection, Mr. -- Officer Gillespie was asked questions about the charging of resisting arrest.  And his answer was he did not cite Ms. Winkler with resisting arrest.

But in the police report, it was a police report titled "Trespass/Resisting Arrest."  And the police report was submitted to the county attorney for charging for resisting arrest.

And I intend to elicit -- again, over our objection this was allowed, and because there was an inference that there was no charging information submitted to the county attorney, that the case report was submitted to the county attorney for charging for resisting arrest.  I just wanted to alert the Court to that.

THE COURT:  Okay.  That's 403.  That's not coming in.

The fact that it says, slash, resisting arrest is meaningless.  Officer Gillespie testified that there was no charging of resisting arrest.  The question was, was she charged with resisting arrest?  And I don't see how this can -- how that's relevant.

MS. WIENEKE:  Well, Your Honor, that's -- if I may correct the record, he was -- he stated that she wasn't cited.  Because this is a felony, there would be no citation.  It was submitted to the county attorney for charging.  And I think there's been a misimpression --

THE COURT:  Okay.

MS. WIENEKE:  -- in the record.

THE COURT:  All right.  So what you want to have the jury hear is that Officer Gillespie wanted the county attorney to charge her with resisting arrest, and the county attorney reviewed it and decided not to charge her?

MS. WIENEKE:  No, Your Honor.  That is not accurate.

THE COURT:  Okay.  I'm trying to understand it.  What happened?

MS. WIENEKE:  Right.  That's what I'm trying to explain.

I want to rebut the improper inference that was made by the plaintiff's questioning, which is that --

THE COURT:  I understand what you're trying to do, but what did I say that was wrong?

MS. WIENEKE:  I don't want any evidence about charging or not charging, which was my objection.  I want to correct the record that has been created falsely here by saying that the case was submitted to the county attorney for charging.  That's it.

Because what has been created is that there was no probable cause, and whether there was charging is not for --

THE COURT:  I'm sorry to interrupt you, but --

MS. WIENEKE:  If I may finish, Your Honor.

THE COURT:  I'm just trying to understand.  You say no

probable cause for a trespass?  Because I thought the trespass was the issue here.  Are you saying resisting arrest was also charged?

MS. WIENEKE:  No, Your Honor.  And as we addressed in our trial memo, probable cause can exist for a myriad of crimes.  We don't need just probable cause for trespass, but for resisting arrest, disorderly conduct, harassment, and resisting arrest.

So long as we have probable cause for any of these crimes, we have -- we can negate the false arrest claim under 1983.

THE COURT:  Okay.  You can bring out evidence that if he claims -- if his defense is that "I had probable cause to arrest her for resisting arrest," that's fine.  I mean, I don't -- you're not prohibited from doing that.

MS. WIENEKE:  And that's what we're trying to do, Your Honor.  But a false impression has been created that there was no charging information for probable -- probable cause for resisting arrest.

THE COURT:  I don't think that was the question.  It wasn't charging information.  The question was, was she charged with resisting arrest?

MS. WIENEKE:  And he said she wasn't cited.  And I'm merely trying to correct the record by asking Mr. Gillespie, was it submitted to the county attorney for charging?  Which

then makes a different independent assessment, which is out of the police officer's control.

THE COURT:  Okay.  I see what you're saying.

Yeah, I think he can testify as to what his reasons for his actions were.  And if there was, in his belief, a charge for resisting arrest that went -- that was submitted, I think that's fair.  But I think it's also fair that it comes out that the County Attorney's Office reviewed it and didn't charge her.

MS. WIENEKE:  And how would that evidence be coming out, Your Honor?

THE COURT:  It already came out.  He asked him if she had been charged.  He said, no, she hadn't.

So I think your position is fair in response to what's come up.

MS. WIENEKE:  The last thing, Your Honor, I would like to do is make an offer of proof.

And my offer of proof is yesterday I was attempting through my cross-examination --

THE COURT:  Let's do this offer of proof during a recess.  We got a jury waiting.  We can do this later.  Okay?

MS. WIENEKE:  Thank you, Your Honor.

THE COURT:  Anything else?

MR. BLACKWELL:  Can I address at least the Court's ruling?

THE COURT: Okay.

MR. BLACKWELL: I'm sorry. Well, not sorry, but the issue that was raised yesterday was a statement made by Officer Gillespie. I just said she wasn't charged with resisting arrest.

THE COURT: I remember.

MR. BLACKWELL: Officer Gillespie said she wasn't cited. If they're going to get in that charging went up, we know for a fact that Officer Gillespie didn't submit his report for charging. His police report doesn't say anything about charging her with anything. It's titled "Trespassing/Resisting Arrest." The last page of his report has nothing to do with charging.

And so it's another officer's report, and that officer isn't here. I can't -- I can't cross-examine anybody from the County Attorney's Office, so I would ask for a limiting instruction to say that --

THE COURT: Hang on a second.

MR. BLACKWELL: I'm sorry, Judge.

THE COURT: Maybe I misunderstood. I thought Officer Gillespie was the one who submitted it for charging for resisting arrest.

MS. WIENEKE: Your Honor, there was a departmental report submitted --

THE COURT: Officer Gillespie can testify about what

he did.

MR. BLACKWELL:  Thank you.

THE COURT:  Okay?

MS. WIENEKE:  Your Honor --

THE COURT:  And the reasons why he did it.  If you have someone else to testify on the other things, they can testify about that.  But he can't -- what's he going to talk about, what the other officer did?

MS. WIENEKE:  Well, then, Your Honor, I will avow to the Court that as part of the departmental report, it states the following:  This report is -- which includes Officer Gillespie's portion -- is being submitted to the County Attorney's Office for review of the charge of trespassing, 13-1501 A1, a Class 3 misdemeanor, and resisting arrest, 13-2508 A2, a Class 6 felony.

THE COURT:  We're getting too far afield.  403, if there's any relevance to it, it's overwhelmed by the substantial risk of unfair prejudice and waste of time.

So let's move forward.  Officer Gillespie can testify about what he did and why he did it.

Ready?

MR. BLACKWELL:  Judge, and in the report, I still object to -- I'm sorry to hold the time up.  But the report, I don't know if the Court made a ruling on the report coming in but --

THE COURT:  I haven't seen the case yet she cited.

MR. BLACKWELL:  The case --

THE COURT:  This was just brought up now.  Neither one of us has seen this.  When you're done with it, let me see the case.

MR. BLACKWELL:  Yes, sir.  I'll bring it to the Court's attention.

May I approach?

THE COURT:  Let's get started.  And when we get to the point, let me know, Ms. Wieneke, and we'll take a sidebar and I'll rule.  Okay?

MR. BLACKWELL:  Thank you, Judge.

Judge, I know we're on the record, but we still had the issue with I think someone spoke to a juror.  I don't think we ever took care of that.

THE COURT:  Okay.

MR. BLACKWELL:  That happened this morning.

THE COURT:  Michele told me that one of the jurors asked -- was asked if she or he was cold by one of the people in the gallery.

MR. BLACKWELL:  Okay.

THE COURT:  But we'll -- if you want to address it now, we'll do it.

MR. BLACKWELL:  The defense brought it up, Judge.

THE COURT:  No.  I mean, we need to take care of it.

MR. BLACKWELL:  Yes, sir.

THE COURT:  We need to speak to that one juror.

THE COURTROOM DEPUTY:  Okay.

(Juror 6 present.)

THE COURT:  Good morning.

JUROR 6:  Hi.

THE COURT:  You're Juror No. --

JUROR 6:  6.

THE COURT:  -- 6, okay.  Just have a seat.

Michele informed me that someone from the gallery approached you and spoke to you?

JUROR 6:  Barely.  I went to the bathroom.  I saw a guy lingering outside walking around, and when I came back, I said something like -- because I was walking like this and yawning, because I have been up since 4:30.  And I said, "Just trying to stay awake."

And then he said, "You look cold."

And I was like, "Well, I'm just walking around, like circulation."  That's it.

THE COURT:  Who was it you spoke to?  Do you know?

JUROR 6:  The guy in the light blue shirt, waving --

THE COURT:  Okay.

JUROR 6:  -- raising his hand.

THE COURT:  All right.  Mr. Blackwell, do you have any questions?

MR. BLACKWELL:  No questions.  Thank you.

THE COURT:  Ms. Wieneke?

MS. WIENEKE:  No questions.

THE COURT:  Okay.  Thank you.

I assume there's no objection and no --

MR. BLACKWELL:  No, Your Honor.

THE COURT:  All right.  Let's bring the jury in.

JUROR 6:  Should I go back?

THE COURT:  No, you can just stay where you are.

(Jury present.)

THE COURT:  Please be seated.

Where are we with witnesses?

MR. BLACKWELL:  Your Honor, I would still like to recall Officer Gillespie.

THE COURT:  Okay.  Officer Gillespie, please take the stand.

I will remind you, you're still under oath.

THE WITNESS:  Yes, sir.

JASON GILLESPIE,

called as a witness herein by the plaintiff, having been previously duly sworn or affirmed, testified further as follows:

UNITED STATES DISTRICT COURT

DIRECT EXAMINATION (Continued)

BY MR. BLACKWELL:

Q.   Officer Gillespie, yesterday when we left off, you had testified that you thought Martha, or Ms. Winkler, was the person who was trespassing when you arrived on the scene. However, you said nothing to her about trespassing; correct?

A.   At which time, Mr. Blackwell?

Q.   When you arrived on the scene, you thought Ms. Winkler was the person that was alleged to have trespassed at the Circle K. However, when you initially saw her, you said nothing to her about trespassing; correct?

A.   Correct.  The initial contact.

Q.   You testified that you did not care as to why Ms. Winkler called 911.  Do you recall making that statement?

A.   That I didn't care that she called 911?

Q.   Remember you went inside the store and you were talking to the clerks.  My question to you was, did you ask them about why she may have called?

A.   I don't recall if I did or not.

Q.   All right.  And then I asked you, was that -- did you care about the reasons for her calling the police?  Was that in your mind?  Did you have any thoughts of that when you were in the store talking to the clerks?

A.   I was focused more on the trespassing.

Q.   All right.  You testified that when she walked away from

you initially, that you didn't ask her to come back because you don't chase people. Correct?

A. I don't chase after people for that particular reason.

Q. Okay. All right. But when she walked out of the frame -- remember when we had the video up and she's walking back away from you; right?

A. During the second contact?

Q. The second contact, right. It looks like you chased after her; correct?

A. I walked after her, yes.

Q. All right. You testified that you didn't say she was under arrest until you had her arms up behind her back; is that correct?

A. Yes, until I initially made contact with her, physical contact.

Q. And when she was there talking to you when she -- when you were both obscured by, I guess, this placard in the Circle K window, we can't see both you and Ms. Winkler, but you're talking. Your testimony was at that time you told her she needed to leave?

A. Yes.

Q. All right. And so when she's backing up, why didn't you just let her go?

A. Because at that point she was under arrest.

Q. Okay. But you didn't say she was under arrest at that

point; correct?

A.   Not until I had physical contact with her.

Q.   So with that statement you just made, you didn't say she was under arrest until you had physical contact with her. After she walks away from you, when you grab her and her arms are behind her back, that's when you actually said, "You're under arrest."

         Correct?

A.   Yes.

Q.   So if you actually told her she needed to leave, you would agree you didn't give her a chance to leave; correct?

A.   She had ample opportunity to acknowledge my request for her to leave.

Q.   So when she's backing away from you, why didn't you just let her go?

A.   Because at that point I decided that she was going to be placed under arrest for trespassing.

Q.   And at that point when she's walking away from you, you don't tell her she's under arrest and turn around; correct?

A.   I don't tell her that until I have physical contact with her.

Q.   Until you grab her; correct?

A.   Correct.

Q.   You initially said in your report that she fell; correct?

A.   Yes, that's the word I used.

Q. Please explain to the jury your definition of "fall" versus taking someone to the ground on their head. What's your definition of that? Please explain that to the jury.

A. Taking them to the ground on their head?

Q. Well, you took her down to the ground on her head; correct?

A. I did a straight-arm takedown on her; yes, I did.

Q. And that straight-arm takedown, when you used that particular maneuver, she landed on her head; correct?

A. She did land on her head.

Q. All right. So what's the definition -- your definition of "fall" versus taking somebody down using a straight-arm takedown on their head? What's the difference to you?

A. To me, they're one and the same. My actions caused her to fall.

Q. All right. Your actions caused her to fall.

So I have a pen on this particular table located next to the ELMO. If I push the pen off, it falls on the floor; right?

Did the pen fall by itself; yes or no?

A. Looks like you pushed it onto the ground.

Q. Now, when you wrote in your report, you didn't write, "I used a straight-arm takedown and I -- she hit her head using that maneuver, when I used that maneuver," did you?

A. I described the method I used in my report.

Q. In your report, on page 2, you state: After several

seconds struggling with Martha, I swung her to my right side in an attempt to place her on the ground to avoid being struck by a vehicle.  Martha had lost her balance and fell in the parking lot, striking her head on the asphalt.

Now, you would agree with me, when you read your statement, it seems like she lost her balance, her balance, while you were trying to struggle with her.  And then during that struggle, she fell to the ground.  Would you agree with my assertion about your own statements?

A.   The way I wrote it is -- describes my actions.  She fell. She lost her balance because I made her fall, because I took her down --

Q.   Did she fall --

A.   -- when I did the straight-arm takedown maneuver.

Q.   Did she fall -- after your actions, did you just let go and she just fell to the ground?

A.   I believe I had constant contact with her right arm up till the point where she was on the ground.

Q.   So your actions caused her to hit her head on the ground; correct?

A.   That was one of the results of it, yes.

Q.   All right.  Your actions caused her injuries; correct?

MS. WIENEKE:  Objection.  Lack of foundation.

THE COURT:  Overruled.

BY MR. BLACKWELL:

Q.   Correct?

A.   The straight-arm takedown maneuver that I conducted at that time?

Q.   Yes, sir.

A.   Yes.  Unfortunately, it did.

Q.   All right.  Now, you knew at the time, since you were right there on the scene looking at Ms. Winkler, that she had lost consciousness; correct?

A.   She may have been out for a few seconds.

Q.   May have been out or she was out for a few seconds?  Which one is it?

A.   She may have.

Q.   Didn't you write in your report you think she lost consciousness?

A.   It's possible she did, but I'm not a medical doctor.

Q.   All right.  And, I'm sorry.  You didn't write that in your report, but later on in the interview you made that statement; correct?

A.   I believe I did.

Q.   All right.  Now, if we use --

         MR. BLACKWELL:  Can we give Officer Gillespie Exhibit 9?  And if we can, if we can use the -- is it the HDMI or what -- HDMI at our table.  I was going to have Officer Gillespie can only see it, not the jury, Exhibit 9.  It hasn't

been admitted yet.

BY MR. BLACKWELL:

Q.  Do you have Exhibit 9 in front of you?

A.  No, I do not.

Q.  It's on the table, I think.

A.  I thought you were referring to the screen.

Q.  I'm sorry.  My apologies.

A.  Yes.  The paper form, yes, I do.

Q.  Do you see Exhibit 9 now?

A.  Yes, it's on my screen.

Q.  All right.  Let's turn to page 17, looking at lines 21 through 25.

Now, yesterday I asked you, if it's not in your report, it's something that you wouldn't be able to recall; correct?  You remember that statement -- that question to you?

A.  I believe you had made mention of that, but again, what was that again?

Q.  If I had it -- when we interviewed, back in 2016, some three years ago, I said to you, in referencing your report, if you don't have it in your report, is it something that you can remember?  If you don't write it down, how can you remember it from years ago?

You follow my gist?

A.  Yes.  Is that coming with a paraphrasing?  Is that what you're inquiring about?

Q.   No, sir.  I'm just asking you if you ever said, "If it's not in my report, I don't recall it."

Do you recall that question yesterday, sir?

A.   I believe I did.

Q.   All right.  So look at page 17 in Exhibit 9, lines 21 through 25.  All right.  Do you see that?  Now, can you read that to yourself?

All right.  And my question was:  Okay.

And then you say:  She remained in the parking lot, harassing the customers.

What did they say about her harassing the customers?  Did he tell you what she did?

The next page is page 18, line 1.  Your answer:  No.  If it's not in my report, I don't know.

Is that something you said, sir?

A.   That's referring to the clerk's statement about your client harassing customers in the parking lot?

Q.   Yes, sir.

A.   Yes.  That would be correct.

Q.   All right.  Turning to page 19, lines 22 through 23.

MR. BLACKWELL:  Same exhibit, Your Honor.  Exhibit 9.

THE WITNESS:  I'm sorry.  22 through 25?  Is that --

BY MR. BLACKWELL:

Q.   Yes.  And if you want to read -- just go ahead and read the question at line 14, so you can get the full context.

A.   Okay.

Q.   All right.  Now, in this particular embodiment of the interview, I was asking you about your conversations again with the clerks in the store; correct?

A.   Correct.

Q.   And what they said about her; correct?

A.   Correct.

Q.   And what did you say?

MS. WIENEKE:  Objection.  This is improper impeachment.  It's hearsay.

MR. BLACKWELL:  I'm impeaching your -- I'm sorry, Judge.  If I may -- if I need to answer, I'm impeaching Officer Gillespie's statement yesterday as it pertains to whether or not, if it's not in his report, he said, "I don't recall it." I think I can ask these questions.

MS. WIENEKE:  It's asked and answered.

THE COURT:  So you're not offering it for the truth of the matter asserted, you're offering it to show the inconsistency?

MR. BLACKWELL:  Yes, sir.

MS. WIENEKE:  There's no inconsistency that's been established.  He's admitted that he doesn't -- if it's not in his report, he does not remember.  There's no inconsistency established.

THE COURT:  What inconsistency are you showing?

MR. BLACKWELL:  Well, I'm showing that yesterday he didn't say that.  Yesterday, when we were in front of this jury, I asked the same question.  Basically, he was like, what am I talking about.  As a matter of fact, defense counsel said, "Page and line, please.  Exhibit page and number."

I said, "I'm going to get to it."  Now I'm getting to it, Your Honor.  And I should be able to flesh this out.

THE COURT:  Okay.  It's not being offered -- your objection is hearsay.  It's not hearsay.  So --

Your objection is hearsay; right?

MS. WIENEKE:  Well, it's also improper impeachment. And the witness just testified that as he just pointed out, as you just read from the statement, that he just admitted that if he didn't -- if it's not in that particular portion, if it's not in his report, he doesn't remember.  So now we're doing it again so --

THE COURT:  Okay.  If he said -- if he's already said what you want him to say, it's not -- doesn't do any good to impeach him.  You're not impeaching him if what you're showing him is what he just agreed to.

MR. BLACKWELL:  I agree, Judge.

THE COURT:  Okay.  So --

MR. BLACKWELL:  Duplicative.

THE COURT:  I'm sorry?  Did you have something --

MR. BLACKWELL:  I can understand it being duplicative.

I can understand that.

THE COURT:  Okay.  So the objection is sustained.  This isn't proper impeachment.

MR. BLACKWELL:  Thank you, Judge.

THE COURT:  Because it's not impeachment.  He's agreed.

MR. BLACKWELL:  I agree.  I agree with you, Judge.  Thank you.

Let's turn to Exhibit 60.  May Mr. Gillespie or Officer Gillespie have Exhibit 60?

BY MR. BLACKWELL:

Q.  Is it still up there?

A.  Yes.

Q.  6-0.

A.  Yeah.

Q.  Mr. Bernard's going to put it on your screen.

A.  Okay.

Q.  We're going to go to page 4, lines 130 through 135 -- I'm sorry, page 5, line 146.  I apologize.

All right.  Yesterday I asked you whether or not -- please answer -- well, let me know if you recall the question.  I asked you whether or not Ms. Winkler refused to leave the property.  Do you recall that question?

A.  Yes.

Q.  All right.  Did she refuse to leave?

A.  Yes, she did.

Q.  All right.  Looking at your statement during your interview 11 months later with these officers, what did you say, looking at line 146?

And if you need to read the full paragraph, please read the full paragraph so you can get the full context.

A.  Okay.

Q.  Let me know when you finish.

A.  Okay.

Q.  All right.  Now, it's true, based on your statement to the officers, that you said you didn't know if she refused?  I'm asking.

MS. WIENEKE:  Your Honor, I would ask that the whole answer be read for context and completeness.

THE COURT:  He's not reading anything.  He's just asking him the question.  So he's had a chance to read the entire context of the paragraph.  He can answer it however he feels is appropriate.

THE WITNESS:  What was the question again?

BY MR. BLACKWELL:

Q.  I'm sorry.  I'll repeat it.

A.  Please.

Q.  During this conversation that you had with the officers, you would agree that they were trying to determine, from your perspective, what was going on out there during your

conversation with Ms. Winkler; correct?

A.   Correct.

Q.   And then they asked you, as it pertains to, you know, the -- your request to leave, and I'm paraphrasing that.  And when you're explaining your answer, you're talking about the fact that you said that you're telling her to leave.  And you said, "I don't know if she refused to leave."

Is that what you said, sir?

MS. WIENEKE:  Objection, Your Honor.  For context and fairness and completeness, he is paraphrasing the answer and it's improper.

THE COURT:  Well, the witness can tell him that.

Overruled.

THE WITNESS:  Well, from what I wrote in here, I says: I don't know if she refused or -- or what her deal was, but I wasn't getting through with her.

BY MR. BLACKWELL:

Q.   Okay.  So you don't know if she refused to leave; correct?

A.   I know she wasn't leaving after I explained to her that she was.  So I don't know if her refusal or -- maybe I picked the wrong choice of words when I said -- because I don't know what's going through her mind, if she's refusing.  I explained to her as simple as I could that she's trespassing and she needed to leave.

Q.   All right.

A.   She didn't leave.

Q.   She did leave.  She was trying to leave when she was backing up.

A.   That's after my body language showed to her that I was going to place her under arrest.  That's when I started to reach out for her.  She seen that.

Q.   Your body language?  Your body language put her in fear.  She's now leaning -- backing away from you?

A.   Because she knew I was --

Q.   You haven't said --

A.   -- going to arrest her for trespassing.

Q.   You haven't said she's under arrest at that moment; correct?

A.   Not until I put my hands on her.

Q.   And then when you put the -- but the problem is, Officer, Officer Gillespie, you're telling the jury on one hand, "She refused to leave."  You're telling officers on another hand, "I don't know if she refused to leave."

     Those are two diametrically opposing statements by your -- by yourself, Officer Gillespie.

A.   I think you're taking that out of context.  It says, "I don't know if she refused to leave but she wasn't leaving."

Q.   Okay.  All right.

A.   I explained it to her as clearly as I could.

Q.   All right.  Just like that?

A.   Yes.

Q.   The way you're talking right now?

A.   Absolutely.

Q.   All right.  All right.  And we know for a fact that you weren't wearing a body cam video camera; correct?

A.   No, I was not.

Q.   And we know that none of the conversations you had with Ms. Winkler were recorded; correct?

A.   No, they were not.

Q.   So all we have are your words and Ms. Winkler's words about this less than 40-second interaction; correct?

A.   We also have the clerks' statements as well.

Q.   Oh, but the clerks -- have you heard from the clerks?  Have they testified?

A.   Not in this hearing.

Q.   And we also know that you, as an officer for the Phoenix Police Department, didn't go back in there and ask those clerks any additional questions; correct?

A.   Me personally, no --

Q.   You personally.

A.   -- but my squad mates did.

Q.   But we don't have those squad members here, do we?

        (Court reporter clarification.)

BY MR. BLACKWELL:

Q.   So now, next question, did you -- when you told this jury

yesterday that she refused to leave, did you tell the jury, from your perspective, that she uttered any statement that she's not leaving the Circle K parking lot?

A. When I initially told her that she was trespassing and that she needed to leave, she rebuked that with some -- a mention of something about her purchase of a lottery ticket. And she held up a piece of paper in her hand.

Q. Oh. Oh. But is that a refusal to leave if she's saying, "Hey, I called the police. I have a lottery ticket"?

Is that refusing to leave? I'm asking.

A. I explained to her twice, as clearly as I possibly could.

Q. Okay. All right. And when you actually went out there, you -- when you spoke to her, you told her they said she was trespassing, and she said absolutely not. Correct? Correct? "Absolutely not. I bought lottery tickets." Correct?

A. Some -- yes, something about lottery tickets and customer or something like that.

Q. All right. Now, go to -- still in Exhibit 60, go to page 20. When you get to page 20, just read the whole page.

And it should be -- this is COP -- Bates stamp is 007615. The top of the page says page 20. And you can read the whole page to yourself. And it's lines 811 through 855.

A. Do you mind if I read the page before this to put it in context?

Q. Whatever you want to do, sir.

A.   Okay.

     Okay.

Q.   All right.  You read the page before --

A.   Yes.

Q.   -- which was page 19; correct?

A.   Yes.

Q.   And you read page 20?

A.   Correct.

Q.   All right.  Now, you have testified a number of times that you used a straight-arm takedown --

A.   Correct.

Q.   -- correct?

     All right.  As a matter of fact, in my opening I called it a one-arm takedown.  Do you remember me saying that?

A.   I do not.

Q.   Now, when you spoke to these officers back, I guess, 2015, right, you told them something close to a straight arm?

A.   Correct.

Q.   Right.  So it wasn't a real or true straight-arm takedown; correct?

A.   I would -- I believe I described it as something very similar to it.

Q.   So what was it?

A.   It was --

     MR. BLACKWELL:  And, Judge, if I may ask the officer

to come down and demonstrate what he did.  Can I do that,

Judge?

THE COURT:  Yeah.

BY MR. BLACKWELL:

Q.  Could you please come down and demonstrate?

A.  Demonstrate to who?  Or on who?

Q.  To the jury.

You can use me.  Just don't throw me down.

A.  Well, you're quite a bit bigger than she.

MS. WIENEKE:  Your Honor, I object to the

demonstration.

THE COURT:  Overruled.

MS. WIENEKE:  Well, who's he going to do it on, if I

could ask?

MR. BLACKWELL:  You can do it on Mr. Bernard.

MS. WIENEKE:  Your Honor, I object.  It's not --

THE COURT:  No, you're not going to do it on

Mr. Bernard.  I'll let you do it on somebody else, but I think

it would be helpful and illustrative to understand what

happened if he demonstrates it.

So you can go down there and demonstrate it.  You can

use Mr. Blackwell or you can use Mr. Bernard.  Is it

Mr. Bernard?

MR. BERNARD:  Yes, Your Honor.

THE COURT:  Yeah, Mr. Bernard, that would be fine.

MS. WIENEKE:  Renew my objection, Your Honor.

THE COURT:  Your objection is noted.

MS. WIENEKE:  I'm sorry?

THE COURT:  Your objection is noted.

MS. WIENEKE:  Thank you.

THE WITNESS:  Okay.

MR. BLACKWELL:  All right.

THE COURT:  Yeah, you can use Mr. Bernard.

MS. WIENEKE:  Will Mr. Bernard be resisting and struggling?

THE COURT:  This is a demonstration.  It's just to show how it happened.  This is not intended to be a total reenactment.  This is just to describe, I assume, the takedown, how it works.  I think it would be helpful for all of us to see that.

BY MR. BLACKWELL:

Q.  And without taking him down, just like you did in your demonstration when you were with the officers.  The officer got up -- during this interview 11 months after the incident, there was officers there, and you did a demonstration with an officer; correct?

A.  Yes.

Q.  And you grabbed the officer's arms as close as you can remember as it pertains to grabbing Ms. Winkler's arms; correct?

A.   (Inaudible response.)

THE COURT REPORTER:  I didn't hear your answer.

BY MR. BLACKWELL:

Q.   Was that a yes?

A.   Yes.

Q.   All right.  And so we want you to do the same thing, just like the officer said, without putting a lot of pressure, without throwing Mr. Bernard down, just show the jury how you grabbed Ms. Winkler's arms.

A.   Okay.

Q.   Now, my question is, was Ms. Winkler with her back to you when you grabbed her arm?

A.   She was backing away from me.

Q.   Backing away, okay.

And then what did you do as she backed -- when you go out of that screen, the shot, how do you grab her arm and which arm did you grab first, based on your memory?

A.   I believe it was her right arm that I grabbed first.

Q.   Did you grab her right arm as she's facing you or away from you?

A.   As she's facing me.

Q.   All right.  What did you do?

A.   Want me to just do --

Q.   Just grab the arm.

And then what happens?

A.   Explained to her she's under arrest.  I --

          (Court reporter clarification.)

BY MR. BLACKWELL:

Q.   You can come over here.

A.   I explained to her that she's under arrest.  She's screaming and yelling at the top of her lungs at this point.  I managed to get behind her, ended up grabbing her left arm.  So we're standing like this initially in the parking lot.  She leans forward at the waist.

          THE COURT:  Can the jurors all see this?

          THE WITNESS:  All right.  She leans forward at the waist.  She lowers her center of gravity a little bit more.  All right.  Then she starts pulling away with her feet.  All right.

          She begins to make a -- I believe it was a counterclockwise motion, screaming and yelling.  At this time we're moving closer into the lanes of the traffic, of the parking lot.  I notice a car in my peripheral vision.

          She's still screaming, pulling as hard as she can away from me.  I'm constantly having to readjust my balance to keep my -- to keep standing.

          I noticed the vehicle.  I see it's very close.  It's putting us in a very dangerous situation.  I feel that I'm going to get struck by this car and/or Mrs. Winkler at this time.  So I figure at this time, there's no other option but to

gain compliance from her to get her into handcuffs.

Because when you have somebody that's not compliant like I am right now, he's -- like I am right now with Mr. Bernard, I can't put handcuffs on him.  I can't release one hand, because that's going to go wherever it's going to go, more likely back, hit -- strike me in the face.  I can't get to my --

Sorry.  So I can't get handcuffs on her.  She's still pulling away, using her lower center of gravity.  I noticed the vehicle.  Feel my life's in danger.  My physical safety's in danger from getting struck by this vehicle.

I realize at this point there's no other way to gain compliance other than to place her on the ground.  So I release her left arm.  Still have ahold of her right hand.  I started the straight-arm takedown procedure where you roll the arm, kind of locks the joints.

Then I'm not -- can't remember if I put my arm on her shoulder like I was trained.  It happened pretty quick.  So I pulled from my left to my right, and she goes down to the ground.

Once she's on the ground, I still have ahold of her right arm.  She's laying facedown.  Reach over, get her other hand behind her back, just -- she's being compliant at this point.  She's not resisting anymore.  Put handcuffs on her.

MR. BLACKWELL:  All right.  Go have a seat.

THE WITNESS:  Thank you.

BY MR. BLACKWELL:

Q.  All right.  Now, you would agree that your reenactment was longer than the time when it actually happened; would you agree?

A.  Absolutely.

Q.  All right.  It was seconds; correct?

A.  Yes.  In the second count, I would say.

Q.  Right.  All right.

Now, which way, when you -- remember, you said you grabbed both arms, and that's when you said she's under arrest. That's what you said yesterday.

A.  Yes.  And I tried to correct that.  I can't remember if I had both arms, but I know it was my first initial physical contact with her is when I said it.

Q.  All right.  And when I tried to reenact it yesterday, I had both of my arms up and from behind, and I said, is this when you said she's under arrest?  And you said yes, when you had both of her arms back behind her back.  Isn't that what you said yesterday?

A.  Yes, Mr. Blackwell.  I can't remember the exact point of -- I didn't -- it wasn't under video.  There was no -- anybody else there to say, okay, well, this is what happened at precisely this second versus anything else.

Q.  All right.  All right.  Now, do you recall, when you took

her down, which way were you facing?

A.   I do not.

Q.   All right.  And you said that you took her down to her --
to your right side; correct?

A.   I pulled from my left to my right, so she would have went
off to my right side.

MR. BLACKWELL:  All right.  Can we get Exhibit 6.

Your Honor, Exhibit 6 has been admitted.

THE COURT:  Okay.

MR. BLACKWELL:  May we publish?

THE COURT:  Yes, if it's admitted, you may.

BY MR. BLACKWELL:

Q.   This is Bates stamp 67 of Exhibit No. 6.

Now, you would agree, Officer Gillespie, that this is
the area in which you used this takedown maneuver and where
Ms. Winkler struck her head; correct?

A.   Yes, it appears to be the area.

Q.   Do you see that bloodstain?

A.   I -- right there?

Q.   Yeah.

A.   Yeah.

MR. BLACKWELL:  All right.  Can we zoom out?

BY MR. BLACKWELL:

Q.   Now --

A.   Do I delete that or --

THE COURTROOM DEPUTY:  I got it.

BY MR. BLACKWELL:

Q.  All right.  Now, when you're standing there, you -- well, looking at this picture, this is a long lane line; correct? The lane line in this particular parking lane, that white line there, is it long?

A.  Correct.  Long.  It looks like a standard parking space.

Q.  Is it more than 10 feet long?

A.  You know, I've never measured one, but I would say it's probably about that.

Q.  There was a car there; correct?

A.  Yes, from my memory, there was.

Q.  Did your bodies ever move past the back of that car, if you recall?

A.  I -- I don't recall the exact position.  I know we were moving around quite a bit.

Q.  And then your car was parked to -- in looking at the screen, to the left; correct?

A.  Yes.  It was off to the left side of the screen.

Q.  At an angle?

A.  Correct.

Q.  Towards the street?  Towards the back side of this car that you're near when you take Ms. Winkler down; correct?

A.  The nose of my -- the front end of my vehicle would probably be pointed towards the rear of that vehicle, correct.

Q. All right. All right. Now, are you telling this jury that your bodies, your bodies were at the back side of this lane line?

A. What do you mean by "back side"?

MS. WIENEKE: It's on the back of that easel, Mr. Blackwell.

MR. BLACKWELL: If I may, Judge.

THE COURT: You may.

BY MR. BLACKWELL:

Q. Well, not to waste any additional time. My question is, did you ever remember going to the back of that lane line?

A. Yes.

Q. All right. And --

A. Well, just to be clear, what do you mean by back?

Q. Meaning way to the end of the lane line, where your bodies may be in harm's way.

A. To the rear of that vehicle --

Q. Yes, sir.

A. -- that was parked there?

Yes.

Q. And when you threw her, it looks like -- when you took her down --

A. I didn't throw her.

Q. I'm saying "throw," but when you took her down, you must have moved back up closer to the side of the car at some point,

closer to the curb.

A.   At what point?

Q.   At the point where you took her down.

THE COURT:  Wait a minute.  That's a compound question.  I don't understand that question.  Please rephrase it.

BY MR. BLACKWELL:

Q.   All right.  When you took her down, you didn't take her down near the back side of the vehicle parked in this lane we're looking in; correct?

A.   I -- again, we were moving around quite a bit in that space.

Q.   Yeah.  But my question is --

A.   Where the initial point of me -- I'm sorry.

Q.   My question is specific.  The bloodstain, you would agree, is not at the back side of the lane where the car was parked; correct?

A.   It appears to be about in the center of that lane line.  Or the parking space line.

Q.   All right.  You say "center."

My question is, so when you took her down, she wasn't at the back side of the car; correct?

A.   I -- I don't remember exact position of where it was when the initial -- where I began the takedown procedure.

Q.   All right.  And when you -- when she goes down, you recall

seeing yourself move a couple of times in the video and then you stand up and you look at Ms. Winkler on the ground?  Do you recall looking at yourself do that?

A.   What do you mean?

Q.   When you take her down and she hits her head, right, you -- based on your actions, you recall putting on handcuffs?

A.   Yes, I placed her in handcuffs.

Q.   When you put the handcuffs on her, she's on her face; correct?

A.   She was on her chest, yes.

Q.   All right.  And then you turn her over?

A.   Correct.

Q.   All right.  When you turned her over, did you take your time turning her over?  Were you gently and genteel and you held her head as you turned her over?

A.   I placed her in handcuffs.  I double-locked the handcuffs --

Q.   Right.

A.   -- standard procedure.  Then I grabbed her shoulder, and she was still facedown at this point, and I rolled her over. And I could see the blood that was on the ground and the cut on her head.

Q.   All right.  Now, when she came to, do you recall her asking you what happened?

A.   When she came to, she -- again, I'm not sure if she went --

she passed out or not.  But right -- right as I rolled her over, you know, she asked what happened.

Q.  And you said?

A.  At this point I told her that she fell.

Q.  All right.  Now, you told her she fell; correct?

A.  Correct.

Q.  All right.  But she didn't fall; correct?

A.  Yes, she did.

Q.  All right.  Now, when you went into the Circle K, you would agree that the individuals in the Circle K didn't tell you that they wanted her arrested; correct?

A.  They wanted her trespassed from the property.

Q.  My question is, they didn't tell you that they wanted her arrested; correct?

A.  I don't remember them saying those specific words that they wanted her arrested.

Q.  And if you wanted a person -- if they said they wanted her arrested, then you would have put that in your report; correct?

A.  Yes.

Q.  All right.  And it's not in your report; correct?

A.  No, it's not.

Q.  All right.  And as a matter of fact, when you walked out of that Circle K, you didn't even know if you had the authority to arrest; correct?

A.  No.  I did have authority to arrest.

Q.  All right.  Turn to Exhibit 60, page 24.

Looking at lines -- you can read the whole page, but we're going to specifically look at lines 993 to 997.  But read the whole page.

A.  Do you mind if I look at the page before this?

Q.  Whatever you want to do, Officer.

A.  Thank you.

I'm sorry, what was the line you wanted me to focus on?

Q.  Oh, focus on -- are you -- you're currently on page 24, sir?

A.  Yes, I am.

Q.  Have you read 991 through 1035, the full page?

A.  I'm sorry, I didn't.

Q.  And then if you just look at 993 to 997.

And in this particular -- I'm sorry.  You're still reading.

A.  I'm done with that page.  And what else, you wanted me to --

Q.  I'm sorry.  I wanted you to look at -- specifically at 993 to 997.

A.  Okay.

Q.  All right.  And in that area of your statements to the officers, you don't recall whether or not you had authority to arrest.  Is that what you said?

A.   If they granted me authority?

Q.   So question:  And -- and I'm not -- I'm not -- I -- I just want to clarify, since -- since you didn't put it in the report.  You're not sure whether they actually gave you any authority to arrest?

     Answer:  Uh, I -- I -- I can't remember if I did or not or if they...

     Is that what you said?

A.   Yes, that's what I said.

Q.   And you're saying you don't know if you had authority or if they gave you authority to arrest?

A.   We do have authority, once they ask somebody to be trespassed.

Q.   All right.  But my question to you is not whether or not you have authority.  My question is, did you tell these officers that you didn't know if you had authority because you don't even remember if they told you they wanted her arrested?  Correct?

A.   I said at that point I couldn't remember them specifically saying, "We give you the authority to arrest her."

Q.   All right.  And the officers in this particular -- on this particular day were trying to figure out from your perspective and your memory and/or your report if you had any authority from these particular -- the particular people in the store to arrest the lady outside; correct?

A.   That appears to be their line of questioning.

Q.   Right.  And you -- and based on other pages, they were asking you, well, it's not in your report.  So what do you remember?

     Correct?  Yes?

A.   Correct.

Q.   All right.  And based on -- based on it not being in your report, you're telling those officers, hey, I don't know if I had authority at the time or whether or not they asked me to arrest her.

     Correct?

A.   They asked me to trespass her from the property.

Q.   Trespass and arresting are two different things; would you agree?

A.   No.

Q.   Oh, all right.  What's a trespass?

A.   Trespass is when somebody enters or remains on real property after the reasonable request to leave has been given.

Q.   All right.  Now --

     THE COURT:  Let me -- I'm not clear on this either.

     What does it mean when someone asks you to trespass her?  What does that mean to you that you're supposed to do?

     THE WITNESS:  Well, it's a very common call that we respond to in the city of Phoenix.  Generally how that works out is somebody will be on someone's property, generally a

store or business.

That person usually doesn't -- the owner or the person that's in charge of that business at the time generally doesn't make any approach to people. They'll usually call us to do that and to make the initial contact with them and say, on the behalf of the store owner or whatnot, or whoever's in charge, that they want you trespassed from the property and that you need to leave.

THE COURT: See, that's what I'm not understanding. They want you trespassed from the property. What does that mean?

THE WITNESS: They want you to be removed from the property.

THE COURT: Okay. Thank you.

BY MR. BLACKWELL:

Q. Does that mean they want you to arrest them, in your mind?

A. Well, it starts the trespass process. But in this --

Q. It's a yes or no. I'm sorry.

In your mind, if I own a Circle K and I say, there's an individual, this Mr. Blackwell, out there in a suit. He's there for no reason. He hasn't bought anything in the store, nor has he pumped any gas. He's not waiting for a ride. I've asked him to leave.

Okay, you get there. Do you believe you should arrest me or ask me to leave?

A.   Just to make sure I completely understand your question, they've already told you to leave several times and you're still there?

Q.   I didn't say that.  The person has asked me to leave.  You get there.  I'm still there.

A.   Well, so this isn't a direct comparison to this case, then, is it?

Q.   From your perspective, does an owner of an establishment have to ask a person to leave more than once for you to come out there and tell that person, you need to leave the property?

A.   I'm sorry.  I don't -- I'm misunderstanding your question.

Q.   My question simply is, does a store owner in a case -- in a trespass case have to ask a person to leave more than once for there to be an issue of trespass?

A.   For there to be an issue of trespass?  To arrest that person?  If they give them a reasonable request to leave and they remain on the property, I can see that being an issue because it violates the statute.

Q.   So when you get there, with the backdrop you have right now -- and this is the explanation you gave to the Court and to the jury.  When you get there, you would agree that you don't actually know if these individuals in the store told her to leave; correct?

A.   The information from the 911 calls stated that they did. That's why I spoke with them to corroborate that information.

Q.   I'm asking -- listen.  You would -- you would agree that even though you have information and 911 calls, people may mishear things on the 911 call or people may misspeak about the issue; correct?

A.   Yes.  That's why I corroborate that information.

Q.   All right.  So then you go there and you speak to these individuals, but you haven't spoke to the lady outside; correct?

A.   Yes, I did.

Q.   When you spoke to the lady outside, you said, "What do you want"?

A.   You're referring to your plaintiff?

Q.   I'm referring to Ms. Winkler, yes.  My client.

So when you get there -- I don't know why we have to do this again.  When we get there, you know for a fact you only said to her, "What do you want?"

Correct?

A.   Yes, based on how she approached me.

Q.   Is that yes or no?

You go inside.  You speak to these guys; right?  Yes?

A.   The clerks.

Q.   You don't say anything about the reason for her calls; correct?

A.   If I did, I don't recall.

Q.   And they don't say anything to you about her being in the

store buying anything; correct?

A.   If they -- if they did, I don't recall.

Q.   Not in your report.  All right.

So when you come outside, you see this lady.  She comes to you.  She gives you an ID.  You said she didn't; correct?

A.   She never gave me her ID.

Q.   All right.  And then she tries to tell you, "I didn't -- I'm not a trespasser.  I bought lottery tickets."

From that backdrop, my question is, in your mind, you need to arrest this person?  Is that what you're telling the jury?

At that moment when you see her and she says, "I bought lottery tickets," my question to you is, in your mind, at that moment when she speaks, are you telling this jury that you need to arrest her?  Yes or no?

MS. WIENEKE:  Compound.

THE COURT:  Overruled.

THE WITNESS:  What does the lottery tickets have to do with it?

BY MR. BLACKWELL:

Q.   Next question.

THE COURT:  Rephrase the question.

BY MR. BLACKWELL:

Q.   All right.  I'm going to make it easy for you.

A.   Please.

Q.   Yesterday when you testified, you told this jury when you walked out of the door, she could have walked away.  Correct?

A.   I would have been perfectly happy with that.

Q.   With the knowledge that these individuals in here -- inside the store are corroborating that this lady outside was told several times to leave; correct?

A.   By the store manager, yes.

Q.   All right.  But she can leave when you walk outside the door; correct?

A.   I -- again, I would be perfectly happy with that.

Q.   My question is specific.  "I would be perfectly happy" is not answering my question.

     When you walk out that door, she can walk away; correct?

A.   I would have been --

Q.   Yes or no?

A.   I would have been fine with that.

Q.   You can't say yes or no?  Yes or no?

A.   I would have used my discretion, if she didn't leave, that that would have been the end of the situation.

Q.   She could have got in her car, drove out.  You wouldn't have tried to stop her at all; correct?

A.   No, I would not.

Q.   All right.  Now, will you move a few more seconds.  You

walk past the window.  You come back because she comes towards you.  Now we can't see you.  Is she still free to leave?

Before you hear her on the phone with your supervisor, before you say anything about "Put your phone down," could she just turn around and walk away from you and get in her car?

A.  Well, I did have probable cause to arrest her.

Q.  What has --

A.  I would have used -- I would have used my discretion if she would have self-complied with my request for her to leave.  And if she would have left the property, I would have been good with that.

Q.  All right.  So your testimony is you get one side of a story, correct, you come outside and you see this person, and whoever this person is, Ms. Winkler or anybody else in the world, and they tell you, "I wasn't trespassing.  I actually was in the store and I bought something," from your perspective, they still have to leave; correct?

MS. WIENEKE:  Objection.  Compound and argumentative.

THE COURT:  Yeah.  Please rephrase the question.

MR. BLACKWELL:  Thank you.

BY MR. BLACKWELL:

Q.  From your perspective, when somebody inside the store says somebody's trespassing, with your knowledge and understanding, you don't care about the other person's issue of whether or not they actually were there as a paying patron of that store;

correct?

A.   When you say that they're trespassing, I mean, is this the same information that I have from the store clerks, that they've already been told several times to leave the property?

Q.   Let's say --

A.   Or is this like a completely different scenario?

Q.   Let's say the scenario is the same.  You get some information that a manager has told this person several times to leave, and when you come outside and you're confronted with this person, from your perspective and your training, you don't have to talk to that person about why they were there; right?

A.   No, I do not.

Q.   All right.  Even if that person has called the police several times for an issue that took place at the Circle K, you don't have to ask that person those questions; correct?

        Correct?  Who cares?  Somebody in the store said leave?

A.   If they want to --

        MS. WIENEKE:  Hold on.  Excuse me.

        Your Honor, it's argumentative and it's compound --

        THE COURT:  Sustained.

        MS. WIENEKE:  -- and it's 403, cumulative and repetitive.

        THE COURT:  Yeah, let's move on.

        MR. BLACKWELL:  Judge, I understand, but he hasn't

answered the question.

THE COURT:  Well, make your questions one question at a time and no more compound.

MR. BLACKWELL:  Yes, sir.  You got it, Your Honor.

BY MR. BLACKWELL:

Q.  Real simple.  When you come outside with the same scenario, a manager has told an individual to leave several times based on what you said they said, my question to you is four parts.

First, do you have to arrest that person when you first come in contact with them; yes or no?

A.  Do I have to?  Or could I?

Q.  Do you have to arrest a person?

A.  Do I have to, no.

Q.  All right.  Second question:  Do you have to acknowledge or -- I'm sorry.  Bad question.

Do you care whether or not the person had a legitimate basis for being on their property?  Yes or no?

A.  In a retail situation like that?

Q.  My question, again:  Do you care if the person had a reasonable basis to be on the property?

A.  If they want to be cooperative with me and talk in a normal tone, I would listen to them.  But the store employees have the ultimate decision on who's going to be on their property or not.  I have no say in that.

Q.  So you can't answer my question if you care whether or not

the person had a legitimate reason?

A.   If I care --

MS. WIENEKE:  Objection, Your Honor.  It's irrelevant. Whether the officer cares is irrelevant.

THE COURT:  Yeah.  Why don't you rephrase the question.

MR. BLACKWELL:  Well, I'd ask the Court to strike that answer, because he's not answering my question.  It's a yes or no.

THE COURT:  Ask the question in a different way, as to whether or not he cares.  Whether it's important to him or whatever, but that's an argumentative question.

MR. BLACKWELL:  Thank you, Judge.

BY MR. BLACKWELL:

Q.   Is it important for you, when you come outside, to ascertain if the person had a legitimate reason to be on the property?

A.   If that person's not argumentative or hostile towards me, I would listen to them.

Q.   So you're telling this jury if a person is argumentative or hostile, it's not -- their reason for being on the property isn't important at that moment?  Yes?

That's what you just said; correct?

A.   Again, it's not up to me on who gets -- who Circle K wants on their property or not.

Q.   All my -- I moved on past that.  I'm on the -- what you just said.

My question is:  You just said if they're being hostile with you, then it's not important.  Their issue for being there isn't important if they're being hostile; correct?

Correct?  Yes or no?

A.   Again, it's not up to me on who Circle K wants on their property.  Now, if it's like a --

Q.   I'm not -- there's no question before you.

A.   Okay.

Q.   All right.  The next question, fourth question, is based on your previous testimony.

This person, hostile or not --

A.   What year was this testimony that you're referring to?

Q.   Talking about your testimony yesterday, sir.

A.   Oh, yesterday, okay.  Well, you'd agree that there's quite a few different statements throughout the years.  I just want to be clarified on when it was.

Q.   Your testimony yesterday, sir.

A.   Okay.

Q.   All right.

A.   Yesterday.

Q.   All right.  As it pertains to Ms. Winkler, she was free to leave at any moment during the time you walked out of the store up until the point you said she's under arrest; correct?  Yes

or no?

A.  I could have placed her under arrest immediately after learning the information that I did inside the store.  If she would have left, prior to me making -- contacting her again, even when I'm contacting her after I told her to leave, if she would have left, I would have been fine with that.

Q.  But that's not correct.  You know why, Detective Gillespie?

A.  It's Officer Gillespie.

Q.  Because your -- your explanation is that when you went over there, you asked her to leave.  You said, "They said you're trespassing."  Correct?

        Correct?

A.  Correct.  My second --

Q.  Then you said -- you claim in your testimony you said to her, "You need to leave."  Correct?

A.  Correct.

Q.  All right.  Now, you also agree with -- there's other statements to officers when you were interviewed about this case.  You actually don't recall if she said she wasn't leaving; correct?

        MS. WIENEKE:  Objection.  Asked and answered.  403.

        MR. BLACKWELL:  I'm just trying to get to my point, Judge.

        THE COURT:  Okay.  Well, wrap it up.  This has been covered many times.

MR. BLACKWELL:  Thank you.  That's what I'm trying to --

THE COURT:  Let's move on.

MR. BLACKWELL:  Yes, sir.

BY MR. BLACKWELL:

Q.  You already testified that you don't recall if she refused to leave; correct?

A.  She wasn't leaving after I explained it to her so --

Q.  Can you say yes or no, Officer Gillespie?

A.  Well, I want to be perfectly clear here.

Q.  Well, it's a -- you can explain through Ms. Wieneke.  My questions are based on your statements.  I'm not making this stuff up.

THE COURT:  Let's just ask a question, please.

BY MR. BLACKWELL:

Q.  So isn't it true you told an officer of the law you don't know if she refused to leave?  Yes or no?

A.  Well, she did refuse to leave.

Q.  So why did you -- either you were lying to the officers back in 2015 or you're lying now.

MS. WIENEKE:  Objection, Your Honor.  Argumentative.

THE COURT:  And sustained.

If you have a specific statement from him you want to point him to that may be inconsistent, that's fine.  But --

MR. BLACKWELL:  Judge, I've already did that,

because -- and then when I do it again, he's already did that, Judge.

THE COURT:  Well, then you've already done a -- then you're repeating yourself.  Let's move on.

MR. BLACKWELL:  All right.

BY MR. BLACKWELL:

Q.  Now, can you answer yes or no?

A.  What's your question?

Q.  All right.

MS. WIENEKE:  The objection was sustained.

THE COURT:  The objection was sustained.  Rephrase the question.

BY MR. BLACKWELL:

Q.  No.  I mean from this point on.  I want to sit down.  Can you answer yes or no?

A.  If it's a yes-or-no question, yes, I will.

Q.  You don't believe that when I ask you a question --

THE COURT:  Just move on and ask a question, please.

MR. BLACKWELL:  Thank you, Judge.

BY MR. BLACKWELL:

Q.  When I asked you this question right here:  When you were in front of Ms. Winkler, when she was moving back from you, she was leaving your area of operation.  Correct?

Correct?  Yes or no?

A.  She was stepping away from me after I --

Q.   And at the moment --

A.   -- initiated the arrest.

Q.   Whoa, hold up.  Let's go back.

     You never initiated an arrest before she walked back from you, based on your previous testimony in this case today and yesterday; correct?

A.   No.  I was actually reaching out for her when she start -- when she seen my body language, and that's why she started backing up.

Q.   When she seen your body language, let's use your term --

A.   Please.

Q.   -- did you say to her, "You're under arrest, ma'am"?

A.   When I grabbed her arm, I did.

Q.   All right.  So let's take that.

     You would agree that you already testified that before she moved back from you, you didn't say she's under arrest; correct?

     MS. WIENEKE:  Rule 403.  Asked and answered.

     MR. BLACKWELL:  Impeachment, Judge.  I can impeach him on his previous statement.

     THE COURT:  He's already said this.  He's already agreed to what you just asked him.  Let's don't ask that question again.  Let's move on.

BY MR. BLACKWELL:

Q.   All right.  Last question.  If your statements to this jury

were that you would be happy if she left on her own, when she's moving away from you, why didn't you let her leave?  Why?

A.  Why?  Because my decision that she was going to be placed under arrest for trespassing.  She refused to self-comply with my request to leave the property.

The only time she did start backing up is when I began to reach out for her to place her under arrest for trespassing.  At that point, she couldn't leave.

Q.  And she never verbally refused to leave; correct?

A.  She never made any acknowledgment that she was going to leave, that she agreed that, "Okay, I understand.  I will leave."

Q.  My question specifically was:  She never made any verbal statement that she wasn't going to leave?

A.  She had made mention of her purchasing a lottery ticket.

MR. BLACKWELL:  I'm done with this witness, Judge.

THE COURT:  Okay.  Cross-examination and direct examination.

CROSS-EXAMINATION

BY MS. WIENEKE:

Q.  Good morning, Officer Gillespie.

A.  Good morning.

Q.  So I need my glasses to see you, but I don't need them to read, so I'll be taking them off and on.

I want to get to something right away.  Going to go

off my outline a little bit.

Do you have that Exhibit 60 in front of you?  That's the statement that you gave in June of 2015.

A.  Yes, I do.

Q.  I just want to clear something up right away.  I want to have you turn to page 9.  If we could publish -- oh, sorry. We'll just have you look at page 9, Officer Gillespie.

And I want you to read lines 330 to 338 to yourself.

MR. BLACKWELL:  You said page 9?

MS. WIENEKE:  Yes, sir.

MR. BLACKWELL:  Thank you.

THE WITNESS:  Okay.

MR. BLACKWELL:  One second.

THE WITNESS:  To 338; correct?  Line 338?

BY MS. WIENEKE:

Q.  Line 330 to 338.

A.  Okay.

Q.  Now, I want to take you back to the moment where you're having your second encounter with Ms. Winkler.

And you've told this jury that you have explained to her this issue about she was trespassing and that she needed to leave.  Do you recall that testimony?

A.  Correct.

Q.  And now you have made this decision that she's going to be arrested.

Having reviewed Exhibit 60 at page 9, does that refresh your memory about anything else that you told her as part of your decision-making process that she's going to be arrested?  In terms of what you told her about if -- the consequence of what is going to happen if she doesn't leave.

A.   Right.  I explained in this paragraph or this answer that, you know, that I explained to her as clear as I possibly could, laid it out that if she remained on the property, she didn't leave, she would be arrested.

Q.   You told her, "If you don't leave, you're going to be arrested"?

A.   Yes.

Q.   So given that information, is it your reasonable belief, sir, that before you laid hands on her, she was told that she was going to be arrested if she did not leave the property?

A.   Yes.

Q.   Now, you have arrested people for trespassing before this day?

A.   Correct.

Q.   You have handled trespassers before this day where you have asked them to leave and they have left peacefully?

A.   Yes.

Q.   Has it been your experience, sir, that when you have encountered trespassers and you have asked them to leave, they have left in the manner in which we saw in the video, like this

(indicating)?

A.   No.

Q.   And what I've just done, for the record, is I put my hands up and I've walked backwards in the manner in which we saw in the video.

Have you, in your experience in arresting trespassers, ever saw somebody leave the property in response to your reasonable requests to do so with their hands up and walking backwards towards cross traffic in a parking lot?

A.   No, I never have.

Q.   Was it your reasonable belief that when you watched Ms. Winkler in response to your request to have her leave the property, that when she put her hands back and she started to walk backwards toward the cross traffic in the parking lot, that that was in response to your reasonable request to leave that she was, in fact, leaving the property?

MR. BLACKWELL:  Objection.  Foundation and speculation.

THE COURT:  Overruled.

THE WITNESS:  No.  Her -- the actions that she took as she was walking backwards indicated to me that she was not going to be compliant with me placing her under arrest.

BY MS. WIENEKE:

Q.   Was it your reasonable belief that her actions, in putting her hands up and walking backwards as we saw in the video, was

in response to your telling her that she was going to be arrested if she didn't leave, that she was going to be arrested for trespassing?

A.   It's -- after I explained to her that if she remained on the property she was going to be arrested if she didn't leave, I received no response for self-compliance with her acknowledging that, "Okay, I'll leave."

It wasn't until I started walking towards her, reached out my arm to grab her arm, is when she put -- started waving her hands up and walking backwards into the parking lot.

Q.   And by the way, when she made those movements, that is, raised her arms and started walking backwards, was she verbalizing anything at the time?

A.   She was.  She was -- she began screaming and yelling at that point.  I couldn't make out what she was yelling or -- but it was loud.

Q.   And in your experience, in either telling people to leave the property, that is, people that you are asking to leave as trespassers, do they typically put their arms up and walk backwards screaming in the manner in which you experienced with Ms. Winkler?

A.   That would -- no.  I've never come across that before with somebody that's self-complying by leaving.

Q.   You were asked about whether a person has a legitimate reason to be on property.  And I want to follow up on that line

of questioning.

If a person goes into a convenience store such as a Circle K and they buy a Polar Pop, and they remain on the property with their Polar Pop that they bought for 99 cents, and for whatever reason the store clerk doesn't want them on the property anymore and they make a reasonable request to leave and the person doesn't leave, and now they call the police and they want that person trespassed from the property.

Under your knowledge of the law, which you explained to us earlier about what the elements of trespass are, does it matter that that customer bought a Polar Pop?  Is that -- had a legitimate reason to be on the property.  They're a customer.

Under the law as you understand it in enforcing trespass law in the state of Arizona, does it matter that that person had a legitimate reason to be on the property if there has been a reasonable request to leave by the store owner and a refusal to leave?

MR. BLACKWELL:  Objection.  Foundation.

THE COURT:  Overruled.

THE WITNESS:  No.  That -- purchasing any type of product has -- gives you no basis to stay on the property.

BY MS. WIENEKE:

Q.  Now, I want to go back --

THE COURT:  Is this a good place for a break?

MS. WIENEKE:  Perfect, Your Honor.

THE COURT:  Let's take a recess.  We'll come back at 10:15.

(Jury not present.)

THE COURT:  Officer Gillespie, you may step down.

THE WITNESS:  Thank you.

THE COURT:  Okay.  Let's talk about -- I've reviewed the case.  What is the -- please have a seat.

What is the report you want to admit?

MS. WIENEKE:  Yes, Your Honor.

THE COURT:  Because the rule basically is pretty clear.  You can put in factual determinations from a police report.

MR. BLACKWELL:  If they're trustworthy, Judge.

THE COURT:  If they're what?

MR. BLACKWELL:  If they're trustworthy.  That's what the -- the way the Court -- the ruling --

THE COURT:  I've read the rule.  I want to look and see -- I don't know what she's going to offer, so I can't make any determinations until I see it.

MS. WIENEKE:  Yes, Your Honor.  I have defendant's proposed Exhibit 583.  I've provided a copy to counsel, and if I may approach for the Court.

THE COURT:  Yes.

Is it this entire exhibit you intend to offer?

MS. WIENEKE:  Yes, Your Honor.  I have a copy for the

clerk.

THE COURT:  Okay.  Mr. Blackwell, have you had a chance to review this?

MR. BLACKWELL:  If it's -- it's only 583; correct?

MS. WIENEKE:  Yes, sir.

MR. BLACKWELL:  Officer Gillespie's report?

THE COURT:  Yeah.

MR. BLACKWELL:  Yeah.  I think reports generally do not come in because they're unreliable, and it's the way they're written --

THE COURT:  No, no.

MR. BLACKWELL:  They're written to effect an arrest.  So as it pertains to that case --

THE COURT:  Well, I'm not going to follow that rule.

MR. BLACKWELL:  Okay.

THE COURT:  All I'm saying is I'm following the rules of evidence, and they do come in for factual observations by the officer.  Are there things in here that you feel aren't factual observations that you want to object to?  Because I'm going to let in any factual observations that appear to be reliable.

Why don't you take a moment and go through it, and we'll come back and talk about it.

MR. BLACKWELL:  Thank you.

THE COURT:  When are you going to get to this?  Do you

know?

MS. WIENEKE:  I was just going to next start with the -- his background, and then I was going to get right to it.

THE COURT:  Well, let's come back in about 10 minutes and see what you have to say about this, Mr. Blackwell. Because there are some things in there that may not be factual. I don't know.

MR. BLACKWELL:  Yes.

THE COURT:  But I haven't had a chance to go through it carefully.  But if you point out things you feel aren't based on his factual observations, that's a legitimate objection probably.

MR. BLACKWELL:  Thank you.

MR. BERNARD:  And, Your Honor, there's one more issue.

MS. WIENEKE:  Okay.  I also wanted to make an offer of proof.  If you want, we can do it when we come back or --

THE COURT:  Yeah, go ahead and do it.

MS. WIENEKE:  Okay.  Thank you, Your Honor.

So my offer of proof is for proposed Exhibit 585. This is a call for service made by Ms. Winkler at 6:09 p.m. on July 16th, 2014.  This is on the date of the incident.  This is a call made to Crime Stop, and it was a report of illegal parking at 720 East Montebello Avenue.

And this is a call that she made to report to the City of Phoenix to report this illegal parking.  You may recall that

she testified that she was at home in the hour before the incident. She arrived at the Circle K at 6:28 p.m. or so, and she testified that she was home and she was emotional about this person that she helped.

We believe this exhibit is important to impeach Ms. Winkler for the following reasons:

1. It impeaches the fact that she said she was at home, which this address, 720 East Montebello, is not near her home address, at least as indicated in the DR; and

2. It reflects her knowledge of calling Crime Stop and not remaining at the scene of the event. You recall that she was told to stay at the scene so that the officers could respond. And so she wasn't remaining at the scene of this incident when she called in.

And also, in answers to interrogatory, she did not report this call for service, and we believe it's impeachment for that reason.

So that would be our offer of proof with respect to proposed Exhibit 585, a copy provided to the Court, the clerk, and counsel.

THE COURT: My ruling stands under 403. Whatever probative value it has, which I don't see any, but if there is any, it's substantially outweighed by the risk of unfair prejudice, confusion of issues, and a waste of time.

Okay. We're going to come back at 10:15, and we'll

have the jury come back at 10:20 so we give a little time

for --

MR. BERNARD:  Your Honor, I just have one brief issue

regarding a witness that we're going to have in the afternoon.

THE COURT:  Okay.

MR. BERNARD:  We can cover it now or we can cover it

before lunch.

THE COURT:  All right.  What is it?

MR. BERNARD:  I plan on introducing the discharge

summary for Dr. Weise.  He's testifying in the afternoon.  In

light of our time constraint and having -- I don't want to

introduce her entire chart from Abrazo.  Based on the Court's

ruling, he can only testify to his discharge summary.

So I'm suggesting that we make two exhibits, one that

we would -- I try to get into evidence, which would be his

discharge summaries, and then bifurcating just the rest of the

chart just in case he needs to rely on it, because his

discharge summary is based on what other doctors have done.

THE COURT:  So have you talked to Ms. Wieneke about

this?

MR. BERNARD:  I talked to Ms. Retts.

THE COURT:  You object to that?

MS. RETTS:  Yes, Your Honor.  We have a continuing

objection based upon the disclosure problems.  These doctors

were listed with no identification of what they reviewed.  This

is a discharging doctor.  The first time he ever laid eyes on Ms. Winkler was for the discharge summary only.

So this shouldn't be a back door to get in other records that were authored by other doctors who are not here in the courtroom.  Plaintiff had the ability to bring other doctors in the courtroom.

He can testify to his discharge summary, is my understanding of the Court's prior ruling, and not exceed that. He did not, in a 26(a)(2)(C) summary, identify the documents he relied upon in formulating the discharge summary.  It is not listed in the documents in the discharge summary what he specifically relied upon that is outside of that discharge summary, so it's not fair for plaintiff to then have him on the stand and exceed the scope of that discharge summary by referencing the entire record when he didn't personally give treatment.

THE COURT:  Okay.  Is he going to talk about something outside the discharge summary?

MR. BERNARD:  No, Your Honor.  That's the reason why I'm offering to bifurcate it, so we don't have get in the entire record.  I want to take out his discharge summary, make that a separate exhibit so I can give it to him.  He can testify to that.

THE COURT:  Yeah.

MR. BERNARD:  But if he needs to rely on the rest of

the chart, yes, there would be another exhibit for him to rely on.

THE COURT:  You're not offering that exhibit; you're just --

MR. BERNARD:  No, Your Honor.

THE COURT:  Oh, well, he can rely on whatever he wants to rely on.

MR. BERNARD:  I understand that.  But if I wanted to offer his discharge summary as an exhibit and it's still attached to the other --

THE COURT:  All you're asking is to take out the discharge summary from the other --

MR. BERNARD:  Yes, Your Honor.

THE COURT:  Do you object to that?

MS. RETTS:  I object to him relying upon anything else in the record, because it wasn't disclosed to us.

THE COURT:  Well, no, I'm going to -- he can rely on that.  You guys have the medical records.  So --

MS. RETTS:  But he shouldn't be -- there are no opinions that have been disclosed.  So if he's giving opinions that haven't been disclosed based upon anything else --

THE COURT:  Well, he said -- they've promised me his opinions are only what's in his discharge summary.  And he can rely on whatever he relied on in preparing that discharge summary.  You guys have all the records.

So anything else?

MR. BERNARD:  No, Your Honor.  Thank you.

THE COURT:  All right.  Let's come back at 10:20.

Michele, would you ask the jury to come back at 10:25?
We just need a little more time.

THE COURTROOM DEPUTY:  Okay.

THE COURT:  Thank you.

(Recess taken, 10:06 a.m. to 10:24 a.m.)

THE COURT:  Mr. Blackwell, do you have any objections
to any of the contents in Exhibit No. 583?

MR. BLACKWELL:  Yes, Judge.  The objections that I
have are anything that's not a fact.  So --

THE COURT:  Okay.  I understand that.  I want you to
point out to me what portions you object to.  I need you to
highlight it so I can see it and show Ms. Wieneke.

MR. BLACKWELL:  All right.  Well, I need a clean copy.

THE COURT:  That's what we talked about.

MR. BLACKWELL:  I did this in the room that I had
there, Judge.  I made notes on this --

THE COURT:  I don't need -- just do it, please.

MR. BLACKWELL:  All right.  I'm doing it on the
record.

So if you turn to page 2, do you have it, Judge, in
front of you?

THE COURT:  Yeah.

MR. BLACKWELL:  The first paragraph should be stricken.  It's not facts.

THE COURT:  Let me back up.  You have no objection to what's on page 1?  Is that what --

MR. BLACKWELL:  Page 1, I'm sorry.  Yes.  The type of report, trespassing/resisting arrest.

THE COURT:  Okay.  That's not a fact.  That's an opinion, so that will come out.  Redact that.

Anything else?

MR. BLACKWELL:  This liquor served/sold, bias.  I don't know what bias is.  Is that a fact?  I don't know what b-i-a-s means.  Where it says offense involved.

THE COURT:  I'm sorry.

MR. BLACKWELL:  Middle, under premises market parking lot.  Next words are:  Offense involved.  It says liquor served/sold.  Bias is irrelevant.  I don't think that should come in.

THE COURT:  I'm not seeing bias.

MR. BLACKWELL:  B-i-a-s.

THE COURT:  Oh.  Okay.  Liquor served/sold, bias none.

Yeah, I don't think that's relevant.  So that will be redacted.

What else?  I don't think that's a fact.

MR. BLACKWELL:  Person -- call person, victim 01.  Not a fact.

THE COURT:  Where?

MR. BLACKWELL:  Under latents submitted to crime lab.

THE COURT:  Okay.

MR. BLACKWELL:  There's no victim.

THE COURT:  Ms. Wieneke, any objection to taking that out?

MS. WIENEKE:  No.

THE COURT:  Victim 01.  Okay.  Victim 01 will be redacted.

MR. BLACKWELL:  Nothing wrong with the biographical information.

Emotional conditions, angry, irrational.  Those aren't facts.

THE COURT:  Ms. Wieneke?

MS. WIENEKE:  That's Officer Gillespie's observations.

THE COURT:  Yeah.  That's his observation, so I don't think that comes out.

MR. BLACKWELL:  Based on what investigation?

THE COURT:  His -- he was there.  He saw her.  That's based on his observation.

MR. BLACKWELL:  Then it's cumulative.  Then he's already testified about that.

THE COURT:  All right.  I'm letting it in.

Anything else?

MR. BLACKWELL:  Yes.  Next page.  After serial

number 9223, full first paragraph:  Martha committed trespassing and resisting arrest.  Not a fact.

After she's told to leave, then resisting arrest by physically resisting being placed into handcuffs.  Well, in this case we know from the facts she was placed in handcuffs on the ground after being told she's under arrest.

THE COURT:  Okay.

MR. BLACKWELL:  There's no resisting there.

THE COURT:  All right.  Even if this meets the rule for allowing it in as an exception to the hearsay rule, this is cumulative and he's already testified to all this.  And I don't think this -- this is what the argument in the case is about, so we're not going to put it in the form of a police report. It's -- under 403, it's cumulative and it's just what the officer testified to.  I don't know why we need to put it in a report.

So all right.  What else?

MR. BLACKWELL:  I would make the same argument the judge made with the whole thing.

Next paragraph:  7/16/14 at approximately 1940 hours, I responded to a report of trespassing at the Circle K.  While en route, I read five separate related calls that were added to the original one.  The calls consisted of -- so that whole thing should come out.

THE COURT:  That is a fact.  Those are facts.

MR. BLACKWELL:  He's already -- first and foremost, he's already testified.  And secondly, this paragraph --

THE COURT:  Well, no --

MR. BLACKWELL:  If I may, Judge.

THE COURT:  Go ahead.

MR. BLACKWELL:  Secondly, the paragraph doesn't state that she called for harassment.  If you read the paragraph, he's not even saying he's responding to her calls --

THE COURT:  Overruled.

MR. BLACKWELL:  -- so that's improper.

THE COURT:  All right.  That's coming in.  Anything else?

MR. BLACKWELL:  Next paragraph.  The full paragraph is disputed.  Outside of --

THE COURT:  Whether it's disputed or not is not the question.  The question is whether or not it's a factual recitation of what the officer observed.

MR. BLACKWELL:  Okay.  Officer says he parked in front of the store.  The part that's not a fact:  I want your supervisor.  That's not what she said.  That's not what she said.  It wasn't recorded.

THE COURT:  Listen to me.  I'm not here to argue whether this is accurate or not.  It's based on what he observed, and it was prepared that evening.  And I think that's his recollection at that time, apparently, of what he observed,

so I'm not going to exclude that.

MR. BLACKWELL:  All right.  Then the next paragraph. Next paragraph is full of hearsay statements.  If you look at the bottom of this particular case that they gave us: Statements made by third persons that are recorded in an investigative report are hearsay.  The statements are inadmissible unless they qualify for their own exclusion or exception to the hearsay rule.

THE COURT:  I don't know that it's being offered for the truth of the matter asserted.  It's being offered for what he understood the facts to be.  They might have been lying to him about that, but that's not what's relevant.  What's relevant is whether he was told by someone that there was a person out there who had been asked to leave.  So that's not being offered for the truth of the matter asserted.  It's being offered to say, this is what the clerks told me.

MR. BLACKWELL:  Which clerk, Judge?  It doesn't say in his report which clerk he --

THE COURT:  Overruled.  Let's move on.

MR. BLACKWELL:  Next paragraph.

And I need to make -- well, I'm going to make a record at the end, if the Court will allow it.

THE COURT:  We'll do it at the next break.  We got a jury waiting outside, so move on.  I'd assumed you highlighted it and are ready to talk about this --

MR. BLACKWELL:  I already -- I highlighted it, Judge. The issue is, we already -- you already -- Your Honor, respectfully, you already ruled against it before we got here. Then this day, right now, they come into this court asking -- because we objected to it.  We already objected to this issue for --

THE COURT:  I don't remember that, but whether it happened or not, I'm going to consider it.  And I've looked at the case she provided, and I've looked at the rule.  And hearsay objection -- and I assume your objection is -- if you have other objections, let me know, but I'm addressing the hearsay issue in this.

MR. BLACKWELL:  The issue -- the issue that they presented based on the case they provided.  The conclusions can come in based on factual investigations, not factual statements.  He didn't perform an investigation, Judge.

THE COURT:  I've already ruled on it.  Let's move on to the next paragraph.

MR. BLACKWELL:  The next paragraph.  That's what I'm getting to.  The next paragraph.

The sentence that says -- the first two sentences.  At this time, he walked out.  No problem.  Martha was speaking on her call -- on her phone.  No problem.  No problem with the next sentence.  The next -- I advised Martha she was trespassing.  No problem.

THE COURT:  I want you to show me which ones you have problems with.  That's what I'm trying to get to.

MR. BLACKWELL:  The problem that I have with is:  When I was struggling with Martha, several vehicles were passing close by.

That's not even factual.  There's nothing they presented in any embodiment in this case that several vehicles were passing by during this particular encounter with Ms. Winkler.  It didn't happen, and he -- there's no proof of it.  So that shouldn't come in.

After several seconds -- that entire part.  He's already testified, Judge, that -- against his last sentence: After several seconds struggling with Martha, I swung her to my right side and attempted to place her on the ground to avoid being struck by a vehicle.  Martha had lost her balance and fell in the parking lot, striking her head on the asphalt.

Didn't happen.  He already testified that he -- she didn't fall.  He's calling it a fall, but he testified that he -- his actions, by taking her down to the ground on her head, he caused those injuries.  That goes against this paragraph.  Why is that coming in?  Even his own factual testimony goes --

THE COURT:  I think that's fertile ground for cross-examination, if he sticks by that.  You've already --

Okay.  So --

MR. BLACKWELL:  The next paragraph, Judge.

THE COURT:  Please make the redactions that I --

The next paragraph, do you have any objection to that?

MS. WIENEKE:  I'm sorry?

THE COURT:  No, I was asking Mr. Blackwell.

MR. BLACKWELL:  No.  No.

THE COURT:  Okay.  So the redactions I identified need to be made.

Finally, the last page, anything in here?

MR. BLACKWELL:  One second, Judge.

No, Judge.  No problem with that.

THE COURT:  All right.  I'll allow this in with the redactions we discussed.

MS. WIENEKE:  And just to be clear, you're redacting the entire first paragraph on page 2?

THE COURT:  Yep.  And then on page 1, the trespassing/resisting arrest, the bias -- liquor served/sold, bias none, no bias.

MS. WIENEKE:  And the basis of the redaction of the first paragraph on page 2 is that it's cumulative under 403?

THE COURT:  It's cumulative and it's not a factual determination.  It's a question -- he's making a legal determination on the very issue that's in front of this jury as to whether or not she committed trespassing and resisting arrest.

MS. WIENEKE:  But the officer can testify as to this. I believe the Court --

THE COURT:  Yeah.  He can testify to what his beliefs were and why he did what he did.

MS. WIENEKE:  Right.

THE COURT:  Okay.  But that's not going to come in in this police report.

Okay.  We ready?

MR. BLACKWELL:  The only thing is, the officer said on direct with -- on direct with me, I'm sorry, I apologize, that he had probable cause to make an arrest.  I think it invades the province of the jury.  I don't believe it opened the door yet, but I believe it does invade the province of the jury.

The jury's supposed to determine whether or not there's probable cause to make an arrest.  That's their --

THE COURT:  Well, I think he can testify that "I thought I had probable cause to make an arrest based on the facts in front of me at the time."

MR. BLACKWELL:  I agree with that, but I think he stated -- if the Court wants the court reporter to read it back, I think he said he had probable cause.  He doesn't have probable cause, Judge.  And I would ask the Court to strike that.

THE COURT:  Well, I think you can clear that up with the jury when you cross-examine him.  Okay?

MR. BLACKWELL:  Thank you.

MS. WIENEKE:  Wait, what?

(Conference off the record between Ms. Wieneke and Mr. Blackwell.)

THE COURT:  Ms. Wieneke, just to clarify, what I think he's saying is that he's objecting to the officer saying "I had probable cause" as opposed to saying "I think I had probable cause."  And so I think he --

When you cross-examine him, you can explore that with him.

MR. BLACKWELL:  Yes, sir.

THE COURT:  Okay?

So make the redactions before you offer that into evidence.

MS. WIENEKE:  Yes, sir.

(Jury present.)

THE COURT:  Please be seated.  We needed a little more time than I expected because we had some legal issues to resolve, but we're ready to go now.

MR. BLACKWELL:  May we approach, Judge, real quick?

THE COURT:  Okay.

(At sidebar on the record.)

MR. BLACKWELL:  Judge, I just want to make sure that we all understand that it's the jury's province for probable cause on whether or not the officer made a lawful arrest.  It's

not up to us.  It's not up to the defense.  So the jury needs to know that's their province.  The officer can't say, "I had probable cause."  And the jury needs to know that from the Court, not from me.

THE COURT:  Well, I think the officer can testify --

MR. BLACKWELL:  That's why we're here.

THE COURT:  -- that "The reason why I arrested her is because I thought I had probable cause to make an arrest based on these facts."

MR. BLACKWELL:  Yeah.  He can say that, but he can't say, "I had probable cause."

THE COURT:  Okay.  Just don't ask the question in a way that says "Did you have probable cause?"  It's "Did you think you had probable cause?"  I think that will solve his concern.

MS. WIENEKE:  All right.

THE COURT:  I'm not sure it makes a lot of difference.

MS. WIENEKE:  Yeah.  I don't understand the difference either, but I'll try to use the right tense.

THE COURT:  All right.  Thank you.

MR. BLACKWELL:  One second.

Okay.  We're good, Judge.  We're good.

(End of discussion at sidebar.)

THE COURT:  Okay.  I think we're ready now.  You may continue with your direct and cross-examination of the witness.

MS. WIENEKE:  Thank you, Your Honor.

BY MS. WIENEKE:

Q.  All right, Officer Gillespie.  Before the break, I was about to get into a new area, and I want to talk to you about -- I told the jury in opening statement that before you became a City of Phoenix police officer, you lived in the state of Michigan.  And I want to start there.

Tell the ladies and gentlemen of the jury about your life before living in the state of Arizona and what you did in Michigan, where you grew up.

MR. BLACKWELL:  Objection.  Relevance.

THE COURT:  Overruled.

THE WITNESS:  I grew up in just north -- a county just north of Flint, Michigan.  Small town, one stoplight.  Both me and my wife grew up in the same town.

Got married about -- I'm going to mess this up.  Probably 16 years ago.  Sorry, my wife's sitting in the back there.  I forgot her birth date the other day.  She got really upset at me, so I don't want to mess up the anniversary thing.

We got married out there, had a child.  And, was it 2007, we decided to move out to Arizona.  I was still an auto mechanic.  My wife was a landscape designer.  I got a job --

MR. BLACKWELL:  I'm going to object to narrative at this point, Judge.

THE COURT:  Sustained.

BY MS. WIENEKE:

Q. All right. Let's just break it up into smaller chunks, if you would.

A. You got it. I'm sorry.

Q. All right. So in Michigan as an adult, you worked as an auto mechanic?

A. Yes, I did.

Q. How long did you do that?

A. Oh, probably about 13 years or so.

Q. And then you moved to Arizona in what year?

A. 2007.

Q. What brought you to Arizona?

A. The economy and the weather. Try something new.

Q. And what year did you get hired by the City of Phoenix?

A. It was February of 2008.

Q. And you attended the police academy?

A. Yes, I did.

Q. Which academy did you go to?

A. The Phoenix Area Law Enforcement Academy.

Q. Do you recall approximately how long the academy was?

A. Well, we start -- I started on St. Patrick's Day of 2008 was the first day of the academy, and I graduated in July, like first week of July, I believe it was.

Q. As part of the Phoenix Law Enforcement Academy, were you required to cover a variety of different topics and various

issues pertaining to law enforcement such as defensive tactics?

A. Yes.

Q. Laws of arrest?

A. Correct.

Q. Arizona criminal law?

A. Yep.

Q. Search and seizure?

A. Yes.

Q. Patrol procedures?

A. Yes.

Q. And as part of that training, did you have to pass a series of written tests in order to graduate?

A. Correct.

Q. You successfully completed that?

A. Yes, I did.

Q. All right. And you had to demonstrate proficiency, both physical fitness, use of firearms, and all of that in order to successfully pass?

A. Correct.

Q. All right. Now, after your completion of the Phoenix Law Enforcement Academy, did you have to attend another academy just for the City of Phoenix?

A. Yes. It was our POST academy.

Q. How long did that last?

A. I believe at that time it was two weeks.

Q.   And what did you cover in that City of Phoenix POST academy?

A.   It was just City of Phoenix Police specific topics and specialty areas of where they wanted us to be proficient at.

Q.   And did you successfully pass that?

A.   Yes, I did.

Q.   All right.  Now, after the completion of that, are you then certified as a peace officer in the state of Arizona?

A.   Yes.  I met the requirements of the Arizona POST.

Q.   And Arizona POST stands for Peace Officers Standards and Training?

A.   Correct.

Q.   All right.  Now, after your completion of your academy and your Phoenix POST academy, then what do they do, put you in a patrol car and send you on your way?

A.   No, not quite.  I had to undergo the field training program that every officer has to go through when they're new.

Q.   And the field training program, that's FTO.  Is that like the on-the-job training?

A.   Yes.  Yes, it is.

Q.   And do they assign you to an FTO training officer?

A.   Yes.  During that -- the FTO process, you're assigned to -- they break it up.  It's about 16 weeks, and they break it up between two field training officers so you get a different take on how one officer teaches versus the other one.

Q.   And you then basically tag along with your FTO officer for those 16 weeks until you're ready to be able to go out on your own then?

A.   Correct.  The goal of the FTO program is to have somebody with standardized training that is solo-capable as an officer.

Q.   And then after you complete that 16 weeks, then you're ready -- if you successfully pass that 16 weeks, then you're ready to go out on your own?

A.   Correct.

Q.   And you successfully completed that 16 weeks?

A.   Yes, I did.

Q.   Now, you know a little bit about that FTO program, because I see on your left shoulder a patch.  And what does that patch say?

A.   It's our field training officer patch.  The last eight months or so, I transferred over to the field training squad to be a field training officer.

Q.   So now you are a field training officer, teaching the young recruits how to be a police officer?

A.   Yes.  Yes, I am.

Q.   All right.  So as part of your requirement to be -- continue to be a peace officer in the state of Arizona, are you required to do continuing officer education to make sure you're current every year?

A.   Absolutely.  We have to meet a minimum of training hours to

keep our certification as a police officer.

Q.   Does the City of Phoenix provide you with that training every year?

A.   Yes, they do, and more.

Q.   And have you kept current every year since 2008 when you passed the academy?

A.   Correct, I have.

Q.   And you're a current certified peace officer in the State of Arizona?

A.   Yes, I am.

Q.   All right.  Let me show you what's been marked as Exhibit 520.

     MS. WIENEKE:  If we could get Ms. Michele to hand you Exhibit 520.

BY MS. WIENEKE:

Q.   Officer Gillespie, do you recognize Exhibit 520 as your Phoenix Police Department Training Bureau Academy Training Record and Continuing Officer Education Record, which tracks your training since your completion of the academy?

A.   Yes.

     MS. WIENEKE:  Your Honor, at this time I would offer Exhibit 520.

     THE COURT:  Any objection?

     MR. BLACKWELL:  Of the officer looking at it, Judge?

     THE COURT:  No.  She's offered it into evidence.  Do

you have an objection to it?

MR. BLACKWELL:  No objection.

THE COURT:  Exhibit 520 is admitted into evidence.

(Exhibit No. 520 admitted into evidence.)

MS. WIENEKE:  May I publish, Your Honor?

THE COURT:  You may.

BY MS. WIENEKE:

Q.  Now, just to give the jury some idea of some of your training, do you -- is it your understanding that the AZPOST requirement for the number of hours that you're supposed to maintain for your continuing officer education is 10 per year or -- I'm sorry, 8.5 per year?

A.  It's somewhere around that number.

Q.  All right.  Now, is it your understanding based on your training record that the City of Phoenix provides more -- way more than the minimum by the State of Arizona per year?

A.  Yes.

MR. BLACKWELL:  Objection.  Relevance.  Sorry.

THE COURT:  Sustained.

MR. BLACKWELL:  Move to strike the answer.

THE COURT:  It's not relevant.  Just ignore it, please.

BY MS. WIENEKE:

Q.  Okay.  So as part of your training that you've received from the City of Phoenix, have you received training in

defensive tactics?

A.  Yes, I have.

Q.  And has that defensive tactics training included training in how to perform maneuvers such as the straight-arm bar takedown?

A.  Yes.

Q.  Has it received -- have you received training, for example, if we're looking at Exhibit 520, in things such as advanced officer training?

A.  Correct.

Q.  Have you received training in, for example, use of force?

A.  Yes.

Q.  All right.  And the jury will have an opportunity to look at Exhibit 520, which is all of your training history, in more detail.

Let's go on and talk about your first assignment after your FTO training.  Where were you assigned as a solo officer?

A.  I was a -- I got lucky and I went to a first shift squad in the same area that I'm working in now, which is the Sunnyslope area.

Q.  Which precinct was that?

A.  It's the Desert Horizon Precinct.

Q.  And since your graduation from the academy, up until 2014, have you always been assigned to patrol?

A.  Yes.

Q.   And what about shifts?  At the time of 2014, July, which shift were you working?

A.   It was second shift.

Q.   What are the hours for second shift?

A.   I would -- we would start at 1:00 o'clock in the afternoon until 11:00 o'clock at night.

Q.   And have you also worked graveyard shifts in your career?

A.   Yes, I have.

Q.   And are graveyard shifts overnight?

A.   Correct.

Q.   Have you also worked early morning shifts?

A.   Yes, I have.

Q.   What are some of the other shifts or precincts that you've worked for in your career?

A.   I've worked everything north of Camelback Road, the Cactus -- Cactus Park Precinct, the Desert Horizon, the Mountain -- Black Mountain Precinct as well.

Q.   And where is the Desert Horizon Precinct?  Where is it physically located?

A.   The main precinct is located at 56th Street and Paradise Lane.  There's a big park there.

Q.   Now, I want to talk to you about your experience before July 2014.  You've told us already that you handled trespass calls before that date; right?

A.   Yes, I have.

Q.   And have you also handled calls in which you've had to deal with people that were resisting arrest?

A.   Yes, I have.

Q.   And let me go back to your experience involving trespassing calls.

Have you handled specifically trespassing calls prior to July of 2014 at Circle K stores?

A.   Yes, I have.

Q.   And in your experience in handling trespassing calls at Circle K stores, have you had the experience that Circle K stores have authority to arrest on file?

A.   Yes, I do.

Q.   What is an authority to arrest, based on your experience?

A.   It's a form the corporation or somebody in the corporation will fill out.  It essentially agrees that they will be willing to prosecute if they have trespassers or shoplifters and stuff like that on the property.

That's -- the form has to be renewed --

MR. BLACKWELL:  I'm going to object to narrative at this point, Judge, and foundation, because he didn't know about it.

THE COURT:  Whoa.  There's an objection?

MR. BLACKWELL:  Narrative at this point.  And my second objection is foundation, if I may make one more statement.  Based on his previous testimony, he didn't know

about this authority to arrest before he got there at the Circle K store.

THE COURT:  Wait, wait, wait.  Just state your objection and the rule you're objecting to.

MR. BLACKWELL:  I'm objecting to narrative right now.

THE COURT:  Okay.

All right.  Ask him questions.

BY MS. WIENEKE:

Q.  Well, the question was, based on your experience in making arrests at Circle Ks for trespass, you're familiar with the authority to arrest document.  What is that document?

A.  The document is a form that's filled out that encompasses the Circle K in its entire properties in the city of Phoenix. What the authority to arrest means is the Circle K Corporation is agreeing to assist in prosecution if there is an issue with their properties.

MS. WIENEKE:  And if I could have Ms. Michele provide the witness with Exhibit 541, please.

BY MS. WIENEKE:

Q.  And if you could, look at Exhibit 541.

Is the authority to arrest form a form that is provided by the City of Phoenix to businesses, based on your knowledge and experience?

A.  Correct.

Q.  All right.  And based on your knowledge and experience, are

the authority to arrest forms something that are filed with the precincts?

A.   Correct.

Q.   Looking at Exhibit 541, do you recognize Exhibit 541 as a City of Phoenix form that is maintained as a regularly conducted record by the City of Phoenix?

A.   Yes, I do.

Q.   Is it kept in the ordinary course of business within the various precincts of the City of Phoenix Police Department?

A.   Yes, it is.

Q.   And if you'll look at Bates label 8109, is that a City of Phoenix authority to arrest trespassers form for the Desert Horizon Precinct?

A.   Yes, it is.

Q.   And have you seen documents such as this on file with the Desert Horizon Precinct related to Circle Ks prior to July 2014?

A.   I have seen them before.

        MS. WIENEKE:  Your Honor, I would offer Exhibit 541 as a business record under 803(6).

        THE COURT:  Any objection?

        MR. BLACKWELL:  Yes, Judge, relevance.  And based on his previous testimony.  If we may approach briefly.

        THE COURT:  All right.

(At sidebar on the record.)

MR. BLACKWELL:  This document is not relevant.  First and foremost, the officer already testified that he didn't even know if he had authority.  He didn't know if somebody in the store gave him authority.  He actually didn't speak to the manager.

There's been no testimony by the manager from -- in this courtroom that he wanted Ms. Winkler arrested or removed from the property.  They're just trying to -- this is basically 403.  Nobody's going to come in and testify that the store clerks knew about this or that Officer Gillespie knew about this.

THE COURT:  He's already said he knew about it.

MR. BLACKWELL:  He said he didn't know about it.  He didn't know that this store -- he said he didn't know if he had authority to arrest when he got there, and he didn't know if they -- if the store clerks --

THE COURT:  You know, the thing is, he didn't mention this in any way as a basis for his arrest.  And I'm not saying he didn't -- he can't argue he had probable cause, but he said, "I was told that they had asked her to leave."

It doesn't matter whether this is on file or not.  If there's an owner of a property, that's what he said, who tells me, "There's someone on the property who we've asked to leave" and doesn't leave, he said, "That gives me probable cause."  So

I don't know how this helps any.

MS. WIENEKE:  Well, Your Honor, I haven't been able to ask my questions.  The only testimony was from a tiny little bit from his prior statement, which asked him if it was in his report.

THE COURT:  Okay.  Did he mention this before, that this was the basis for his arrest?

MS. WIENEKE:  It's not a basis for his arrest, Your Honor, but he --

THE COURT:  Then how is it relevant?

MS. WIENEKE:  He knew that there were authority to arrests on file, but this only goes to a prosecution.  It doesn't -- all this talks about --

THE COURT:  Well, then prosecution's not relevant here.  We're going to keep out the fact that she was prosecuted and acquitted.  If you bring that in, you might open the door to that.

MS. WIENEKE:  The plaintiff has raised the fact that he didn't have authority to arrest.  This rebuts that inference.  He has raised it.  The plaintiff, I should say, has raised it.

THE COURT:  He's raised the question whether or not the officer had enough facts.  This doesn't go to that.

MS. WIENEKE:  No, sir.  Respectfully --

THE COURT:  I don't think it's relevant.  It's

irrelevant.  I'll sustain the objection.

MS. WIENEKE:  Just so if I can make my record.

THE COURT:  Go ahead.

MS. WIENEKE:  The question was asked, did you have authority to arrest her based -- from the store.  This officer will testify that he knew that their Circle Ks had these authorities to arrest on file.  I am introducing this to rebut the inference that the plaintiff had created through the questioning of the witness.

THE COURT:  My question is, was it ever mentioned anywhere in his statements that "The basis for my belief of my authority to arrest was that City of Phoenix Police Department authority to arrest trespassers statement signed by Circle K"?

MS. WIENEKE:  It will be his testimony.

THE COURT:  That's not my question.  Has he ever said that before?

MS. WIENEKE:  Well, Your Honor, he was not asked this question yet.

THE COURT:  He was asked -- I'm talking about in his interviews with the other police, in his interviews with Mr. Blackwell, whoever interviewed him, did he ever once say, "This is the basis for my arrest"?

MS. WIENEKE:  Well, Your Honor --

THE COURT:  Yes or no?

MS. WIENEKE:  Specifically, to answer your question,

no --

THE COURT:  Okay.  It's not relevant.

MS. WIENEKE:  -- but that doesn't mean he didn't know about it.

THE COURT:  Whether he knew about it or not, he wasn't thinking about it.  That wasn't the basis for his arrest.

So this is irrelevant, it's cumulative, it's confusing, and it also has -- there's nothing about this that helps this case, other than you're going to show us a statement that says, this proves the authority to arrest.  And you told me yourself this goes to authority to prosecute.  If you want to go to authority to prosecute, then you're opening the door for the prosecution.  So let's just end this.

(End of discussion at sidebar.)

BY MS. WIENEKE:

Q.  Officer Gillespie, let's talk about the use of force training that you received from the City of Phoenix Police Department.  I want to talk about the four reasons that officers are authorized to use force.

Were you trained that you were authorized to use force for self-defense?

A.  Correct.

Q.  In defense of others?

A.  Absolutely.

Q.  You can use force for arrests?

A.   Yes.

Q.   And you can use force to prevent escape?

A.   Correct.

Q.   And I want to talk to you now about the levels and the types of arrests -- resistance.

Let's talk about verbal noncompliance.  What does that consist of, based on your training?

A.   When you give somebody commands and they refuse to follow up what your commands were.

Q.   So if you give a command and you say, "Put your hands behind your back" and the person says no?

A.   Uh-huh.  Correct.

Q.   Is that verbal noncompliance?

A.   Yes.  That's also them telling you that they're not going to comply.

Q.   Okay.  Let's talk about passive resistance, physical actions that don't prevent an officer's attempt to control. Give us an example of passive resistance.

A.   Passive resistance, that's described as somebody going limp, not -- just using their body weight not to do anything at all, like not getting into the back of a car or assisting the officer whatsoever.

Q.   Okay.  And what about defensive resistance?  What were you trained constitutes defensive resistance?

A.   Defensive resistance, it's physical actions by the suspect

that you -- that you encounter that prevents the officer's control of them, such as pulling away, tightening up their muscles, things of that nature.

Q.  So with respect to defensive resistance, was part of your training that those physical actions don't necessarily include an intent to harm the officer?

A.  Correct.

Q.  Okay.  And then what about active aggression?  What were you trained constitutes active aggression?

A.  Active aggression is going to be the next step up.  It's physical threats to the officer; clenching their fists, taking a fighting stance, things of that nature.

Q.  Okay.  Now I want to talk about your use of force training with respect to response options.  That is, the officer's response options in response to those levels of resistance that you encounter.

So let's first talk about officer presence.  What were you trained about officer presence?  What's that?

A.  Officer presence is -- I mean, it could be summed up with just being on the scene, being very clearly visible as a police officer and having a police car that's fully marked, saying "Police" on the side, wearing a uniform like I am today.

Q.  By the way, let's talk about your uniform.

What is on your chest there?  Is that your name identified there?

A. Yes, it's my name.

Q. And does it have your badge number?

A. The badge number is on the other side, on my badge.

Q. All right. And the Phoenix Police emblem on your sleeve there?

A. Correct.

Q. And on both sides?

A. Both sides.

Q. All right. And you also wear a duty belt?

A. Correct.

Q. What's on your duty belt?

A. There are quite a few things on there. My portable radio. My gun, of course. Ammunition carrier. I have a Taser with a couple cartridges. The OC spray or -- and some handcuffs.

Q. And what about your police car, and the police car you were driving that night, what is on that police car?

A. On the exterior we have the standard overhead lights, the Phoenix Police blue emblem on the side of the door on both sides of the car. There's a push bar on the front and spotlights on it as well.

Q. So your marked police car, your Phoenix uniform, both of those serve to be officer presence when you arrive at a situation --

A. Correct.

Q. -- agreed?

A.   Correct.

Q.   All right.  So let's talk about another response option, and that is verbal commands.  What are verbal commands?

A.   Verbal commands are, you know, commands an officer would give somebody to gain compliance.

Q.   Telling somebody, "You're under arrest"?

A.   Correct.

Q.   Telling somebody, "Hey, you need to leave"?

A.   Correct.

Q.   Telling somebody, "Hey, if you don't leave, you're going to be under arrest"?

A.   Correct.

Q.   Let's talk about empty-hand control techniques.  What's that?

A.   Empty-hand control techniques covers a wide range of things such as just handcuffing somebody, holding them in like a control position, like their arms behind their back type -- things of that nature.  It also controls -- encompasses some takedown maneuvers such as the straight-arm takedown.

Q.   And what were you taught in the academy by the police department about the techniques, these control techniques, including takedowns, with respect to the chance of injury when you utilize these types of takedown maneuvers, these empty-hand techniques?

A.   The empty-hand techniques are supposed to have the lowest

probable risk to injure the suspect.

Q. Now, I want to talk to you about the straight-arm takedown in particular. You received training in that maneuver?

A. Correct.

Q. And that maneuver that you received training, the straight-arm takedown, was that a maneuver that you were taught was a technique to take down a subject to the ground when they are resisting?

A. Correct.

Q. When you were taught the maneuver, were you taught that maneuver in a classroom setting?

A. Yes. It was a defensive tactics room, classroom setting.

Q. And prior to this night, had you done that straight-arm takedown in the field?

A. Yes, I have.

Q. That is, out and about as part of your patrol duties?

A. Yes, I have.

Q. And do you know how many times you had done it before July 16th?

A. I would say that's probably my second or third one up to that point.

Q. And by the way, when you had done it, was this on somebody who was compliant, was doing everything they were being asked to do?

MR. BLACKWELL: Objection.

THE WITNESS:  No.

THE COURT:  Whoa, stop.

What's your objection?

MR. BLACKWELL:  Foundation.

THE COURT:  Overruled.

THE WITNESS:  The only reason I've ever had to do it in the -- when I was working in the field, if you want to call it that, it's -- was somebody who's being noncompliant and resisting.

BY MS. WIENEKE:

Q.  So help us to understand, when you were taught how to do this straight-arm takedown, were you taught that you need to adjust the level of force that you are using based on the level of resistance that you are encountering from the subject?

A.  Yes, that is correct.

Q.  And so would it be fair to say, Officer Gillespie, that you have to adjust to those real world circumstances from the classroom that you are encountering in the field?

A.  Yes.

Q.  And so in the classroom, you have a controlled environment; right?

A.  Yes.

Q.  And in the field, you have to consider things like the possibility that you may be moving towards what you perceive to be the cross traffic of a parking lot; right?

A.   Correct.

Q.   Now, you demonstrated for us, with Mr. Bernard's help, the straight-arm takedown.  Right?

A.   Correct.

Q.   Now, can you tell us whether that demonstration accurately depicted the real world experience that you encountered with Ms. Winkler that night in the parking lot?

A.   No, it did not.

Q.   And tell us why.

A.   There was quite a few other variables involved.  The environment that we were in, vehicle traffic.  Mr. Bernard didn't have the same demeanor as what the plaintiff did during that time, and he was standing stationary at -- when I was doing the demonstration.

Q.   Well, and let me talk to you about that stationary point, because I noticed that Mr. Bernard, while you did ask him to bend at the waist, his legs remained static and stationary during the demonstration.  Right?

A.   Correct.

Q.   And was that an accurate depiction of what Ms. Winkler did?

A.   No, it was not.

Q.   Did the demonstration accurately represent issues of balance both for Ms. Winkler and you during this encounter that you had with her?

A.   No, it did not.

Q.   Well, explain that to the ladies and gentlemen of the jury.

A.   Well, during -- about the incident?  Or --

Q.   Yes.

A.   -- balance?  Okay.

Q.   Well, I mean, did the demonstration that was done for the ladies and gentlemen of the jury show any problems with balance?  Was Mr. Bernard off balance at any time during the encounter?

A.   No.  We both had our balance at that time.

Q.   All right.  Was that true of the incident out there in the parking lot?

A.   No.  It was -- that was completely different.  We --

Q.   Explain that.

A.   Well, when I had the plaintiff's arms behind her back, she was using her lower center of gravity and her leg muscles to pull me around in the parking lot.  I constantly had to readjust my balance.  As she's pulling away from me, I'm pulling back on her.  I kept losing, I guess, my center of gravity, if that makes sense.  Constantly had to readjust on it, and I was not in control of her movement.

Q.   Now, what were you taught in your defensive tactics training about the importance of retaining your balance?

A.   That if you don't retain your balance, you're going to end up on the ground pretty quick.

Q.   And what about the retaining your center of gravity were

you taught in defensive tactics?

A.   It's, again, keep -- keep your center of gravity straight. You know, legs equal distance apart, about the length of your shoulders, shoulder blades apart when you're going into any type of physical maneuvers.

MS. WIENEKE:  Can -- Ms. Piasecki, can you please display Exhibit No. 18 for the witness, the 2011.

I surprised you with that.

So this is in evidence.  With the Court's permission, if we could publish?

THE COURT:  You may.

MS. WIENEKE:  Thank you.

BY MS. WIENEKE:

Q.   Officer Gillespie, I want to show you this Google Earth image of the Circle K.  And I want to ask you about -- you recognize this picture of the Circle K?

A.   Correct.

Q.   Now, you see the van that's parked there in the parking stall?

A.   Yes.

Q.   That's next to the --

MS. WIENEKE:  Can we zoom that out a little bit, get closer?  Zoom it in, I suppose.

BY MS. WIENEKE:

Q.   Do you see the van is next to that handicapped stall?

A.  Yes, I do.

Q.  All right.  Now, the -- would it be fair to say, Officer Gillespie, that as you and Ms. Winkler are struggling about in this space between that parked car and your patrol car, you're moving about?

A.  Correct.

Q.  And as you're moving, are you going in that circular motion?

A.  Yes.

Q.  And in that circular motion, are you also moving backwards towards the cross traffic area?

A.  Yes, we were.

Q.  Now, it's dark outside at this time?

A.  Yes.  It was -- it was getting dark at that time.

Q.  You're wearing a dark uniform?

A.  Correct.

Q.  Is your concern, not knowing where this is going to end up, that you all might end up in that cross traffic area?

A.  Yes, it was.

Q.  And if y'all end up in that cross traffic area here and y'all end up on the ground, is it your concern, given these entrances, that you may be vulnerable to traffic coming into the parking lot and -- or simply traffic coming in and y'all being vulnerable to traffic encountering you and Ms. Winkler on the ground?

A.   Yes.

Q.   Was that part of your decision-making process that you had to make when you decided to use that straight-arm bar and take her to the ground?

A.   It was part.  The main reason was me seeing the vehicle pass us in the parking lot while we were -- I was struggling with the plaintiff.

        MS. WIENEKE:  Can we look at that video of the vehicle?

BY MS. WIENEKE:

Q.   Now, first, let's take you back to that time period.

        MS. WIENEKE:  If we could look at Exhibit 768 and go back to the time of when Ms. Winkler is backing up with her hands up.

        MR. BLACKWELL:  Did you say 768?

        MS. WIENEKE:  I'm sorry.  Thank you so much.  568. All right.

        MR. BLACKWELL:  What time stamp?

        MS. WIENEKE:  We're going to start at 7:44:31, and we'll play it.

        (Video played for the Court and the jury.)

BY MS. WIENEKE:

Q.   All right.  We're starting at 7:44:31, and you can see Ms. Winkler there.

        At this point, Officer Gillespie, is she talking to

you in a normal voice, in a normal conversation?

A.   I remember her voice was elevated.

Q.   Do you see the lady in the purple shirt turning around to look?

A.   Yes, I do.

Q.   And you see Mr. Nelson turning around to look?

A.   Yes.

Q.   And the lady in the gray shirt turning around to look or going to the door to look?

A.   Yes, I do.

Q.   And more people going to the door.

All right.  At 7:45:06, we're going to stop.  And now we're going to look at the front door view starting at the same time, at 7:44:30.

THE COURT:  And, counsel, I just want to -- there was some testimony about the time on this not being the real time.  Is it slower or faster or is that the actual time?  You're saying 7:44.  I'm just trying to understand what time we're talking about.

MS. WIENEKE:  It's going in second intervals.

THE COURT:  No, but is that the absolute time?  Is it 7:44 there, or is -- sometimes these aren't -- you said earlier, I think in your opening statement, that they aren't synced with the actual time.

MS. WIENEKE:  The times on the Circle K surveillance

are all the same times on each of the views, but they're not synced with the CAD report.  So they're not the same times from the CAD.

THE COURT:  So I'm just trying to understand.  Are they off by being faster or slower than the CAD time?  That's all I'm trying to understand.

MS. WIENEKE:  The CAD time is slower.  So, for example, on the Circle K video we see her making her 911 call at approximately 6:45, but we know from the CAD she made her 911 call at 6:44.

THE COURT:  Okay.  That's all I wanted to know.

MS. WIENEKE:  If that makes sense, Your Honor.

(Video played for the Court and the jury.)

BY MS. WIENEKE:

Q.  So now we're looking at the front door view, which is Exhibit 566.  And we started at 7:44:30, and we're going to go to the same end time at 7:45.

And do you see that car in the upper right corner?

A.  Yes, I do.

Q.  We can just keep going.

All right.  We'll stop at 7:45.

Officer Gillespie, the car that we see in the upper right corner of Exhibit 766, is that -- is it your reasonable belief that the car that we see there is the vehicle that you saw out of your corner of your eye as you and Ms. Winkler were

struggling in the parking lot?

MR. BLACKWELL:  Objection.  Speculation.

THE COURT:  Lay some foundation.

BY MS. WIENEKE:

Q.  All right.  Can you tell us, as you and Ms. Winkler are struggling in the parking lot, what you saw out of the corner of your eye.

A.  I see a vehicle pass by us, I felt was extremely close to our location.

Q.  And describe what you saw in terms of the vehicle.  Was it a flash?  Did you make out a make or model or --

A.  I was more focused on dealing with the plaintiff.  I know it was a car.  It was a sedan of some sort.  At that time, I couldn't tell you what make or model it was.  I don't remember what color it was, but I know it was a vehicle that had passed us.

Q.  And did you note in your police report that you observed traffic in the parking lot as one of the reasons for the takedown?

A.  Yes, I did.

Q.  And based on looking at Exhibit 566 -- by the way, you didn't look -- you didn't look at any of the video when you wrote your report; right?

A.  No.  It wasn't available to me.

Q.  Right.  And based on now having seen the video, is it your

reasonable belief that that vehicle that's shown in Exhibit 566 was the car that you saw out of the corner of your eye?

A.   Yes, I do.

MR. BLACKWELL:  Same objection.  Foundation and now -- speculation and now foundation.  He hasn't laid --

THE COURT:  Sustained.

MR. BLACKWELL:  Thank you, Judge.

Sorry.  Move to strike the answer.

THE COURT:  Motion to strike is granted.

MR. BLACKWELL:  Your Honor, may we approach?

THE COURT:  Okay.

(At sidebar on the record.)

THE COURT:  We've got to stop meeting like this.

MR. BLACKWELL:  One, I understand, Judge, and I'm also looking at the time.  But I thought if I made the objection -- I mean, my argument after the fact that we can't unring the bell.  So I think the objection that we're about to make is going to enlighten the Court on this issue.

THE COURT:  What exhibit are we talking about?

MR. BLACKWELL:  She's talking about the police report. We further read the case and the Supreme Court case that this case referred to.

MR. BERNARD:  I'll explain it briefly, Your Honor. This case references *Beechcroft versus Rainey* [phonetic].  And in that case, when this -- first of all, this case is a

products liability case.  And *Beechcroft versus Rainey* says that police reports are admissible as long as they are truthful or they don't -- they cross the truthfulness test.

THE COURT:  Yeah, that's what the rule says.

MR. BERNARD:  Right.  So in this case, the case that they gave us, it was -- could be truthful because it was not a party to any of the litigation.  And the case law since *Beechcroft v. Rainey* said police reports aren't allowed in criminal cases because they are written to get the other party in trouble.

Now, in this case, the truthfulness of this police report has been brought into question not only because he says that she fell when he later contradicted himself, but he's also a party to this case.  So the truthfulness in his police report is at question.  That's why it shouldn't be admitted.

THE COURT:  Okay.  I've already ruled on that.

MR. BERNARD:  Thank you.

MS. WIENEKE:  Your Honor, can I just ask, what is the foundation lacking?

THE COURT:  He didn't see what the car was.

MS. WIENEKE:  He said he saw --

THE COURT:  You can make the argument that circumstantially --

Hang on.  We're talking.

MR. BLACKWELL:  I'm sorry, Judge.  I apologize.

UNITED STATES DISTRICT COURT

THE COURT:  Circumstantially, this looks like the car, but he doesn't know.  There's no way.  He's just speculating. He's down on the ground.  He's not paying attention to what the car is.

So he's no better situated than you or the jury to make that determination.

MS. WIENEKE:  Okay.

THE COURT:  So he's just saying that came about the same time.  It could have been.

MS. WIENEKE:  Okay.  Okay.  Thank you.

(End of discussion at sidebar.)

THE COURT:  You may continue.

MS. WIENEKE:  Thank you, Your Honor.

BY MS. WIENEKE:

Q.  As part of your training, Officer Gillespie, you learned about the laws of arrest?

A.  Correct.

Q.  You learned about concepts such as probable cause?

A.  Yes.

Q.  Reasonable suspicion?

A.  Yes.

Q.  And you learned about the statutes in Title 13, which is the criminal code?

A.  Correct.

Q.  Crimes such as trespassing?

A.  Yes.

Q.  Disorderly conduct?

A.  Yes.

Q.  Harassment?

A.  Correct.

Q.  Threatening and intimidating?

A.  Yes.

Q.  Now, in your vehicle, you have a computer called the Mobile Data Terminal, or the MDT?

A.  Correct.

Q.  Are you able to look things up on your Mobile Data Terminal such as -- well, can you do Google searches?

A.  I never tried.

Q.  All right.  Can you look up statutes?

A.  Yes.

Q.  And in the Mobile Data Terminal, are you provided information in that Mobile Data Terminal from calls for service?  Are you -- such as the CAD information that we've heard about, Exhibit No. 5?

A.  Yes.

Q.  And you can get that information en route to calls when you're stopped safely at stoplights and --

A.  Correct.

Q.  All right.  Okay.  And you have a recollection of having looked at the data from this call prior to actually getting out

of your car and responding to this call; right?

A.  Yes, I do.

MS. WIENEKE:  All right.  And if we could, if the Court pleases, switch to the ELMO and look at Exhibit No. 5 in evidence.

BY MS. WIENEKE:

Q.  You recognize Exhibit No. 5 as the CAD for this call?

A.  Yes, it is.

Q.  Now, I'm going to ask you to define some terms for us and speak cop talk for us.

Looking at this code right here, 236, what's a 236?

A.  It's a code for threats.

Q.  And what's a 418T?

A.  It's our radio code for trespasser.

Q.  And I'll ask you to define what this ID is or these various numbers.

A.  It's the ID number for the call taker.

Q.  All right.  So if I were to look at this and I see different ID numbers, does that mean a different call taker is taking these various calls?

A.  Yes, that would be.

Q.  So, for example, if I look at this call at 19:08, and I see that this call taker is A5405 and wrote "Comp yelling on 21," what's a 21?

A.  That's a radio code for telephone.

Q.  All right.  And so that tells me that A5405 wrote the word "yelling."  Right?

A.  Correct.

Q.  All right.  And then if I look at this call at 19:18, and I see A5196, and I see "very angry," does that tell me that this is a different call taker writing "very angry"?

A.  Yes, it is.

Q.  So we could just go on and look at the various ID numbers and find out that these are various call takers writing this information?

A.  Yes.

Q.  Okay.  And 101?

A.  That's a radio code for a female.

Q.  All right.  So if I look at this call, "101 said being 236'd."  What's 236?

A.  Threatened.  They put a D at the end.  It's kind of an abbreviation for it.

Q.  All right.  And "CB"?

A.  "CB" is callback.

Q.  So "Caller disconnected.  On callback, said her phone was going dead and HU."

What's that?

A.  Hung up.

Q.  Okay.  And "CMP," what's that?

A.  It's the abbreviation for complainant.

Q. Okay. And make sure I got all the codes.

And "COM," is that also complainant?

A. Correct.

Q. 250'ing?

A. 250 is stalking.

Q. So "101 will not stop stalking people in the parking lot"? Or --

A. I'm sorry.

Q. Harassing?

A. Harassing.

Q. Yeah. Okay.

And "PD" is police department?

A. Correct.

Q. Okay. Officer Gillespie, did you prepare a police report from your encounter at the Circle K?

A. Yes. I wrote a report that night.

Q. And you did that at, as we established earlier, at 8:30 p.m. that night?

A. Correct.

Q. Now, is it part of your job to prepare police reports?

A. Correct.

MS. WIENEKE: If we can have Ms. Michele show Mr. Gillespie Exhibit 283.

THE COURTROOM DEPUTY: 283?

MS. WIENEKE: I'm sorry. 583.

We just have a technical issue.

THE COURT:  All right.

(Conference off the record between Ms. Wieneke and Mr. Blackwell.)

BY MS. WIENEKE:

Q.  Officer Gillespie, you prepared that report.

MS. WIENEKE:  Your Honor, I would offer Exhibit 583.

MR. BLACKWELL:  And it's the same objection, Judge.

THE COURT:  All right.  Exhibit 583 is admitted.

(Exhibit No. 583 admitted into evidence.)

BY MS. WIENEKE:

Q.  Officer Gillespie, is this the first page of your report?

A.  Yes, it is.

Q.  All right.  And we see here that code again, 418T?

A.  Yes.  Trespasser.

Q.  That's trespassing?

And this beat, 615, that's the beat that you were working that evening?

A.  Correct.

Q.  The address of the Circle K?

A.  Yes.

Q.  And this is the Wednesday of July 16, 2014?

A.  Correct.

Q.  This is the approximate time of the occurrence, which was 7:40 p.m.?

A.   Correct.

Q.   And that's you?

A.   Yes.

Q.   And this is your unit?

A.   That's the squad that I was assigned to.

Q.   Or the squad, right.

     All right.   And you're the reporting officer?

A.   Correct.

Q.   All right.   This is Ms. Winkler?

A.   Correct.

Q.   Now, when did you get her name?

A.   I --

Q.   Full name?

A.   After the fire department had left at some point, somebody had discovered what her name was.

Q.   So the personal information you had was that she was five-foot-six, 140?

A.   That was the information that was on the motor vehicle records on her -- on the motor vehicle records screen when we run it electronically, that's what comes up.

Q.   Now, how tall were you on the date of the incident?

A.   I was five-nine.

Q.   And how much did you weigh on the date of the incident?

A.   Probably 165, 170, maybe.

Q.   Now, you have to indicate here level of force.   What does

this mean:  restraint, joint locks, pressure points, or cuffs?

A.   That is the level of force category that fit the straight-arm takedown maneuver, the soft empty-hand control techniques.

Q.   Now, when you complete these police reports, are these -- is this done through a system that is preselected fields that you just fill in the blanks and you --

A.   This is our -- was our old system, called Pace.  And there were quite a few drop-down menus where you couldn't type any text in.  You just had to select from the information that was in the box.

Q.   Can you put that microphone just a little bit closer to you?

A.   Yes.

Q.   So was one of the choices that you had a straight-arm takedown when you completed this level of force here?

A.   No.  That would -- that is the closest one that would fill in the category.

Q.   All right.  So let's look at page 2 here.  And this is what's called your narrative portion of the report?

A.   Correct.

Q.   And you're indicating here that on July 16th, 2014, at approximately 1940 hours, you responded to a report of trespassing at the Circle K store located at 701 East Bethany Home.

A.   Yes.

Q.   Now, why didn't you indicate you were responding to a report of threats call?

A.   There was no substantial -- anything found as far as the threats went.  And this was a -- ended up being a trespassing call with the arrest.

Q.   Well, if we look at the -- if I could switch over to Exhibit No. 5, if we look at the initial call, 236, and then the final disposition is what?

A.   Trespassing.

Q.   All right.  And your report was documenting the what call?

A.   The trespassing.

Q.   All right.  Now, you indicate, while en route, what?

A.   While en route, I discovered that there were several other related calls to -- that were attached to the original one that I was on.

Q.   So you say:  The calls consisted of a female named Marty calling 911 to report the Circle K employees were harassing her.

A.   Correct.

Q.   Now, you say "were harassing her."  The call was actually a threats call; right?

A.   Yes.  Yes, it was.

        MR. BLACKWELL:  Objection, Judge.  Foundation.

        THE COURT:  Sustained.

UNITED STATES DISTRICT COURT

BY MS. WIENEKE:

Q.  Well, let's see --

        MR. BLACKWELL:  Move to strike.

        THE COURT:  Sustained.

BY MS. WIENEKE:

Q.  I don't think there was a response, but all right.

        What kind of call was it?

A.  The initial --

        MR. BLACKWELL:  Same objection.  He doesn't know what -- he wasn't on the phone with the 911 operator, Judge.

        THE COURT:  I guess --

        MR. BLACKWELL:  Foundation.

        THE COURT:  Are you asking him what the 911 operator wrote down?

        MS. WIENEKE:  I'm asking from Exhibit 5 what the initial call was.

        THE COURT:  I know, but he doesn't know.  All he knows is what he was told.  Is that what you're asking him?

        MS. WIENEKE:  Right.  From Exhibit 5, the CAD that he read en route.

        THE COURT:  Okay.  That's in evidence; right?

        MS. WIENEKE:  Yes, sir.

        MR. BLACKWELL:  Yes, sir.

        THE COURT:  Okay.  You can ask him.

        THE WITNESS:  The initial -- I'm sorry.

BY MS. WIENEKE:

Q. Go ahead.

A. The initial call was a threats call, a 236.

Q. All right. So you then say, upon your initial arrival, you parked your patrol car in front of the store. You saw a female in her late 40s approach your vehicle. You asked the female what she wanted. Female later identified as SP 1, Martha Winkler, aka Marty.

Why do you say "aka Marty"?

A. That was the only information we had that she had given 911 when she had called.

Q. You say, stated, quote, "I want your supervisor," close quote. Why do you put that phrase in quotes?

A. Because it was somewhat strange, and I felt it needed to be documented.

Q. Well, when you put something in your report in quotes, are you trying to communicate that that was an actual quote, that that was words actually said, as opposed to a paraphrase?

A. Correct. It was the actual words spoken.

Q. All right. You then say: I then entered the store and spoke with the clerk. I asked the clerk what he wanted done. The clerk replied that Martha had been asked to leave the store several -- I'm sorry, the store property several times by the store manager.

After she left interior of the store, she remained in

the parking lot harassing customers as they entered the store. The clerk asked if I would trespass Martha from the property.

Now, what did you mean when you wrote that "I would trespass Martha from the property"?

A.   That I would trespass -- that I would go out and formally tell her that she needed to leave, make sure that she would leave the premise.

Q.   At this time -- well, let me go back.

When you read -- or when you wrote that information, was that information that you had received consistent with the information that you had read in the CAD?

A.   Yes, it was.

Q.   The call that came in at 1919, from Exhibit 5:  To remove 101 from property.  101 will not stop harassing people in the parking lot and refusing to leave.

Do you see that?

A.   Yes, I do.

Q.   Why is it important that you receive corroborating information?

A.   Just solidifies the reason the -- that the Circle K clerks -- it verified with them that they had already told her to leave, and it just validates that information when I put it all together.

Q.   Now, let me be clear.  Do you know if those clerks were telling you the truth or not?

A.   I would have no reason not to believe them, but they --
it's possible they could be lying.

Q.   So you don't really know if people, when you encounter
them, tell you the truth or not --

A.   No.

Q.   -- right?

A.   No, I do not.

Q.   Sometimes people lie to you; right?

A.   Correct.

Q.   Is that why corroboration is important?

A.   Yes.

Q.   At this time -- you're right:  At this time I walked back
out to the parking lot where Martha was standing.  Martha was
speaking on her cell phone, asking the person on the other end
to have my supervisor respond to the call.

     I asked Martha for her identification.  Martha replied
she wanted the police report.

     So she was not just talking on the phone, but she was
also communicating with you; right?

A.   Correct.

Q.   I asked Martha -- or I advised Martha she was trespassing
on Circle K property.  Martha continued to ignore my request.

     Now, what did you mean when you said "Martha continued
to ignore my request"?  Because if you just tell somebody, hey,
you're trespassing, what does it mean when you write, "She

continued to ignore my request"?  Request for what?

A.  Well, when I -- that portion of my report and pretty much the entire report other than the quotation marks is paraphrased.

When I explain to somebody that they're trespassing, it goes into like a three-step process.  First I let them know that they're trespassing.  Some people may not understand what that means.  I explain to them that they need to leave the property or whatever place they're at where they're trespassing.  And if they refuse to do so, they'll be arrested for doing -- for remaining on the property after they've been told to leave.

So -- I'm sorry.

Q.  Now, was this a situation when Martha said, "but, see, I have this ticket.  And, you see, this is what happened to me. I went in.  I bought this ticket.  There was this misunderstanding.  I wanted a $2 ticket.  They tried to charge me $4.  And you see, Officer, it's just a misunderstanding, but this man, he was not nice to me, and I really need to be here and I just want a police report"?

MR. BLACKWELL:  Objection.

BY MS. WIENEKE:

Q.  Is that how it went down?

MR. BLACKWELL:  Objection.  Facts not in evidence.

THE COURT:  I don't understand that objection.

Overruled.

THE WITNESS: No. That's not what happened.

BY MS. WIENEKE:

Q. Tell the ladies and gentlemen of the jury how it happened.

A. Well, after I spoke with the clerks, I went back outside to the parking lot in attempt to contact the plaintiff. I noticed -- I walked over to my patrol car.

Then I noticed her approach me from the south side of the parking lot. She was holding up a telephone to her ear, and I heard her make a statement of -- while she was on the phone that she wanted a supervisor.

Assuming that she was on the phone again with 911 placing another call for service, I used my portable radio to let my dispatcher know that the subject that had called previously appears to be making another call and she's requesting my supervisor.

Q. Go ahead.

A. At this time I advised her that she was trespassing on the property. She rebuttaled that with holding up in her other hand that didn't have the telephone in it a piece of paper. She made mention of a lottery ticket.

I had asked her for her identification. She never provided that to me. Again, I explained to her that she was trespassing. She needed to leave the property. She'd be arrested if she remained.

She continued talking on the phone, looking at me the entire time, and just not complying with my request that she needed to leave the property.  She made no acknowledgment that "I understand" or "Okay, but this happened" type thing.  It was just, bought a lottery ticket and, yeah, that was it.

Q.  Now, you just said that you -- let me go back.

Oh, it looks like on the second page of Exhibit No. 5, we can see an A here.

A.  Can you lower it down?

Q.  Whoops, can't see that.  All right.

See this A615, Henry?  See that?

A.  Correct.

Q.  At 6:40 -- 7:41:07, 1941:07?

A.  Yes.

Q.  That's when you arrived; right?

A.  Correct.

Q.  And you just said you got on the radio and you said:  My 918 part of call on with 911.  Request supervisor.

Do you see that?

A.  Yes, I do.  That's -- are you asking what the time frame was as far as what transpired in the store?

Q.  Well, you said that's after you came out of the store the second time --

A.  Correct.

Q.  -- and she's on the phone.

A.   Correct.

Q.   And then that's when you called dispatch to advise; right?

A.   Correct.

Q.   And in response to Mr. Blackwell's question, you said -- you explained this "EN" means en route.  61F is Sergeant Austin, your supervisor?

A.   Correct.

Q.   And 40 seconds or so after you made that transmission, he's en route to the call; right?

MR. BLACKWELL:  Objection.  Speculation.  Foundation.

THE COURT:  Rephrase the question.

BY MS. WIENEKE:

Q.   Sure.

What does "EN" mean?

A.   En route.

Q.   And so looking at Exhibit 5 in evidence, 61F is Sergeant Austin; right?

A.   Correct.

Q.   And it says:  En route, 61F, to 701 East Bethany Home Road, Circle K, at 7:43:10; right?

A.   Yes.

Q.   And that's -- I don't know -- I don't do math so well, but looks like 30 seconds or so right after you got on the radio, Sergeant Austin is en route to the call; right?

A.   Yes.

Q.   And if we look, Sergeant Austin arrives at 7:46 --

          MR. BLACKWELL:  Objection.  Relevance.

BY MS. WIENEKE:

Q.   A61F, Sergeant Austin; right?

          MR. BLACKWELL:  At this point, Judge, objection.

Relevance.  This is after she's on the ground.

          THE COURT:  I'm not sure what the relevance is, but I

don't see any harm with it, so it's overruled.

          MR. BLACKWELL:  Thanks, Judge.

          THE WITNESS:  Yes, that is his arrival time, Sergeant

Austin's.

BY MS. WIENEKE:

Q.   Now, you actually called for a supervisor twice; right?

A.   I did.

Q.   And we look on the radio on the CAD.  At 1943, you say:

615 Henry.  Need fire and a supervisor.

          See that?

A.   Yes, I do.

Q.   Why did you call for a supervisor the second time?

A.   It's -- I also -- the line below that was -- it was all in

one sentence.  I need a fire, a supervisor, and a camera.

          This was after the use of force incident where she --

the plaintiff was injured.  It's standard procedure to notify

your supervisor anytime that you have an injured prisoner; the

fire department for -- to treat the injuries; and the camera to

document it.

Q. All right. Let's go back to your police report, Exhibit 583.

Where we left off: Martha continued to ignore my request. You then grabbed Martha's right wrist in an attempt to place her under arrest for trespassing. When I grabbed Martha's right wrist -- I'm sorry, when I grabbed Martha's wrist, she began to scream and pull away from me.

Let me stop at that point. At that point, did you believe you had probable cause for resisting arrest?

A. Yes, I did.

Q. And is that conduct, pulling away while you're attempting to arrest, defensive resistance?

A. Yes, it is.

Q. And have you been trained that you can use force to make an arrest in the academy?

A. Yes.

Q. Have you been trained that you can use empty-hand techniques to use force in response to defensive resistance?

A. Yes, I have.

Q. And can you use a takedown maneuver such as a straight-arm bar in response to defensive resistance?

A. Yes.

Q. I then grabbed Martha's left wrist. Martha began twisting her body, causing me to adjust my balance several times. The

parking lot at the Circle K store at the time had heavy vehicle traffic. When I was struggling with Martha, several vehicles were passing close by.

After several seconds struggling with Martha, I swung her to my right side in attempt to place her on the ground to avoid being struck by a vehicle. Martha had lost her balance and fell in the parking lot, striking her head on the asphalt.

Did I read that correctly?

A. Yes, you did.

Q. I then placed Martha in handcuffs and had the Phoenix Fire Department respond to treat a cut on Martha's head.

And you saw that; right? You saw the cut on her right head?

A. Yes, I did.

Q. Martha was transported to Phoenix Baptist Hospital for treatment. Sergeant Austin was notified and responded to the scene.

And you were interviewed by Sergeant Austin, so he completed his use of force report; correct?

A. Yes, I was.

Q. And that happened right there on the scene?

A. Yes, it did.

Q. And did you see the fire department come and respond to Ms. Winkler?

A. Yes, I did.

UNITED STATES DISTRICT COURT

Q.   And at some point, did the woman who had the car that was parked there come out and say, "I'd like to leave.  I'd like to take my car"?

A.   Yes, she did.

Q.   And what did you do in response to that?

A.   Well, at this time the plaintiff was sitting down in the parking lot area between that vehicle and the -- and my vehicle.  Given that that vehicle wanted -- the driver of that vehicle wanted to leave, I had the plaintiff step up and walk back closer to the Circle K store to get her out of the lanes of traffic that were going to be opened up in the parking lot.

Q.   So Ms. Winkler was awake at that time?

A.   Yes, she was.

Q.   All right.  And so can we look at Exhibit 568 at -- to show you assisting Ms. Winkler up in the parking lot and moving her towards the sidewalk area.

        MR. BLACKWELL:  Excuse me?  What are you showing?

        MS. WIENEKE:  This is -- yeah, 568, position B, at the time of 7:48:30.

        (Video played for the Court and the jury.)

BY MS. WIENEKE:

Q.   And do you see yourself standing up at this point?

A.   Yes, it appears to be me.

Q.   And that white vehicle is still parked there?

        MS. WIENEKE:  Just go ahead and play that,

UNITED STATES DISTRICT COURT

Ms. Piasecki, if you would, please.

BY MS. WIENEKE:

Q.   And the driver of that white car is now there?

A.   Yes.

Q.   It looks like you're bending over.

Just, if you would, describe for us what is happening there from your memory, as also assisted by the video.

A.   I'm at -- allowing the plaintiff to stand up and move her closer to the store while the driver of that vehicle leaves the parking lot.

Q.   Now, do you see the plaintiff there?

A.   Yes.

Q.   And where was the plaintiff, then, after this?  Where was she moved to?

A.   If I remember correctly, it's going to be right at the sidewalk portion, up closer to the building.

Q.   And then was she sat down there on the sidewalk?

A.   From what I remember, she did.

MS. WIENEKE:  Okay.  Is this a good time to break, Your Honor?

THE COURT:  Yes, it is a good time.

I'm just kind of confused on the timings on this thing.  How soon after you called fire did this happen?

THE WITNESS:  This was -- I called fire immediately, and the fire department was on their way at this point.

THE COURT:  Yeah, but that's not my question.

How soon after you called fire does this video show that she was moved?

THE WITNESS:  I wouldn't have the time frame on it. It was probably in a matter of seconds, I would have to say.

THE COURT:  If you called fire -- what time was fire called?

Can you show him?

I'm just trying to get some time frames here.

MS. WIENEKE:  Well, Your Honor, again, the video is not synced with the CAD, but --

THE COURT:  I think it was about a minute off, I think you told me.

MS. WIENEKE:  The -- 7:43:54 is when the officer called for the fire.

THE COURT:  Okay.

MS. WIENEKE:  But the video is not in sync.

THE COURT:  Okay.  All right.

Let's take our lunch recess.  We'll come back at 1:00 o'clock.

(Jury not present.)

THE COURT:  Officer Gillespie, you can step down.

THE WITNESS:  Thank you.

THE COURT:  Please be seated.  Anything we need to take up?

UNITED STATES DISTRICT COURT

MR. BLACKWELL:  Oh, no, Your Honor.

THE COURT:  Ms. Wieneke?

MS. WIENEKE:  Thank you.

THE COURT:  You know, we're kind of close on time here.  How's this looking for our witnesses?

I'm showing each -- defense has 3 hours and 2 minutes, and plaintiff has 3 hours and 13 minutes left.

MR. BLACKWELL:  Well, I don't know how much more Ms. Wieneke has on Gillespie, but she covered a lot of ground.  I'm not going to cover as much.  And then I have --

THE COURT:  I'm not asking you to speak for Ms. Wieneke; I'm just asking you to speak for yourself.  How much time do you think you're going to need?

MR. BLACKWELL:  Well, I'm going to need -- I got to finish my redirect of Officer Gillespie.  I think I can finish today with him.  I have -- Mr. Kirby is waiting.  He's been here since this morning, so -- and then Dr. Weise.  I need at least --

THE COURT:  Is Dr. Weise scheduled to come tomorrow?

MR. BERNARD:  I can have him come here tomorrow, Your Honor.  He'll be here today.

THE COURT:  When do you have him scheduled?

MR. BERNARD:  He's here.

MR. BLACKWELL:  He's scheduled to be here today.

THE COURT:  Well, maybe we can put the experts on and

finish up with Officer Gillespie after you get your experts done.

MR. BERNARD:  I can have Dr. Weise come back tomorrow. That's not a problem.

THE COURT:  He's a doctor.  I assume --

MR. BERNARD:  He has today and tomorrow off.

THE COURT:  Okay.  It's up to you guys.  I'm just making a suggestion how you want to handle your witnesses.

MR. BLACKWELL:  I want to finish -- I want to finish with Gillespie while he's fresh.

THE COURT:  All right.  When I tried cases, I wanted to pay my experts to be here as short a time as possible.  But if you guys want to have a doctor here, that's up to you.

MS. WIENEKE:  Sounds like a good idea.

THE COURT:  We'll stand in recess until 1:00 o'clock.

MR. BERNARD:  Thank you, Your Honor.

MR. BLACKWELL:  Thanks, Judge.

(Proceedings recessed at 12:02 p.m.)

UNITED STATES DISTRICT COURT

C E R T I F I C A T E


I, JENNIFER A. PANCRATZ, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control.

DATED at Phoenix, Arizona, this 16th day of June, 2020.



                    s/Jennifer A. Pancratz_____
                    Jennifer A. Pancratz, RMR, CRR, FCRR, CRC