**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

_____

| | | |
|---|---|---|
| Martha Winkler, a single woman, | ) ) ) | |
| | ) | No.  CV-15-01786-PHX-DLR |
| Plaintiff, | ) ) | |
| vs. | ) ) | Phoenix, Arizona April 12, 2019 |
| City of Phoenix, et al., | ) ) | 8:31 a.m. |
| Defendants. | ) ) | **AMENDED AS TO DATE ONLY** |
| _____ | ) | |

**BEFORE:  THE HONORABLE DOUGLAS L. RAYES, JUDGE**

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**JURY TRIAL - DAY 4**
**(Pages 753 through 927, inclusive)**

Official Court Reporter:
Jennifer A. Pancratz, RMR, CRR, FCRR, CRC
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 42
Phoenix, Arizona 85003-2151
(602) 322-7198

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

**A P P E A R A N C E S**

For the Plaintiff:

    Blackwell Law Office, PLLC
    By:  Jocquese L. Blackwell, Esq.
         Gillmore B. Bernard, Esq.
    3101 North Central Avenue, Suite 820
    Phoenix, AZ 85012

For the Defendants:

    Wieneke Law Group, PLC
    By:  Kathleen L. Wieneke, Esq.
         Christina G. Retts, Esq.
    1095 West Rio Salado Parkway, Suite 209
    Tempe, AZ 85281

# I N D E X

**SUMMARY OF COURT PROCEEDINGS**                              **PAGE:**

Rule 50 Motion                                                762
Sidebar Conferences                                      797, 878
Jury Instructions                                        844, 918
Closing Arguments
         By Mr. Blackwell                                 856, 911
         By Ms. Wieneke                                       883
Jury Verdict                                                  924

| **WITNESSES FOR THE DEFENSE:** | **DIRECT** | **CROSS** | **REDIRECT** | **RECROSS** |
|---|---|---|---|---|
| **Greg Meyer** | | | | |
| By Ms. Wieneke | 786 | | 827 | |
| By Mr. Blackwell | | 810 | | |

**P R O C E E D I N G S**

(Proceedings commenced at 8:31 a.m.)

(Jury not present.)

THE COURT:  Please be seated.

Okay.  You've presented all your evidence; is that right, Mr. Blackwell?

MR. BLACKWELL:  I would ask the Court if I could recall Officer Gillespie.

THE COURT:  Well, you can, but I'll tell you what, you've got one hour and one minute left.  Do you want to spend that time with Officer Gillespie or do you want to do a closing argument?

MR. BLACKWELL:  If I -- I can ask him -- I don't know, Judge.  I mean, are you -- is the Court telling me you're going to cut into my time for my closing argument based on me recalling Officer Gillespie?

THE COURT:  No.  You've got an hour and one minute to use however you want to use it.

MR. BLACKWELL:  But I thought the Court said yesterday when we left you would determine whether or not we get more time for Friday because --

THE COURT:  Right.  What happened was Ms. Wieneke said she wasn't going to need all her time, but she's got an hour and 11 minutes left, so I think she's going to need all her time.

So, you know, we've got to instruct the jury, we've got to do closing arguments, and we have to give the jury some time to deliberate.  We told them we'd be done today.

MR. BLACKWELL:  Right.  And the reason that I think I should call -- this will be quick.

The reason I think I should recall Officer Gillespie is the fact that during the case -- our case in chief, the defense was allowed to import hearsay statements from individuals at the store.  But we know -- we all know, except this Court knows, that when we went to trial in this particular case for the trespass case, statements by those employees did not reveal to that Court that they told Ms. Winkler to leave, first and foremost.

Secondly --

THE COURT:  Well, I guess -- I don't know how Officer Gillespie can help you with that.

MR. BLACKWELL:  He was there and witnessed their testimony.  He was right there in the courtroom the entire time they testified, first and foremost.

The second issue, with Officer Gillespie's personal testimony, he was presented with three questions by a judge.  And during those three questions, he couldn't tell that judge whether or not the store clerks said they were -- that she was trespassed or trespassing, trespassed from the store or trespassed from the property.

And so all I want to do is ask the questions about whether or not he remembered the individuals testifying differently than the statements that came out during this trial.  Because their hearsay statements are in.  We objected to them.  They came in anyway.

And so I can impeach a prior statement that was made in trial under oath by any means, particularly if we have the documents, the transcripts.  And so in this courtroom, we have the transcripts from that trial.  I should be able to impeach those statements, either through Officer Gillespie or I should be able to impeach those statements through their expert, Mr. Meyer.

Now, if the Court is inclined not to let me recall Officer Gillespie, then I would ask the Court to wait on ruling on the defense's Rule 50 motion until after I'm able to cross Mr. Meyer.  Mr. Meyer's report -- his entire report was based on hearsay statements from interviews from Ford and Nelson.  However, Mr. Meyer did not look at the depositional testimony from Officer Gillespie.  He did not look at the trial testimony from Gillespie, Ford, or Nelson.

And so I would ask the Court either to let me recall Officer Gillespie shortly, briefly, or don't have to recall him.  Let me call Officer -- I mean, Mr. Meyer.

THE COURT:  You can use your hour however you want to do it.  Okay?  I'll leave that up to you.

MR. BLACKWELL:  Thank you, Judge.

Can I have a two-minute recess to talk to my co-counsel?

THE COURT:  Okay.

MR. BLACKWELL:  Thank you.

MS. WIENEKE:  Your Honor, can we be heard, Your Honor?

THE COURT:  Yeah.

MS. RETTS:  Your Honor, as an initial matter, I would object to Mr. Blackwell's suggestion that he can question Officer Gillespie about what he heard in the criminal trial. That has been precluded by this Court and gets into --

THE COURT:  The outcome of that trial has been precluded.  That's all that's been precluded.

MS. RETTS:  But Officer Gillespie hearing what the clerks said during that trial is hearsay.  And I would note, Your Honor, that we have focused a lot in this case about the trespass.  But any crime, probable cause for any crime, based upon the Supreme Court's decision in *Devenpeck versus Alford* 543 U.S. 146, that case stands for the proposition that it does not matter what the officer said was the specific crime as long as there is probable cause for any crime.  That is because it is an objective inquiry.

So if there is probable cause to support the notion that Ms. Winkler was disorderly, that she was harassing, that she was engaged in any other crime, probable cause exists and

we're going -- foraying down this focus again on merely the trespass.

The Ninth Circuit, in *Ewing versus City of Stockton,* 588 F.3d 1218, 2009, also addressed this issue that Mr. Blackwell is getting into, which is an officer doesn't have to conduct a trial on the merits at the time that he approaches a scene. This is the exact basis for doing this, is to get into whether later on --

THE COURT: Okay. Thank you.

All right. We're ready to argue? Or what are we doing now?

MR. BLACKWELL: I just needed two minutes, Judge.

THE COURT: All right.

MR. BLACKWELL: Thank you.

(Recess taken, 8:37 a.m. to 8:38 a.m.)

THE COURT: Why weren't the clerks called? I mean, that would save all of this.

MR. BLACKWELL: That's a good question, Judge. That's an excellent question. Because, one, we have the transcripts. We have the transcripts from their trial. We were told at the last minute, you know what, Mr. Blackwell, you know, we're not -- at the last minute, Judge. We weren't anticipating that Mr. Nelson -- and they had given us their --

THE COURT: Okay.

MR. BLACKWELL: They were --

THE COURT:  Let me rephrase the question.

MR. BLACKWELL:  I'm sorry.

THE COURT:  Were the clerks available for you to subpoena and bring them into trial?

MR. BLACKWELL:  They were subpoenaed by the defense, Judge.

THE COURT:  I'm not -- that's not my -- were they available for you to bring into this trial?

MR. BLACKWELL:  Yes, we could have brought them in.

THE COURT:  Okay.

MR. BLACKWELL:  And then waste our time?  Again, we -- I remember when we were in this court --

THE COURT:  I was just curious.  Now --

MR. BLACKWELL:  They were subpoenaed by -- I'm sorry. Can I make a record on that issue since the judge asked the question, please?

THE COURT:  No.  That's not relevant.  You can make it later.

We've got things to resolve before the jury's here, and one of the things we need to resolve is jury instructions. All right?

MR. BLACKWELL:  Yes, sir.

THE COURT:  So I'm not sure.  What do you want to do now?

MR. BLACKWELL:  Let's move forward with the argument,

Judge.

THE COURT:  Okay.  Go ahead.

Ms. Wieneke, you have a motion.

MR. BERNARD:  And, Your Honor, she needs her hearing device.

THE COURT:  Okay.

MS. RETTS:  Your Honor, I'm a little confused.  Are we moving forward -- my understanding from Mr. Blackwell was he thought he was going to recall Officer Gillespie and then not argue the Rule 50.  Are we arguing the Rule 50 right now?

THE COURT:  No, he said go ahead and argue the Rule 50 now.

MS. RETTS:  We are going to?

THE COURT:  Yes.

MR. BLACKWELL:  Yes.  So I can preserve my time for my closing, yes.

THE COURT:  You have two minutes.  Make it quick.

MS. RETTS:  Your Honor, just for the record, I'm going to renew the arguments that we put forth in the motion for summary judgment, Document 68; Document 69, the statement of facts; Document 79, the reply.

And we would move for judgment as a matter of law on both the wrongful arrest/false arrest claim as well as the excessive force claim.

Earlier I mentioned the *Devenpeck* case as well as the

*Ewing* case. There was probable cause based --

THE COURT: I said go fast, but talk slow.

MS. RETTS: Sorry. Trying to get in.

There was probable cause based upon the information that the officer had in the CAD. The officer did not have any obligation to investigate further than that, based upon *Ewing*. An officer doesn't have to pursue all avenues of investigation. He can rely upon information that is undisputed in that CAD. That CAD establishes that the Circle K asked for the trespassing to occur, that she should be removed from the property.

And in addition to that, Officer Gillespie went further and asked Circle Ks and confirmed that information, corroborated it, went out, and then based upon his own personal interaction with Ms. Winkler, instructed her that she was being trespassed.

I'd also note that there is also disorderly conduct in there, harassment, but the undisputed evidence supports those claims.

THE COURT: Okay.

MS. RETTS: I'm going to move on to the excessive force claim, and I would point the Court to the *Brayshaw* case. That is 2015 U.S. District, Lexis 44034. That involved a very similar case to this case here. A gentleman who was causing a disturbance at a hot dog stand was escorted away from the hot

dog stand.  And then during the interaction with the officers, a straight-arm bar was applied and he fell.  Or alleged that he was taken to the ground incorrectly.

Could I have access to the ELMO, Your Honor?

As we work that out, I'll -- in this case, the gentleman sustained nearly the identical injuries to Ms. Winkler.  He had a skull fracture, multiple skull fractures, and the Court noted that:  It is not completely clear whether it was Officer Bellavance's imperfect arm bar takedown or plaintiff's imperfect balance or both that caused plaintiff's --

(Court reporter clarification.)

MS. RETTS:  Trying to be quick.

Although it was conceivable that Officer Bellavance's use of force would cause plaintiff to suffer serious injury, it was by no means inevitable and there is no evidence that the serious injury was deliberately inflicted.

This case involves a reasonable mistake of fact, that Officer Gillespie, when he was going to take control of Ms. Winkler to avoid her coming toward the cross traffic, when we have seen in the video that there is a vehicle in the same time period, to keep her from going into that cross traffic, he believed that he was employing a soft empty-hand technique that had minimal risk of injury.

Whether that was performed imperfectly because he lost

his balance, she lost her balance, or how it happened, it was rapidly evolving, split-second decision-making, and there is nothing in the record to suggest that Officer Gillespie intended or knew that the consequences would result at that time. We're working backwards from the injury and the severity of the injury to suggest that that would be the case. And we would just submit that this case suggests otherwise.

Also, there isn't a case that would tell Officer Gillespie in this instance that he would not be entitled to qualified immunity.

Going back to the issue of probable cause for the arrest, the plaintiff's expert has admitted there was probable cause for trespassing.

THE COURT: Okay. Your time's up. Thank you.

All right. I'm going to grant the motion under Rule 50 as to the arrest. And I'm going to save some time, Mr. Blackwell.

As to the arrest, there was probable cause. It's undisputed that Officer Gillespie was told by the clerks that they asked her to leave.

I'm going to deny the motion as to the excessive force claim. There's plenty of information here to argue excessive force. It's not even a close call on that one. I think this one goes to the jury. Okay?

MR. BLACKWELL: Will the Court allow me -- I know the

Court said two minutes.

THE COURT: Yeah, you may go ahead.

MR. BLACKWELL: I just want to make a record.

THE COURT: Make your record, but I've heard all the evidence, and I know what your argument is. The question isn't whether or not the clerks actually told him that. The question is now the evidence is -- let me back up.

The question isn't whether or not the clerks actually told Mrs. Winkler to leave; the question is whether they told Officer Gillespie that they told her to leave. And that's what the evidence is, is they told her to leave.

Also, there's information that he received from his computer screen that suggests the same thing. He had probable cause to make the arrest. I'm not suggesting that was reasonable, doesn't have to be reasonable to arrest someone. But the use of force, I think there's arguments and evidence to suggest that could have been excessive.

MR. BLACKWELL: Thank you, Judge.

My record will only be made as it pertains to the arrest.

As the Court noted, in ruling in favor of the defense for their motion for Rule 50 as it pertains to the arrest, the Court noted that -- and I'm paraphrasing. Basically, the judge basically believes the statements made by the officer and witnesses that didn't even testify.

I think if you look at Rule 50, it should be ruled in favor of the nonmoving party, which is Ms. Winkler.  And in this case, you have to look at not the credibility of the witnesses but the facts.

Ms. Winkler testified, Your Honor, that no one told her to leave.  Officer Gillespie testified that he doesn't even remember if she refused to leave.  And so there -- I think this -- these are facts that should go to the jury.

THE COURT:  It's an interesting dynamic there when you've got a person who obviously is disturbed, she only wants someone to air her grievance to, and that's Officer Gillespie, and he turns out to be the guy that doesn't want to hear her grievance and things spiral out of control.

But he had probable cause based on the information he had to make the arrest.

MR. BLACKWELL:  I understand that, Judge.  I think if we go forward -- when we go forward, if they have the nerve to call Mr. Meyer, I think you'll see -- when I say "nerve," meaning you'll see what comes out of his testimony when we're able to prove that the Court is saying that the clerks told Mr. -- Officer Gillespie --

THE COURT:  That's what Officer Gillespie said.

MR. BLACKWELL:  That's what he said.

THE COURT:  And no one's disputed that here.

MR. BLACKWELL:  Because those witnesses haven't

UNITED STATES DISTRICT COURT

testified, number one.

THE COURT:  Well, if -- you have the burden of proof. If you have witnesses who are going to testify that Officer Gillespie wasn't told that, that's something you should have presented.

MR. BLACKWELL:  I presented my witness -- I don't have to present their witnesses.  I can just present my -- my witness told this Court under oath that no one told her to leave, Judge.  And you haven't heard --

THE COURT:  Okay.  Let me --

MR. BLACKWELL:  -- respectfully --

THE COURT:  -- make it clear again.

MR. BLACKWELL:  Yes, sir.

THE COURT:  What she said she was told isn't the basis of probable cause.  It's what Officer Gillespie was told.  And Officer Gillespie testified he was told that she was told to leave.

Now, that may have been wrong, but there's no reason for him to disbelieve them, in the record, that these clerks are somehow not credible.

MR. BLACKWELL:  Well, if you look at the statute, the statute says that either the officer gives a reasonable request to leave or the store owner or an employee telling them to leave the property.

The issue is Officer Gillespie never testified, Your

Honor, that a store clerk or manager told Ms. Winkler to leave the property.  Officer Gillespie told us when he testified that the store clerks, via the store manager, said they wanted her trespassed.

She -- no, I'm sorry, said that she was trespassing. All right.  Is she trespassing in the store?  Was she trespassing on the property?

We also know that Officer Gillespie didn't know about the ongoing --

THE COURT:  Okay.

MR. BLACKWELL:  If I may just make a record, Judge. I'll be -- give me one more minute.

Officer Gillespie never testified that he knew about the ongoing request to remove people who were trespassing from Circle K property.  And so when he gets there, if Officer Gillespie is making -- is trying to really ascertain the facts, he told us when he came out to the store, she could have -- she could have just walked away.

So he didn't have probable cause to make an arrest until he's speaking to her.  Now he's speaking to her, and he's telling this Court that he said, they want you to -- they told me that you were trespassing.  The next thing he needs to say to her is, "Ma'am, you need to leave" and then give her a reasonable opportunity to leave.

37 seconds, Judge, isn't that reasonable opportunity,

Your Honor.  It's not.  That's what he said.  37 seconds, when he's sitting there talking to her, he's not -- he couldn't tell this Court that she understood that these people actually wanted her to leave the property.

He said there was a question.  It was an inquiry.  "Ma'am, these people are telling me that you are trespassing."  That's an inquiry, Judge, not a command.  It's not a statement of fact.  It's an inquiry.

And she says, "Sir, absolutely not.  I bought a lottery ticket."

And then he -- there's no explanation, "Well, ma'am, you've got to go because I believe these guys.  Can we go next door and talk about this."

So that's why I'm saying where is the probable -- from the officer's perspective --

THE COURT:  I'm not going to disagree with you about that confrontation in the parking lot.  That was -- I don't understand how that developed like it did.  It didn't make any sense.

But you're talking with someone who was -- he came outside, and my understanding was he had been told inside that she had been asked to leave.  Am I mistaken?

MR. BLACKWELL:  He came outside and told --

THE COURT:  Did he not testify --

MR. BLACKWELL:  His statement --

THE COURT:  Let me ask the question.

MR. BLACKWELL:  Yes, Judge.

THE COURT:  Did he testify that he was told by the clerks that she'd been asked to leave?

MS. WIENEKE:  Yes, sir.  Repeatedly.

THE COURT:  That's my recollection of the testimony.  So that's the only evidence we have about what the clerks told him in the store.

MR. BLACKWELL:  But it's -- what the issue is, it's diametrically different than what he told her.  When he goes out to -- when he comes outside, his testimony is that he said to Ms. Winkler, "Ma'am, they said you were trespassing."  That's not "Ma'am, they told me to tell you to leave," Judge.  That's his testimony.  So his testimony goes against --

THE COURT:  Well, let me back up.  The clerks didn't say, "We told Officer Gillespie to tell her to leave."  They said, "We told her to leave."

MR. BLACKWELL:  No.  If you look at Officer Gillespie's report, he said in his report --

THE COURT:  I'm talking about what he testified to.

MR. BLACKWELL:  His testimony is that the people inside the store said she was told to leave either by them or by a manager.  I'll take that.

THE COURT:  Okay.

MR. BLACKWELL:  When he goes outside, he doesn't say

that, Judge.  So how does she know?  How does she know?  She has to have a reasonable -- the probable cause comes from when she refuses to leave.

THE COURT:  Well, the clerks said they asked her to leave and she refused to leave.

MR. BLACKWELL:  Judge --

THE COURT:  I mean, that's what he's told.

MR. BLACKWELL:  But the truth of the matter is, that's not what happened.

THE COURT:  Well, that's what the evidence is.

MR. BLACKWELL:  But the evidence is also that the officer gives a different instruction to Ms. Winkler.  You got to look -- at least look at the statements made from the officer to Ms. Winkler, Judge.

THE COURT:  Well, I just -- my ruling is that you've been fully heard on the issue --

MR. BLACKWELL:  Yes, sir.  Thank you, Judge.

THE COURT:  -- and I don't find a reasonable jury would have a legally sufficient evidentiary basis to find for you on the unlawful arrest issue.

MR. BLACKWELL:  And I would still make my -- I understand, Judge.  I'll make the same request before.  I think I'm able, under Rule 50, to ask the Court to -- for a modification -- not a modification, I'm sorry.

THE COURT:  Reconsideration?

MR. BLACKWELL:  Reconsideration, I'm sorry, Judge -- after they present their witness, if they're going to present the witness at all.

Thank you, Judge.

THE COURT:  Okay.  Let's talk about instructions.  You guys -- we have a final set ready to go?

MR. BLACKWELL:  We have some, Judge.  We had a long conversation last night.  We got through a ton of them.  We have a few outstanding, and then Ms. Retts came in this morning with some additional issues, a few issues, Judge.  But we can ferret that out, hopefully shortly.

THE COURT:  Do you want to share them with me?  Do you have a copy that I can look at that we're working off of?

MR. BLACKWELL:  I'll give him mine.

MS. RETTS:  Do you have a clean copy?

MR. BLACKWELL:  A clean copy without notes?  Yeah, I think I have a clean copy without notes.

MS. RETTS:  Your Honor, would it be easiest for us to first go through all the ones we agree on, just to get those out of the way?  And there are quite a few that I believe we can remove, just so that we narrow the focus.

THE COURT:  Yeah.  I don't know what I did with my copy.

MR. BLACKWELL:  This is it.  I got a clean one.

THE COURT:  Here we go.  I've got it.  Here it is.

Let's go off the record for a minute so we don't have the court reporter taking down all of our gibberish.  Then we can make a record after we're done.  Okay?

(Discussion held off the record.)

THE COURT:  Let's go on the record, and then we'll make a record of what instructions we're not giving that you want to object to.

Let me just make sure -- I need to go further back here than where we started, because we've got a lot of instructions regarding the first --

All right.

MS. RETTS:  Your Honor, we do also need to remove -- I don't remember if we dealt with this, but the stipulated testimony.  We didn't have any stipulated testimony.

THE COURT:  Okay.  That's what I was going to ask you guys.

MS. RETTS:  And then we don't have any stipulations of fact, so we can remove that one as well.

THE COURT:  All right.

MR. BERNARD:  I'm sorry, Your Honor.  Did we go over number 3?

MS. RETTS:  And, Your Honor, I handed you the burden of proof - preponderance of the evidence, where we were striking through the affirmative defense.

THE COURT:  You handed that to me?

UNITED STATES DISTRICT COURT

MS. RETTS:  There were two.  I have another copy.

THE COURT:  When did you hand that to me?

MR. BLACKWELL:  A loose copy, Judge.

MS. RETTS:  They would have been loose.

MR. BLACKWELL:  Like three or four pages.

THE COURT:  Oh, I've got it here.  The expert opinion and the burden of proof?

MS. RETTS:  Yes, those two.  So it will just substitute to be specific.

THE COURT:  All right.  So let's go through them now.

You have them in front of you?  I'm going to go quickly.

MS. RETTS:  Yes.

THE COURT:  Okay.  I'm giving duty of jury.

MR. BERNARD:  Yes, Your Honor.

THE COURT:  Burden of proof - preponderance of the evidence, I'm substituting.  I think I've already made that correction on it.  Okay.

What is evidence.  What is not evidence.  Direct and circumstantial evidence.  Credibility of witnesses.

We're taking out stipulated testimony.  We're taking out -- there's no stipulations; right?

MS. RETTS:  Correct.

MR. BERNARD:  No, Your Honor.

THE COURT:  Taking out stipulations.  We're

substituting in the expert names in here.

Okay. Consideration of evidence - conduct of jury. All right.

The Section 1983 claim, is this one we're giving?

MS. RETTS: Yes, that's the model instruction.

THE COURT: All right. Particular rights - Fourth Amendment - unreasonable seizure of person generally, that comes out?

MS. RETTS: Yes.

THE COURT: Do you agree?

MS. RETTS: And substituted in is the model instruction.

THE COURT: Mr. Bernard, do you agree?

MR. BERNARD: Yes, Your Honor. With the model instruction, yes, Your Honor.

THE COURT: Yeah. Okay.

MR. BLACKWELL: With some changes, I think.

MR. BERNARD: Well, yeah, with taking out the domestic violence clause.

THE COURT: Particular rights - Fourth Amendment - unreasonable seizure of person, that's coming out at page 17?

MS. RETTS: Agreed.

MR. BERNARD: Yes, Your Honor.

THE COURT: Page 18 comes out?

MS. RETTS: Agreed.

THE COURT:  20 comes out?

MR. BERNARD:  I'm sorry, Your Honor?

THE COURT:  Page 20 and 21 come out?

MS. RETTS:  Agreed.

MR. BERNARD:  Yes, Your Honor.

THE COURT:  Page 22 comes out?

MS. RETTS:  Agreed.

MR. BERNARD:  Yes, Your Honor.

THE COURT:  Page 23 --

MS. RETTS:  Agreed.

THE COURT:  -- comes out.

And then color of law instruction's not being given. Section 1983 instruction is not being given.  Expert testimony not required is not given.  Public employee witness - bias is not given.  Law enforcement policies and procedures.

Okay.  All right.  I think those first ones were the plaintiff's requested instructions.  Do you want to make any record on any of the instructions that I'm not giving?

MR. BERNARD:  No, Your Honor.  We agree that we don't want those.

THE COURT:  All right.  The rest of these I believe are defense requested instructions.

MS. RETTS:  Some of them are intermixed, I think, with the plaintiff's.

THE COURT:  All right.  Law enforcement policies and

procedures not given.

MS. RETTS:  Agreed.

THE COURT:  Reasonable mistake of fact not given. Less intrusive alternatives not given.  Unreasonable seizure and excessive force not given.  Reasonable suspicion to detain not given.  Probable cause to arrest not given.  Criminal acquittal not binding not given.  Definition of causation not given.  Actual and proximate cause not given.  Justification for nondeadly physical force not given.  Crimes in Arizona not given.  Justification for physical force not given.  Force not justified to resist arrest not given.  Retreat not required not given.  Reasonableness of use of force not given.  Police community caretaking function not given.

Okay.  Those are, I assume, mostly defense.  If you want to make a record on any of those, you may do that now.

MS. RETTS:  Yes, Your Honor.  And I pulled them out so I'll try to go in order.

We would request that the Court give a reasonable mistake of fact instruction.  That states a police officer may make a mistake as to the facts as long as the mistake is based on a perception that is objectively reasonable --

THE COURT:  You don't need to read it in the record. It's already in the record if you submitted it and filed it. Just make your reasons for arguing it.  Okay?

MS. RETTS:  This one was modified a little bit so --

to address the Rule 50.  So if I could just -- this is the only one that I --

THE COURT:  You can continue.  I'm going to go give this to my bailiff, but you can continue making your record. I'll be right back.

MS. RETTS:  An officer's factual determination may be incorrect as long as it is objectively reasonable.  We would request that that instruction be given as it is a correct pronouncement of the law.

And as argued in the Rule 50 motion, the *Brayshaw* case, the issue of reasonable mistake of fact is directly relevant to the excessive force inquiry, particularly in this case as there's quite a factual similarity between the two cases.

We would request that the less intrusive alternatives instruction be given, as less intrusive alternatives is part of the model Ninth Circuit instruction on the Fourth Amendment but it is not defined.  We incorporate the sources set forth in our jury instruction submitted to the Court as to why this should be given, and it is a correct pronouncement of the law.

We would request that the police community caretaking function instruction --

THE COURT:  Slow down a little bit, please.  I know you're making a record, but she still has to get it.

MS. RETTS:  Sorry.

Police community caretaking function instruction be given as it is also a correct pronouncement of the law as set forth in our source material provided with the jury instructions.

The evidence in this case relates to Officer Gillespie's beliefs of imminent danger from a passing car, unrelated to crime apprehension and detention, and this instruction directly relates to that.

We would request that the crimes in Arizona instruction be given because part of the *Graham* analysis is the crime at issue. And the Supreme Court has said that it can be any crime that there is probable cause for, not simply what the officer may have cited the suspect for.

We would incorporate by reference the Rule 50 arguments that were made and the instructions -- the source materials in the instructions that were submitted.

Thank you, Your Honor.

THE COURT: Thank you.

Okay. Are we ready to -- when the jury gets here in a few minutes, we'll be ready to go?

MR. BERNARD: I believe so, Your Honor.

MS. WIENEKE: Your Honor, there is one issue. In light of the Rule 50, I want to inquire as to the scope of the potential cross-examination of our police procedures expert. I assume that there will be -- I'm not going to cover the false

arrest issue with my police procedures expert, and I assume that we're not going to rehash, then, the issue of the trespass issue and what the clerks told him and things like that.

I think that the issue of resisting arrest would be relevant because it's one of the Graham factors, as the Court just went over on the jury instructions. But as to the issue of the trespass and what the clerks told them, that's not a relevant issue anymore in light of the Rule 50 motion.

MR. BLACKWELL: I believe what she's arguing is my scope of my cross on Mr. Meyer. If she asks Mr. Meyer anything about his opinion, all the issues of Mr. Nelson and Mr. Ford come in. Because his opinion is 98 percent based on what Mr. Nelson and Mr. Ford said.

He has a little excerpt about what Ms. Winkler said during the interview. He has a smaller excerpt -- I mean, a little larger excerpt about what Mr. Gillespie -- I mean, Officer Gillespie said either in his report or during his interview.

However -- however, Judge, just like she raked my expert over the coals about what he didn't look at, Mr. Meyer didn't look at depositional testimony. Mr. Meyer didn't look at testimony at the trespass trial.

And so the problem that we have is, if she puts him on the stand and he talks about his report, I get to bring in those other factors for impeachment purposes for statements

that he gleaned on or he leaned on -- leaned on, with an L -- to author his report that these individuals were -- told Ms. Winkler to leave the store.  Simply put.

THE COURT:  All right.  You've got an hour.  You can spend it that way if you want.  I've already ruled.

MS. WIENEKE:  Well, I don't understand the Court's ruling.  My --

THE COURT:  He's saying he's going to do it for impeachment.  If it's truly impeachment that he didn't have all the information, he can bring that up.

MS. WIENEKE:  Well, I understand, Your Honor, but --

THE COURT:  I've already ruled.  Let's move on.

MS. RETTS:  Your Honor, I apologize.  I missed two of the instructions.

THE COURT:  Okay.

MS. RETTS:  Just very briefly, we would request that the definition of causation and actual and proximate cause be given as requested, because actual and proximate cause are still relevant to the excessive force inquiry, even though there has been a bifurcation of damages.  There still has to be a determination of whether the injury connected with the force, because if you're looking backwards from the force.  And we would incorporate by reference the sources set forth in our jury instructions submitted to the Court.

Thank you.

THE COURT:  Thank you.

MR. BLACKWELL:  Your Honor, can I make two statements?

THE COURT:  Mr. Blackwell, you'd best use your time, I would think, on the excessive force case.  That's where your case is.  And that's where you --

MR. BLACKWELL:  I understand.  I totally understand that, Judge.  There's other compelling issues as well.  I have Rule 32 issues.

THE COURT:  All right.

MR. BLACKWELL:  So two things.

First and foremost, I want to still make a standing objection for the Rule 50 instructions that the Court took out, because I have to make that objection on the record.  Even though the Court has --

THE COURT:  I'm not -- Rule 50 instructions?

MR. BLACKWELL:  The instructions -- the arrest instructions that are removed because we're not -- I have to make a standing objection to that, Judge.

THE COURT:  Okay.  You're making an objection to not giving instructions that I have removed because my Rule 50 ruling makes them no longer relevant?

MR. BLACKWELL:  Yes, sir.

THE COURT:  Okay.

MR. BLACKWELL:  All right.  And then we need a limiting instruction because -- as it pertains to the

information that came in from witnesses that never testified. So you have an instruction in your preliminary instructions, what is not evidence, on page 6.  And if you go to the second sentence:  In addition, some evidence may be received only for a limited purpose.  When I instruct you to consider certain evidence only for a limited purpose, you must do so and you may not consider that evidence for any other purpose.

And your instruction before that, Judge, on page 5 of the preliminary instructions, you talk about what is evidence. Sworn testimony of any witness; the exhibits that are admitted into evidence; any facts to which the lawyers have agreed; and any facts that I may instruct you to accept as proved.

And in this case, over our objection, hearsay statements came in from individuals who did not testify.  And I would ask that the Court put some type of limiting instruction on those issues.

THE COURT:  I thought -- you're talking about the testimony of the information considered by the expert?  Is that what you're talking about?

MR. BLACKWELL:  Either my expert and/or their expert when he testifies.

THE COURT:  I gave a limiting instruction at the time when I let it in and said this isn't being offered to prove that this is true; it's being offered to show what he considered for his opinions.

MR. BLACKWELL:  I would ask the Court for the same thing if Mr. Meyer testifies.

THE COURT:  Yes, I will do that.

MR. BLACKWELL:  Thank you very much, Judge.

THE COURT:  Okay.  Whenever the jury's here, we'll get started.

(Recess taken, 9:26 a.m. to 9:34 a.m.)

THE COURT:  One last thing.  I wonder if I should tell the jury that there is one count left for you to decide, and you're not to imply anything from that fact?  Does anyone have a problem with that?

MR. BLACKWELL:  That's the standard, Judge.  I don't have a problem with that.

MS. RETTS:  We agree with that.

THE COURT:  I think I'll tell them that now.

(Jury present.)

THE COURT:  Please be seated.

We're getting close to the end.  The lawyers assure me they'll finish today.

We're moving along pretty well.  There's one thing that -- we started out, there were two counts when we started.  There's one count now.  The excessive force count is the only count that's left for you to decide.  You're not to make any assumptions or implications from the fact that the other count went away as to why it went away.  But for your purposes,

excessive force is the issue before you now.  Okay?

All right.  Mr. Blackwell, do you have any further evidence to present?

MR. BLACKWELL:  No, Your Honor.  The plaintiff rests.  Thank you.

THE COURT:  All right.  Thank you.

Ms. Wieneke, are you prepared to proceed?

MS. WIENEKE:  Yes, Your Honor.

THE COURT:  You may call your first witness.

MS. WIENEKE:  Defendant calls Captain Greg Meyer.

THE COURT:  Mr. Meyer, would you come up here, please, and be sworn.  The clerk's going to swear you in.

GREG MEYER,

called as a witness herein by the defense, having been first duly sworn or affirmed, was examined and testified as follows:

THE COURT:  You may proceed.

MS. WIENEKE:  Thank you, Your Honor.

DIRECT EXAMINATION

BY MS. WIENEKE:

Q.  Good morning, Captain Meyer.

A.  Good morning, ma'am.

Q.  Can you please introduce yourself to the ladies and gentlemen of the jury, and tell them what you do for a living.

A.  Thank you.

My name is Greg Meyer.  Retired captain, Los Angeles

Police Department.  I retired 13 years ago.  At the time I retired, I was the captain of the Los Angeles Police Academy. I served for 30 years.

I've been doing expert witness work primarily on use of force for 30 years, starting long before I retired.  I've done more than 300 cases, civil and criminal.  Probably 80 percent or 85, 90 percent of those have to do with use of force.  Most are in the defense of officers; some are against.

And that's an overview.

Q.  Do you hold any college degrees?

A.  I do.  I have an associate of arts degree, I have a bachelor's degree, and I have a master of science degree in public administration.

Q.  What was your master's thesis on?

A.  My master's thesis, published in 1991, was entitled "Nonlethal Weapons Versus Conventional Police Tactics, the Los Angeles Police Department Experience."

Q.  Do you hold any certifications?

A.  I do, from California POST, Peace Officer Standards and Training Commission, the basic, intermediate, advanced, supervisory, and management certificates.  I also hold a lifetime teaching credential in police science from the State of California.

I have a certification from a Chicago-based legal research firm called -- and training firm called Americans for

Effective Law Enforcement.  The certification is as a certified litigation specialist.  And from the Force Science Institute, for ten years now, I've been certified -- it's called a certified force analyst.

Q.  Captain Meyer, what have you done to keep current in the area of law enforcement use of force issues since your retirement from the Los Angeles Police Department?

A.  Well, I'm missing one today because I'm here.  Since 2006, I've taught use of force in various places around the country for various organizations 14 or 15 times.  And I've attended use of force-related training sessions or lectures, seminars, whatever, around the country, easily 45 or 50 times.

I've published dozens of articles on the subject of use of force and even written a couple of textbook chapters for other people's textbooks on the subject.

Q.  And what about policies on use of force?  Have you been asked by entities to write and assist them in writing policies on the use of force?

A.  Yes.  I've been a writer of policies for the Los Angeles Police Department on use of force, training material for the police department on use of force.  I've been a coauthor of policy on use of force for the International Association of Chiefs of Police, of which I'm a longtime member, and also the Police Executive Research Forum, which is a Washington, DC, based law enforcement think tank.  I've written for them on

several occasions.

Most recently, for two years recently, I had a contract with the United States Department of Homeland Security's Division of Civil Rights and Civil Liberties in Washington, DC.  Just about exactly two years ago, they asked me to rewrite policies for one of their agencies on use of force.

Q.  All right.  Now, I am limited in my time today because we promised this jury we're going to get done today, so I want to get right to it.

My law firm hired you to work on this case; is that right?

A.  Yes.

Q.  And you are a professional consultant in litigation and you charge for your services?

A.  Yes.

Q.  And you're charging my law firm for your services in this case?

A.  Yes.

Q.  All right.  And by the way, sir, you have sat in this courtroom and you have listened to the testimony, haven't you, sir?

A.  Yes.

Q.  And you have the right to do that.  This is an open courtroom.  There was no rule barring you from being here, was

there, sir?

A.   No.

Q.   And Mr. Kirby, if he had wanted to, could have sat here and listened to the testimony as well; right?

A.   That's kind of a legal question, but I guess what's good for the goose is good for the gander, so why not.

Q.   All right.  And you were able to listen to Mr. Kirby's testimony?

A.   Yes.

Q.   You heard Mr. Gillespie's testimony?

A.   Yes.

Q.   And you heard Ms. Winkler's testimony?

A.   Part of it.  I arrived midday on Wednesday, so I probably missed the morning session of that.

Q.   All right.  Now, you told us about your use of force experience.  Do you also -- did that include your familiarity with defensive tactics?

A.   Yes.

Q.   Tell us about your familiarity with defensive tactics.  I neglected to talk to you about that.

A.   Okay.  So I was trained in defensive tactics under the guidelines of the California Peace Officer Association -- I'm sorry.  It's another one of my organizations.  California POST, Peace Officer Standards and Training Commission.  And through in-service training that officers are required to go to every

year or two to keep up their certification, there was occasionally defensive tactics update classes where you practiced some things like that.

And then again, my final year and a half with the Los Angeles Police Department I ran the police academy, which included, you know, all of the tactics training.  All those instructors worked for me.

Q.  Now, in this case, your -- you understand that the use of the straight-arm bar takedown is involved?

A.  Yes.  You've heard it variously called an arm bar takedown or a straight-arm takedown.  They're really the same thing.  Different agencies and training organizations call them variations of that, but, you know, straight-arm takedown I think is what is taught in Arizona POST lesson plan 8.5.3, and -- but arm bar works just as well.  They're really the same thing.

Q.  Is the arm bar takedown, the straight-arm takedown, something that you're familiar with both from your own experience, your experience in the California training academy, as well as your review of the Arizona POST training materials?

A.  Yes.  I've been trained in that technique.  I've used that technique on the street when I was a much younger man.

Q.  All right.  Now, with respect to your activities in this case, what were you asked to do -- well, let me narrow it down, because the scope of this case has been narrowed.

Q.      Did you prepare a report in this case?

A.   Yes, I did.

Q.   What was the date of your report?

A.   November 29th, 2016.

Q.   And in your report, you were given materials to review, which you listed in your report?

A.   Yes.  Well, without counting them, just pages and pages of a list of documents.  There's easily more than a hundred different documents.

Q.   Now, for purposes of the examination here today, Mr. Meyer, I want to focus you only on Opinion No. 2 in your report.  Are you with me?

A.   Yes.

Q.   All right.  Now, as part of your Opinion No. 2 in your report, did you review and rely upon the departmental report, the police report?

A.   Yes.

Q.   Did you rely and review the use of force report prepared by Sergeant Austin?

A.   Yes.

Q.   Did you rely on and review Mr. -- Officer Gillespie's statements?

A.   I'm sorry, his?

Q.   Officer Gillespie's statements.

A.   Yes, I did.

Q.   All right.  And did you look at Mr. Kirby's report as well?

A.   I did.

Q.   And you also heard his testimony here on the stand?

A.   Yes.

Q.   And with respect to your Opinion No. 2 contained in your report, is that an opinion that you reached based on your knowledge, education, training, and experience in law enforcement?

A.   Yes, it is.

Q.   And is it an opinion that you reached to a reasonable degree of professional certainty?

A.   Yes.

Q.   Now, before I get to that specific opinion, I want to ask you whether you have any agreement with the opinions expressed with Mr. Kirby in this courtroom.

     For example, do you agree with the opinion expressed by Mr. Kirby that the actions of Ms. Winkler in pulling her arm away constituted defensive resistance?

A.   Yes.

Q.   And do you agree with the opinion expressed in this courtroom by Mr. Kirby that the actions by Ms. Winkler of continuing to pull her arm away and walking back --

     MR. BLACKWELL:  Objection.  Misstates the evidence presented to this jury, Judge.

     THE COURT:  Sometimes lawyers disagree on what the

evidence is.  It's up for you to decide what the evidence truly is.

But I'm going to overrule the objection.  I'm not agreeing or disagreeing.  I'm just saying, you decide what the evidence is.  And she can ask her question.

BY MS. WIENEKE:

Q.  Let me start over, because I was in the middle of a sentence.

Do you agree with the statement expressed by Mr. Kirby and the opinion expressed by Mr. Kirby in this courtroom that the continuing pulling away by Ms. Winkler in response to Officer Gillespie's reaching out to grab her wrist was defensive resistance?

A.  Yes, I do.  I mean, you've also heard the term "active resistance" sometimes in the last couple days.  They're the same.

MR. BLACKWELL:  Objection.  Narrative.  Not answering the question presented to him, Judge.

THE COURT:  Okay.  All right.  I think you've probably testified before.  Just please answer the question and stop.

THE WITNESS:  Well, the answer to the question is "yes."

BY MS. WIENEKE:

Q.  Now, are officers trained that in response to defensive resistance, an officer may use empty-hand techniques as an

appropriate force option in response to defensive resistance?

A.   Yes.

Q.   Explain.

A.   Well, defensive resistance -- or active resistance, but defensive resistance is what Phoenix calls it -- is defined basically as bracing, tensing, pulling away, or otherwise signaling an intention to not be taken into custody.

When someone does that, there's a variety of defensive tactics techniques used to attempt to control the person so that you can get them handcuffed.  So pulling on their arm, trying to twist their wrist, all of that kind of thing is what we call soft empty-hand techniques, okay?

At some point, if the resistance continues and you're not able to get the person's arms and hands manipulated into a handcuffing position, at that point, then you have a variety of ways to take them to the ground.  The arm bar or the straight-arm takedown is one of those techniques used to take a person to the ground so you can get them handcuffed.

Q.   Are officers trained that the arm bar or straight-arm bar takedown is considered an empty-hand technique?

A.   Yes, it is, by definition.

Q.   And with respect to the empty-hand control technique, what are officers taught with respect to the chance of injury?

A.   That -- that type of a control hold or a takedown hold is taught and sanctioned because it's been found to have a

relatively minor chance of injury.  Nothing's injury-free in use of force, but you play in the percentages there, and that's why that technique is authorized at that level.

Q.  Now, other kinds of response options that we've heard about in this courtroom include officer presence.  You're familiar with officer presence?

A.  Yes.

Q.  And that includes just being there in a marked uniform and marked patrol car?

A.  Yes.  I mean, it establishes that there's state authority on scene, and people tend to pay attention to that.  It sometimes even changes their behavior.

Q.  And the other kind of response option we've heard about is verbal direction.  That includes what?

A.  Yes.  Verbal direction is commands or requests.  Hey, step over here or stop doing that or, you know, put the knife down, you know, whatever the situation is, when you're vocally telling someone to do something different than they're doing right now.

Q.  Now, must an officer, when arriving on scene, go through some type of a stair-step of response options and go through and exhaust each one of these options up the line before going up and starting to the next response option?

In other words, must they do the verbal commands before they can get to the empty hands before they can progress

to the next level?  Is it required to exhaust each step before going to the next level?

MR. BLACKWELL:  Your Honor, I'm going to object to outside the scope of this witness's report.

THE COURT:  Your objection is lack of disclosure?

MR. BLACKWELL:  Yes.

THE COURT:  All right.  What's -- where is his report?

Will you approach?  Ms. Wieneke, just show me where it's been disclosed.

(At sidebar on the record.)

MS. WIENEKE:  I would just note for the record, Your Honor, when I objected to nondisclosure from Mr. Kirby on the straight-arm takedown, which was not in his report, my objection was overruled without ever having to look at the report.

THE COURT:  I thought there -- the evidence at that point wasn't even relevant to what -- I just didn't think it was a significant point.  I didn't think it was something we needed to address.

MR. BLACKWELL:  The reason I'm objecting is she said turn to Opinion No. 2.  And we're at Opinion No. 2.  I'm reading Opinion No. 2.  None of the issues she's discussing right now is in this opinion.

If she wanted to build him up as it pertains to his expertise and his knowledge, she should have said that before

we got to, let's look at Opinion No. 2.  And when you look at the opinion, he doesn't say that.

MS. WIENEKE:  The only reason I directed him to Opinion No. 2 is I want to make very clear I am not discussing Opinion No. 1.

THE COURT:  Well, all I want to see -- this is a disclosure issue.  Is it disclosed in here, something that he's talking about?

MS. WIENEKE:  Opinion No. 2 relates to the use of force and the appropriateness of the use of force.  This is background regarding the use of force.  And --

MR. BLACKWELL:  He doesn't make the statements.

MS. WIENEKE:  It's identified in the lesson plans that he footnotes.

THE COURT:  Just show me where it's disclosed.  That's all I want to know.

MS. WIENEKE:  Well, I'd have to pull all the footnotes, Your Honor.

THE COURT:  Okay.  And the question was?

MS. WIENEKE:  Do you have to have a stair-step.

THE COURT:  Do you have to escalate, a stair-step?

MR. BLACKWELL:  We're going to be here all day.  I mean, it's not in the report.

THE COURT:  Okay.

MS. WIENEKE:  Your Honor, do you want me to go and get

all the lesson plans in which this is discussed?

THE COURT:  Yeah.  If those lesson plans were turned over to him, then I think that's something we should have.

Did she give you the lesson plans?

MR. BLACKWELL:  Yeah, I saw the lesson plans, Judge.

THE COURT:  Okay.

MR. BLACKWELL:  All I'm saying is, it's not written -- you know, we're not -- I'm not arguing over footnotes.  When she said turn to Opinion No. 2, I'm saying he's going outside the scope of his opinion, Opinion No. 2.  Stick to Opinion No. 2 so we can get him in and out.

THE COURT:  Yeah.  I'm going to sustain the objection. I don't see that in there.

MR. BLACKWELL:  Thank you, Judge.

(End of discussion at sidebar.)

BY MS. WIENEKE:

Q.  All right.  Captain Meyer, looking at your Opinion No. 2, do you have an opinion whether it was appropriate for Officer Gillespie to use force to subdue Ms. Winkler, given the defensive resistance and the circumstances?

A.  Yes, I do.

Q.  And what was your opinion?

A.  Because Ms. Winkler engaged in defensive resistance as reported by Mr. Ford and Officer Gillespie, it was appropriate for Officer Gillespie to use force as trained to subdue her,

and any reasonable officer would have done the same thing.

Q.  Now, based on your review of the record, was the altercation between Mr. -- Officer Gillespie and Ms. Winkler witnessed by anyone?

A.  Mr. Ford made comments about it, I recall.  I don't recall if there were others in the record.

Q.  All right.  And did you note that in your report?

A.  I did.

Q.  And what did you note in your report with respect to witness Ford?

MR. BLACKWELL:  Objection.  Hearsay.

MS. WIENEKE:  703, Your Honor.

THE COURT:  Well, I've got to make an evaluation like I did last time as to whether or not the facts or data would have probative value in helping the jury in evaluating the opinions, and if it substantially outweighs the prejudicial effect.

And this is one area I don't know what he said, so -- in the other one, I understood we were talking about what the clerk said about the contact and having talked to Ms. Winkler. Now you're talking about what the clerk saw regarding the confrontation in the parking lot?

MS. WIENEKE:  Yes, sir, with respect to the resisting by Ms. Winkler and the efforts to subdue her.

THE COURT:  Okay.  You haven't laid the proper

foundation yet to even get there under Rule 703.

MS. WIENEKE:  Did you -- thank you, Your Honor.

BY MS. WIENEKE:

Q.  Did you review the statement made by Mr. Ford regarding what he witnessed with respect to the altercation between Officer Gillespie and Ms. Winkler?

A.  Yes.  It was in one of the police reports.

Q.  And did you rely on that statement in formulating your opinion with respect to Opinion No. 2?

A.  Yes.  It was supportive of the opinion, so I specifically mentioned it in the opinion.

Q.  You cited it as one of the facts as the basis for your opinion?

A.  Yes.

Q.  And is it -- are those kinds of statements the type of information that you reasonably rely upon in support of your opinions in your field?

A.  Yes.  You look at the totality of the circumstances and what everybody's saying and, you know, ultimately reach conclusions and write an opinion.

MS. WIENEKE:  Your Honor, I would offer the statement now in support of his opinion, as he stated it, in support of the opinion underneath the articulated opinion.

THE COURT:  Mr. Blackwell?

MR. BLACKWELL:  Same objection, Judge.

THE COURT:  I'm going to find that the -- what he relied on in establishing his opinions is helpful for the jury to understand the opinion and that the probative value in helping the jury evaluate the opinion is substantially outweighed by the prejudicial effect.

But I'm going to tell the jury that what he's telling you is something he read in a report.  It's thirdhand hearsay.  It's not even -- he didn't even talk to Ford.  So, but this is something he's relied on.

So it's not being offered for the truth of the matter asserted.  It's being offered to explain how he got to his opinion.

Ms. Wieneke, you may proceed.

BY MS. WIENEKE:

Q.  Thank you, Your Honor.

And so, if you would, please tell the jury what you found with respect to witness Ford.

A.  At the top of page 10 of my report about witness Ford, Alex Ford, I wrote this:  Ford was a clerk at the Circle K.  Plaintiff was at the store and upset about a lottery ticket transaction.  Plaintiff was asked several times --

MR. BLACKWELL:  Objection, Judge.

THE COURT:  Hold on.  Wait.  There's an objection.

MR. BLACKWELL:  He's going to read the statement?  That's improper.

UNITED STATES DISTRICT COURT

THE COURT:  Yeah.  I mean --

MS. WIENEKE:  No.  I'm sorry --

THE COURT:  I'm going to sustain the objection.

MR. BLACKWELL:  I'm going to ask the Court to strike all of that.

BY MS. WIENEKE:

Q.  I just wanted you to look at page 15, the last sentence in that first paragraph, if you would.

A.  Yes.

The altercation was observed by witness Ford --

MR. BLACKWELL:  Objection.

THE WITNESS:  -- who stated that --

THE COURT:  Whoa, whoa, whoa.

She just asked you to look at it.  She didn't ask you to read it.

THE WITNESS:  I'm sorry, Your Honor.

THE COURT:  Go ahead.  Ms. Wieneke, you may continue.

MS. WIENEKE:  I believe that's the foundation that I laid for that one sentence.

THE COURT:  Okay.  Well, if you have a question, go ahead and ask it.

BY MS. WIENEKE:

Q.  And go ahead and read that one sentence.

A.  The altercation was observed by witness Ford, who stated that plaintiff pulled her arms away from the officer.

MR. BLACKWELL:  Objection, Your Honor.  He can't read from the document.

THE COURT:  Well, I assume she's going to tie it into his opinion and explain how he relied on that as an important piece of his evidence in considering his determination.  If she doesn't do it, then I'll strike it.

MR. BLACKWELL:  Thank you, Judge.

BY MS. WIENEKE:

Q.  Go ahead and read it again.

THE COURT:  No.  We've heard it.  Let's move on.

You can ask some questions about how it applied to his -- fit into his opinions.

BY MS. WIENEKE:

Q.  So how did that statement that you just read support your opinion that the force used by Officer Gillespie was reasonable in light of the defensive resistance that Ms. Winkler was experiencing -- was providing Officer Gillespie at the time?

A.  Because you have a witness, Mr. Ford, who's observing part of the altercation and specifically said that the plaintiff pulled her arms away from Officer Gillespie.  And that pulling your arms away, by definition, is defensive resistance.  Therefore, you may use force to overcome defensive resistance.  And a straight-arm takedown or arm bar takedown is one of the taught methods to do that.

MS. WIENEKE:  And if I could activate the ELMO and

publish just to the witness Exhibit No. 12, which is the use of force report.

BY MS. WIENEKE:

Q.  You did say that you did review the use of force report; correct?

A.  Yes.

THE COURTROOM DEPUTY:  Ms. Wieneke, do you want to use mine?

MS. WIENEKE:  Could you show it to the witness, please?  Thank you, Ms. Michele.

Oh, there it is.  Okay.

THE WITNESS:  Thank you.

BY MS. WIENEKE:

Q.  And I believe that we previously established that the use of force report is the type of report that you regularly and reasonably rely upon in support of your opinions?

A.  Yes.

Q.  Did the use of force report with respect to the level of resistance assist you in determining the level of resistance?

A.  I'm sorry.  Could you ask that again?

Q.  Sure.  Did the use of force report assist you in determining the level of resistance that Ms. Winkler displayed at the scene?

A.  Yes.

Q.  And how so?

A.   Well, Sergeant Austin documented that there was defensive resistance and --

         MR. BLACKWELL:  Objection, Judge.  One, it's hearsay, and he's reading.

         THE COURT:  Sustained.  I'm not sure this is one that -- whatever the lieutenant knew came from Officer Gillespie, so I'm not sure how this use of force report would be something that would be the type of evidence an expert would rely on, and I don't think you've laid that foundation.  This is --

         MS. WIENEKE:  I'm sorry?

         THE COURT:  I don't think you've laid the proper foundation for this.

         MS. WIENEKE:  What is missing, Your Honor?

         THE COURT:  That this is the type of expert -- type of evidence an expert would rely on in these opinions, coming from the officer through his supervisor.

         MS. WIENEKE:  I believe I just asked that, Your Honor.

         MR. BLACKWELL:  And, Your Honor, it goes outside the scope of his Opinion No. 2.  That's what we're looking at.  If we're only looking at Opinion 2, goes outside the scope of that as well.  Not listed in Opinion 2.

         THE COURT:  Okay.

         MS. WIENEKE:  It's listed in the materials that he relied upon, and I just asked the question, and he said yes.

On --

THE COURT:  You didn't establish this is the type of material experts in his field typically rely on.  He may have relied on it --

MS. WIENEKE:  All right.

THE COURT:  -- but --

MS. WIENEKE:  Fair enough.  Thank you, Your Honor.

THE COURT:  And I'm not sure how -- this may be one where I think that the risk of unfair prejudice is not substantially outweighed by the probative value, since it's just a recitation from the sergeant as to what he was told by Officer Gillespie.  I don't know what other evidence he has to make these opinions.

MS. WIENEKE:  All right.  Thank you, Your Honor.

BY MS. WIENEKE:

Q.  Captain Meyer, do you have an opinion to a reasonable degree of probability whether the force used by Officer Gillespie was reasonable and necessary?

A.  Yes, I do.

Q.  What's your opinion?

A.  That it was reasonable to use the arm bar or the straight-arm takedown.  It was necessary to get Ms. Winkler under control and handcuffed at that point.

MR. BLACKWELL:  I'm going to object, Judge.  He's stating the ultimate issue.  He's invading the province of the

jury.

THE COURT:  Overruled.

MR. BLACKWELL:  Thank you, Judge.

BY MS. WIENEKE:

Q.  Now, Captain Meyer, we know that in this case, Ms. Winkler did sustain an injury to her forehead and to her skull.  And is that suggestive that the force that was used was excessive?

A.  No, I don't believe so.  It's unfortunate that an injury happens.  Injuries sometimes happen when they're not intended.  But the dynamics of a physical altercation, which happens in seconds, with ever-changing circumstances, if you're not able to get the person fully under control and one or both of you go to the ground, injuries sometimes happen.

Q.  Can an officer, in utilizing an approved force option, takedown maneuver, do everything right and someone still get injured?

A.  Yes.  That's happened.  It's happened to me.  I mean, it's -- again, it's unfortunate that, you know, if there's resistance, then force is used, force is not pretty, and sometimes there are injuries.

MR. BLACKWELL:  Going to object at this point, Judge, to a narrative.

THE COURT:  Overruled.

MR. BLACKWELL:  Thank you.

UNITED STATES DISTRICT COURT

BY MS. WIENEKE:

Q.  I'm sorry.  I didn't hear the rest of your answer.

THE COURT:  Why don't you reask the question.  I think this was a yes-or-no question.

MS. WIENEKE:  Your Honor, am I permitted to not ask my witness yes-or-no questions?

THE COURT:  You are.

MS. WIENEKE:  Okay.

THE COURT:  But he was -- I don't know what his answer was in response to, so I'm asking you to reask your question.

BY MS. WIENEKE:

Q.  All right.  And I've forgotten what it was, Captain Meyer.

A.  Me too.

Q.  Is it the case, sir, based on your experience as a police officer, based on your experience in evaluating use of force cases, that an officer can do a technique that is approved force option and do it correctly and a person can still be injured?

A.  Yes.  That happens.

MS. WIENEKE:  I have nothing further, Your Honor.

THE COURT:  All right.  Cross-examination.

MR. BLACKWELL:  Yes, Judge.  Briefly.

Judge, if the Court will allow, we want to put up Exhibit 566 to 569, which is the store video.  We're going to show two positions.

THE COURT:  If it's in evidence, you can do it.

MR. BLACKWELL:  It's in evidence, Judge.  Thank you.

And the time stamp is going to be 7:44:46.

CROSS-EXAMINATION

BY MR. BLACKWELL:

Q.  Now, before we start, Mr. Meyer, I looked at your report.
You would agree there's a number of pages; correct?

A.  I'm sorry?

Q.  You would agree that your report is voluminous; right?
It's voluminous.  It's a large report; correct?

A.  Not for me.  It's probably average length, 16 pages.  It's
actually a little on the short side, probably.

Q.  Okay.  So all this stuff in here, all your experience and
whatnot, that's part of your report; correct?

A.  Yes.

Q.  As well as how much you got paid for performing for the
defense in your expert -- giving them your expert opinion;
correct?

A.  Yes.  All of those things are required by the federal
court.

Q.  Right.  As a matter of fact, you charge 450 an hour; is
that correct?

A.  Yes, currently.

Q.  And that's after a $5,000 retainer?

A.  Yes, for the first eight hours.

Q.   All right.  And your fee for a deposition is $1,500?

A.   Whatever it says in there.

Q.   For up to four hours?

A.   1,500 for half a day, 3,000 for a full day, but you didn't depose me so we didn't get to that.

Q.   And your fee for court appearances, being here every day, is 3,000 a day; correct?

A.   Yes, sir.

Q.   All right.  Now, you testified as it pertains to your Opinion No. 2 that you relied on Mr. Ford's recitation of what he saw or his statements therein that -- or his statements about what he saw during the altercation with Ms. Winkler; correct?

A.   Yes.  That's part of those circumstances, yes.

Q.   Right.  And did you watch the video?

A.   Yes.

Q.   All right.  And when you watched the video, were you trying to ascertain if the statements made by Ford were accurate?

A.   Sure, yes.  I'm looking at all the evidence and trying to analyze what's accurate, what's not accurate, what's useful, what's not.

Q.   All right.  So you would agree that you -- you state that the encounter was -- you state that a minute and 30 seconds -- 37 seconds later, meaning that when Officer Gillespie arrives at the Circle K, looking at page 9 of your report, which is

Bates stamped 8007.  Can you see that?

A.  I'm sorry.

MS. WIENEKE:  Objection.  Beyond the scope of my examination.

THE COURT:  I don't know what his question is, but where are you going?

MR. BLACKWELL:  The time stamp -- the time in which -- I'm trying to get to the time in which Mr. Ford could have seen anything.

THE COURT:  All right.  Overruled.

MR. BLACKWELL:  All right.

BY MR. BLACKWELL:

Q.  You follow me?

A.  I have the page, but I'm not sure where you started reading, sir, if you can guide me.

Q.  Near the bottom of the page, if you come up above at some point, and then right maybe four sentences up, or four lines up, you see:  A minute and 37 seconds later?

Do you see that, sir?

A.  Yes, I do.

Q.  All right.  And you say there, at 19:42:44, Officer Gillespie requested a supervisor to respond; correct?

MS. WIENEKE:  Objection.  Beyond the scope.

MR. BLACKWELL:  I'm trying to get there, Judge.  I promise.

THE COURT:  I'll let him have some leeway to lay some foundation.  What he's telling me, he's laying foundation to challenge Ford's observations.  That's what I understand.

So you can go forward.

MR. BLACKWELL:  All right.

THE COURT:  Ford's statement came in, so he's entitled -- that's not beyond the scope.

THE WITNESS:  That's what I wrote.

BY MR. BLACKWELL:

Q.  All right.  You said a minute and 10 seconds after that, at 19:43:54 hours, Officer Gillespie requested the fire department.  Correct?

A.  Yes.

Q.  All right.  Now, it looks like some of the times you're using may be from a CAD call time versus a store time.  What do you think?

A.  That's from the 911 CAD report at Bates -- beginning at Bates stamp 80.

Q.  Okay.  So you're not using the storefront -- the store surveillance camera times during that embodiment of your report; correct?

A.  Correct.  And --

Q.  Okay.

A.  -- if I may?

Q.  All right.  So, now --

A.   Okay.

Q.   So, now, let's turn to --

No, you want to explain something?  You want to brief -- if it's brief, go ahead.

A.   That's okay.

I was just going to say that the times from fire department, police department, store videos, CAD, these times rarely sync up.  Sometimes there's ways to sync them up.  I did not do that in this case.

Q.   All right.  Thank you very much for that explanation.

Now, let's -- are you ready?  We're going to look at Exhibits 566 through 569.  We're looking at position 2 and position 3.  These are synced up.  The time stamp is 7:44:44.

A.   Yes, I see it.

Q.   All right.

A.   I'm not sure which ones -- yes.

Q.   We're going to look -- so --

A.   Oh, I'm sorry.  A is on the left; B is on the right.

Q.   Yes, sir.  A is on the left; B is on the right.

A.   Thank you.

Q.   And do you see Mr. -- oh, first and foremost, do you know who Alex Ford is?  Have you ever talked to him?

A.   That's two questions.

Q.   First question.

A.   First is I know the evidence says he was a Circle K

UNITED STATES DISTRICT COURT

employee.  Have I ever talked to him, no.

Q.  All right.  Do you know -- based on your report, you didn't listen to Mr. Ford's prior testimony in another -- at another court?

Did you listen to his prior testimony or read a transcript of a prior testimony by Mr. Ford?

A.  I'll have to look, if you give me a moment.

Q.  Go ahead.

I'm sorry, sir.  Can you please look at your report, meaning the document that I received from Ms. Wieneke.  Can you look at your report and tell me whether or not you listed looking -- reviewing Mr. Ford's prior testimony.

Please look at pages 8000, which is 008000, 008001, 008002.  Do you understand?

A.  Sir, I don't know what page you're on.  I'm sorry.

Q.  Looking at the bottom --

You've testified before; correct?  Yeah?

A.  Oh, about 60 times, maybe.

Q.  We're looking at Bates stamps.  You've heard of the term "Bates stamps"; correct?

A.  Yes.

Q.  So go to those Bates stamps, if you will.

A.  Well, I've got probably eight pages of Bates-stamped documents listed, sir.  I'm not sure --

Q.  Looking at Bates stamp 8000, documents reviewed, do you see

that, sir?  Which is page 2 of your report.

A.  Page 2?

THE COURT:  Mr. Blackwell, if you have what you want him to see, just walk up and show it to him, please.

MR. BLACKWELL:  May I, please?

THE COURT:  Yes, please.

THE WITNESS:  I have page 2 now that you've told me it's page 2, yes, sir.

BY MR. BLACKWELL:

Q.  All right.  Page 2, looking at page 2 and 3, do you see where you looked at or reviewed Mr. Ford's prior testimony; yes or no?

A.  Sir, I have to look at my chronological notes, not my report, to answer your question if I reviewed the testimony. If you don't want me to do that, then I can't answer the question.

Q.  Well, you would agree, if you actually looked at it, when you prepared this report, you would have typed it into this report; correct?

A.  I don't know.  If -- I don't know when the testimony occurred.  This report is like two and a half years ago or something.  I don't have it in my memory, but I can answer it if I look at my chronological notes.

Q.  Did you have a conversation with Ms. Wieneke about this issue as it pertains to whether or not you reviewed Mr. Ford's

prior testimony?  Yes or no?

MS. WIENEKE:  Objection.  Privilege.

THE COURT:  Overruled.

BY MR. BLACKWELL:

Q.  Yes or no, sir?

A.  No, I didn't.

Q.  All right.  So you would agree that it would be very simple for us and even the people who are reading this report to ascertain whether or not you actually viewed Mr. Ford's prior testimony; correct?

A.  I don't know what would be easy for you.  I just know that I can answer your question if I look at my chronological notes and see what I reviewed for this case.

Documents reviewed are different than documents provided.  There's a lot of documents provided that have nothing to do with my expertise, so I kind of flip through them and, okay, that's not for me.  That's not for me.  Oh, that's for me, and I review it.

Q.  Did you disclose to us, the plaintiff, Ms. Winkler, that you actually reviewed or received Mr. Ford's trial testimony?

A.  Again, sir --

Q.  Yes or no?

A.  I don't know.

Q.  Okay.

A.  I have to look at my chronological notes to answer your

question, sir.

Q. Let's just stick with "I don't know." Can we do that?

A. Okay. I don't know.

Q. All right. Now, did you inform us, meaning did you send us any documentation in your report that you reviewed Officer Gillespie's depositional testimony and/or trial -- I mean, and/or -- not trial testimony, not this trial testimony, but former testimony at another hearing?

MS. WIENEKE: Objection. Compound.

THE COURT: Sustained.

BY MR. BLACKWELL:

Q. Did you send Ms. Winkler any information that you reviewed any prior testimony performed by Officer Gillespie, sir?

A. You want a yes/no answer.

Q. I don't --

A. I understand that.

Q. If you don't know, you can say, "I don't know."

A. No, I do know. His deposition was months after I submitted my report.

Q. And in your report --

A. So I reviewed it, but it didn't help me add anything to a report that I sent in three or four months earlier.

Q. How about any other testimony that Mr. Gillespie performed or -- yeah, any other testimony by Mr. Gillespie for this matter?

A.  Right.  We're back to I need to look at my chronological notes to see if I reviewed the other testimony or not.

Q.  But you did --

A.  If so, it would have been after I wrote my report.

Q.  So you did perform a -- provide a supplemental report; correct?

A.  I provided a supplemental report about the trespassing signs and the trespass authorization letter only.

Q.  And when was that?

        Strike the question.  Strike the question.  Don't look for it.

        MR. BLACKWELL:  All right.  You ready to play the video?

        MR. BERNARD:  Uh-huh.

        MR. BLACKWELL:  Let's hit play.

        (Video played for the Court and the jury.)

BY MR. BLACKWELL:

Q.  Now, as you're looking at this video while it's playing, Mr. Meyer, I want you to pay attention to where Alex is -- oh, first and foremost, Alex is in the left screen, left part of the screen.  You understand?

        So looking at the screen, Mr. Ford is in the left screen, which is position A.  Mr. Nelson is in the right screen, position B.

        Do you see this area here, sir?

UNITED STATES DISTRICT COURT

A.   I do see that area, yes.

Q.   All right.  And do you see Mr. Ford?  Do you see Mr. Ford there on the left?

A.   If you're telling me that's Mr. Ford, I'll accept it.  So, yes, I see him.

Q.   All right.  Now, do you agree that the time stamp is 7:44:44 in both images?

A.   Yes, sir.

        MR. BLACKWELL:  All right.  Now, Mr. Bernard, can you please press play.

BY MR. BLACKWELL:

Q.   All right.  Now, you would agree that when looking at this particular video footage, that the area where Mr. -- I'm sorry, Officer Gillespie and Ms. Winkler were is obscured; yes or no?

        MS. WIENEKE:  Objection.  Foundation.  Not an expert opinion.

        THE COURT:  I don't know how he can answer that from that video.  And I think that's something the jury can fathom out themselves, if that's an issue.  But you're asking him to comment on what someone in that video could see?

        MR. BLACKWELL:  No.  I'm asking, looking directly at the --

BY MR. BLACKWELL:

Q.   Mr. Meyer, looking directly at the video footage that we're all looking at right now, when Officer Gillespie and

Ms. Winkler were outside, do you agree that they are behind this area where there's something over the glass, that window?

MS. WIENEKE:  Same objections.  Also 611.

MR. BLACKWELL:  I'm impeaching the issue that he said Mr. Ford saw this incident.

THE COURT:  The 611 objection is overruled because I think this is what he's trying to do.

But I don't think he can answer that question.  I don't know.  That's --

BY MR. BLACKWELL:

Q.  All right.  Mr. Meyer, are you saying you can't answer that question?

THE COURT:  And if he can, the jury can answer it too.

MR. BLACKWELL:  Yes, sir.

THE COURT:  Go ahead.

MR. BLACKWELL:  Thank you.  One second.

BY MR. BLACKWELL:

Q.  Is -- well, when you were watching the video -- last question.

Where is Ford looking?  Look right now.  Where is he looking?

A.  At 7:44:49, in this frame, he appears to be looking out through the doors past -- or towards the white car and where Officer Gillespie and Ms. Winkler had been a few moments before.

Q. And that's Mr. Ford; correct?

A. I don't know. You're telling me that's Mr. Ford. If it's Mr. Ford, then, yes. The guy in the red shirt, yes, that's where he's looking.

Q. What if the guy in the red shirt you were talking about isn't Mr. Ford?

A. Sir, I'm not talking about -- oh, there's two guys in red shirts. Is that what you're telling me?

Q. Yes.

THE COURT: Why don't you again show him who you believe is Mr. Ford so he can answer your question.

MR. BLACKWELL: Yes, sir. Thank you, Judge.

BY MR. BLACKWELL:

Q. Mr. Meyer, Mr. Ford is the individual in position A, as I stated initially.

THE COURT: Mark it with an X so we can all see what you're talking about.

MR. BLACKWELL: Thank you, Judge.

THE WITNESS: Okay. Then it's not the guy in video B.

BY MR. BLACKWELL:

Q. Correct. Thank you.

A. Got it. Thank you.

Q. All right. You agree that the entire incident took about 10 seconds; correct?

A. I don't know what you mean by "the entire incident."

THE COURT:  You need to define "incident."  That's --

MR. BLACKWELL:  Meaning -- thank you, Judge.

BY MR. BLACKWELL:

Q.  Meaning when -- the time between Ms. Winkler backing away and Officer Gillespie taking Ms. Winkler down to the ground took about 10 seconds; yes or no?

A.  No.

Q.  All right.  And you do agree that when you watched the video, unless you need to watch it again, Mr. Ford, the guy on the left, isn't looking in the direction of Officer Gillespie and Ms. Winkler during that time they're -- she's backing away?

A.  I'd have to see it again from where you started the video last time now that I know which guy is which.

THE COURT:  Are you going to show it again?

THE WITNESS:  Okay.  Go ahead.

MR. BLACKWELL:  You ready?

THE WITNESS:  Yes.

MR. BLACKWELL:  You ready?  Let's play it.  One second.

(Video played for the Court and the jury.)

BY MR. BLACKWELL:

Q.  All right.  We're playing 7 -- we're starting at 7:44:44, sir.

A.  Okay.  I see that's where we're at.

Q.  All right.  Now, watching the video, can you testify that

Mr. Ford -- you can't speculate that Mr. Ford actually saw everything; correct?

A.  Oh, no, of course not.

Q.  Because there is a car that's -- at least you agree that there is a car where Officer Gillespie and Ms. Winkler are located behind during this altercation; correct?

A.  Yes, I do.

Q.  All right.  And the last question is, I was trying to ask you, do you see an area where -- and if I'm looking from inside the store, as we look at this video, that there's something covering one of the glass windows of the Circle K?

That was my question.  Yes or no?  Do you see --

A.  Is there a cover on one of the windows?

Q.  Yes, sir.

A.  Yes, there is.

Q.  All right.  Last question about your Opinion No. 2:  If you look at your Opinion No. 2, do you ever mention anything about Ms. Winkler's injuries on page 15, which is Bates stamped 8013?

A.  Not on page 15, no.

Q.  All right.  Not on page 15.

And your Opinion No. 2 was your opinion about the excessive use of force; correct?

A.  It was my opinion about the use of force, yes, whether it was legitimate or not.

Q.  And in your --

A.   It's not about -- I don't make opinions about injuries.

Q.   You don't make opinions about injuries?

A.   No.

Q.   That's what you just said.

     Do you consider the severity of the injuries as it pertains to whether or not the use of force was reasonable or unreasonable?

A.   Yes, and --

Q.   Yes or no?

A.   I'm sorry?

Q.   Yes or no?

A.   Yes.

Q.   All right.  And in this case, when you wrote your opinion, when I'm looking at page 15, which is your full opinion for use of force, which is almost half the page, a little more than half the page, you -- again, you never state anything about the severity of Ms. Winkler's injuries; correct?

A.   Correct.  Not on that page.

Q.   And let me ask you this:  If Ms. Winkler didn't use defensive resistance, would Officer Gillespie's use of force be reasonable?

A.   No.  If there was no defensive resistance, then that tactic would not be reasonable.

Q.   And your testimony is, from your experience as an officer, backing away and/or pulling a hand away is defensive

resistance; correct?

A.   Yes.  By definition, it is.

Q.   Without touching the officer; correct?

A.   No.  It --

Q.   I'm asking.  It's either yes or no.

A.   Is that a yes/no?

Q.   Without touching the officer --

A.   Yes, it's still defensive.  If -- I don't understand that question, maybe.  Yes, it's --

Q.   I'll ask it one more time.

A.   Okay.

Q.   From your opinion as an officer -- who used to be an officer, right, now you're an expert officer -- by backing away, moving back away from the officer as the officer tries to grab at the individual, without touching the officer, from your perspective, that's defensive resistance; correct?

A.   Yes.  I agree with your expert on that point.

Q.   I'm asking you, sir.

A.   I just said yes.

Q.   And when you said yes, you agree with my expert, do you recall when you were sitting in the courtroom that those were hypotheticals presented to Mr. Kirby; correct?

A.   I believe they were.

Q.   All right.  Not the facts in this case; correct?

A.   I think that hypotheticals sometimes match the facts of the

case, sometimes they don't.

MR. BLACKWELL:  All right.  All right.

THE COURT:  Redirect.

REDIRECT EXAMINATION

BY MS. WIENEKE:

Q.  The definition of defensive resistance, this isn't your definition, is it, sir?

A.  No.  Arizona POST Academy lesson plans have definitions for it, and Phoenix Police Department also has definitions for it.

Q.  So the definition that you're using as defensive resistance comes from what is taught to Officer Gillespie from his own police department, as well as all police departments in the state of Arizona --

MR. BLACKWELL:  Objection.

BY MS. WIENEKE:

Q.  -- by the academy?

MR. BLACKWELL:  Objection.  Foundation.  All the police agencies in the state of Arizona?

THE COURT:  All right.  Lay some foundation.

BY MS. WIENEKE:

Q.  Did you read the Arizona POST lesson plan 8.5 as part of the materials that you were provided in this case?

A.  Yes, I did.

Q.  Did that lesson plan provide a definition of defensive resistance?

A.   Yes, it does.

Q.   And what was the definition of defensive resistance in that lesson plan?

A.   Physical actions that attempt to prevent an officer's control but do not involve attempts to harm the officer.

Q.   And were examples given of defensive resistance?

A.   Yes.  To my memory, you see this all over the country: bracing, tensing, pulling away, signaling the intention to not be taken into custody.

Q.   And did you find evidence in this record of conduct by Ms. Winkler that met the definition of defensive resistance as defined in Arizona POST lesson plan?

A.   Yes.

     MS. WIENEKE:  Now, if we could, Ms. Piasecki, go to the exhibit of the video, which is Exhibit 560 --

     MR. BLACKWELL:  6.

     MS. WIENEKE:  566?

     MR. BLACKWELL:  566 through 569.

     MS. WIENEKE:  Which one?

     MS. PIASECKI:  566 and 567.

BY MS. WIENEKE:

Q.   566 and 567.  You were asked some questions about what Mr. Ford was doing in this video.  And in your report, you cited the testimony that you read or the statement that you read.

And to be clear, you were citing what was in the record; right?

MR. BLACKWELL:  Objection.  Foundation.  What record?

THE COURT:  Lay some foundation.

BY MS. WIENEKE:

Q.  Well, you didn't hook Mr. Ford up to a polygraph or anything to know if he's telling the truth or not; right?

A.  No.  I saw the police report of what he said and, you know, today I was asked questions and never really got to give the answer about what he was looking at.

Q.  All right.  Well, this is Mr. Ford.  And we can also take a look at these folks, too, when we watch this video to see what they're looking at.  And at 6 -- I'm sorry, 7:44:44, we'll run these simultaneous and see which way their heads turn as we watch this video.

(Video played for the Court and the jury.)

BY MS. WIENEKE:

Q.  So at 7:44:46, you see this woman in the purple shirt now looking -- and this man here now looking to their right, and Mr. Ford now looking towards the window.

Do you see that?

A.  Yes, I do.

Q.  And now Mr. Ford appears again to be looking towards the front door and actually taking a step towards the front door and a step to the left looking towards the front door.  Do you

see that?

A.  Yes, I do.

Q.  Now, you can't say definitively what these folks are looking at, can you?

A.  No.

Q.  All you can look at is their observation that they're looking at something that caused their bodies to turn.  Right?

A.  I believe so.

Q.  And as we continue to look at the video, we see this movement by these people in position B also moving towards the door; correct?

A.  Yes.

Q.  And that front door is closed; right?

A.  Yes, it is.

Q.  Would it be fair to say that there's some kind of commotion that's loud enough that it's drawing the people's attention in some fashion towards the door?

A.  Right.  I don't -- I think that's common sense, not an expert-type opinion.

Q.  And you were asked some questions about materials that you reviewed and whether they were listed in your report.  You were specifically asked questions about whether you reviewed some testimony.

        I'm going to publish --

        MS. WIENEKE:  I would ask to publish just for the

witness.

BY MS. WIENEKE:

Q.  Were you aware that the testimony that you were being asked about was not even produced by the plaintiffs in this case until February 16th, 2017?

MR. BLACKWELL:  Objection.  Outside the scope of cross, and it's going to potentially open the door.

THE COURT:  Overruled.

MR. BLACKWELL:  All right.

BY MS. WIENEKE:

Q.  Three months after the date of your report?

A.  I didn't know that.  I know when I reviewed it, because it's in my notes.

Q.  And were -- and you were aware, I think you told us, that the deposition that you were asked about of Mr. Gillespie was not even taken until February of 2017, which was also three months after the date of your report?

A.  Yes.  I was aware of that.

MS. WIENEKE:  Thank you very much, Captain Meyer.

THE COURT:  Does any member of the jury have any questions for this witness?

Sir, you're excused.  Thank you for coming.

THE WITNESS:  Thank you, Your Honor.

(Witness excused.)

THE COURT:  Ms. Wieneke, do you have any further

evidence to present?

MS. WIENEKE:  Subject to review of the exhibit list, the defendant rests, Your Honor.

THE COURT:  Okay.  Any rebuttal?

MR. BLACKWELL:  No, Your Honor.

THE COURT:  All right.  The lawyers and I have a little bit of work to do, but this case is ready for final instructions and closing arguments.

Let's take a recess, come back at 15 minutes after 11:00.  And then we'll -- what will happen then is I'll read you the final instructions, and the lawyers will make their closing arguments.

(Jury not present.)

THE COURT:  Sir, you may step down.  Mr. Meyer, you may step down.

THE WITNESS:  Thank you.  I spilled some water here, Your Honor.

THE COURT:  We'll clean up after you.

THE WITNESS:  I don't want to have your staff upset at me, so I'll clean it up.

THE COURT:  Please be seated.

Your privilege objection may have been right.  Under the new laws of Arizona, there is a privilege -- and I haven't reviewed it carefully, but there is a certain privilege for communications with experts, and I had forgot about that.

But I don't think it was any harm.  I don't think it went anywhere.  So -- but that -- I stand corrected.  That was probably a proper objection.

Okay.  We're going to get the instructions and go over those, and then here's where we are, the time.  Mr. Blackwell, the plaintiffs have 37 minutes; and the defendants have 30 minutes.

So we should have time enough if we give -- plaintiff, you're going to make an opening and a rebuttal.  An hour total?  Will that be enough time?

MR. BLACKWELL:  Yes, Judge.

THE COURT:  Ms. Wieneke, 45 minutes?

MS. WIENEKE:  Yes, Your Honor.  Thank you.

THE COURT:  Okay.  So I think we can make those adjustments and that will just give us enough time to get it to the jury early this afternoon and give them time to deliberate.

All right.  Make sure we got all the exhibits properly into evidence and then we can get the instructions.

(The Court and the courtroom deputy confer.)

THE COURT:  Let's come back at 11:00 o'clock.

MS. RETTS:  Your Honor, verdict forms weren't in the packet.

THE COURT:  Yeah.  Let me just -- I suggest we use the one verdict form that says:  We, the jury, duly impaneled, upon our oaths, make the following findings as to plaintiff's Fourth

Amendment claim for excessive force:

Did Officer Gillespie use excessive force against Ms. Winkler?  Yes or no?

That should be that simple, I think.

MR. BERNARD:  Yes, Your Honor.

MS. RETTS:  We would just, for the record, make the objection that there isn't the causation question asked.  I understand the Court's ruling that those causation instructions won't be given, but we had proposed that they go and -- further and decide the question of causation.

THE COURT:  I don't know what -- how -- if she fell and came up with a bloody head, are you claiming that didn't happen as a result of --

MS. RETTS:  If she tripped and lost her balance.

THE COURT:  Okay.  No, that's not an issue.  If she tripped and lost her balance, it wouldn't be excessive force.

MS. RETTS:  Right.

MR. BLACKWELL:  And, Judge, I would make sure -- I just want to put on the record, they cannot argue that she tripped and fell and lost her balance, based on the testimony provided by Officer Gillespie.

It sounds like, based on their repeated questions of getting this instruction in, that they want to argue their particular point that Ms. Winkler caused her own demise.  And they can't argue that.  We haven't proved causation.

Officer Gillespie already testified that he took her down to the ground on her head, and he meant to use that type of action, the so-called straight-arm takedown. And the *Graham* standards don't have an element for causation.

MS. RETTS: We have a reasonable mistake of fact, Your Honor, as demonstrated in that case, involving a straight-arm bar takedown that was utilized and had unintended consequences. So he may intend to use a straight-arm bar takedown that has unintended consequences because of the plaintiff's resistance, which has been elicited from Mr. Meyer and from this witness.

I mean, that case also involved an occipital fracture, nearly the same injuries. This is an empty-hand technique that is designed to cause minimal injury. If she is resisting and causes the arm bar --

THE COURT: Well, it's designed to cause minimal injury if she has an arm or a shoulder she can land on, but if their hands are behind her, she's going to fall on her head. So --

MS. RETTS: And the evidence is is that she had one arm free.

THE COURT: Well, the evidence is that he had both arms behind her for a while, and he wasn't sure what was going on, it was happening so quickly.

But you can argue whatever the evidence suggests and then you can point out to the jury if they're wrong. Okay?

MR. BLACKWELL:  Thank you, Judge.

MS. WIENEKE:  What did you say, Your Honor, in terms of the timing?  I'm sorry, I didn't catch it.

THE COURT:  Let's come back at 11:00 and talk about instructions.

MS. WIENEKE:  At 11:00?

THE COURT:  Yeah.

MS. WIENEKE:  Thank you.

(Recess taken, 10:44 a.m. to 11:09 a.m.)

THE COURT:  Please be seated.

Everyone, you've reviewed the exhibits, and all the exhibits are in order and in evidence?

MR. BERNARD:  Yes, Your Honor.

MS. WIENEKE:  Yes, sir.

THE COURT:  Okay.  Take a few moments and go over these final instructions, make sure I haven't left something out and make sure I have the one you guys stipulated to the way you wanted it regarding the Excessive Force instruction.

MR. BERNARD:  Your Honor, looking at page 3, the affirmative defense where it says, "When a party has the burden of proving any claim or affirmative defense," I think we agreed to take out --

THE COURT:  Okay.  I thought that was out.  It didn't come out?

MR. BERNARD:  No.  It's still there.

UNITED STATES DISTRICT COURT

THE COURT:  All right.

MR. BLACKWELL:  Sorry, Judge.

THE COURT:  No problem.

You know, I just noticed we have this instruction on page 12 talking about instructions 9.23 and 9.25.  We need to fix that.

MR. BERNARD:  I'm sorry, Your Honor?

THE COURT:  On page 12.

MR. BERNARD:  Yes, Your Honor.

THE COURT:  It talks about instructions 9.23 and 9.25.

MR. BERNARD:  Okay.  So you're just taking out the numbers?

THE COURT:  Well, no, we need to -- if we're going to refer to instructions, we need to refer to a specific instruction so they know what we're talking about.

MR. BERNARD:  I agree with that.

THE COURT:  Should we just say "the next instruction"?

MR. BERNARD:  Yeah.

THE COURT:  Does that make sense?

MS. RETTS:  I'm sorry, Your Honor.  I didn't hear.

THE COURT:  I'm looking at page 12.  And in there, we refer to instructions 9.23 and 9.25.

MS. RETTS:  You mean just excise that?  Required to prove, excise under instructions 9.23 and 9.25?

THE COURT:  Required to prove --

MS. WIENEKE:  No, the next instruction is 9.25 so --

THE COURT:  So why don't we just say "to prove under the next instruction."

MS. RETTS:  Yes.

MR. BERNARD:  Yes, Your Honor.

MS. RETTS:  Your Honor, after the close of evidence, with what was not elicited from Mr. Meyer or wasn't gone into in cross-examination by the plaintiff, we think that there is no basis for giving the warning part of the model instruction.

THE COURT:  Okay.  I'm not -- give me -- where are we with that?

MS. WIENEKE:  Page 14.

MS. RETTS:  On page 14.

THE COURT:  Yeah?

MS. WIENEKE:  Subsection 9.

MR. BERNARD:  8.

MS. RETTS:  Subsection 9.

MS. WIENEKE:  I'm sorry, 8.

MR. BERNARD:  8.

MS. RETTS:  8.

We don't have any testimony from anybody that's been elicited about a warning, and the warning generally relates to excessive force.  The model instruction is for deadly and nondeadly force, and there's been no testimony about a warning.  And nothing came out from Mr. Meyer in cross-examination about

the need to give any type of warning or giving a warning.

THE COURT:  Isn't this an instruction of what the law is?

MS. RETTS:  For both deadly and nondeadly, though. The Ninth Circuit model instruction doesn't specify between deadly and nondeadly.  It just includes everything.  And based upon the close of the evidence now, we have no one claiming there should be any warning that should have been given, and there was no allegation of deadly force.

THE COURT:  So you're saying that warning only applies in the use of deadly force?

MS. RETTS:  Correct.  Or under the case law it can apply for a Taser, too, but we don't have a Taser.

THE COURT:  Tell them it will be about 11:30.  Okay? Thanks.

MR. BERNARD:  Your Honor, the defense asked for this. Again, defense asked for this instruction, the model instruction.

THE COURT:  Well, let's address their issue.

MR. BERNARD:  Okay.

THE COURT:  Is the --

MR. BERNARD:  In the model instruction, it doesn't say anywhere that this Instruction No. 8 is only for deadly force or for tasing, and we -- in the direct examination for Officer Gillespie, Mr. Blackwell went over a number of times how

Officer Gillespie --

THE COURT: Okay. What I was concerned about is this is an instruction informing the jury what the law is. They've already heard the facts.

MR. BERNARD: Yes, Your Honor.

THE COURT: So I'm wondering, is there a case or something that says this applies only to deadly force? Is there some --

MS. RETTS: *Tennessee versus Garner*. I do not have any case where it's been applied in the course of an arrest, so I don't know what -- there's been nothing elicited about warning of a use of force. The only warning we're talking about is warning that she was under arrest, and the warning that she's under arrest is not at issue anymore because there's no false arrest claim.

MR. BLACKWELL: Your Honor, I asked the officer, did he give her any warning, like stop resisting. He didn't say that.

THE COURT: No, no. I think he warned her that "If you don't leave, I'm going to have to arrest you."

MR. BLACKWELL: And the next -- I asked --

THE COURT: That's his testimony. I know Ms. Winkler disagrees with that, but I think that was his testimony, wasn't it?

MR. BLACKWELL: Yes.

841

THE COURT: Yeah. I don't think it makes any difference. It's just -- he gave a warning. And there's evidence that he said, "I was going to arrest you."

MR. BERNARD: Right, Your Honor.

THE COURT: So I'm going to leave it in.

MR. BERNARD: Thank you, Your Honor.

THE COURT: All right. Anything else?

MR. BERNARD: Were the verdict forms attached to this?

THE COURT: We've already agreed on the verdict form. Michele will show it to you.

All right. So I'm going to fix page 12, and I'm going to fix page 3. Are there any other changes we need to make to this?

MS. WIENEKE: Can we see the verdict form, Your Honor?

THE COURT: Yeah.

MS. WIENEKE: And we have reviewed the verdict form, Your Honor, just subject to the previously stated objection regarding the causation instruction and the causation of -- no question regarding causation on the verdict form.

THE COURT: Okay. Is there any objection other than that?

MS. WIENEKE: No, Your Honor.

THE COURT: Mr. Blackwell, any objection to the verdict form?

MR. BLACKWELL: No, Your Honor. None at all.

THE COURT:  All right.  Why don't you guys set up your stuff for your closings so that you're ready to go.  We'll start at 11:30.

Let me ask -- I think this jury probably would rather go through lunch.  That's typically what they'd rather do, but you want me to ask them first to see if --

MR. BLACKWELL:  We'd ask for that, Judge.  We were already going to ask you for that.

THE COURT:  What do you want to do?  What do you guys want to do?

MR. BLACKWELL:  Go to lunch and come back.

THE COURT:  I'm sorry?

MR. BLACKWELL:  Go to lunch and come back and do our closing arguments.

THE COURT:  You want to go to lunch now?

MR. BLACKWELL:  If that's okay with the Court, yes.

THE COURT:  Did you want to -- is that what you said?

MS. WIENEKE:  Instruct the jury, then go to lunch, and then come back.

THE COURT:  All right.  That makes sense.

MS. WIENEKE:  But could we get a copy of the verdict form, Your Honor, for use for our arguments?

THE COURT:  Sure.

MS. WIENEKE:  Thank you, Your Honor.

MR. BLACKWELL:  Thank you.

THE COURT:  Okay.  Anything else?

All right.  I'll get these instructions finalized, we'll bring the jury in, I'll instruct them, we'll take a break and then we'll go to lunch, and then be ready to go.

MR. BLACKWELL:  Yes, sir.

MS. WIENEKE:  Yes, sir.

THE COURT:  All right.

(Recess taken, 11:18 a.m. to 11:41 a.m.)

THE COURT:  Please be seated.

One more time.  Let's make sure we've got it this time.  I think we've got the affirmative defense completely out of there finally.

MR. BLACKWELL:  Thank you.

THE COURT:  So we'll do the final instructions, take an hour for lunch, and come back about 1:00 o'clock and start.

MR. BLACKWELL:  Yes, sir.

THE COURT:  Oh, we have nine jurors.  We talked about -- in this courtroom, we don't have any really, typically, alternates, but we can pick an alternate so it takes it down to eight jurors.  That's what we talked about doing. Is that what everybody wants to do still?

MR. BLACKWELL:  Yes.

THE COURT:  Ms. Wieneke?

MS. WIENEKE:  Your Honor, I don't mind if we allow the alternate to deliberate.

THE COURT:  We agreed to select an alternate, but we can disagree on that -- I mean, agree to undo what we did, but only if we all agree.

MR. BLACKWELL:  Well, I don't have a --

THE COURT:  We can decide this later.

MR. BLACKWELL:  Yes, sir.

THE COURT:  Okay.  Ready?

(Jury present.)

THE COURT:  Please be seated.

Okay.  We're at the last phases of the trial.  The first day and the last day of trial are the most disjointed because we have a lot of things we have to do.  I think we're ready to finish this up now.

What's going to happen now is we'll go over the final instructions together, we'll break for lunch, and the lawyers will come back after lunch and give their closing arguments. After the closing arguments, you'll go to the jury room and deliberate and hopefully reach your verdict.

All right.  Let's turn to page 2 of the final instructions.

Duty of Jury.

Members of the jury:  Now that you have heard all the evidence and you will hear the arguments of the attorneys, it's my duty to instruct you on the law that applies to this case. Each of you has received a copy of these instructions that you

may take with you to the jury room to consult during your deliberations.

It's your duty to find the facts from all the evidence in the case.  To those facts, you will apply the law as I give it to you.  You must follow the law as I give it to you, whether you agree with it or not, and you must not be influenced by any personal likes or dislikes, opinions, prejudices, or sympathy.

That means you must decide the case solely on the facts, the evidence before you.  You will recall that you took an oath to do so.

Please do not read into these instructions or anything that I may say or do or have said or done that I have an opinion regarding the evidence or what your verdict should be. That's entirely up to you.

Burden of Proof-Preponderance of the Evidence.

When a party has the burden of proving any claim by a preponderance of the evidence, it means you must be persuaded by the evidence that the claim is more probably true than not true.  You should base your decision on all of the evidence, regardless of which party presented it.

What is Evidence.

The evidence you are to consider in deciding what the facts are consists of:

1.  The sworn testimony of any witness;

2.   The exhibits that are admitted into evidence;

3.   Any facts to which the lawyers have agreed; and

4.   Any facts that I've instructed you to accept as proved.

What is Not Evidence.

In reaching your verdict, you may consider only the testimony and exhibits received into evidence.  Certain things are not evidence, and you may not consider them in deciding what the facts are.  I will list them for you.

1.   Arguments and statements by the lawyers are not evidence.  The lawyers are not witnesses.  What they have said in their opening statements and what they'll say in their closing arguments and at other times is intended to help you interpret the evidence but is not evidence.  If the facts as you remember them differ from the way the lawyers have stated them, your memory of them controls.

2.   Questions and objections by lawyers are not evidence.  Attorneys have a duty to their clients to object when they believe a question is improper under the rules of evidence.  You should not be influenced by the objection or by the Court's ruling on it.

3.   Testimony that is excluded or stricken or that you've been instructed to disregard is not evidence and must not be considered.

In addition, some evidence was received only for a

limited purpose.  When I have instructed you to consider certain evidence for a limited purpose, you must do so, and you may not consider that evidence for any other purpose.

4.  Anything you may have seen or heard when the Court was not in session is not evidence.  You are to decide the case solely on the evidence received at the trial.

Direct and Circumstantial Evidence.

Evidence may be direct or circumstantial.  Direct evidence is direct proof of a fact, such as testimony by a witness about what that witness personally saw or heard or did. Circumstantial evidence is proof of one or more facts from which you can find another fact.

You should consider both kinds of evidence.  The law makes no distinction between the weight to be given to either direct or circumstantial.  It's for you to decide how much weight to give to any evidence.

Credibility of Witnesses.

In deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe.  You may believe everything a witness says or part of it or none of it.

In considering the testimony of any witness, you may take into account:

1.  The opportunity and ability of the witness to see or hear or know the things testified to;

2.   The witness's memory;

3.   The witness's manner while testifying;

4.   The witness's interest in the outcome of the case, if any;

5.   The witness's bias or prejudice, if any;

6.   Whether other evidence contradicted the witness's testimony;

7.   The reasonableness of the witness's testimony in the light of all the evidence; and

8.   Any other factors that bear on believability.

Sometimes a witness may say something that is not consistent with something else he or she said.  Sometimes different witnesses will give different versions of what happened.  People often forget things or make mistakes in what they remember.  Also, two people may see the same event but remember it differently.  You may consider these differences, but do not decide that the testimony is untrue just because it differs from other testimony.

However, if you decide that a witness has deliberately testified untruthfully about something important, you may choose not to believe anything the witness said.  On the other hand, if you think the witness testified untruthfully about some things but told the truth about others, you may accept the part you think is true and ignore the rest.

The weight of the evidence as to a fact does not

necessarily depend on the number of witnesses who testify. What is important is how believable the witnesses were and how much weight you think their testimony deserves.

Expert Opinion.

You've heard testimony from Greg Meyer and Ronald Kirby, who testified to opinions and the reasons for their opinions.  The opinion testimony is allowed because of the education or experience of these witnesses.

Such opinion testimony should be judged like any other testimony.  You may accept it or reject it, and give it as much weight as you think it deserves, considering the witness's education and experience, the reasons given for the opinion, and all the other evidence in the case.

Consideration of Evidence-Conduct of the Jury.

Because you must base your verdict only on the evidence received in the case and on these instructions, I remind you that you must not be exposed to any other information about the case or to the issues it involves.

Except for discussing the case with your fellow jurors during your deliberations, do not communicate with anyone in any way and do not let anyone else communicate with you in any way about the merits of the case or anything to do with it.

This includes discussing the case in person, in writing, by phone or electronic means, via email, via text messaging, or any internet chat room, blog, website or

application, including, but not limited to, Facebook, YouTube, Twitter, Instagram, LinkedIn, Snapchat, or any other forms of social media.

This applies to communicating with your family members, your employer, the media or press, and the people involved in the trial.  If you are asked or approached in any way about your jury service or anything about the case, you must respond that you've been ordered not to discuss the matter, and report the contact to the Court.

Do not read, watch, or listen to any news or media accounts about the case or anything to do with it.  Do not do any research such as consulting dictionaries, searching the internet, or using other reference materials, and do not make any investigation or in any other way try to learn about the case on your own.  Do not visit or view any place discussed in this case, and do not use internet programs or other devices to search for or view any place discussed during the trial.

Also, do not do any research about this case, the law, or the people involved, including the parties, the witnesses, or the lawyers, until you've been excused as jurors.  If you happen to read or hear anything touching on this case in the media, turn away and report it to me as soon as possible.

These rules protect each party's right to have this case decided only on evidence that has been presented here in court.  Witnesses here in court take an oath to tell the truth,

and the accuracy of their testimony is tested through the trial process.  If you do any research or investigation outside the courtroom or gain any information through improper communications, then your verdict may be influenced by inaccurate, incomplete, or misleading information that has not been tested by the trial process.

Each of the parties is entitled to a fair trial by an impartial jury, and if you decide the case based on information not presented in court, you will have denied the parties a fair trial.

Remember, you've taken an oath to follow the rules, and it's very important that you follow these rules.  A juror who violates these restrictions jeopardizes the fairness of these proceedings, and a mistrial could result that would require the entire trial process to start over again.

If any juror is exposed to any outside information, please notify the Court immediately.

And in that regard, your deliberations take place only when you're all together and only in the jury room.  If you take a break and go out together and you all sit at the same table in the cafeteria, you're not talking about the case.  You can't do that.  You can only deliberate when all of you are there and in the jury room.  If someone takes a break to go to the bathroom, deliberations stop.  Everyone has to be present during deliberations in the jury room.

Section 1983 Claim Against Defendant in Individual Capacity-Elements and Burden of Proof.

In order to prevail in a Section 1983 claim against Officer Gillespie, the plaintiff must prove each of the following elements by a preponderance of the evidence:

1.  The defendant acted under color of state law; and

2.  The act of the defendant deprived the plaintiff of her particular rights under the United States Constitution, as explained in later instructions.

The parties stipulate that Officer Gillespie was acting under color of state law.

If you find the plaintiff has proved each of these elements, and if you find that the plaintiff has proved all the elements she's required to prove under the next instruction, your verdict should be for the plaintiff.

If, on the other hand, you find that the plaintiff has failed to prove any one or more of these elements, your verdict should be for the defendant.

Particular Rights-Fourth Amendment-Unreasonable Seizure of Person-Excessive (Deadly) -- this is not a deadly force case.  It's nondeadly force.

In general, a seizure of a person is unreasonable under the Fourth Amendment if a police officer uses excessive force in making a lawful arrest and in attempting to stop a fleeing or escaping suspect.

Therefore, in order to prove an unreasonable seizure in this case, the plaintiff must prove by a preponderance of the evidence that the officer used excessive force on July 16, 2014.

Under the Fourth Amendment, a police officer may use only such force as is objectively reasonable under all of the circumstances. You must judge the reasonableness of a particular use of force from the perspective of a reasonable officer on the scene and not with 20/20 vision hindsight.

Although the facts known to the officer are relevant to your inquiry, an officer's subjective intent or motive is not relevant to your inquiry.

In determining whether the officer used excessive force in this case, consider all of the circumstances known to the officer on the scene, including:

1.  The nature of the crime or other circumstances known to the officer at the time force was applied;

2.  Whether the plaintiff posed an immediate threat to the safety of the officer or to others;

3.  Whether the plaintiff was actively resisting arrest or attempting to evade arrest by flight;

4.  The amount of time the officer had to determine the type and amount of force that reasonably appeared necessary and any changing circumstances during that period;

5.  The type dand amount of force used;

6.    The availability of alternative methods to take plaintiff into custody;

7.    The number of lives at risk -- motorists, pedestrians, police officers -- and the parties' relative culpability, that is, which party created the dangerous situation and which party is more innocent;

8.    Whether it was practical for the officer to give warning of the imminent use of force and whether such warning was given;

9.    Whether it should have been apparent to the officer that the person he used force against was emotionally disturbed;

10.    Whether a reasonable officer would have or should have accurately perceived a mistaken fact; and

11.    Whether there was probable cause for a reasonable officer to believe that the suspect had committed a crime involving the infliction or threatened infliction of serious physical harm.

Probable cause exists when, under all the circumstances known to the officer at the time, an objectively reasonable police officer would conclude that there's a fair probability that the plaintiff has committed or was committing a crime.

The final three instructions, we'll go over together after the closing arguments and also go over the form of

verdict with you at that time.

Let's take our lunch recess.  Come back at 1:00 o'clock.  When we come back, the attorneys will make their closing arguments, and the case will be in your hands.

We'll see you after lunch at 1:00 o'clock.

(Jury not present.)

THE COURT:  Please be seated.

Are there any objections to the instructions as read?

MR. BLACKWELL:  As read, no, Judge.

MS. WIENEKE:  No, Your Honor.

THE COURT:  Okay.  Anything else we need to talk about?

MR. BLACKWELL:  Just with the jury, Judge, I think we do -- we should do our closing arguments, and then the alternate juror should be chosen by the Court in whatever way the Court does so, and then that juror should not remain for deliberations.

THE COURT:  I know how alternates work.  I was just wondering if you wanted an alternate.

So we've talked about that.  We agreed on it beforehand.  And since we have that agreement, I'll do that.

MR. BLACKWELL:  Thank you.

MS. WIENEKE:  Yes, Your Honor.

THE COURT:  Okay.  So Michele will pick an alternate out of a hat.  That's how we typically do it.

MR. BLACKWELL:  Thank you, Judge.

THE COURT:  All right.  How much time do you need?  You comfortable with 45 minutes, or do you need an hour?

MS. WIENEKE:  If I may have leeway to take up to an hour, but, Your Honor, I think I can do it in 45 minutes.

THE COURT:  I'm giving plaintiffs an hour.  You have an hour.

MS. WIENEKE:  Thank you, Your Honor.

THE COURT:  So you've got an hour total for your open and your rebuttal.

MR. BLACKWELL:  Yes, sir.

THE COURT:  Okay.

All right.  We'll stand in recess.

MS. WIENEKE:  Thank you, Your Honor.

(Recess taken, 11:59 a.m. to 1:03 p.m.)

(Jury present.)

THE COURT:  Mr. Blackwell, are you ready to proceed?

MR. BLACKWELL:  I am, Judge.

THE COURT:  You may proceed.

MR. BLACKWELL:  Thank you very much.

Can we please get HDMI access on our table?

Ladies and gentlemen, almost five years ago, almost five years ago, Ms. Winkler experienced the worst day of her life.  Now, you've heard the evidence in this case.  You've heard testimony from Ms. Winkler.  You also heard testimony

from Officer Gillespie.

And when you go back in that room to deliberate on this case, I want you to ask yourselves, was the force used against Ms. Winkler reasonable?  Was it reasonable?  Based on an interaction where Officer Gillespie is at the scene for 1 minute and 40-plus seconds.  Less than 2 minutes.  He's at the scene for less than 2 minutes.

A trained officer, trained in deescalation tactics.  A trained officer in uses of force.  A trained officer as it pertains to, you know, maybe knowing statutes.

But in America, when you go to a Circle K in any state, in any city, you should leave in the same way you arrived.  I think we all can agree to that.  Go to a store, you come in, you buy whatever you want to buy.  When you leave, you should leave in the same way you came.  Looking the same way you looked.

In this case, Ms. Winkler called the police.  And she called the police because of a discrepancy over a lottery ticket.  Now, some of you and even the defense may come and say, a lottery ticket?  A lottery ticket?  She called for a lottery ticket?  She called the police?

What did Ms. Wieneke say when she opened?  She could have just walked away.  We wouldn't be here.  And I guarantee she's going to say that when she gets up and speaks to you.

She could have just walked away.  But she didn't walk

away.  As a matter of fact -- as a matter of fact, Ms. Winkler testified that Mr. Ford asked her to stay.  She said, can I speak to the manager?

No problem.  Wait here.  Let me find the manager's number.  Let me find the store manager's number.

Ms. Winkler told you that Mr. Ford or Mr. Nelson, neither one of them told her to leave the store.

Now, ask yourselves, have you heard any testimony, any testimony from Mr. Ford or Mr. Nelson?  Have Mr. Ford or Mr. Nelson came in here to corroborate what Officer Gillespie said?  The answer is no.

Did the manager of the store, this person you've never heard of -- you don't even know the manager's name.  It's never been uttered during this trial.  Did the manager testify to either one of you and say they told -- he or she said leave the store?

MS. WIENEKE:  Objection, Your Honor.  Relevance.  There's no false arrest claim.

THE COURT:  Overruled.

MR. BLACKWELL:  Now, the answer is no.

All right.  So you have to ask yourselves, looking at the -- looking at the statute, looking at the instructions you have in front of you, if you would -- please turn to page 12.

Looking at page 12, it says:  In order to prevail on her 1983 claim against Officer Gillespie, the plaintiff,

Ms. Winkler, must prove each of the following elements by a preponderance of the evidence:

1.   The defendant acted under color of state law; and

2.   The act of the defendant deprived the plaintiff of her particular rights under the United States Constitution, as explained in later instructions.

In this case, the parties stipulate that Officer Gillespie was acting under color of state law.

If you find the plaintiff has proved each of these elements, and if you find that the plaintiff has proved all the elements she is required to prove under the next instruction, your verdict should be for the plaintiff, Ms. Winkler.

If, on the other hand, you find that the plaintiff has failed to prove any one or more of these elements, your verdict should be for the defendant, Officer Gillespie.

Now, on this page, page 12, we've already stipulated that Officer Gillespie was acting under color of state law.

The next thing we have to prove, when you go to the next page, is the act of Officer Gillespie, did it deprive Ms. Winkler of her particular rights under the United States Constitution.

So we turn to page 13.  Page 13.  In general -- and this is Particular Rights-Fourth Amendment-Unreasonable Seizure of a Person-Excessive Force.  In this case, this is nondeadly force, as the Court reminded you.

In general, a seizure of a person is unreasonable under the Fourth Amendment if a police officer uses excessive force in making a lawful arrest and in attempting to stop a fleeing or escaping suspect.

Therefore, in order to prove an unreasonable seizure in this case, the plaintiff must prove by a preponderance of the evidence that the officer's use -- officer used excessive force on July 16th, 2014.

The preponderance of the evidence, that burden, is more probably true than not true.  All Ms. Winkler has to prove is that Officer Gillespie's use of force was excessive, unreasonable excessive -- unreasonably excessive, and that our claim, her claim, is more true -- I'm sorry, probably more true than not true.

Now, the next paragraph, if you look at the next paragraph, it says:  Under the Fourth Amendment, a police officer may use only such force as is objectively reasonable under all of the circumstances.  You must judge the reasonableness of a particular use of force from the perspective of a reasonable officer on the scene and not with the 20/20 vision of hindsight.

Although the facts known to the officer are relevant to your inquiry, an officer's subjective intent or motive is not relevant to your inquiry.

Now, ladies and gentlemen, if you look at the

paragraph when it says, "You must judge the reasonableness of a particular use of force from the perspective of a reasonable officer," in this case, Officer Gillespie's actions were unreasonable.

So you have to -- you have to think, okay, let's not look at Officer Gillespie. Let's look at a reasonable officer. And what would a reasonable officer do in a case like this when he got to the -- he or she got to the Circle K? That's how you look at the statutes, this instruction.

Now, Officer Gillespie gets there at around 17 -- or 19:41:07. As you remember, he gets there. The first thing he says to Ms. Winkler, the individual he knows, based on his testimony to you, the individual he knows, based on looking at this CAD, must be the person who called the police. That's what he told you. The first thing out of his mouth was, "What do you want?"

And I know I made him say it a number of times. The reason I did so was for you to understand that that action in and of itself is unreasonable. That saying, "What do you want," particularly if Ms. Winkler's been waiting in the hot sun for 57 minutes for officers to arrive, not told to go home by anybody on 911, not told to leave the store, based on her testimony, by anyone in the store. And he says, "What do you want?"

Also, Officer Gillespie told you he had an idea that

862

the trespass call to 911 was in reference to Ms. Winkler. And when he sees Ms. Winkler, he didn't say, "You're trespassing." Didn't say that.

Gets out of the car after Ms. Winkler asked for him to get a supervisor. Ms. Winkler testified and said, "We need a supervisor." Officer Gillespie does nothing but get out of the car, walk inside the store.

He's in the store for 32 seconds. When you watch the video, I ask each and every one of you when you have a chance to watch the video, please watch the video. Check the statements that I'm making.

As the Court informed you, what I say is not evidence. What Ms. Wieneke is going to say to you is not evidence. The evidence was presented to you from individuals who testified under oath on the stand to you, or any exhibit that came in that was admitted by this Court.

So he's in for 32 seconds. Based on his report that I'll show you in a few moments, he claimed that -- in his report, he says he spoke with a manager and the manager said, "Hey, I told Ms. Winkler several times to leave the property."

Well, Officer Gillespie tells you he doesn't even know if he spoke to a manager. He thought one of the store employees was the manager. That's what he said.

Now, the next thing, when you're thinking about reasonable use of force, is when he came outside, he told you

when he testified, "You know, she could have just left the place.  She could have walked away."

I asked him, "When you stepped foot outside of the store, could Ms. Winkler have just walked away without you saying anything to her as it pertains to what you heard from the employees in the store?"

He said yes.  That's what he said.

When he walks up to her, he told you that he's having a conversation with Ms. Winkler.  "I need your ID." Ms. Winkler says she gave him her ID.

He tells us on the stand under oath that he says this: They said you are trespassing.  They said you were trespassing. I think I may be paraphrasing the "are" or "were."

In any event, that's not an order to leave by any stretch of the imagination.  It's not a request to leave, any stretch of the imagination.  It's an inquiry.  "Ma'am, they're saying you're trespassing."

Ms. Winkler says, "Absolutely not.  I bought a lottery ticket."

They're having this conversation for about a minute. Now, I took a great amount of time on my next issue as it pertains to what happened next.  Officer Gillespie told you when he was there, next to Ms. Winkler, he said he cannot recall if Ms. Winkler refused orally to leave.

And I'm saying orally because Officer Gillespie is

saying by her not moving, she was refusing.  I asked him, did she say, "I'm refusing to leave or not going anywhere"?  Can't recall if that happened.

I asked Officer Gillespie, when Ms. Winkler backed away from him, backed away, at any moment in time when she's backing away, did he grab her hand -- well, I'm sorry -- did he have her hand in his hand before she backed away.  Do you recall his testimony?  He said no.

All right.  Okay.  Now, Officer Gillespie's testimony, he's saying to her, before she backs away, he's claiming that he said, "If you don't leave, I'm going to arrest you."

That's what he said.  Right?  Now, let's say he actually said that.  Now, Ms. Winkler is saying he didn't say that.  Let's assume, because Ms. Wieneke's going to say he said it, he says that.  When she backs away, she's not resisting arrest.

Officer Gillespie testified, "She knew I was going to arrest her."  That's what he testified.  That's what he said.

I asked him, Did you say -- and I think somebody was actually listening to me when I said, Did you say, "Please turn around, I'm placing you under arrest"?

Officer Gillespie said, "I don't use those terms.  I don't say that.  I don't want anybody to know, basically" -- and I'm paraphrasing -- "that I'm about to arrest them."  That's what he said.

So the issue is whether the force he used when Ms. Winkler's backing away was a requisite for this alleged trespass.  Okay.

Well, when she's backing away from him, she could have just walked away if he let her.  Officer Gillespie can't create the issue.  Right?  The rules don't say he can create the issue that necessitates a reason to use the force.

Look at the instructions.  Still on page 13.

In determining whether the officer used excessive force in this case, consider all of the circumstances known to the officer on the scene, including:

1.  The nature of the crime or other circumstances known to the officer at the time force was applied.

All right.  The only thing we know, based on testimony, is Officer Gillespie is saying something and Ms. Winkler is saying something else.  What Officer Gillespie is saying, she was told to leave, and Officer Gillespie's also saying he told her to leave.

Ms. Winkler is saying, "I was never told to leave," and "Officer Gillespie didn't tell me to leave."

Number 2.  Whether the plaintiff posed an immediate threat to the safety of the officer or to others.

I stated a moment ago, Officer Gillespie created that issue.  Why?  Because when Ms. Winkler was walking away, all he had to do was let her go.

Why am I saying that?  Why am I saying all he had to do was let her go?  Because when he walked out of the store, he testified and said that she could have walked away.  He testified again, when she was next to him, when they were talking, and we can't really see them behind that placard in the window, that he didn't say she -- that she didn't say she wasn't going to leave.

He didn't say he grabbed at her, which made her move away from him.  Based on the evidence that Ms. Winkler presented, he frightened her and that's what made her move away.

Number 3.  Whether the plaintiff was actively resisting arrest or attempting to evade arrest by flight.

You go to Officer Gillespie's testimony.  Even his own testimony is disjointed, inconsistent about what actually happened.  When I asked him to reenact it, before I asked Officer Gillespie to reenact, I asked him, Did you have her hands behind her back, both of them?  And I did a motion like this with both of my hands outstretched behind my back.  Officer Gillespie agreed, yes.

Were you both facing the street at the time you grabbed her hands from behind her back?  Officer Gillespie said yes.

What did you do next?  I took her.  I swung her around, using this one-arm takedown, based on his testimony, a

modified version of it, and he threw her down to her right side -- to his right side, I'm sorry.

I asked Officer Gillespie: At any time when you were doing that, did you tell her, stop resisting?

Answer: No.

He said he told her, "You're under arrest." Did he say, "You're under arrest for trespassing" when he had his hands on her? No. Did he tell you when he had his hands on her that she pulled away from his grasp? Answer: No. Please check your notes.

Number 4. The amount of time the officer had to determine the type and amount of force to use.

Ten seconds. Ten seconds. When he's out there outside of the store and he's talking with Ms. Winkler, that's about a minute. Ten seconds later, she's on the ground. He handcuffs her. Throws her over. Sees she's injured. Sees the blood. He calls fire and a supervisor. The supervisor gets there within two minutes.

That same two minutes that it took the supervisor to get there after he injured Ms. Winkler, he could have used when Ms. Winkler asked for a supervisor. When Ms. Winkler was on the phone, when he says to you, "I believe she was on the phone asking for my supervisor." He could have waited another two minutes for the supervisor to come.

He could have said, hey, you know what, this lady --

868

if he actually thought Ms. Winkler was being unruly, you know what, let's have a supervisor come and figure this thing out. That would have been a reasonable thing to do.

Number 4. The amount of time the officer had to determine the type and amount of force that reasonably appeared necessary and any change in circumstances during that period.

We just discussed that.

Mr. Bernard, can you put up Exhibit No. 6 -- number 5. And we're looking at Bates stamp 00158. And can you highlight time stamp 19:56:18.

I want to ask, when you get back there, look at the CAD report. CAD report's going to be in evidence. The defense took their time to talk about a lot of the minutiae as far as the calls that were made, who was calling, who was saying what.

The only people that testified about this CAD report is Officer Gillespie. Officer Gillespie testified about the CAD report. Other individuals may have used it in their expert opinion.

Ms. Winkler wasn't given a CAD report on that day in question. Did she look at it? Yes. And she agrees she made the calls? Yes. Did she state that she agreed that she was yelling at people? No. Did you hear from anybody else in this courtroom that testified that Ms. Winkler was out there yelling at people? Outside of Officer Gillespie's testimony about other people's statements, nobody came and testified under oath

that that happened.

Officer Gillespie told you he didn't have her ID. What does it say there at 19:56:18?

You don't see it?  19 -- I'm sorry, 19:50:11.  I apologize.  Her information.

Now, Exhibit 6.  Officer Gillespie testified that when -- after he turned Ms. Winkler over, she comes to and she says, "What happened?  What just happened?"

Officer Gillespie tells her, "You fell."

Now, ladies and gentlemen, that in and of itself is disingenuous.  When Officer Gillespie testified, he didn't tell you that she fell.  I asked him a number of times.  He never said Ms. Winkler fell.

Because the evidence just doesn't support her falling on her own.  His testimony is that he took her down, and when he took her down, he took her down in a way that made her strike her head on the ground first.  And she received traumatic injuries.  Traumatic injuries.

You heard from Dr. Weise.  Occipital bone fracture. The back of her skull was fractured from the skull to the base. Orbital fracture.  Her eye was fractured.  The orbital bone was fractured when crashing into the ground.

A subdural hematoma.  And the defense wants to make light of the size of the hematoma.  No hematoma is a good hematoma, 1 millimeter or 3 millimeters, 5 inches.  There's no

such thing as a good hematoma, as Dr. Weise said.

Football players play football in the National Football League and get crashed every day in their heads. And there's nobody stopping football from going on because these football players are getting hematomas. Not happening. It doesn't happen on a regular basis.

And it shouldn't happen to somebody who goes to the Circle K asking for a lottery ticket and then calling the police. It shouldn't happen. Not in our country, and not in our state, and not in this city.

Dr. Weise said that Ms. Winkler suffered -- can you highlight it again -- from this -- thank you.

She -- the number 1, fall with right periorbital ecchymosis and a forehead laceration as a result of a traumatic injury. Number 1.

All right. This is his testimony from yesterday. You all heard it. This is an admitted exhibit. You saw the picture of her eye, and we'll show it in a second, with the injury under her eye. You saw the picture of the large laceration on her head.

Officer Gillespie said himself that she was bleeding on the ground. We showed the picture of the blood on the ground.

There's no earthly reason why that much force was used for a trespass case. A trespass case?

The amount of force -- let's -- he's telling you, based on the biographical information he gave, Ms. Winkler is almost his size.  He may be an inch or two taller.  He has to take that person, take Ms. Winkler with her arms and throw her down, boom, on her head.  He's not laying her down like a baby.  He's throwing her down like a rag doll.  And he told the first people who could ever hear from his mouth what happened from his own words in his own report that Ms. Winkler fell.

Well, if there was nothing wrong with the use of force he performed that day -- he utilized that day, I'm sorry -- then why didn't he put in the report that he did so, that he actually threw her to the ground?  Ask yourself that question.

Why, years later -- well, 11 months later, is he changing his tune when he's asked by other officers, "Hey, man, you said a second ago that she fell.  Did she fall?"

"Well, no.  I took her down on her head, and I meant to use that technique.  I meant to do that."

Now, we don't have to prove that he meant to hurt her.  And we're not even saying that he meant to hurt her.  We're saying that Officer Gillespie meant to use, intended to use, the force that he used.  That force was unreasonable, it was excessive, and it caused Ms. Winkler's injuries.

He said she lost her balance and fell.  I asked Officer Gillespie, "Did you lose your balance?"

"No.  I may have been moved from my center of gravity,

but I didn't lose my balance."

"Did you fall?"

"No."

And instead of waiting for the paramedics to come, he picks her up off the ground.  After knowing she had an injury to her head, seeing it himself, an injury he caused.

Instruction No. 5 is what I've been talking about for the past five minutes, the type and amount of force used.  Unreasonable, ladies and gentlemen.  It speaks for itself.

Would you put up the picture, Gil.  Exhibit 6 -- 54.  54, and the exhibit is -- what's the number there?  This is in number 69 of Exhibit 54.

It speaks for itself, ladies and gentlemen.  The injuries speak for themselves, ladies and gentlemen.  It speaks for itself, ladies and gentlemen.

There is no way in the world that the defense can get up here and tell you that these injuries, these injuries that Ms. Winkler received as a result of Officer Gillespie's actions weren't excessive.  There's no way that they can prove -- I'm sorry, there's no way they can argue -- that they can argue that his use of force was reasonable in light of the totality of the circumstances.

They want to tell you when they get up here, oh, he was trying to save her life.  He didn't want her to get hit by this phantom car.

Did he see the car?  No.  He says he thought he felt something coming close.  Even if a car was in the parking lot, there's an officer's vehicle there blocking the handicapped space, partially blocking another space, and they're protected by another vehicle.

If -- can you put the picture up of -- let's go back to 6.  We want to see the lane line.

This is Exhibit No. 6, but we're looking at Bates stamp 67.

In here, you can see the bloodstain.  Now, Officer Gillespie is telling us that he threw her to his right side. He's going to say -- they're going to say, oh, I'm sorry, he took her down using this maneuver called the straight-arm, or something modified, something close to it, as he says, to his right side.

Now, if they're facing the street when he does it, if he's facing the street and she's facing the street, his right side would be in the hash mark area, this yellow hash mark area adjacent to the handicap lane.

He had to use so much force to get her body swung around to land over here by that white car.  That's a lot of force, ladies and gentlemen.  Excessive, unreasonable, for a trespass case.  A trespass case.

Back to page 14.

Number 6.  The availability of alternative methods to

take the plaintiff into custody.

What alternative methods did Officer Gillespie tell you he used?  Did he say he used any alternative method?  Ask yourselves.  Look at your notes.  Look into your brains.  Think about it.  What alternative methods did he say he used?

He says that, "Well, you know what, she was screaming, and I couldn't understand what she was saying."  Well, that went on for like 30-something seconds.  He gets out of the store.  He walks.  It's going to take about 10 seconds to get there.  He walks away.  He walks back.  Ms. Winkler comes over with her ID.  He takes her ID.  He has this conversation again that we already discussed.

And he's telling you that during that conversation, she's screaming.  "Well, I'm telling her she has to leave."

Uh, she's not moving.

"Well, I made my decision.  I'm going to arrest her." That's what he said, basically.

All right.  Well, could he have waited?  What was the urgency at that moment in time for him to arrest her?  I don't know.  What was the urgency at that moment to use the force?  I don't know.  Because based on his testimony, the urgency to use the force was based on Ms. Winkler walking away after he allegedly said, "You got to get out of here."

And I specifically asked him, when he said that, when she walked away, was he reaching for her?  Again, look in your

memories.  Look in your notes.  He said no.

So, now, if he was reaching for her as she's walking away, when she has her hands up and he had reached for her before she had her hands up, we had a different story.  And that's why I asked Officer Gillespie specifically did that happen, and Officer Gillespie said no.

At no time when he was behind that area where we couldn't see him did he reach for her hand and she pulled away.  He told each and every one of you that.

Number 8 -- I'm sorry, number 7.  The number of lives at risk, motorists, pedestrians, police officers, on and on.

The officer, from our perspective and based on the evidence that was presented, created the dangerous situation.  He could have just let her walk away.

If the defense opening is she could have walked away, Officer Gillespie, not told by anybody in the store to make an arrest.  He wasn't told by anybody in the store to make an arrest.  Just tell her she's trespassing.  Could have just let her walk away.

Number 9, whether it should have been apparent to the officer that the person he used force against was emotionally disturbed.

Again, if you look at Exhibit No. 5, in the CAD report, based on a code that he said, the 918 code, he's saying that that to him meant the person was mentally disturbed.  He

used another word, another term for it.

Well, if he actually thought that Ms. Winkler was mentally disturbed, a person he's never met, why didn't he use any deescalation tactics when she asked him for a supervisor? Please take that in consideration.

Number 10, whether a reasonable officer would have or should have accurately perceived a mistaken fact.

A mistaken fact. Well, he couldn't even get to the point of whether or not Ms. Winkler had any reason to be on the property. She was an invitee, a business invitee. She was allowed to come on this public parking lot -- it's owned by somebody, but it's still a public lot because everybody uses it to get gas.

She goes inside the Circle K like everybody else who's getting Big Gulps, you know, I don't know, hot dogs. Anything anybody wants out of the Circle K. M&Ms. She wanted lottery tickets.

So the issue is, when she was outside, hey, could he have said, "Ma'am, why are you here? You called."

So what happened? Didn't want to know. He told you himself, "wasn't my concern."

Number 11. Whether there was probable cause for the reasonable officer to believe that the suspect had committed a crime involving the infliction or threatened infliction of serious physical harm.

Never happened.  Never happened.  Officer Gillespie should have taken the time to ascertain what was going on by the person who called several times.  They want you to believe that, you know what, she shouldn't have been there.  Who cares that you have an issue with Mr. Nelson?  You got your money back.  Let's get out of here.

Well, she had a legitimate beef.  And, yes, she called 911, but guess what?  The 911 operator, based on the information that you heard, never said, hey, why don't you call the nonemergency number.  Or let me get you over to nonemergency.

The 911 operator never said, ma'am, this isn't a high priority to us.  The 911 operator never said, ma'am, it's going to be a long time before somebody comes.  Why don't you just go home, and I'll send somebody to your house.  It never happened.

Officer Gillespie, ladies and gentlemen, used an excessive amount of force to effect an arrest for a trespass case.  It was unreasonable.  It was unnecessary.

And when you get the verdict form -- there's going to be a verdict form.  It's going to say:  Martha Winkler, plaintiff, versus City of Phoenix, et al., defendants.  Fourth Amendment Excessive Force Claim.  Verdict.

We, the following -- I'm sorry:  We, the jury, duly impaneled and sworn in the above-entitled action, upon our oaths, make the following findings as to the plaintiff's Fourth

Amendment claim for excessive force.

Question:  Did Officer Gillespie use excessive force against Ms. Winkler?

I'm going to ask that all of you put a check mark or an X in the box that says "yes."

Ms. Winkler deserves justice.  It's been over 35,000 -- 35 million seconds.  Over 35 million seconds.  Officer Gillespie couldn't give her a hundred seconds.

I'm asking you to find that Ms. Winkler proved by the preponderance of the evidence, more probably true than not, that Officer Gillespie's force was unreasonable and excessive.

Thank you.

MS. WIENEKE:  Your Honor, may we approach?

THE COURT:  Yes.

(At sidebar on the record.)

MS. WIENEKE:  We have two legal matters to take up with the Court in light of the arguments.

One is that the plaintiff argued that Officer Gillespie created the need to -- for force.  This is in violation of *Mendez versus United States*.  It's a Supreme Court opinion, which is a violation of the provocation rule.

The officer does not create the need for force.  There's no provocation rule in the Ninth Circuit or in the United States, for that matter, in light of the *Mendez* case.

It overruled the *Billington* case, which held that an

officer does not create the need for force, and it is judged by the time that he uses the force and not the circumstances that may create the need for force.

And I warned the Court of this, and I said that the issues relating to the trespass and the circumstances would not be relevant, and it's exactly what counsel did in arguing all of this stuff about the trespass.

The second issue, Your Honor, is that the plaintiffs just reargued the trespass and created a false impression with this jury that the -- this was not a lawful arrest and this was not -- this was not a trespass.

And I'm asking the Court to instruct the Court [sic] on the provocation rule and that there was a lawful arrest supported by probable cause for trespass to cure what has just happened and to avoid a mistrial.

And if I could, Your Honor, no disrespect to the Court, but this same thing just happened in front of Judge Tuchi in an excessive force case that we tried in January, and the Court did instruct on the provocation rule after the closing argument in order to cure what happened.

THE COURT:  Okay.  Let me see the case.

Do you want to respond?

MR. BLACKWELL:  Yes, sir.

Judge, during this entire trial, the defense's issue was that Ms. Winkler caused her own demise by not listening to

Officer Gillespie and going out into traffic.

The issue is, I'm able -- based on the instruction, I'm able to say Officer Winkler is the one who caused this issue as it pertains to the traffic issue, because he's the one, when she backed away from her, chased her into the street.

He's the one who testified that he doesn't chase people, but then you see him chasing her down.  If he actually thought there was traffic, he could have done anything like, "Ma'am, stop.  Ma'am, there's a car."  He said nothing like that, Your Honor.  He just went and chased her.

So if they're going to say Ms. Winkler -- because what they're going to say when they get up is Ms. Winkler is the one who caused Officer Gillespie to come after her to keep her out of the street.  This stuff just goes to the jury.  You already have -- we have the instructions.  I followed the instructions to the T.

THE COURT:  Let me take a look at the case.  But I think I may need to tell the jury that they're not to determine -- it's already -- they're to assume that the arrest was lawful.  I think that's our starting point.

MR. BLACKWELL:  But look at the instruction.  Can I get the instruction?

THE COURT:  Well, I'm not going to rule on her first argument.  But I think that the jury needs to understand that their starting point is that this was -- the lawful arrest

issue is no longer an issue.

MR. BLACKWELL:  But I still get to explain what they heard.  I can go over the evidence.  Why would --

THE COURT:  No, no.  That -- I'm not arguing -- I need to look at this other stuff first.  But the starting point from this instruction is that there's a lawful arrest.

MR. BLACKWELL:  But you can't say it was a lawful arrest.  You can say that the arrest is not an issue.  I didn't put the arrest at issue.  It was not a lawful arrest because we won the case.  She was found not guilty, so the arrest wasn't lawful.

THE COURT:  That has nothing to do with -- arrests can be lawful and she could be acquitted.  That's not an issue.  So I'm going to tell the jury -- just so that there's no misunderstanding on that.

MR. BLACKWELL:  But I'm just asking the Court -- I'm just asking the Court to say -- if you're going to say anything, I don't think you should say that the arrest was lawful.  You can say that the -- the arrest isn't an issue where we are.  Because --

THE COURT:  I think the instruction suggests that --

MR. BLACKWELL:  We don't have any instruction on that, on the arrest.

THE COURT:  No, the one you were --

MR. BLACKWELL:  Thank you.

THE COURT:  This is the starting point.  If making a lawful arrest --

MR. BLACKWELL:  Yeah.  But I --

THE COURT:  So that's the starting point of that instruction.

MR. BLACKWELL:  And I was here.  I'm not going to write on it.

THE COURT:  No, no.  I'm not going to get to the second -- I just want to clear up any question about the arrest being lawful.  Okay?

MR. BLACKWELL:  Yes, sir.

THE COURT:  All right?  Thanks.

MR. BLACKWELL:  Thank you very much.

(End of discussion at sidebar.)

THE COURT:  Okay.  We're going to hear from Ms. Wieneke, but first I want to make sure we're all on the same page of music here.

If you look at the instruction on page 13, we're talking about unreasonable force during a lawful arrest.  So whether the arrest was -- the issue of the arrest being unlawful is no longer an issue.  This is an instruction for force during a lawful arrest.

So the issue before you isn't whether it's lawful.  The issue is the reasonableness of the force that was applied during the -- during a lawful arrest.  Okay?

Ms. Wieneke?

MS. WIENEKE:  And if I could get clarification, is the Court going to review the --

THE COURT:  Yeah.  I'm looking at the case you gave me.

MS. WIENEKE:  And if, Michele, we could transfer over to Ms. Piasecki, please.

May it please the Court, counsel, Ms. Winkler.

Oh, I don't think we've switched -- it is on?  Oh, if we could --

THE COURTROOM DEPUTY:  All you have is a black screen.

MS. PIASECKI:  Yeah, I'm on a black screen.

MS. WIENEKE:  Oh, on a black screen.  There we go.

If it please the Court, counsel, Ms. Winkler, Officer Gillespie, and ladies and gentlemen of the jury.

I'm going to start where I began.  Walk away.  That is what Martha Winkler did when Officer Gillespie told her she was under arrest and she improperly resisted his lawful arrest.

And that is what Martha Winkler should have done when the Circle K clerks told her to leave the property and Officer Gillespie told her to leave the property and after buying that lottery ticket.

That simple purchase of the lottery ticket, that misunderstanding between a customer and a clerk, that was immediately made right with no money out to the customer.  If

884

Martha Winkler would have just taken her ticket and walked away from the Circle K, then none of this would have happened.

That lawful arrest with reasonable force, because of plaintiff's unreasonable actions, resisting arrest, and an unfortunate injury.

Ms. Winkler had the power all along to avoid this police interaction.  Stop resisting.  Stop the need for force.

Now, Ms. Winkler's call for service to the Phoenix Police Department was based on a mistruth.  And I suggest to her that her mistruths were continued in this courtroom on that witness stand.

When plaintiff called 911 that day and she told the 911 operator that Les had made threats to her, she told you on that stand that was a lie.  And it was.

Because during her interview that she had in the hospital with Detective Moseley, she admitted there was no information in that entire interview about any threats made by Les or anybody at the Circle K that night.  There was no crime.

I submit to you that she made it up that night.  And she made it up because she was angry at Les over that lottery transaction, and so angry that she blamed him solely and completely for what happened at that store and she wanted him fired.

Remember what she said to Detective Moseley?  She said:  I told him, "You caused this, and I'm reporting you, and

I want you fired."

That's what she said that night. That's what she meant. And even though she took that witness stand and she said, in response to her own lawyer's question, "Yeah, I take some partial responsibility," when I questioned her, "Do you take partial responsibility, Ms. Winkler," she paused.

Now, you've been given that instruction, that packet. And one of the things it talks about in judging a witness's credibility is their manner while testifying. And you can assess them and you can see how do they act on direct examination and how do they act on cross-examination. Do they act the same? Do they act differently?

Now, Mr. Bernard, who's a fine lawyer, questioned Ms. Winkler. And Ms. Winkler had no trouble understanding Mr. Bernard and didn't pause in response to his questions. In fact, it seemed very orchestrated.

MR. BLACKWELL: Objection. Argumentative, Judge.

THE COURT: This is closing argument. Overruled.

MR. BLACKWELL: Improper argument, Judge. I'm sorry.

THE COURT: Overruled.

MR. BLACKWELL: Improper.

MS. WIENEKE: As if it had been rehearsed, and that's something you can consider in evaluating the testimony.

And when I questioned her, there were long pauses and, "Repeat that." "Can you say again, please?"

When you have to think longer between the question and the answers, it suggests that maybe you're searching for the words, searching for -- maybe it's not so readily on your mind because it's not something you practiced before.  It's something for you to think about in assessing the credibility of the witness.

Now, Ms. Winkler made up that story to 911 about the threats.  And we have the CAD, 236.  We know that's the number for threats.  That's what she called in that night.

And you just heard Mr. Blackwell, also a fine lawyer, tell you, 911 never told her this.  911 never told her that.  But how many times did Ms. Winkler hang up on 911?  That's in the CAD.  Over and over and over again, she hung up on 911.

Now, she told you, "My phone was dying.  I didn't have a charger, I suppose."  But her car was right out front.  Now, is it reasonable for us to believe that she had a charger in her car and she could have gone out into her car and cranked it up in that hour she was waiting and plug in her phone into her charger?

And if she didn't want to do that, is it reasonable for us to believe she could have driven that quarter of a mile and plugged her phone in at home?  But her explanation was, "Nobody told me I could leave."

Is that reasonable?  "Nobody told me I could leave."  This wasn't a crime.  This wasn't an emergency.  She just

wanted a police report. Did it really matter where she was in order for her to get that police report?

She didn't have to be at the Circle K. She could have been in the comfort of her air-conditioned home in order to get that report. I submit to you that her explanation is not reasonable. It's not logical.

So she made up that story about the threats why? Because in her mind, if she makes up a story about threats, she's going to go to the top of the line and get a quicker response time. Because she wanted it now.

Just like she wanted that district manager -- I'm sorry, that on-site manager to come to the store now. "I don't want your customer service number." You saw in the video she gave it back.

"I don't want your regional manager. That's not who I want to talk to. I want to talk to your manager, Les." Why? "Because I want you fired." That's what she wanted.

And when she did finally talk to the manager, who wasn't even working that night but took her call, "I want you to come to the store now." That's what she demanded.

"Ma'am, I'll come tomorrow and I'll meet with you then."

"No. I'm never coming to this store again." That wasn't good enough for her either.

"I want it now." That's what she demanded. And so

when they didn't come soon enough for her, she continued to call.  "What's your ETA?"

And you'll be able to look at the CAD call, and it's Exhibit 57.  Every single call after that is called an ETA call.  She's not calling again to report threats.  She's calling, "What's your ETA?  What's your ETA?  What's your ETA?"

And having asked for that manager at the Circle K, she elevates it up again with a 911 operator.  "I want your manager now.  I want your supervisor."

So she calls again and again because they're not sending that officer soon enough.  Never mind that the CAD demonstrates how busy they were that night.  No units available.  No units available.  Never mind that you don't have a real emergency.  Never mind that you don't have a crime.  You just want a police report because you want a customer service clerk fired.

So like the person who pushes the elevator button over and over thinking it's going to make the elevator come faster, but we all know it doesn't really work, but that's not how Ms. Winkler thought.  She thought pushing that button over and over would make it faster.  So what did she do?

She went out into the parking lot and she solicited six people, 20 people?  Depends on who you believe.  Do you believe her when she told Detective Moseley in the hospital, or do you believe her when she was on the stand?

Solicited 20 people to call 911 for me. Because if I can get you to call 911, too, that will elevate us up in line, because the more people we call, then the faster they'll come.

That's pushing the button more and more and will get it into the front of the line.

So we can -- you can look on the video, and you can see -- if we can show that, Ms. Piasecki, at 7:10:26. Here is Ms. Winkler talking to somebody in a pickup truck. You can see her in the left screen there.

And you'll be able to see this in the video in this exhibit in this front-door view. She talks to this man for quite a while. And as he pulls out of the parking lot, out of that parking space, she actually follows him and goes to the passenger side and talks to him again.

And the Circle K clerks can see this from their view. And if we go to the next slide, you can see that Ms. Winkler actually then talks to this man in the white pickup truck.

And you may recall, I asked her, "Did you talk to a guy in a white pickup truck?"

And she says, "I think I may have, yes."

And so these are just the ones we can see from the video surveillance that she talked to.

And then when she saw those officers across the street at the CVS and she thought, "Wait, why are you over there? You should be coming to me because my call is more important. You

should be coming and responding to my call," she called again and she said, I'm -- and the call taker reported:  Complaining because PD's response.  Because the CVS officers weren't coming to her.  Because for Ms. Winkler, her view is the most important view.

And one of those persons that she talked to in the parking lot was her friend, Curtis.  And out of all those people she solicited that night, he was the only one who called 911 for her.  But he didn't call for her.  He called on her. And he told the 911 operator that she was -- that she was yelling at people passing by.

Now, Ms. Winkler denies that she was yelling at all that night.  In fact, as you can see, Ms. Winkler -- go to the next slide -- disagrees with anybody who characterizes her conduct as yelling or angry, complaining.  And when you look at the CAD, you will see that Ms. Winkler didn't talk to just one 911 operator.  You look at their ID number, you'll see that she spoke to many 911 operators.

And any of those 911 operators who characterized her demeanor as very angry, complaining, yelling, upset, Ms. Winkler and I had a conversation about that, and she denied that and said, "You know, they're wrong.  They're wrong. They're wrong."

And remember Curtis Tucker describing her as yelling. "He's wrong.  I wasn't yelling.  I wasn't upset."

And then there's Alex Ford and Les Nelson and what they said.  "They're wrong."

Take a look at what they had to say -- what she said about them.  This guy -- remember, the issue about whether she knew she was going to be arrested?  And she was asked about that.  And she said:  This guy is going to freakin' arrest me, meaning Officer Gillespie.  He was wrong, too, by the way.  I just knew that.  I just knew that these -- these people inside, Eric and Sal, were made lies, all lies about me, all lies.

Now, ask yourselves, why in the hospital, hours after this incident, did she know, without ever having talked to them from the time of this incident to when she's in the hospital, did she tell Detective Moseley that she knew that Eric and Sal were telling lies about her?

Everybody's wrong.  Everybody's lying.  Detective -- or Officer Gillespie.  Everybody's lying.

Now, the plaintiff has the burden of proof in this case.  I told you at the beginning, that burden stays with this table at all times.  It never shifts over here.

Now, you were just told, where's the manager?  Where's the Circle K clerks?  Why didn't we bring them to you?

But it's their burden.  It's their burden of production, their burden to bring you those witnesses.

MR. BLACKWELL:  Objection, Judge.  Misreads the law.

THE COURT:  Overruled.

MR. BLACKWELL:  Misstates the law.

MS. WIENEKE:  They have the obligation to prove the case.  We don't have to call a single witness.  We don't have to produce to you a single exhibit.  If they fail in their burden, they lose.

We don't have to call the manager.  We don't have to call the clerks.  Why didn't they call the clerks?  Do you think the clerks have anything favorable to say about their interaction with Ms. Winkler?  Of course not.  Why would they call them?

Officer Gillespie told you about his interaction with the clerks.  You heard about that.  So your question should not be why didn't we call them, but why didn't they call them.  Because the answer is, they would have nothing good to say about Ms. Winkler and the interaction they had with her that night.

But because they have the burden, they have some benefits.  They get to go first.  They get to go last.  They get the last word.  And I can assure you, that, for me, is probably the hardest thing.  They get to sit closest to you.  But that burden always rests with them and their table.

Now, what do they have to prove to you?  What they have to prove to you is that a seizure of a person is unreasonable under the Fourth Amendment if a police officer uses excessive force in making a lawful arrest.

And to be very clear, I'm not going to talk to you about the trespass, because that was a lawful arrest.  That issue is not before you anymore.

In order to prove an unreasonable seizure in this case, the plaintiff must prove by a preponderance of the evidence that the officer used excessive force when he arrested Martha Winkler.

If you'd go to the next slide.

So under the Fourth Amendment, a police officer may use only such force as is "objectively reasonable" under all the circumstances.  And this is in your packet of jury instructions.

You must judge the reasonableness of a particular use of force from the perspective of a reasonable officer on the scene -- and this is most important -- on the scene and not with the 20/20 vision of hindsight.

So what does that mean?  Not with the 20/20 vision of hindsight?  That means that you don't start with the injury and work backwards.  Which is, frankly, what they wanted you to do from the start of this case.

They want you to start at the back of the book, read the last chapter, and then go the beginning.  Well, you don't get in life to start out how the story ends and then start at the beginning.  It changes how you view the story.

In trials, we know how the story ends, and the law

says you don't get to judge this man with that vision of 20/20 hindsight.  You have to put those blinders on and not do it.  That's the law.

Because no man, no woman is perfect.  Perfection is not the standard.  It's a reasonable officer standard.

Officer Gillespie, when he went to that Circle K, could not know how this story ends.  And you cannot judge him with that knowledge.

As Mr. Kirby, their own hired expert, has told you, an officer does not need to be right.  He only needs to be reasonable.

Remember that demonstration I did?  If an officer reasonably believes, by reaching into the waistband, I'm pulling out a gun, but I end up pulling out a wallet, the officer need not be right but only needs to be reasonable.  And the fact that the officer turns out to be wrong in that assessment, so long as it's reasonable, the officer can use reasonable force.

So when you hear argument, for example, that the car in the video was not necessarily the same car that he may have seen, or they never really got close enough to be in danger, how could they truly have been in danger, or while that takedown may have been an authorized technique, it seems like because of that injury, maybe that was too much force, tell one of your fellow jurors, hey, that's applying that 20/20

hindsight, which you cannot do.

So take off those 20/20 hindsight glasses and judge this man on what he reasonably believed at the time.

So let's look at the evidence.  There's some things here that are undisputed.  An officer can use force to make an arrest.  Both sides agree.  They called an expert witness to assist you in this case.  Their expert agreed an officer can use force to effect an arrest.

In response to a subject's resistance, an officer can use force to combat that resistance.  Let's talk about those force -- that force.

Officer presence, everybody agrees.  Verbal direction.  Empty-hand control techniques.  A takedown is empty-hand control.

Now, we just saw in the jury instructions that an officer can try to use alternative methods in using force.  And that's one of the things you can look at in judging the reasonableness.

Well, what did Officer Gillespie do here?  He showed up at the scene.  He tried to, with his officer presence and his verbal directions, speak to Ms. Winkler.

And how did that go for him?  Not so well.  He said he tried to get through to her.  She was irate.  She was screaming.  She was yelling.  And it didn't work.  He tried to reach her, to get through to her, and it wasn't effective.  So

those two methods, officer presence, verbal direction, were not effective.  Not effective.

So he went to the next level.  Especially because when he went to use his wrist to grab onto her, that's when she began her resistance.

Now, what about that resistance?  Both sides agree, Mr. Kirby, Mr. Meyer, what she did that day was defensive resistance.  There's no dispute there.  And both sides agree that the straight-arm takedown is an authorized force option.  No disagreement there.  And both sides agree that that straight-arm takedown is taught in the state of Arizona, that it has minimal chance of injury.

And you heard Officer Gillespie tell you that he has done this before, both in the classroom and in the field, and he has never had anybody have any injury.  They normally land on their shoulder.

So when he performed it here, he had the one arm.  The other arm was free, available for her to brace.  And he was surprised when she went down and she landed on her right side of her face.

Now, she can't tell us what happened because she has amnesia.  She can't say why she didn't brace.  She can't say whether her feet went out from underneath her.  She can't tell us that.  And Officer Gillespie was in the throes of all of that struggle and resistance and trying to keep his balance and

trying to prevent them from moving back and turning around, and she's screaming the whole time.

So he can't say exactly how it went down in terms of whether her feet fell out from underneath her.  She's wearing flip-flops.  It's a slippery parking lot.  You've seen all the oil stains.

All he knows is that as he attempted to do that maneuver, she landed -- and he didn't even know until he rolled her over and saw the blood on her head.

Let's look at the elements of the jury instruction that you have been instructed in determining whether an officer uses excessive force, to consider the circumstances.  One of those considerations is whether the nature of the crime or other circumstances known to the officer at the time the force was applied.

Now, in this case, you have Mr. Kirby and Mr. Meyer agreeing that there was probable cause to believe that Ms. Winkler had committed the crime of trespass and resisting arrest.

You may recall, I asked Mr. Kirby, was there probable cause to believe resisting arrest?  It was one of the last few questions I asked him on the stand.  He said yes.

Because he also told you, do you have the right to resist an arrest in Arizona?  Now, we know this is a lawful arrest.  He said no.  You don't have the right to resist an

arrest.

And this is important because resisting arrest -- now, they want to make it just about a trespass. But their own expert, who they brought to you to help you, said there was resisting arrest.

And Ms. Winkler knew she was going to be arrested. She told us that. And Officer Gillespie told her she was going to be arrested. Not only did he tell her that, but he said, "You're trespassing."

And now she's walking it back, and she said, "Well, I thought you were saying the clerks said I was trespassing." But either way, the words "trespassing" were uttered to her.

The next one of the elements in that jury instruction is whether a reasonable officer would have -- go to the next one -- whether the plaintiff was actually resisting arrest or attempting to evade arrest by flight. And we just talked about that.

Now, at one point there was a suggestion that by walking back like this, I was just trying to leave the property.

I think that's pretty much been abandoned. Most people don't leave the property with their hands up and walking backwards and screaming. But there's no question that plaintiff was trying to resist arrest.

And if we go to the next one: Whether a reasonable

officer would have or actively -- or accurately perceived a mistaken fact.

Now, this one is whether there was that car coming or not, in that glimpse of the eye, the glimpse of a light, glimpse of metal. This is going to whether the officer -- doesn't have to be right; he just has to be reasonable. If he perceived that in that split second, that's an element for you to think about.

Also, if because of her resistance -- I need you to think about this. If you've ever done with a sibling or a buddy or somebody, a tug-of-war, and you're pulling and they're pulling and all of a sudden one just kind of lets go and momentum kind of makes you go back, that's kind of the struggle and the fight that he was in.

And so if suddenly, you're pulling and all of a sudden somebody kind of gives out a little bit, momentum is going to take them down. And it's not a matter of, as it's been suggested, throwing them down to the ground. It's a matter of that resistance and you're trying to use force to combat that resistance and trying to accurately gauge and judge enough force to take him to the ground.

And that's what was happening. And that jury instruction says, whether a reasonable officer would have accurately perceived a mistaken fact. Did I misperceive? And I asked Mr. Meyer: If an officer mistakenly judges the amount

of force necessary, and if you do everything right and somebody still gets injured, does that mean you used excessive force? And he said no.  That doesn't mean you've used excessive force. That's what that instruction is about.

It's also about this, ladies and gentlemen. Mr. Bernard asked Ms. Winkler this question when he was asking her about the 911.  He said, now, are these calls answered by robots or human beings?  And of course, she said human beings.

Officer Gillespie is a human being.  He has a family. He has a wife.  He has a daughter.  And you heard evidence that he was surprised when this happened.  He never thought this was going to happen.  It was an unfortunate consequence of unauthorized resistance to Officer Gillespie's lawful arrest.

Let's look at the next option.  This one talks about the number of lives at risk and the parties' relative culpability, and which party created the dangerous situation and which party is more innocent.

Do you remember when I asked Mr. Kirby, "Mr. Kirby, was Ms. Winkler a danger to herself and others?"

"She could be."

"Mr. Kirby, when she was backing up and she was going towards that cross traffic and she didn't look where she was going, was she a danger to herself and others?"

"She could be."

Well, you all have common sense.  If you start to back

up in a parking lot without looking where you're going in the night, in the dark, which Ms. Winkler herself described as a busy parking lot, do you think that's a danger?

For you parents out there, do y'all have a rule when you take your kids in a parking lot, hold hands, hold hands, hands in a parking lot? Why? Because you don't want your children darting out in traffic, because people maybe don't pay as much attention in parking lots.

That is what Officer Gillespie was concerned about. And he had to make that decision before she got into harm's way. But she made that decision to back up. She put herself and Officer Gillespie in harm's way. That was her choice.

And then the type and amount of force. And I submit to you -- look at the next one -- that Officer Gillespie, in using that authorized technique that he was taught in the academy, used reasonable force. The amount of time that he had was very short, very quick, after she pulled away.

Now, if we could go to the next one. These are Kirby's opinions. This is what their own expert admitted to. This was reasonable force to use if somebody's pulling away and if somebody then -- go to the next one -- continues to pull away.

And then if we could go to the next one.

And this is Mr. Meyer's opinion that we talked about: A miscalculation about the amount of force is not excessive.

All right.  Let's go to the next one.

All right.  Now, I want to talk to you about -- and ask you a question.  Where are all the witnesses to this police brutality?  Because the statement was made that we are here because an officer beat up Ms. Winkler.

You know, in this day and age, there's cell phone footage of every kind of interaction with police officers.  You saw all those people in the Circle K looking out.  You saw all the traffic.  If Officer Gillespie had beat up Ms. Winkler, you can be darn sure that there would be witness after witness after witness coming in and telling you about it.  So where are all the witnesses?

I submit to you that there are no witnesses because it did not happen.  Because what those people saw as they looked out of the windows and the door of the Circle K did not alarm them.  Did not concern them.  Did not raise an eyebrow other than perhaps at Ms. Winkler's behavior.  Because they did not see anything that shocked them to the point of a complaint as to Officer Gillespie's behavior.

Now, you were shown Exhibit 48, which was the medical record.

And I don't know if we can show that, Ms. Piasecki.

But that we heard from Dr. Weise, from the medical -- from the hospital.  You heard a lot about falls.  But what is the very first diagnosis from the emergency room from the

hospital but the word "fall."  From their own medical record.

And we can talk a lot about that word, but Officer Gillespie is not debating, ladies and gentlemen, that his actions assisted in her takedown.  But after that, he does not know what happened to her, and neither does the emergency room.  But there's no question that from a standing height, this kind of injury can occur.

And 3 centimeters is a very, very small measurement.  And I also want to point out that where the sutures are is not where the orbital bone is.

I want to talk to you about accountability.  Officer Gillespie wrote a report.  You've been able to see that report.  He was interviewed within hours of this interview -- incident by his supervisor, who wrote a report.

And as Mr. Blackwell has pointed out, he's given numerous interviews, both to Mr. Blackwell twice, three times, and others, including a deposition under oath.

Ms. Winkler has written no report.  She was never deposed under oath.  And while she has given a statement in the hospital, she has disavowed it.  "I was under morphine.  I can't be held responsible for what I said."

Even though she -- it was cleared by a nurse before she gave her statement, and even though she asked them to tape-record it, and even though she thanked the detective, telling them that he was great and everyone should be like him.

She's denied being angry to the call-takers.  And you saw how she testified here.  And she -- while she tried to accept partial responsibility, she walked it back during my questioning.

And I submit to you, because -- she did that because in her heart, she never really meant that.  And she feels the same way today that she did that night about Mr. Nelson's responsibility and that he caused this.  And when I asked her, "Do you accept responsibility for resisting arrest," what was her answer?

"I can't answer that question."

Our lives are shaped by the choices we make.  Has Ms. Winkler owned up to her choices?  Has she fully accepted responsibility for them?

We are not here because Officer Gillespie beat up a woman.  We are here because a woman resisted arrest and an officer used reasonable force to get her into custody.

Would any of this have happened if Ms. Winkler had not resisted arrest?  Would any of this have happened if Ms. Winkler had walked away?

Now, when I sit down, these folks will be able to talk to you again.  And since I cannot stand up and talk to you, because they have that burden of proof, they get that last word.

I am asking you to be my voice in that jury room, for

you know I will have an answer to everything that they say. Every issue that they bring up.  So when they raise those issues, I am going to ask that you say:  What would Officer Gillespie say to that?  What would his answer be?  What would the evidence say to that?

Be my voice for me in that jury room.  And if they exaggerate the evidence, if they overreach, remember what I told you in the beginning:  We have spent four days in this courtroom dissecting, picking apart every single decision that this officer had a split second to make.  And as we have sat here, we've had the luxury that Officer Gillespie never had and never will have when he goes out to do his job:  20/20 hindsight.

We know the end of this story instead of what Officer knew -- Officer Gillespie knew at the beginning.  Imagine what our lives would be if we could live with knowing the end.  We would buy low and sell high and even wouldn't hold that grudge, thinking now it's just kind of silly.

So as you go and deliberate in that calm, cool jury room, and you look at all these videos and the photos and the papers, the exhibits, your heart won't be racing at 150 feet a minute like Officer Gillespie, and you won't be running towards the traffic and turning around in circles and struggling and fighting in a dark and busy parking lot in a fight.

And maybe, just maybe, you'll be asking yourselves the

question that this officer asks himself, and if Martha Winkler would look down deep into her heart, she would acknowledge that she asks herself as well:  Why didn't she just walk away?

I ask you for a verdict in favor of Officer Gillespie, and I thank you so kindly for your time.

THE COURT:  Let's take 15 minutes, come back at 10 minutes to 3:00.

(Jury not present.)

THE COURT:  Please be seated.

Mr. Blackwell, do you want to take a look at this case?  I think I need to give an instruction.

And the instruction I propose -- I'll let you respond, but let me tell you, the instruction I propose is -- we'll call it provocation.  When deciding whether an officer used excessive force during a lawful arrest, you are to consider the 11 factors set forth in the Excessive Force instructions found at page 13 and 14.  However, whether an officer provoked a plaintiff to resist arrest is not a factor to consider.

MR. BLACKWELL:  Yes, Your Honor.  I mean, I haven't read the case but --

THE COURT:  Take a look at it, and if you have an objection to that instruction, I'll give you a chance to argue it.  But that's the instruction I propose and give you a chance --

Ms. Wieneke, do you have any objection to that

instruction?

MS. WIENEKE: Your Honor, the only thing I would add is the clause "or created the need to use force," based on the language in the closing argument that -- the precise language that Mr. Blackwell used.

THE COURT: Okay. So --

MS. WIENEKE: And that language is in the opinion as well.

So when you said "provoked the need for force," I think I would add the clause --

THE COURT: All right. "Provoked plaintiff to resist arrest."

MS. WIENEKE: Comma, "or created the need to use force."

THE COURT: I think that cover -- resisting arrest is what he claims was the need to use force, wasn't it?

MS. WIENEKE: Well, I think that the problem is is that I'm concerned about the issue regarding the trespass, and somehow by -- by not investigating the trespass and not spending more time with her, that somehow that created the need to use force.

And that doesn't really go to the resisting. Do you see what I'm saying, Your Honor?

THE COURT: Yeah.

MR. BLACKWELL: Exactly what I'm talking about.

THE COURT:  Take a look at it.  We'll come back at quarter till and you can tell me what your position is, Mr. Blackwell.

MR. BLACKWELL:  Thank you, Judge.

(Recess taken, 2:35 p.m. to 2:47 p.m.)

THE COURT:  Please be seated.

Mr. Blackwell, have you had a chance to review that case?

MR. BLACKWELL:  I reviewed it, Judge, briefly.  I would like the Court to look at the record.  I think the Court can look at the record as it pertains to what I said in reference to subsection number 1 and subsection number 2, under Particular Rights-Fourth Amendment-Unreasonable Seizure of a Person-Excessive (Nondeadly) Force.

Judge, I was not trying to make an argument during my first close as it pertains to Officer Gillespie causing the violent situation that took place between he and Ms. Winkler. What I said was --

THE COURT:  Well --

MR. BLACKWELL:  What I thought I said was --

THE COURT:  Well --

MR. BLACKWELL:  Go ahead, Judge.

THE COURT:  I had the impression that you were.  So this is just a statement of the law.  You can explain to the jury the elements set forth in there and show them why those

elements apply. I'm just going to say something that's not in there that doesn't apply.

MR. BLACKWELL: I understand that, but I think we -- this is closing argument. The defense has made some mistakes -- misstated some of the facts in the case during their closing argument. As far as a limiting instruction, I know we -- the only one we have for that is, you know, what we say isn't evidence, and what I said isn't evidence.

And so you already gave the jury an instruction on that.

THE COURT: I know it's not evidence, but you made an argument that suggests the jury can factor in the provocation of the arrest itself. And the law is clear that the arrest itself, when it's a lawful arrest, can't be provocation for an excessive force claim. So that's all I'm going to tell the jury.

MR. BLACKWELL: All right. Thank you.

THE COURT: Here's the instruction I'm going to -- I'll read it again.

When deciding whether an officer used excessive force during a lawful arrest, you are to consider the 11 factors set forth in the Excessive Force instruction found at pages 13 and 14. However, whether an officer provoked plaintiff to resist arrest or created the need to use force is not a factor to consider.

MR. BLACKWELL:  That's fine, Judge.

THE COURT:  I'll include that in the instructions.  I have three more instructions to give them.  I'll make that one of the instructions I give them when we send them to the jury room.

MR. BLACKWELL:  Thank you, sir.

THE COURT:  All right.  You ready?  You have 20 minutes left.

MR. BLACKWELL:  That's what I thought.

THE COURT:  Okay.  You ready?

MS. WIENEKE:  And, Your Honor, just if I could make my record, while I appreciate the Court giving the instruction, it is given after my presentation.  And so I didn't have the benefit of the instruction to be able to argue to the jury.

And while I did ask for the instruction prior to my presentation, I wasn't able to use that instruction in my closing argument.  I just want to make that record.

THE COURT:  Okay.  So noted.

You didn't ask for a recess or time for me to -- I hadn't seen that case before, so I read the case when I -- as soon as I had it.  So I'm sorry if there's something you wanted done.  I didn't know that.

MS. WIENEKE:  Well, Your Honor, I did ask for clarification right before I started.  You said, tell me -- you asked me to start, and I said, are you gonna read the case, and

you said, I'll read it during your presentation.

MR. BLACKWELL:  Judge, she wouldn't be able to read that --

THE COURT:  I don't know what we're talking about. Let's bring the jury in.

MR. BLACKWELL:  Thank you, Judge.

(Jury present.)

THE COURT:  Please be seated.

Mr. Blackwell, you may proceed.

MR. BLACKWELL:  Thank you very much, Judge.

Ladies and gentlemen, during Ms. Wieneke's close, she uttered a number of personal attacks towards Ms. Winkler.  As a matter of fact, she's blaming Ms. Winkler for her own injuries in this case.

For the first 17 minutes, she talked nothing about Officer Gillespie.  She didn't say anything about Officer Gillespie's report, which is Exhibit 583.

She wants you to say or to think, when you go back and deliberate on this case, that it's Ms. Winkler's fault that she had a subdural hematoma.  It's Ms. Winkler's fault that she had a cranial fracture.  It's Ms. Winkler's fault that she got a back -- the back of her skull was fractured.  It's Ms. Winkler's fault that under her eye was bruised.  It's Ms. Winkler's fault that she was placed in the ICU.  It's Ms. Winkler's fault that she was in the hospital for four days.

It's Ms. Winkler's fault.

Well, this is not a criminal trial.  We're not in a criminal courtroom.  This is a civil trial.  Ms. Winkler is telling you, and she testified, that Officer Gillespie, an individual who was wearing a uniform -- and we already talked about his uniform.  He had a tunic belt, gun, Taser, ammunition, handcuffs, Phoenix Police on his arm, was supposed to protect and serve.

This case actually is about Officer Gillespie and his use of force.  His use of force against Ms. Winkler, at the time a 56-year-old woman, a grandmother.

And I guess it's okay -- the defense wants you to believe it's okay to take a 56-year-old woman and throw her to the ground, causing those injuries.  It's okay.  Because she's telling you it's Ms. Winkler's fault.

Officer Gillespie never took any responsibility. Ms. Winkler sat up there for hours under cross-examination from a trained defense attorney.  Trained defense attorney.

And Officer Gillespie tells you, using that code for a mentally -- emotionally disturbed, he used another term.  This lady sat there, Ms. Winkler sat there for all those hours and has sat here all these days hearing this vitriol coming from not only Officer Gillespie but an officer of the court.

How dare she sit here and blame Ms. Winkler for what Officer Gillespie did.  She gave you a hypothetical.  Her

913

hypothetical was woman and a child in a parking lot, and they're crossing the street and there's traffic coming.  Of course that woman wants to protect that child.  Of course.

But let's say that same woman, who got mad at the child for asking over and over and over and over for some ice cream at the Circle K, over and over and over and over for some ice cream at the Circle K.  Mom saying, no, no, no, no, no, you're not getting any ice cream.

And as they're walking out of the store, they get close to traffic, and the mom throws the kid on the ground. And the kid hits his head or her head and has the same injuries that Ms. Winkler does, or did at the time.

Are we gonna say the mom made a mistake in her use of force, trying to prevent the child from getting hit?  Does it take that much force?  I don't think so.

This case is not about Ms. Winkler calling the police. This case is not about Ms. Winkler not understanding what trespass means.  This case is about whether or not an American citizen, an individual that goes into a Circle K, can that individual who has called the police, can that person go home unscathed?

That's what this case is about.  Nothing else.  Based on where we are now, the current posture of the case, you have one thing to consider:  whether or not Officer Gillespie used reasonable force.

And the answer is no.  His force was unreasonable.  No officer, no reasonable officer, looking at this case -- not with hindsight of 20/20, but just looking at the case and the facts that were presented to you.  You don't have to go backwards.  Go forward.

If you go forward, you look at what Officer Gillespie testified about.  The first statement.  You know what he's never took responsibility for?  Never ever.  The statement he made in the police report.

Can you put that up, Gil?  583.

And as he's looking for that, we have never agreed, never agreed that Ms. Winkler was using defensive resistance.  Never.

Can we have -- I'm sorry.  Ma'am, can we get HDMI for the plaintiff's table?

Officer -- if -- you know what, Ms. Wieneke talked about looking at the individual as they testify.  Now, you know, Officer Gillespie, he was trying to give me a hard time.  Right?  You saw him.  He's testified before.  This guy's a trained officer.  He's testified before.

This is not his first rodeo.  He knows how these questions come.  They're yes-or-no questions.  If I ask him to explain, you explain.  But don't fight me over stuff.  You know what you said.  You know what you said when you interviewed with me.

Officer Gillespie knew what he said.  He knew what he said -- what he wrote in his report.  He knew what he said to me when I interviewed him.  He knew what he said when he was deposed.

And when you talk about depositions, oh, Ms. Winkler wasn't deposed.  Well, you know who deposes Ms. Winkler in a case like this?  The defense.  Know what they didn't do?  Depose her.  Didn't even ask for an interview.

But they want you to rely on an interview that took place within an hour of her being beaten by Officer Gillespie, brought down on her head, on morphine, in pain, in the ICU.  Hogwash.

Can you expand it?

When has Officer Gillespie took -- or taken, I'm sorry -- responsibility for his statement in his police report?  When did he?  When?  When?  He's still saying she fell.  I'm just asking.  I'm just asking.

A gun?  Who in the world testified about some weapon?  Where is that coming from?  Anybody hear anybody testify about a weapon that Ms. Winkler had or didn't have?  No.

Ladies and gentlemen, honestly, I just ask when you go back there, whoever you are because one person's going to be an alternate, when you go back into that room and you deliberate on this case, the first thing I ask you to do, pick a foreperson.

Second thing I ask you to do, get out the easel, ask the Court for an easel, if you can.  Big cardboard pieces of paper, poster board, white paper, lined paper, and write out on a piece of paper plaintiff's case.  Make a T.  Defense's case. And on there, place down what we proved.

Like Ms. Wieneke said, the burden is ours.  Absolutely ours.

And I ask you, when you look at the facts in this case, the fact that a 56-year-old grandma in flip-flops on a hot summer day who called the police should have been able to call the police, talk to the officer, and go home the same way she came.  She's sitting on her bed, thrown down like a rag doll, for trespassing.

Her injuries speak for themselves.  And, you know what, when you took that oath -- remember when we were picking you -- let's talk about that before I sit down.

When we were picking all of you, each and every one of you, the Court asked everybody in this room, can you remain -- can you be fair and impartial before you get to where you are right now?  And everybody who's here now said yes.

As a matter of fact, right now you still have to remain fair and impartial.  And one of the instructions says if there's anything about how you feel about this case right now, and I'm paraphrasing, and you come to a conclusion that you can't be fair and impartial, supposed to tell the Court.

When you go back into that room and deliberate on this case, I ask each and every one of you to be civil towards one another. And if you feel and want to vote for Ms. Winkler, and somebody is trying to get you to say, hey, you know what, I think the defense is right, then only be persuaded by the evidence that was presented.

And vice versa. If some of you feel that the defense is right and then somebody says, you know what, I think Ms. Winkler, based on the evidence, has proven her case, then only be persuaded, if you're going to change your vote, by the evidence.

Ladies and gentlemen, we presented a case to you over the past four days that Ms. Winkler had no reason, no reason, to be treated the way she was treated by Officer Gillespie. We proved to you that Officer Gillespie -- Officer Gillespie's use of force was unreasonable. It was excessive. We proved to you, and we passed our burden, that it's more probably true than not that his use of force was excessive and unreasonable.

Now, if the defense is right, then if anyone who's in a Circle K who calls the police and Officer Gillespie comes to them, God help them. God help them. Because he told you himself, based on what he was told, he didn't care about why Ms. Winkler called the police. He didn't care.

That's unreasonable. That's unreasonable.

Not taking responsibility for what he did, not

correcting -- not correcting what he said about what actually happened until 11 months later, being interviewed by other officers.  Never wrote a supplemental report to tell the world at large what actually happened.  Never interviewed the individuals at the store.  Unreasonable.

MS. WIENEKE:  Your Honor, this is improper argument based on the provocation rule.  I would ask that it be stricken from the record and the jury be instructed accordingly.

THE COURT:  Okay.  Why don't you move on.

MR. BLACKWELL:  Thank you, Judge.

Ladies and gentlemen, Ms. Winkler deserves justice.  This is not a criminal case.  The defense should not blame her for anything.  It's whether or not Officer Gillespie's use of force was reasonable.

And based on the evidence we've presented, that use of force was unreasonable and it was excessive.  I'd ask that you find for Ms. Winkler, each and every one of you.

Thank you.

THE COURT:  All right.  We have three more instructions to review.  I have one additional instruction I'm going to give you before we do those three.  This is the provocation instruction.

When deciding whether an officer used excessive force during a lawful arrest, you are to consider the 11 factors set forth in the Excessive Force instruction found at pages 13 and

14.    However, whether an officer provoked a plaintiff to resist arrest or created the need to use force is not a factor to consider.

Now, we have three left.  If you would, please turn to page 15, Duty to Deliberate.

Before you begin your deliberations, elect one member of the jury as your presiding juror.  The presiding juror will preside over the deliberations and serve as the spokesperson for the jury in court.

You shall diligently strive to reach agreement with all the other jurors if you can do so.  Your verdict must be unanimous.  Each of you must decide the case for yourself, but you should do so only after you have considered all of the evidence, discussed it fully with the other jurors, and listened to their views.

It is important that you attempt to reach a unanimous verdict, but, of course, only if each of you can do so after having made your own conscientious decisions.  Do not be unwilling to change your opinion if the discussion persuades you that you should.  But do not come to a decision simply because other jurors think it is right or change an honest belief about the weight and effect of the evidence simply to reach a verdict.

Communication With the Court.

If it becomes necessary during your deliberations to

communicate with me, you may send a note through the bailiff signed by any one or more of you.  No member of the jury should ever attempt to communicate with me except by a signed writing. I will not communicate with any member of the jury on anything concerning the case except in writing or here in court.

If you send out a question, I will consult with the lawyers before answering it, which may take some time.  You may continue your deliberations while waiting for the answer to any question.

Remember that you are not to tell anyone, including the Court, how the jury stands, whether in terms of vote count or otherwise, until after you have reached a unanimous verdict or have been discharged.

Return of Verdict.

A verdict form has been prepared for you.  After you've reached unanimous agreement on a verdict, your foreperson should complete the verdict form according to your deliberations, sign and date it, and advise the bailiff that you're ready to return to the courtroom.

And the jury -- and the verdict form in this case is very simple.  You have one question to answer.  The verdict form is entitled Fourth Amendment Excessive Force Claim, and it says:  We, the jury, duly impaneled and sworn in the above-entitled action, upon our oaths, make the following finding as to plaintiff's Fourth Amendment claim for excessive

force:

And here's the question:  Did Officer Gillespie use excessive force against Ms. Winkler?

And you check either yes or no.  And that's your verdict.  And then the foreperson will sign and date it.

At this time, the clerk's going to select the alternate.  One of you is going to be an alternate and gets to go home.  And she's going to do that at this point.

THE COURTROOM DEPUTY:  Number 6.

THE COURT:  Juror No. 6, you are excused as soon as we release everybody.  Thank you for sitting through the trial.  I hope you found it rewarding to some degree.

I'm sorry you're not able to finish in the deliberations, but we don't -- we have alternates in cases where -- in case one of the other jurors is unable to finish and we need all the jurors here.  So thank you very much for your time.

At this time I'm going to swear the bailiff.

(Bailiff sworn.)

THE COURT:  All right.  You're going to go into the jury room and begin your deliberations.  If you do not reach a verdict by 5:00 p.m. this evening, you're to go home and come back on Tuesday and continue your deliberations at 9:00 o'clock on Tuesday morning.

Unless, Michele, would you have a problem with them

coming back Monday?

THE COURTROOM DEPUTY:  Monday's fine.

THE COURT:  All right.  Let's -- can everybody come back Monday if you have to?  You may not have to, but if you do.

All right, Monday.  We'll come back on Monday, 9:00 o'clock, if you don't have a verdict by 5:00 p.m. this afternoon.  Keep Michele informed as to whether you're leaving or not, though, so we know where you are.

But now it's up to you.  The case is in your hands.  You'll go to the jury room to deliberate, and you'll be in touch.

(Jury not present.)

THE COURT:  Please be seated.

Anything to take up?

MR. BLACKWELL:  Not from the plaintiff, Judge.

MS. WIENEKE:  Your Honor, I just want -- after we brought the attention -- the provocation rule, counsel doubled down and did it again.  In addition, made a very personal attack on my character, in violation of the Court's protocol, courtroom decorum.

I think it was highly inappropriate, and I am contemplating a mistrial, but we just sent the jury in to deliberate and I'm not going to make a mistrial motion.  I just simply want it noted for the record.

THE COURT:  Okay.  So noted.

All right.  Does Michele have your numbers where you can be reached?

MS. WIENEKE:  We'll get that to Your Honor.

THE COURT:  Okay.

MS. WIENEKE:  We'll give it to Michele, Your Honor.

THE COURT:  All right.  If there is a jury question -- is everyone going to be here till 5:00?

MR. BLACKWELL:  Yes, sir.

MS. WIENEKE:  Yes, Your Honor.

THE COURT:  All right.  If they recess and come back on Monday, which I don't think they will but they could, would -- if there's a jury question, will you be here or does anyone want to do a jury question by phone?

MR. BLACKWELL:  Monday?  We can be here, Judge.

MS. WIENEKE:  Well, probably by phone for us, Your Honor.

THE COURT:  Okay.  All right.

Okay.  Anything else?

MS. WIENEKE:  No.  Thank you, Your Honor.

MR. BLACKWELL:  No, Judge.  Thanks.

(Recess taken, 3:15 p.m. to 4:04 p.m.)

(Jury not present.)

THE COURT:  Please be seated.

We have a jury verdict.  We'll bring in the jury and

UNITED STATES DISTRICT COURT

announce the verdict.

(Jury present.)

THE COURT:  Please be seated.

Juror No. 2, I see you have the verdict forms in your hand.  I assume you're the foreperson.

JURY FOREPERSON:  Yes, sir.

THE COURT:  Is there a verdict?

JURY FOREPERSON:  Yes, sir.

THE COURT:  Is it unanimous?

JURY FOREPERSON:  Yes, sir.

THE COURT:  Okay.  Would you please hand it to the bailiff.

Okay.  At this time, the clerk will record and read the verdict.

THE COURTROOM DEPUTY:  Fourth Amendment Excessive Force Claim.

We, the jury, duly impaneled and sworn in the above-entitled action, upon our oaths, making the following findings as to plaintiff's Fourth Amendment claim for excessive force:

Did Officer Gillespie use excessive force against Ms. Winkler?

And the box for "no" is checked.  It's dated today, April 12th, 2019, and it's signed by the foreperson.

THE COURT:  At this time, the clerk's going to ask you

each one question.  Please answer the question "yes" or "no."

THE COURTROOM DEPUTY:  Juror No. 1, is this your true and correct verdict?

JUROR 1:  Yes, it is.

THE COURTROOM DEPUTY:  Juror No. 2, is this your true and correct verdict?

JUROR 2:  Yes.

THE COURTROOM DEPUTY:  Juror No. 3, is this your true and correct verdict?

JUROR 3:  Yes.

THE COURTROOM DEPUTY:  Juror No. 4, is this your true and correct verdict?

JUROR 4:  Yes.

THE COURTROOM DEPUTY:  Juror No. 5, is this your true and correct verdict?

JUROR 5:  Yes.

THE COURTROOM DEPUTY:  Juror No. 7, is this your true and correct verdict?

JUROR 7:  Yes.

THE COURTROOM DEPUTY:  Juror No. 8, is this your true and correct verdict?

JUROR 8:  Yes.

THE COURTROOM DEPUTY:  And Juror No. 9, is this your true and correct verdict?

JUROR 9:  Yes.

THE COURT:  Ladies and gentlemen, your jury service is complete.  Thank you for participating.  Our system of justice doesn't work unless people like you are willing to come into the courtroom, pay attention, and make some hard decisions.

Thank you very much.  Our system of justice relies on people like you.

Thank you.  You're now excused.  Your service is over.

(Jury not present.)

THE COURT:  Counsel, is there anything to take up at this time?

MR. BLACKWELL:  Not from the plaintiff, Judge.

MS. WIENEKE:  No, thank you, Your Honor.

THE COURT:  Okay.  We'll stand in recess.  Thank you.

MR. BLACKWELL:  Thanks, Judge.

(Proceedings concluded at 4:09 p.m.)

C E R T I F I C A T E

I, JENNIFER A. PANCRATZ, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control.

DATED at Phoenix, Arizona, this 16th day of June, 2020.

s/Jennifer A. Pancratz_____
Jennifer A. Pancratz, RMR, CRR, FCRR, CRC